UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | Chapter 11 |
| STEARNS HOLDINGS, LLC, *et al.*, | Case No. 19-12226 (SCC) |
| Debtors.[1] | (Jointly Administered) |
| | Related Docket No. 19, 22 |

INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364, 503, 507, 546, 548, 555, 556, 559, 560 AND 561 (A) AUTHORIZING
DEBTORS TO ENTER INTO REPURCHASE AGREEMENT FACILITIES AND
RELATED DOCUMENTS; (B) AUTHORIZING DEBTORS TO SELL AND
REPURCHASE MORTGAGE LOANS IN THE ORDINARY COURSE OF BUSINESS;
(C) GRANTING BACKUP LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (D) MODIFYING THE AUTOMATIC STAY; (E) SCHEDULING A
FINAL HEARING; AND (F) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of Stearns Holdings, LLC and its debtor

affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy

Court for the Southern District of New York (the "Bankruptcy Court") seeking entry of an

interim order (this "Interim Order") and a final order upon terms substantially similar to those

contained in this Interim Order (the "Final Order") providing for, among other things, the

following relief:

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are: Stearns Holdings, LLC (8219); Stearns Co-Issuer, Inc. (7096); Stearns Lending, LLC (1773); Stearns Ventures, LLC (2386); Protos Acquisition LLC (4941); bSNAP, LLC (2498); and Private Mortgage Advisors, LLC (7493). The address of Protos Acquisition LLC is 345 Park Avenue, New York, NY 10154. The address of the other Debtors is c/o Stearns Lending, LLC, 750 East Highway, 121 Bypass, Suite 150, Lewisville, TX 75067.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

(i)      authorizing, pursuant to sections 105(a) and 363(b), and, to the extent applicable, section 364(c) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"):

(a)      Stearns Lending, LLC ("Stearns Lending") to execute, deliver, perform under, and enter into transactions under (1) that certain Master Repurchase Agreement, to be dated on or about the DIP Closing Date (as defined below), in substantially the form attached as Exhibit B to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Repo Facility Agreement" and, all obligations or liabilities with respect to the DIP Repo Facility Agreement, the "DIP Repo Facility Obligations"), among Stearns Lending, as seller, Barclays Bank PLC, as administrative agent (in such capacity, the "DIP Repo Agent"), and the buyers from time to time party thereto (collectively with the DIP Repo Agent acting on behalf of such buyers, the "DIP Repo Facility Purchasers"), and (2) all other documents related thereto, including the "Program Documents" (as defined in the DIP Repo Facility Agreement) (collectively with the DIP Repo Facility Agreement, the "DIP Repo Facility Documents"), which provide for a maximum committed amount of up to $1.5 billion in the aggregate (the "DIP Repo Facility");[3]

(b)      Stearns Lending to execute, deliver, perform under, and enter into transactions under those certain Amended and Restated Master Securities Forward Transaction Agreements to be dated on or about the DIP Closing Date (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP MSFTAs" and, all obligations or liabilities with respect to the DIP MSFTAs, the "DIP MSFTA Obligations"),[4] between Stearns Lending and the counterparties thereto (the "DIP MSFTA Counterparties"), pursuant to which, from time to time, Stearns Lending and the DIP MSFTA Counterparties will enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as the parties thereto may determine, which provide for a maximum committed amount of up to $2.2 billion, in the aggregate, for all of the DIP MSFTAs;

---

[3]    For purposes herein, the "DIP Repo Facility Parties" means (a) the DIP Repo Agent, acting on behalf of any other DIP Repo Facility Purchaser or otherwise acting pursuant to or in connection with the DIP Repo Facility or any DIP Repo Facility Document, and (b) the DIP Repo Facility Purchasers, in each case, in their respective capacities as such.

[4]    By separate motion, the Debtors are seeking permission to file the DIP MSFTAs under seal.

(c)     Stearns Lending to execute, deliver, and perform under certain Margin, Setoff and Netting Agreement,[5] to be dated on or about the DIP Closing Date, in substantially the form attached as <u>Exhibit D</u> to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>DIP Netting Agreement</u>" and all obligations or liabilities with respect thereto, the "<u>DIP Netting Obligations</u>") with the DIP Repo Agent, the DIP MSFTA Counterparties party thereto from time to time, and the DIP Repo Facility Parties party thereto from time to time, pursuant to which, among other things, Stearns Lending shall grant to the DIP Repo Agent netting and setoff rights with respect to obligations of Stearns Lending arising under the DIP Repo Facility Agreement, the DIP MSFTAs, and any other DIP Repo Documents;[6]

(d)     The Debtors to execute, deliver, and perform under that certain DIP Repo Agent Fee Letter (the "<u>Agent Fee Letter</u>") by and between the Debtors and the DIP Repo Agent, and that certain DIP Master Fee Letter by and between the Debtors, the DIP Repo Agent and the DIP Repo Facility Purchasers (the "<u>Master Fee Letter</u>"[7] and together with the DIP Repo Facility Agreement, the DIP MSFTAs, the DIP Netting Agreement and the Agent Fee Letter, the "<u>DIP Repo Documents</u>");[8] and

(e)     The DIP Repo Documents to contain, among other things, a covenant that requires Stearns Lending to maintain minimum liquidity at all times of not less than $25 million, with $20 million of such liquidity to be comprised of unrestricted cash on deposit in an unencumbered account (the "<u>Unrestricted Account</u>").

---

[5]     For purposes herein, the "<u>DIP Netting Parties</u>" means, collectively, (a) the DIP MSFTA Counterparties (including the Bridge Order MSFTA Counterparties (as defined below) and (b) the DIP Repo Facility Parties, in each case, in their respective capacities as such and to the extent that they are party to a DIP Netting Agreement.

[6]     For purposes herein, the "<u>DIP Repo Parties</u>" means (a) the DIP Repo Facility Parties, (b) the DIP MSFTA Counterparties, (c) the DIP Netting Parties, and (d) the Bridge Order MSFTA Counterparties, in each case, in their respective capacities as such.

[7]     By separate motion, the Debtors are seeking permission to file the Agent Fee Letter and Master Fee Letter under seal.

[8]     For purposes herein, (a) "<u>DIP Closing Date</u>" means the date on which the DIP Facilities are entered into and become effective, which shall occur on the date that this Interim Order is entered or as soon as practicable thereafter; (b) "<u>DIP Facilities</u>" means, collectively, the DIP Repo Facility, the DIP Netting Agreement, and the DIP MSFTAs; and (c) "<u>DIP Repo Obligations</u>" means, collectively, all liabilities or obligations of the Debtors and their respective affiliates under the DIP Repo Documents, including, without limitation, the DIP Repo Facility Obligations, the DIP MSFTA Obligations, and the DIP Netting Obligations.

(ii)  authorizing, in each case pursuant to sections 105(a), 362(b)(6), 362(b)(7), 362(b)(27) 363(b), 363(f), 548(c), 555, 556, 559, 560, and 561 of the Bankruptcy Code, Stearns Lending to repurchase all assets sold pursuant to the terms of the Prepetition Repo Facilities (as defined below), to (a) (i) terminate the Prepetition Repo Facilities and any related documents and (ii) sell all such assets pursuant to the terms of the DIP Repo Facility, thereby repurchasing and repaying the Prepetition Repo Facilities, including with proceeds from the sale of such assets under the DIP Repo Facility Documents, (b) terminate the Prepetition MSFTAs (as defined herein) and assign any outstanding trades to the DIP MSFTA Counterparties, who will assume all rights and obligations under such Prepetition MSFTAs, and (c) terminate the Prepetition Netting Agreements (as defined herein);

(iii)  authorizing, in each case in the ordinary course of business pursuant to sections 105(a), 363(c)(1) and 363(f) of the Bankruptcy Code:

    (a)  Stearns Lending to sell and repurchase mortgage loans and related assets pursuant to the DIP Repo Facility Documents;

    (b)  Stearns Lending to enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities pursuant to the DIP MSFTAs; and

    (c)  Stearns Lending to enter into transactions pursuant to that certain Flow Sale and Interim Servicing Agreement, dated as of December 17, 2013, by and among Bank of America, N.A. ("BANA"), as Purchaser, and Stearns Lending, Inc., as Company (the "BANA FSISA").

(iv)  granting, subject to the priorities identified herein:

    (a)  to the DIP Repo Agent, superpriority administrative expense claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code against (I) Stearns Lending to secure Stearns' Lending's DIP Repo Obligations, which shall be senior to all other administrative expense or other claims and any other superpriority claims that may be granted in these cases (the "Stearns Lending Superpriority Claim"), and (II) Stearns Holdings, Inc. ("Holdco"), as guarantor of Stearns Lending's DIP Repo Obligations, with such superpriority claim against Holdco to be senior to all other administrative expense or other claims and any other superpriority claims that may be granted in these cases, other than the superpriority claim granted to the Cash Flow DIP Lender (as defined in the Cash Flow DIP Order (as defined below)), any claim granted to holders of those certain 9.375% Notes issued by Holdings (the "9.375% Notes") pursuant to section 507(b) of the Bankruptcy Code, and subject in all cases to the Carve-Out (as defined in the Cash Flow DIP Order) at Holdco (the "Stearns Holdco Superpriority Claim" and together with the

4

Stearns Lending Superpriority Claim, the "DIP Repo Superpriority Claims");

(b)     to the DIP Repo Agent, on behalf of the DIP Repo Facility Parties, a "backup" first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP Repo Facility Backup Collateral (as defined below), to secure the obligations of Stearns Lending under the DIP Repo Facility Documents;

(c)     to the DIP MSFTA Counterparties, (1) a first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP MSFTA Collateral (as defined below) to secure the obligations of Stearns Lending under the DIP MSFTAs, and (2) superpriority claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code against Stearns Lending and Holdco to secure the obligations of Stearns Lending under the DIP MSFTAs, *pari passu* with the DIP Repo Superpriority Claims (the "DIP MSFTA Superpriority Claims");

(d)     to the Bridge Order MSFTA Counterparties (as defined below), (1) a first-priority lien and security interest pursuant to section 364(c)(2) of the Bankruptcy Code retroactive to entry of the Bridge Order (as defined below), *pari passu* with the first-priority lien and security interest described in clause (c) above, on the Prepetition MSFTA Collateral (as defined below) of the DIP MSFTA Counterparties to secure the obligations of Stearns Lending under the Prepetition Barclays MSFTA and the Prepetition Nomura MSFTA (each as defined below) incurred under the Bridge Order (as defined below), and (2) superpriority claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, retroactive to entry of the Bridge Order (as defined below), against Stearns Lending and Holdco to secure the obligations of Stearns Lending under the Prepetition Barclays MSFTAs and the Prepetition Nomura MSFTA, *pari passu* with the DIP MSFTA Superpriority Claims and the DIP Repo Superpriority Claims (the "Bridge MSFTA Superpriority Claims");

(e)     to the DIP Repo Agent, on behalf of the DIP Netting Parties, (1) a first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP Netting Collateral (as defined below) to secure the obligations of Stearns Lending under the DIP Netting Agreement; and (2) superpriority claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code against Stearns Lending and Holdco to secure the obligations of Stearns Lending under the Prepetition Netting Agreement, *pari passu* with the DIP Repo Superpriority Claims, the DIP MSFTA Superpriority Claims, and the Bridge MSFTA Superpriority Claims (the "DIP Netting Superpriority Claims," and together with the DIP Repo Superpriority Claims, the DIP MSFTA

Superpriority Claims, and the Bridge MSFTA Superpriority Claims, the "<u>DIP Superpriority Claims</u>");

(v)    upon entry of the Final Order, with respect to the DIP Repo Obligations, the DIP Repo Liens (as defined below), and the DIP Repo Collateral (as defined below), as applicable, granting waivers of:

    (a)    any Debtors' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

    (b)    the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code; and

    (c)    the equitable doctrine of marshaling or similar doctrines;

(vi)    authorizing modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Repo Documents and this Interim Order;

(vii)    requesting a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order; and

(viii)    scheduling a final hearing with respect to the Motion (the "<u>Final Hearing</u>").

The Interim Hearing having been held before the Bankruptcy Court on July 10, 2019, pursuant to Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Bankruptcy Rule 4001-2 of the Bankruptcy Rules for the Southern District of New York (the "<u>Local Bankruptcy Rules</u>"); and upon the record made by the Debtors at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor:

**THE BANKRUPTCY COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**[9]

A.    ***Petition Date***.  On July 9, 2019 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

---

[9]    The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

**B.**    ***Joint Administration***.  On July 10, 2019, the Bankruptcy Court entered an order approving the joint administration of the Chapter 11 Cases.

**C.**    ***Debtors in Possession***.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**D.**    ***Official Committees***.  No trustee or examiner or official committee of unsecured creditors (a "Creditors' Committee") or any other statutory committee has been appointed in these Chapter 11 Cases as of the date of this Interim Order.

**E.**    ***Jurisdiction and Venue***.  The Bankruptcy Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 556, 559, 560 and 561 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Rule 4001-2 of the Local Bankruptcy Rules.

**F.**    ***Notice***.  Adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other further notice of the Motion or the entry of this Interim Order shall be required, except as set forth in Paragraph 46 of this Interim Order.

G.    *Debtors' Stipulations:  Prepetition Repo Facility Parties, the Prepetition Repo Liens, the Prepetition Repo Collateral, and the Prepetition Obligations.*    After consultation with their attorneys and financial advisors, the Debtors, on their behalf and on behalf of their estates, admit, acknowledge, agree, and stipulate to the following:

a.    *Prepetition Repo Facilities and Related Matters.*

(i)    <u>Prepetition Repo Facilities</u>.  (A) Stearns Lending was party to: (1) that certain Amended and Restated Master Repurchase Agreement, by and between BANA (as defined below), as buyer, and Stearns Lending, as seller, dated as of October 14, 2016 (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition BANA Repo Facility</u>"); (2) that certain Master Repurchase Agreement, by and between Wells Fargo Bank, N.A., as buyer ("<u>Wells Fargo</u>"), and Stearns Lending, as seller, dated as of February 15, 2013 (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Wells Fargo Repo Facility</u>"); (3) that certain Master Repurchase Agreement, by and between Barclays Bank PLC, as purchaser and agent, and Stearns Lending, as seller, dated as of November 8, 2016 (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Barclays Repo Facility</u>"); and (4) that certain Master Warehouse Agreement, by and between Texas Capital Bank, National Association and Stearns Lending, dated as of September 26, 2016 (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Texas Capital Repo Facility</u>" and, together with the Prepetition BANA Repo Facility, the Prepetition Wells Fargo Repo Facility, and the Prepetition Barclays Repo Facility, the "<u>Stearns Lending Prepetition Repo Facilities</u>" ) and (B) Private Mortgage Advisors, LLC ("<u>PMA</u>" and together with Stearns Lending, the "Prepetition Sellers") was party to (1) that

certain Master Repurchase Agreement, by and between Wells Fargo Bank, N.A, and PMA, dated as of June 13, 2014 (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "Prepetition PMA Wells Fargo Repo Facility") and (2) that certain Master Repurchase Agreement, by and between Western Alliance Bank and PMA, dated as of April 28, 2016 (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Western Alliance Repo Facility" and, together with the Prepetition PMA Wells Fargo Repo Facility, and the Stearns Lending Prepetition Repo Facilities, the "Prepetition Repo Facilities" and, the prepetition agreements under the Prepetition Repo Facilities, collectively, the "Prepetition Repo Master Repurchase Agreements" and, the agents thereunder, the "Prepetition Repo Facility Agents" and, the buyers or purchasers party thereto, the "Prepetition Repo Facility Purchasers").[10]

(ii)     Prepetition Repo Facility Transactions. Pursuant to the Prepetition Repo Facilities, (A) the applicable Prepetition Seller originated mortgage loans, (B) the applicable Prepetition Seller transferred and sold such mortgage loans to the Prepetition Repo Facility Parties against the transfer of funds by such Prepetition Repo Facility Parties to the applicable Prepetition Seller (which funds were used by the applicable Prepetition Seller to fund the mortgage loans), (C) the Prepetition Repo Facility Parties, simultaneously with the transfer and sale described in the preceding clause (B), agreed to transfer the mortgage loans back to the applicable Prepetition Seller against the transfer of funds by such Prepetition Seller to the applicable Prepetition Repo Facility Parties, and (D) following the such Prepetition Seller's repurchase of mortgage loans from the Prepetition Repo Facility Parties as described in the

---

[10]    For purposes herein, the "Prepetition Repo Facility Parties" means (a) the Prepetition Repo Facility Agents and (b) the Prepetition Repo Facility Purchasers, in each case, in their respective capacities as such.

preceding clause (C), the applicable Prepetition Seller sold the repurchased mortgage loans (using the proceeds from such sales to fund the repurchases from the Prepetition Repo Facility Parties).

(iii)    <u>Prepetition Repo Facility Obligations</u>.  As of the Petition Date, the amount of the outstanding repurchase obligations under the Prepetition Repo Facilities was no less than approximately $800 million in the aggregate, consisting of (1) $170.4 million under the Prepetition BANA Repo Facility, (2) $248.5 million under the Prepetition Wells Fargo Repo Facility, (3) $234.2 million under the Prepetition Barclays Repo Facility, (4) $139.8 million under the Prepetition Texas Capital Repo Facility, (5) $5.2 million under the Prepetition PMA Wells Fargo Repo Facility, and (6) $1.9 million under the Prepetition Western Alliance Repo Facility (together with all "Obligations" as such term is defined in the Prepetition Repo Facilities, arising under any of the Prepetition Repo Master Repurchase Agreements or any agreements or transactions entered into in connection therewith, including interest, fees, expenses, premiums, costs and other charges, the "<u>Prepetition Repo Facility Obligations</u>").

(iv)    <u>Prepetition Repo Facility Account Collateral</u>.  Pursuant to the Prepetition Repo Master Repurchase Agreements, the applicable Prepetition Seller pledged to the Prepetition Repo Facility Agents or the Prepetition Repo Facility Purchasers, as applicable, as security for the performance by such Prepetition Seller of its obligations thereunder, and granted, assigned, and pledged to the Prepetition Repo Facility Agents or the Prepetition Repo Facility Purchasers, as applicable, a fully-perfected, first-priority lien and security interest (collectively, the "<u>Prepetition Repo Facility Account Liens</u>") in, among other things, certain over/under accounts and custodial accounts (such accounts, together with all assets granted as non-

contingent security under the Prepetition Repo Master Repurchase Agreements, the "Prepetition Repo Facility Account Collateral").

(v)     Prepetition Repo Facility Liens and Prepetition Repo Facility Collateral.  Pursuant to the Prepetition Repo Master Repurchase Agreements, the parties thereto acknowledge that, although the parties intend that all transactions thereunder be sales and purchases and not loans, in the event any such transactions are deemed to be loans, the applicable Prepetition Seller pledged to the Prepetition Repo Facility Agents or the Prepetition Repo Facility Purchasers, as applicable, as security for the performance by such Prepetition Seller of its obligations thereunder, and granted, assigned, and pledged to the Prepetition Repo Facility Agents or the Prepetition Repo Facility Purchasers, as applicable, a fully-perfected, first-priority lien and security interest (collectively, the "Prepetition Repo Facility Backup Liens" and, together with the Prepetition Repo Facility Account Liens, the "Prepetition Repo Facility Liens") in the purchased mortgage loans and related collateral as more fully described in the applicable Prepetition Repo Master Repurchase Agreement (the "Prepetition Repo Facility Backup Collateral" and, together with the Prepetition Repo Facility Account Collateral, the "Prepetition Repo Facility Collateral").

(vi)     Validity, Perfection, and Priority of Prepetition Repo Facility Liens and Prepetition Repo Facility Obligations.  The Debtors hereby further acknowledge and agree that as of the Petition Date:

(A)     The Prepetition Repo Facility Obligations of the Prepetition Sellers constitute legal, valid, binding, enforceable, and non-avoidable obligations of such Prepetition Seller enforceable in accordance with the terms of the Prepetition Repo Master Repurchase Agreements;

11

(B)     The Prepetition Repo Facility Liens on the Prepetition
        Repo Facility Collateral are legally valid, binding,
        enforceable, non-avoidable, and properly perfected and
        were granted to the Prepetition Repo Facility Agents prior
        to the Petition Date, for the benefit of themselves and the
        Prepetition Repo Facility Purchasers for fair consideration
        and reasonably equivalent value;

(C)     The Prepetition Repo Facility Liens held by the Prepetition
        Repo Facility Parties are senior in priority over any and all
        other liens on the applicable Prepetition Repo Facility
        Collateral, subject only to certain liens senior by operation
        of law or otherwise permitted to be senior under the
        Prepetition Repo Master Repurchase Agreements (solely to
        the extent any such permitted liens were valid, properly
        perfected, non-avoidable, and senior in priority to the
        Prepetition Repo Facility Liens as of the Petition Date) (the
        "Permitted Prior Repo Facility Liens");

(D)     No portion of the Prepetition Repo Facility Liens held by
        the Prepetition Repo Facility Parties, the Prepetition Repo
        Facility Obligations or any payments made to the
        Prepetition Repo Facility Agents or the Prepetition Repo
        Facility Purchasers or applied to or paid on account of the
        Prepetition Repo Facility Obligations prior to the Petition
        Date is subject to any contest, set-off, avoidance,
        impairment, disallowance, recharacterization, reduction,
        subordination (whether equitable, contractual, or
        otherwise), recoupment, recovery, rejection, attack, effect,
        counterclaims, cross-claims, defenses, or any other
        challenge or claim (as defined in the Bankruptcy Code) of
        any kind, any cause of action or any other challenge of any
        nature under or pursuant to the Bankruptcy Code or any
        other applicable domestic or foreign law or regulation or
        otherwise by any person or entity;

(E)     The Debtors and their estates have no claims, objections,
        challenges, causes of action, and/or choses in action,
        including any claims and causes of action arising under
        sections 502(d), 544, 547, 548, 549, 550, and 553 of the
        Bankruptcy Code and any other avoidance or similar action
        under the Bankruptcy Code or similar state or federal law
        (the "Avoidance Actions"), against any of the Prepetition
        Repo Facilities, the Prepetition Facility Agents or the
        Prepetition Repo Facility Purchasers and their affiliates or

12

any of their officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (the "<u>Representatives</u>");

(F)    The Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors' estates, waived, discharged, and released any right to challenge any of the Prepetition Repo Facility Obligations or the validity, extent and priority of the Prepetition Repo Facility Backup Liens;

(G)    The Prepetition Repo Facility Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code;

(H)    The Prepetition Repo Facility Parties are oversecured as of the Petition Date, and accordingly, pursuant to Section 506(b) of the Bankruptcy Code, are entitled to interest and any fees, costs, and expenses provided under the Prepetition Repo Facilities or applicable law;

(I)    The Debtors are in default of their obligations under the Prepetition Repo Master Repurchase Agreements, including as a result of the Chapter 11 Cases, and one or more Events of Default (as defined in the Prepetition Repo Master Repurchase Agreements) has occurred and is continuing;

(J)    The Prepetition Repo Facility Parties could not be compelled to continue to perform under the Prepetition Repo Master Repurchase Agreements, and all transactions thereunder, following the Petition Date; and

(K)    (i) the Prepetition Repo Facility Parties are "repo participants," "financial institutions," and/or "financial participants," as the case may be, as such terms are defined in section 101 of the Bankruptcy Code and (ii) the Prepetition Repo Master Repurchase Agreements, and all transactions thereunder, by and between the Debtors and the Prepetition Repo Facility Parties, are "repurchase agreements," "securities contracts," and/or "master netting agreements," as the case may be, as such terms are defined in section 101 of the Bankruptcy Code and, as such, are

13

therefore "safe harbored" contracts under the applicable provisions of the Bankruptcy Code.

**b.**    ***Prepetition MSFTAs and Related Matters.***

(i)    <u>Prepetition MSFTAs</u>.    As of the Petition Date, Stearns Lending was party to certain Master Securities Forward Transaction Agreements (as the same may have been amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "<u>Prepetition MSFTAs</u>"),[11] between Stearns Lending and the counterparties thereto (in such capacities, the "<u>Prepetition MSFTA Counterparties</u>" and, each party to a Prepetition MSFTA, including the Prepetition MSFTA Counterparty and Stearns Lending, a "<u>Prepetition MSFTA Party</u>"), pursuant to which, from time to time, Stearns Lending and the Prepetition MSFTA Counterparties entered into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as the parties thereto may have determined, including pursuant to "when-issued," "to-be-announced," "dollar roll" and

---

11    The Prepetition MSFTAs include, in each case as may be amended from time to time, that certain (1) Master Securities Forward Transaction Agreement, by and between Goldman, Sachs & Co. and Stearns Lending, dated as of December 4, 2012, (2) Master Securities Forward Transaction Agreement, by and between BANA and Stearns Lending, dated as of February 21, 2014 (the "<u>Prepetition BANA MSFTA</u>"), (3) Master Securities Forward Transaction Agreement, by and between Barclays Capital Inc. and Stearns Lending, dated as of October 26, 2016 (the "<u>Prepetition Barclays MSFTA</u>"), (4) Master Securities Forward Transaction Agreement, by and between BNY Mellon Capital Markets, LLC and Stearns Lending, dated as of December __, 2013, (5) Master Securities Forward Transaction Agreement, by and between Citigroup Global Markets Inc. and Stearns Lending, dated as of May 8, 2013, (6) Master Securities Forward Transaction Agreement, by and between Daiwa Capital Markets America Inc. and Stearns Lending, dated as of September 2, 2014, (7) Master Securities Forward Transaction Agreement, by and between Jefferies & Company, Inc. and Stearns Lending, dated as of December 7, 2012, (8) Master Securities Forward Transaction Agreement, by and between J.P. Morgan Securities LLC and Stearns Lending, dated as of November 2, 2016, (9) Master Securities Forward Transaction Agreement, by and between Morgan Stanley & Co. LLC and Stearns Lending, dated as of May 13, 2015, (10) Master Securities Forward Transaction Agreement, by and between Nomura Securities International Inc. and Stearns Lending, dated as of April 4, 2013 (the "<u>Prepetition Nomura MSFTA</u>"), and (11) Master Securities Forward Transaction Agreement, by and between Mizuho Securities USA Inc. and Stearns Lending, dated as of February 14, 2011.

other transactions that result or may result in the delayed delivery of securities. Such transactions were subject to netting and setoff rights as set forth in the Prepetition MSFTAs.

(ii)    <u>Prepetition MSFTA Obligations</u>. As of the Petition Date, the amount of the outstanding obligations under the Prepetition MSFTAs, and all transactions entered into in connection therewith, was no less than approximately $1.8 billion in the aggregate (the "<u>Prepetition MSFTA Obligations</u>"), of which no less than $2,691,593.76 in the aggregate was outstanding under the Prepetition BANA MSFTAs.

(iii)    <u>Prepetition MSFTA Liens and Prepetition MSFTA Collateral</u>.[12] Pursuant to each Prepetition MSFTA, any Prepetition MSFTA Party that becomes obligated to provide Forward Collateral (as defined therein) pursuant to the terms of such Prepetition MSFTA agreed to pledge to the other Prepetition MSFTA Party a continuing first-priority lien and security interest (collectively, the "<u>Prepetition MSFTA Liens</u>") in and right of setoff against all Forward Collateral and all securities, money and other property, then or thereafter delivered by or on behalf of the pledging Prepetition MSFTA Party under such Prepetition MSFTA to or for the benefit of the pledgee Prepetition MSFTA Party in connection with such Prepetition MSFTA or any Transaction or then or thereafter held or carried by or on behalf of such pledgee Prepetition MSFTA Party in connection with such Prepetition MSFTA or any Transaction, and all proceeds of any of the foregoing (collectively, the "<u>Prepetition MSFTA Collateral</u>").

(iv)    <u>Transactions By Bridge Order MSFTA Counterparties</u>. Pursuant to that certain *Bridge Order and Stipulation Granting   Certain Limited Relief to Permit*

---

[12]    Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the Prepetition MSFTAs.

*Emergency Hedging Activity* (the "Bridge Order"), Barclays Bank PLC ("Barclays"), Nomura Securities International Inc. ("Nomura Securities," and together with Barclays in such capacities, the "Bridge Order MSFTA Counterparties") and Stearns Lending were authorized to enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities pursuant to the terms of the Prepetition Barclays MSFTA and the Prepetition Nomura MSFTA, respectively, until the earlier of entry of this Interim Order and July 12, 2019, and in connection therewith, any party thereto that became obligated to provide Forward Collateral, as defined in the Prepetition Barclays MSFTA and the Prepetition Nomura MSFTA, respectively, and pursuant to the terms thereof, agreed to pledge to, and the pledgee party was granted by the terms of the Bridge Order, a continuing first-priority lien and security interest (collectively, the "Bridge Order MSFTA Liens") in and right of setoff against all Forward Collateral, whenever provided, whether prepetition or postpetition, and all securities, money or other property, then or thereafter delivered by the pledging party, including in the Bridge Order Cash Collateral (as defined in the Bridge Order), in connection with such Prepetition Barclays MSFTA and Prepetition Nomura MSFTA, as applicable, or any Transaction, and all proceeds of any of the foregoing (the "Bridge Order MSFTA Collateral," and the obligations of Stearns Lending arising under the Bridge Order, the "Bridge Order MSFTA Obligations").

(v)     Validity, Perfection, and Priority of Prepetition MSFTA Liens, Prepetition MSFTA Obligations, Bridge Order MSFTA Liens, and Bridge Order MSFTA Obligations.  The Debtors hereby further acknowledge and agree that as of the Petition Date (and as of entry of the Bridge Order with respect to the Bridge Order MSFTA Liens and the Bridge Order MSFTA Obligations):

(A)    The Prepetition MSFTA Obligations and the Bridge Order MSFTA Obligations constitute enforceable legal, valid, binding, and non-avoidable obligations of Stearns Lending enforceable in accordance with the terms of the applicable Prepetition MSFTA and the Bridge Order;

(B)    The Prepetition MSFTA Liens on the Prepetition MSFTA Collateral for each Prepetition MSFTA and the Bridge Order MSFTA Liens on the Bridge Order MSFTA Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the relevant Prepetition MSFTA Counterparty under such Prepetition MSFTA and, with respect to the Bridge Order Counterparties, under the Prepetition Barclays MSFTA and the Prepetition Nomura MSFTA and the Bridge Order, in each case for fair consideration and reasonably equivalent value;

(C)    The Prepetition MSFTA Liens held by the Prepetition MSFTA Counterparties are senior in priority over any and all other liens on the Prepetition MSFTA Collateral, subject only to certain liens senior by operation of law or otherwise permitted to be senior under the relevant Prepetition MSFTA (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition MSFTA Liens as of the Petition Date) (the "Permitted Prior MSFTA Liens");

(D)    The Bridge Order MSFTA Liens are senior in priority over any and all other liens on the Bridge Order MSFTA Collateral, subject only to certain liens senior by operation of law or otherwise permitted to be senior under the Prepetition Barclays MSFTA and the Prepetition Nomura MSFTA (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Bridge Order MSFTA Liens as of entry of the Bridge Order) (the "Permitted Bridge Order MSFTA Liens");

(E)    No portion of the Prepetition MSFTA Liens held by the Prepetition MSFTA Counterparties, the Prepetition MSFTA Obligations, the Bridge Order MSFTA Liens or the Bridge Order Obligations of Stearns Lending or any payments made to any Prepetition MSFTA Counterparty, the Bridge Order MSFTA Counterparties or applied to or

17

paid on account of any Prepetition MSFTA Obligations prior to the Petition Date or the Bridge Order MSFTA Obligations after the Petition Date under the Bridge Order, is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(F)     The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any Prepetition MSFTA Counterparty or Bridge Order MSFTA Counterparty or any of their respective Representatives;

(G)     The Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors' estates, waived, discharged, and released any right to challenge any of the Prepetition MSFTA Obligations and the Bridge Order Obligations, or the validity, extent and priority of the Prepetition MSFTA Liens and the Bridge Order MSFTA Liens;

(H)     The Prepetition MSFTA Obligations and the Bridge Order MSFTA Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code;

(I)      The Prepetition MSFTA Counterparties and the Bridge Order MSFTA Counterparties are oversecured as of the Petition Date, and accordingly, pursuant to Section 506(b) of the Bankruptcy Code, are entitled to interest and any fees, costs and expenses provided under the Prepetition MSFTAs or applicable law;

(J)      The Debtors are in default of their obligations under the Prepetition MSFTAs, including as a result of the Chapter 11 Cases, and one or more Events of Default (as defined in each Prepetition MSFTA) has occurred and is continuing;

18

(K)    The Prepetition MSFTA Counterparties could not be compelled to continue to perform under the Prepetition MSFTAs, and all transactions thereunder, following the Petition Date; and

(L)    (i) the Prepetition MSFTA Counterparties and the Bridge Order MSFTA Counterparties are "financial participants" and/or "financial institutions," as the case may be, as such terms are defined in section 101 of the Bankruptcy Code and (ii) the Prepetition MSFTAs by and between the Debtors and the Prepetition MSFTA Counterparties and the Bridge Order MSFTA Counterparties are "forward contracts," "securities contracts," and/or "master netting agreements," as the case may be, as such terms are defined in section 101 of the Bankruptcy Code and, as such, are therefore safe harbored contracts under the applicable provisions of the Bankruptcy Code.

c.    ***Prepetition Netting Agreements and Related Matters.***

(i)    Prepetition Netting Agreements.  As of the Petition Date, Stearns Lending was party to that certain (1) Global Netting and Security Agreement (as the same may have been amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Prepetition Barclays Netting Agreement"), dated as of November 8, 2016, by and among Barclays Bank PLC and Barclays Capital Inc. (the "Prepetition Barclays Netting Buyers") and Stearns Lending (the "Prepetition Netting Seller"), and (2) Master Margining, Setoff and Netting Agreement (as the same may have been amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Prepetition BANA Netting Agreement" and, together with the Prepetition Barclays Netting Agreement, the "Prepetition Netting Agreements" and, together with the Prepetition Repo Master Repurchase Agreements and the Prepetition MSFTAs, the "Prepetition Agreements"), dated as of February 24, 2014, by and among BANA (the "Prepetition BANA Netting Buyers" and, together with the Prepetition Barclays Netting Buyers, the "Prepetition Netting Buyers")

19

and the Prepetition Netting Seller, in each case pursuant to which the Prepetition Netting Seller agreed to permit netting and grant setoff rights to each of the Prepetition Netting Buyers with respect to obligations or liabilities (the "Prepetition Netting Obligations" and, together with the Prepetition Repo Facility Obligations, and the Prepetition MSFTA Obligations, the "Prepetition Obligations") arising under various transactions, including transactions under the Prepetition Repo Facilities and Prepetition MSFTAs.

(ii)    Prepetition Netting Agreement Obligations.    As of the Petition Date, (1) the amount of the outstanding Prepetition Netting Obligations under the Prepetition Barclays Netting Agreement was equal to no less than (x) the aggregate amount of the Prepetition Repo Facility Obligations arising out of the Prepetition Barclays Repo Facility and (y) the aggregate amount of the Prepetition MSFTA Obligations arising out of the Prepetition Barclays MSFTA, and (2) the amount of the outstanding Prepetition Netting Obligations under the Prepetition BANA Netting Agreement was equal to no less than (x) the aggregate amount of the Prepetition Repo Facility Obligations arising out of the Prepetition BANA Repo Facility and (y) the aggregate amount of the Prepetition MSFTA Obligations arising out of the Prepetition BANA MSFTA.

(iii)    Prepetition Netting Liens and Prepetition Netting Collateral.[13] Pursuant to the Prepetition Netting Agreements, the Prepetition Netting Seller pledged to the Prepetition Netting Buyers, as security and margin for the payment and performance of all Obligations of the Prepetition Netting Seller to any Prepetition Netting Buyer, a security interest (collectively, the "Prepetition Netting Liens" and, together with the Prepetition Repo Facility

---

[13]    Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the applicable Prepetition Netting Agreement.

Liens, and the Prepetition MSFTA Liens, the "<u>Prepetition Repo Liens</u>"), whether then owned or thereafter acquired, existing or thereafter created, in the Global Security (as defined in the Prepetition Netting Agreements)[14] (the "<u>Prepetition Netting Collateral</u>" and, together with the Prepetition Repo Facility Collateral and the Prepetition MSFTA Collateral, the "<u>Prepetition Repo Collateral</u>").

> (iv)    <u>Validity, Perfection, and Priority of Prepetition Netting Liens and Prepetition Netting Obligations</u>.  The Debtors hereby further acknowledge and agree that as of the Petition Date:

> > (A)    The Prepetition Netting Obligations constitute enforceable, legal, valid, binding, and non-avoidable obligations of the Prepetition Netting Seller enforceable in accordance with the terms of the Prepetition Netting Agreements;

> > (B)    The Prepetition Netting Liens on the Prepetition Netting Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the Prepetition Netting Buyers, for fair consideration and reasonably equivalent value;

> > (C)    The Prepetition Netting Liens are senior in priority over any and all other liens on the Prepetition Netting Collateral, subject only to certain liens senior by operation of law or

---

[14]    In the Prepetition Barclays Netting Agreement, (x) "<u>Collateral</u>" is defined as "any form of collateral, margin or security provided in accordance with the terms of the applicable Relevant Master Agreement, and/or, where Collateral is being returned and/or released, the same property, in which any Barclays Entity or the Counterparty, as applicable, has been granted title or a Security Interest in order to secure any obligation under a Relevant Master Agreement;" (y) "<u>Receivables Collateral</u>" means "(i) all of Counterparty's right, title and interest in and to each Net Default Amount determined pursuant to clause 3.1, regardless of whether a calculation statement with respect to such Net Default Amount has been delivered, and (ii) all of Counterparty's right, title and interest in and to each Relevant Master Agreement (subject to the netting, offset and recoupment rights thereunder or under this Agreement) whether arising heretofore or hereafter, and whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, financial, physical, secured, or unsecured, in each case including without limitation all cash and non-cash proceeds thereof, supporting obligations relating thereto, distributions thereon and substitutions therefor;" and (iii) "<u>Total Collateral</u>" means "(a) Collateral in which any Barclays Entity has been granted title or a Security Interest by the Counterparty in order to secure any Obligation owed to such Barclays Entity by the Counterparty under a Relevant Master Agreement and (b) Receivables Collateral."

otherwise permitted to be senior under the Prepetition Netting Agreements (solely to the extent any such permitted liens were enforceable, valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Netting Liens as of the Petition Date) (the "Permitted Prior Netting Liens" and, together with the Permitted Prior Repo Facility Liens and the Permitted Prior MSFTA Liens, the "Permitted Prior Liens");

(D)    No portion of the Prepetition Netting Liens, the Prepetition Netting Obligations or any payments made to the Prepetition Netting Buyers or applied to or paid on account of the Prepetition Netting Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)    The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the Prepetition Netting Buyers and their affiliates or any of their respective Representatives;

(F)    The Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors' estates, waived, discharged, and released any right to challenge any of the Prepetition Netting Obligations or the validity, extent and priority of the Prepetition Netting Liens;

(G)    The Prepetition Netting Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code;

(H)    The Debtors have been and are in default of the obligations subject to the Prepetition Netting Agreements, including as a result of the Chapter 11 Cases, and one or more Events of Default or Default Terminations (as defined in the

22

Prepetition Netting Agreements) has occurred and is continuing;

(I)     The Prepetition Netting Buyers could not be compelled to continue to perform under the Prepetition Netting Agreements, and all transactions thereunder, following the Petition Date; and

(J)     (i) the Prepetition Netting Buyers are "financial participants" and/or "financial institutions," as the case may be, as such terms are defined in section 101 of the Bankruptcy Code and (ii) the Prepetition Netting Agreements by and between the Debtors and the Prepetition Netting Buyers are "master netting agreements" and, without limiting the characterization of the Prepetition Netting Agreements as master netting agreements, the grants therein constitute "security agreements or arrangement or other credit enhancements," as such terms are defined and/or used in sections 101 and 741 of the Bankruptcy Code and, as such, are therefore safe harbored contracts under the applicable provisions of the Bankruptcy Code.

   d.     ***Stipulations Subject to Freddie Mac's Rights***.  The Debtors' stipulations contained in this Interim Order shall not alter, impair, or otherwise affect Federal Home Loan Mortgage Corporation's ("Freddie Mac") rights, claims, interests, powers or prerogatives.

   **H.     *Government Sponsored Entities***

   a.     ***Fannie Mae; Servicing Rights and Reservation***.     Notwithstanding anything to the contrary contained in the DIP Repo Documents, this Interim Order, or the Cash Flow DIP Order,[15] no lien or security interest granted by the DIP Repo Documents or this Interim Order shall (a) attach to, modify, include or otherwise affect mortgage servicing rights

---

[15]   For purposes herein, the "Cash Flow DIP Order" means that certain Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (A) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief or any final order entered with respect thereto.

or servicer advance receivables with respect to mortgages which are now or hereafter serviced or subserviced by Stearns Lending (or any of its affiliates) for the Federal National Mortgage Association ("Fannie Mae").  Furthermore, notwithstanding anything to the contrary in the DIP Repo Documents or this Interim Order, no lien or administrative expense claim is granted with respect to (i) any right or asset of any Debtor or any non-Debtor affiliate under that certain Mortgage Selling and Servicing Contract between Stearns Lending and Fannie Mae effective April 15, 2002 (together with all supplements, addendums, modifications, amendments, and related agreements, the "Fannie Mae Lender Contract") or (ii) any asset that is the subject of any lien or pledge for the benefit of Fannie Mae, except as expressly set forth in a written agreement hereafter executed by Fannie Mae, and in all cases subject to the terms of such Fannie Mae agreement.  For the avoidance of doubt, and without limiting the foregoing, nothing in the DIP Repo Documents or this Interim Order subordinates, primes, grants a lien or administrative claim in, or otherwise impairs Fannie Mae's interest in, or rights to, any property or collateral held or required to be held by the Debtors, the non-Debtor affiliates, Fannie Mae, or any other party in connection with the Fannie Mae Lender Contract.  Furthermore, none of the rights related to loans and mortgages covered by the Fannie Mae Lender Contract (including any principal, interest, and funds for the payment of property taxes and insurance premiums collected by Stearns Lending in connection with its performance of its servicing or subservicing obligations under the Fannie Mae Lender Contract) are property of the Debtors' estates under section 541 of the Bankruptcy Code and no lien is granted hereunder to any of the Debtors' pre-petition or post-petition lenders therein. Fannie Mae reserves all rights in and under all of its agreements with the Debtors and the non-Debtor affiliates, including the Fannie Mae Lender Contract, none of which is impaired by the DIP Repo Documents or this Interim Order.

b.  ***Freddie Mac; Servicing Rights and Reservation***. Notwithstanding anything to the contrary contained in the DIP Repo Documents, this Interim Order, or the Cash Flow DIP Order, no lien, security interest, or administrative expense claim granted by the DIP Repo Documents or this Interim Order (including, without limitation, any Prepetition Repo Facility Backup Liens or DIP Repo Liens) shall (a) attach to, modify, include or otherwise affect (i) mortgage servicing rights (if any) with respect to mortgage loans sold to Freddie Mac, (ii) any mortgage loan once it has moved to the "Settlement Lock" status under the Cash Program (as defined in the Freddie Mac Guide) or has entered the funding cycle under the Guarantor Program (as defined in the Freddie Mac Guide), or (iii) the "Servicing Collateral" (as defined and referenced in, and except as otherwise expressly authorized by that certain Third Amended, Restated and Supplemented Acknowledgment Agreement dated September 27, 2017 amongst Freddie Mac, Stearns Lending, LLC, Wilmington Trust National Association, and NexBank SSB, as may be amended or modified pursuant to its express provisions, as expressly agreed to by Freddie Mac (the "<u>Freddie Mac Acknowledgment Agreement</u>")), (b) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Stearns Lending and Freddie Mac, or (c) impair Freddie Mac's rights, claims, remedies, powers, interests, payment or lien priority, or prerogatives set forth in the Freddie Mac Acknowledgment Agreement, that certain Customer Agreement between Freddie Mac and Stearns Lending executed on or about March 2, 2018 (the "<u>Freddie Mac Customer Agreement</u>"), the Freddie Mac Single-Family Seller/Servicer Guide (as amended from time to time, the "<u>Freddie Mac Guide</u>"), the Master Securities Forward Transaction Agreement between Freddie Mac and Stearns Lending, executed on or about July 2, 2019 (the

25

"Freddie Mac MSFTA"), the Purchase Documents (as defined in the Freddie Mac Guide), or any purchase contracts memorialized through Freddie Mac's Loan Selling Advisor (or otherwise) (the "Freddie Mac Purchase Contracts") (collectively, the "Freddie Mac Agreements").  Notwithstanding anything to the contrary in the DIP Repo Documents or this Interim Order, no lien or administrative expense claim is granted with respect to any right or asset of the Debtors or any non-Debtor affiliate under the Freddie Mac Agreements, except as expressly provided in the Freddie Mac Acknowledgment Agreement and in all cases subject to the terms of such agreement.

c.    ***Ginnie Mae Reservation.*** Notwithstanding anything to the contrary contained in the DIP Repo Documents, this Interim Order, or the Cash Flow DIP Order, no lien or security interest granted by the DIP Repo Documents or this Interim Order shall (a) attach to, modify, include or otherwise affect the mortgages as defined in that certain Ginnie Mae Mortgage-Backed Securities Guide (the "Ginnie Mae Guide" and, together with all other agreements, amendments, memorandums and supplements thereto with Ginnie Mae, the "Ginnie Mae Agreements"), including, but not limited to, the related mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Stearns Lending (or any of their respective affiliates) that back Government National Mortgage Association ("Ginnie Mae") securities, except as expressly consented to by Ginnie Mae.  For the avoidance of doubt, and without limiting the foregoing, nothing in the DIP Repo Documents or this Interim Order subordinates, primes, grants a lien or administrative claim in, or otherwise impairs Ginnie Mae's interest in, or rights to, the mortgages backing the Ginnie Mae securities and any related collateral, including, but not limited to, cash, accounts or collateral held or required to be held

26

by the Debtors, the non-Debtor affiliates, Ginnie Mae, or any other party in connection with the Ginnie Mae Agreements. Ginnie Mae reserves all rights pursuant to 12 U.S.C. § 1721(g), and all rights in all of its agreements with the Debtors and the non-Debtor affiliates, including the Ginnie Mae Agreements, none of which is impaired by the DIP Repo Documents or the Interim Order.

      **I.**    ***Permitted Prior Liens***.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or nonavoidable.  Moreover, nothing shall prejudice the rights of any party in interests to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien.

      **J.**    ***Transactions in the Ordinary Course of Business.***

      a.    Prior to the Petition Date, in the ordinary course of its business, Stearns Lending sold and repurchased mortgage loans and related assets pursuant to the Prepetition Repo Facilities.  From and after the entry of this Interim Order, Stearns Lending's sales and repurchases of mortgage loans and related assets pursuant to the DIP Repo Facility shall constitute transactions in the ordinary course of Stearns Lending's business within the meaning of section 363(c)(1) of the Bankruptcy Code.

      b.    Prior to the Petition Date, in the ordinary course of business, Stearns Lending entered into transactions under the Prepetition MSFTAs for the purchase or sale of mortgage-backed and other securities, including pursuant to "when-issued," "to-be-announced," "dollar roll" and other transactions.  From and after the date of this Interim Order, Stearns Lending's entry into such transactions under the DIP MSFTAs shall constitute transactions in

the ordinary course of Stearns Lending's business within the meaning of section 363(c)(1) of the Bankruptcy Code.

K.     *Safe Harbors*.  The DIP Repo Facility, the DIP Netting Agreement, and the DIP MSFTAs each constitute, as applicable, a "repurchase agreement," a "securities contract," a "forward contract," a "swap agreement," and a "master netting agreement," as such terms are defined in sections 101(47), 741(7)(A), 101(25), 101(53B), and 101(38A) of the Bankruptcy Code, respectively, and each non-Debtor party thereto, including the DIP Repo Agent and the other DIP Repo Parties, is a "financial institution" within the meaning of section 101(22) of the Bankruptcy Code, a "financial participant" within the meaning of section 101(22A) of the Bankruptcy Code, and/or a "repo participant" within the meaning of section 101(46) of the Bankruptcy Code, and is and shall be entitled to the safe harbor protections, rights, and remedies set forth in the Bankruptcy Code, including, but not limited to, sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(f), 546(g), 546(j), 548(c), 548(d)(2), 555, 556, 559, 560, and 561 of the Bankruptcy Code, in these Chapter 11 Cases, subject to the terms of this Interim Order.  No action or inaction of any DIP Repo Party, including any determination to provide any funding under the Prepetition MSFTAs and the Bridge Order, shall constitute a waiver by such DIP Repo Party of any rights and remedies under the safe harbor protections of the Bankruptcy Code.

L.     *No Waiver*.  Subject to certain conditions, the Prepetition Repo Parties have agreed to not exercise remedies after the occurrence of events of default under the Prepetition Repo Facilities, caused by, among other defaults, the Debtors commencing these Chapter 11 Cases for a period not less than four (4) business days after the Petition Date (the "Bridge Period") unless this Interim Order is entered on or before the expiration of such Bridge

Period.  Such forbearance is not to be construed as a waiver by the Prepetition Repo Parties of any of their respective rights or remedies under the Prepetition Repo Facilities, or the safe harbor protections of the Bankruptcy Code, as applicable, and is subject to the terms and conditions set forth in their respective forbearance agreements.

M.    *Interim Relief*.    Interim relief is necessary to avoid immediate and irreparable harm.  The Prepetition Repo Facility Parties under the Prepetition Repo Facilities, the Prepetition MSFTA Counterparties under the Prepetition MSFTAs, and the Prepetition Netting Buyers under the Prepetition Netting Agreement, have the right to terminate such facilities under sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560 and 561 of the Bankruptcy Code, but have agreed to refrain from doing so pending entry of this Interim Order upon the terms and conditions set forth herein and in the DIP Repo Documents.  Accordingly, good cause has been shown for the entry of this Interim Order.

N.    ***Findings Regarding the DIP Facilities.***

a.    ***Good Cause.***    Good cause has been shown for the entry of this Interim Order.

b.    ***Immediate Need for Postpetition Liquidity.***    An immediate need exists for the Debtors to obtain access to liquidity in order to continue their operations and to administer and preserve the value of their estates.  The ability of the Debtors to maximize value for all stakeholders requires the availability of the DIP Facilities and the other financial accommodations pursuant to the DIP Repo Documents.  Given the unique nature of the Debtors' capital requirements, in the absence of the availability of such funds and liquidity in accordance with the terms of the DIP Repo Documents and this Interim Order, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to

the Debtors and their estates and creditors would occur. The Debtors do not have sufficient available sources of working capital or other liquidity to operate their businesses in the ordinary course without access to the DIP Facilities and the other financial accommodations pursuant to the DIP Repo Documents. Consummation of the transactions contemplated by the DIP Repo Documents pursuant to the terms of this Interim Order therefore is in the best interests of the Debtors' estates.

c. ***No Liquidity Available on More Favorable Terms***. Given their financial condition and capital structure, despite diligent efforts, the Debtors are unable to reasonably obtain postpetition liquidity from sources other than the DIP Repo Parties on terms more favorable than those set forth in this Interim Order and the DIP Repo Documents. The Debtors have been unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain secured credit from other sources (i) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (ii) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (iii) secured solely by a junior lien on property of the Debtors and their estates that is already subject to a lien. Liquidity on a postpetition basis is not otherwise available without (x) granting to the DIP Repo Parties, the DIP Superpriority Claims and the DIP Repo Liens as set forth herein; (y) upon entry of this Interim Order, providing for the repurchase and repayment of the assets and related liabilities subject to the Prepetition Repo Facilities (and assumption and assignment of the Prepetition MSFTAs), thereby repaying all of the Prepetition Obligations; and (z) the other protections set forth in this Interim Order and the DIP Repo Documents. Granting the DIP Superpriority Claims and DIP Repo Liens and allowing the repurchase and repayment

of the assets subject to the Prepetition Repo Facilities pursuant to the DIP Repo Facility as described herein are conditions to the DIP Repo Parties' agreements to provide the Debtors with the necessary liquidity they need under the DIP Repo Documents. The DIP Superpriority Claims against Stearns Lending shall be granted on a superpriority administrative expense basis and shall be senior to all other administrative expense or other claims and any superpriority claims that may be granted in these Chapter 11 Cases. Holdco, as the direct parent company of Stearns Lending, will receive direct and indirect benefits from the transactions contemplated by the DIP Repo Documents and the Bridge Order, and its guaranty of the DIP Repo Obligations, obligations of Stearns Lending arising under the DIP MSFTAs, and obligations of Stearns Lending arising under the Bridge Order on a superpriority administrative expense basis is in the best interests of the Debtors' estates. The superpriority administrative expense claims against Holdco granted hereunder shall be senior to all other administrative expense or other claims and any other superpriority claims that may be granted in these Chapter 11 Cases, other than the superpriority claim granted to the Cash Flow DIP Lender (as defined in the Cash Flow DIP Order), any claim granted to holders of the 9.375% Notes pursuant to section 507(b) of the Bankruptcy Code, and subject to the Carve-Out (as defined in the Cash Flow DIP Order) at Holdco.

d.    ***Willingness to Provide Liquidity.*** The DIP Repo Parties have indicated a willingness to engage in the transactions contemplated by the DIP Facilities, the DIP Repo Documents and this Interim Order in reliance on, among other things, (i) the entry by the Bankruptcy Court of this Interim Order and the Final Order, (ii) approval by the Bankruptcy Court of the terms and conditions of the DIP Repo Documents with respect to the DIP Repo Obligations, and (iii) entry of findings of the Bankruptcy Court that, among other things, (A) the

DIP Facilities and the other financial accommodations pursuant to the DIP Repo Documents are essential to the Debtors' estates and are being extended in good faith, (B) the DIP Superpriority Claims and the DIP Repo Liens will have the protections provided for in sections 363(m) and 364(e) of the Bankruptcy Code, and (C) all terms of this Interim Order will have the protections provided for in section 363(m) of the Bankruptcy Code.

    e.    ***Right to Liquidation/Termination***. Absent immediate entry of this Interim Order, the Prepetition Repo Parties under the Prepetition Agreements would assert and exercise their contractual right to terminate such agreements under sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560 and 561 of the Bankruptcy Code, as the case may be.

    f.    ***Good Faith (§§ 363(m) & 364(e)).***

    (i)    The DIP Repo Documents and the terms of this Interim Order were negotiated in good faith and at arm's length among the Debtors, the DIP Repo Parties, and the Prepetition Repo Parties.[16]

    (ii)    The DIP Repo Facility Parties are entering into the transactions pursuant to the DIP Repo Facility in good faith and are good faith purchasers within the meaning of section 363(m) and, to the extent applicable, section 364(e) of the Bankruptcy Code, and are therefore entitled to the full protection of section 363(m) and, to the extent applicable, section 364(e) of the Bankruptcy Code with respect to all aspects of the transactions contemplated by the DIP Repo Facility.

    (iii)    The liquidity to be provided under the DIP Repo Documents, and any liquidity provided on a postpetition basis by the Bridge Order MSFTA Counterparties under the Bridge Order, shall be deemed to have been extended in good faith and for valid business purposes and uses, within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code. The DIP Repo Parties, including the Bridge

---

[16] For purposes herein, the "<u>Prepetition Repo Parties</u>" means (a) the Prepetition Repo Facility Parties, (b) the Prepetition MSFTA Counterparties, and (c) the Prepetition Netting Buyers, in each case, in their respective capacities as such.

Order MSFTA Counterparties in connection with the Bridge Order, are therefore entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code and this Interim Order to the extent applicable.

g.    ***Final Hearing.***  At the Final Hearing, the Debtors will seek final approval of the proposed DIP Facilities and the other financial accommodations pursuant to the DIP Repo Documents pursuant to the Final Order, which shall be in form and substance acceptable to the DIP Repo Agent, the DIP Repo Parties and the Prepetition Repo Parties, in their sole and absolute discretion or as otherwise required under the relevant documents governing the parties' respective rights.  Notice of the Final Hearing and the Final Order will be provided in accordance with this Interim Order and no further notice, except as provided by this Interim Order, shall be required.

h.    ***Immediate Entry.***  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and Local Bankruptcy Rule 4001-2 and, to the extent applicable, Bankruptcy Rule 4001(c)(2).  The authorization granted herein on an interim basis to enter into the DIP Repo Documents and to enter into the transactions under or contemplated by the DIP Repo Documents, is necessary to avoid immediate and irreparable harm to the Debtors and their estates during the period beginning on the Petition Date through and including the date of the entry of the Final Order by this Court.  This Court concludes that the entry of this Interim Order is in the best interests of the Debtors and their estates and creditors because it will, among other things, allow the Debtors to continue to operate in the ordinary course of their businesses and thereby maximize the value of their estates.

i.    ***Notice.***  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email overnight courier

33

or hand delivery, to certain parties as set forth in the Motion. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and the Interim Hearing constitutes adequate notice thereof and complies with the Bankruptcy Rules and Local Bankruptcy Rules, and no further notice of the relief granted herein is necessary or required.

O.    *Section 506(c) Waiver*.  In the Final Order, the Debtors will request that no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, against any of the DIP Repo Parties.

P.    *Section 552(b)*.  In the Final Order, the Debtors will request that the "equities of the case" exception under section 552(b) shall not apply to the DIP Repo Parties (by its terms).

Q.    *No Marshaling/Applications of Proceeds*.  In the Final Order, the Debtors will request that the DIP Repo Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any obligations, liens or collateral acknowledged or approved pursuant to this Interim Order or the Final Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED that:**

1.    *Motion Granted.*  The Motion is granted on an interim basis to the extent set forth herein.  The Debtors are hereby authorized to enter into the DIP Repo Documents and the DIP Repo Documents are hereby approved as described further below.

34

2.     ***Objections Overruled.*** <u>All</u> objections to and reservations of rights with respect to the interim relief sought in the Motion and to the entry of this Interim Order, to the extent not withdrawn or resolved, are hereby overruled on the merits in their entirety.

**<u>Provisions Relating to the DIP Repo Facility</u>**

3.     ***Authorizations to Enter Into the DIP Repo Facility.*** Pursuant to sections 105(a) and 363(b), and to the extent applicable, section 364(c) of the Bankruptcy Code, Stearns Lending is immediately authorized and empowered to (i) enter into and perform its obligations under the DIP Repo Facility Agreement, (ii) execute and deliver all other DIP Repo Documents required or advisable to implement the DIP Facilities, and (iii) take all actions which may be necessary or advisable for the performance by the Debtors under the DIP Repo Documents. The Debtors are hereby authorized and directed, without need to obtain further Court approval, to pay timely all amounts that are due and payable, or that become due and payable, under the DIP Repo Documents.

4.     ***Ordinary Course Transactions Approved***. Pursuant to sections 105(a), 363(c)(1) and 363(f) of the Bankruptcy Code, Stearns Lending is authorized to sell and repurchase mortgage loans and related assets pursuant to the DIP Repo Facility in the ordinary course of business, free and clear of any and all liens, claims, encumbrances or other interests, and any and all payments or proceeds remitted to the Prepetition Repo Parties pursuant to this Interim Order, subject to paragraph 34 herein, shall be irrevocable and received free and clear of any claim, charge, assessment, or other liability.

5.     ***Repurchase and Repayment of Prepetition Repo Facilities Approved.***

a.     Pursuant to sections 362(b)(6), 362(b)(7), 555, 559, and 561 of the Bankruptcy Code, the Prepetition Repo Facilities and any related program documents are deemed terminated and closed out as of the date of the entry of this Interim Order, and the repurchase contemplated by this paragraph, thereby triggering Stearns Lending's repurchase obligations.   Pursuant to sections 105(a), 363(b), and 363(f), and, to the extent applicable, section 364(c) of the Bankruptcy Code, Stearns Lending is directed and authorized to repurchase, and shall repurchase, all assets sold pursuant to the terms of the Prepetition Repo Facilities and to pay the fees and expenses of any agents, securities intermediaries or custodians with respect thereto, and to sell, and shall sell, all such assets pursuant to the terms of the DIP Repo Facility Documents, thereby repurchasing and repaying the Prepetition Repo Facilities, including with proceeds from the sale of such assets under the DIP Repo Facility.   Upon the repurchase and repayment of the Prepetition Repo Facility Obligations pursuant to the terms of the Prepetition Repo Master Repurchase Agreements (including, without limitation, all fees and expenses with respect thereto) and, in the case of BANA, the assignment of trades under the Prepetition MSFTAs, any existing liens securing the Prepetition Repo Facilities shall be deemed automatically and immediately released and terminated, and the Prepetition Repo Master Repurchase Agreements shall be deemed automatically and immediately terminated.   For the avoidance of doubt, (i) the release of the Prepetition Repo Facility Liens securing the Prepetition Repo Facility Collateral shall be expressly contingent upon the indefeasible repayment, in full and in cash, of the Prepetition Repo Facility Obligations in the manner described above and (ii) the Prepetition Repo Facility Obligations shall be indefeasibly repaid in

full, upon entry of this Interim Order, irrespective of whether the proceeds from the DIP Repo Facilities are sufficient to fund such repayments. To the extent any Prepetition Repo Facility Collateral also secures the Prepetition MSFTAs, such collateral shall not be released until the assumption and assignment of outstanding trades under the Prepetition MSFTAs to Barclays and Nomura pursuant to paragraph 7 of this Interim Order.

b.      Upon the receipt of payment by Wells Fargo of all obligations of Stearns Lending under the Wells Fargo Repo Facility pursuant to Paragraph 5(a) of this Interim Order, all Prepetition Repo Collateral held by, or under the direct or indirect control of, Wells Fargo shall be deemed to be DIP Repo Collateral, and Wells Fargo shall hold such DIP Repo Collateral in trust and as agent for the DIP Repo Agent pursuant to the terms of that certain Warehouse Payoff Agreement by and among Wells Fargo, the DIP Repo Agent, and Stearns Lending.

6.      ***Backup Security for the DIP Repo Facility Parties.***

a.      Effective immediately upon entry of this Interim Order, and immediately upon the repurchase of the assets sold pursuant to the terms of the Prepetition Repo Facilities as contemplated by Paragraph 5 of this Interim Order, the Bankruptcy Court hereby grants, pursuant to section 364(c)(2) of the Bankruptcy Code, to the DIP Repo Agent, for the benefit of itself and the other DIP Repo Facility Parties valid, binding, enforceable, non-avoidable, automatically and properly perfected first-priority liens and security interests (collectively, the "DIP Repo Facility Backup Liens") on the security identified and described in the DIP Repo Facilities (the "DIP Repo Facility Backup Collateral"), in each case, to secure Stearns Lending's obligations under the DIP Repo Facility Documents;

b.       The DIP Repo Facility Backup Liens are granted on the DIP Repo Facility Backup Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or any other DIP Repo Party.  As set forth below in Paragraph 27 of this Interim Order, the DIP Repo Agent or any other DIP Repo Party may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the DIP Repo Facility Backup Liens, or possess or control the DIP Repo Facility Backup Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

**Provisions Relating to DIP MSFTAs**

7.       ***Authorizations Regarding the DIP MSFTAs.***  Pursuant to sections 105(a) and 363(b), and, to the extent applicable, section 364(c) of the Bankruptcy Code, Stearns Lending is immediately authorized and empowered to (a) enter into and perform its obligations under the DIP MSFTAs, (b) execute and deliver all other DIP Repo Documents required or advisable to effect any DIP MSFTA, and (c) take all actions which may be necessary or advisable for the performance by the Debtors under the DIP MSFTAs.  In this regard, the Prepetition Barclays MSFTA and the Prepetition Nomura MSFTA, each as amended and restated on the DIP Closing Date, shall be deemed the DIP MSFTAs and the Debtors shall continue to honor all obligations thereunder and under this Interim Order and the Bridge Order with respect thereto.  Any open transactions under the Prepetition MSFTAs (other than the Prepetition

38

Barclays MSFTA and the Prepetition Nomura MSFTA and the Prepetition MSFTAs of any other

Prepetition MSFTA Counterparties that elect to keep their Prepetition MSFTAs open) shall be

assigned to and assumed by Barclays and Nomura pursuant to the terms of the DIP MSFTAs,

and Stearns Lending is directed and authorized to pay to such Prepetition MSFTA Counterparties

on the DIP Closing Date of the net amount of any "paired-off" trades under such Prepetition

MSFTAs ("Pair Offs"). Upon such assignment of open trades and the receipt by such Prepetition

MSFTA Counterparty of such payment in respect of any Pair-Offs, such Prepetition MSFTAs

shall be terminated, and any existing liens securing such Prepetition MSFTAs shall be deemed

automatically, immediately and irrevocably released and terminated; provided no Prepetition

MSFTA Liens shall be released or discharged, with respect to such Prepetition MSFTA

Counterparty, until such Prepetition MSFTA Counterparty is indefeasibly paid, in full and in

cash, the net dollar amount due in respect of any Pair Offs. For the avoidance of doubt, nothing

herein shall impair or be deemed to impair the rights of any party to a Prepetition MSFTA to

exercise any rights or remedies available to such party pursuant to the terms of such Prepetition

MSFTA.

8.    *Security for the DIP MSFTA Counterparties*.

a.    Effective immediately upon entry of this Interim Order, the Bankruptcy

Court hereby grants valid, binding, enforceable, non-avoidable, automatically and properly

perfected, postpetition first-priority liens and security interests, pursuant to section 364(c)(2) of

the Bankruptcy Code (collectively, the "DIP MSFTA Liens") to the DIP MSFTA

Counterparties, in each case, to secure Stearns Lending's obligations under the DIP MSFTAs

(and, in the case of transactions taken thereunder pursuant to the Bridge Order, the Prepetition

Barclays MSFTA and the Prepetition Nomura MSFTA) in, and right of setoff against, all Forward Collateral (as defined in the DIP MSFTAs) and all securities, money and other property, then or thereafter delivered by or on behalf of Stearns Lending under such DIP MSFTA to or for the benefit of the DIP MSFTA Counterparties in connection with such DIP MSFTA or any Transaction (as defined in the DIP MSFTAs), or then or thereafter held or carried by or on behalf of Stearns Lending in connection with the DIP MSFTA or any Transaction (as defined in the DIP MSFTAs) and, in each case, all proceeds of any of the foregoing (collectively, the "DIP MSFTA Collateral").

b.      The DIP MSFTA Liens are granted on the DIP MSFTA Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or any other DIP Repo Party.  As set forth below in Paragraph 27 of this Interim Order, the DIP Repo Agent or any other DIP Repo Party may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the DIP MSFTA Liens, or possess or control the DIP MSFTA Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

9.      ***Authorizations Relating to Prepetition MSFTAs and Rights of Prepetition MSFTA Parties***.

a.      All Prepetition MSFTA Counterparties are hereby granted in this Interim Order the following rights, remedies and protections:

(i)       The Prepetition MSFTA Counterparties may continue to exercise any and all rights of set-off they may have in the ordinary course of business under or in connection with the Prepetition MSFTAs, including, without limitation, setting off any claim that arises from any marked to market trade that results in a market value that is negative to the Debtors, against any debt that arises from any marked to market trade that results in a market value that is positive to the Debtors, regardless of whether such debt and claim arose prior to or after the Petition Date; and

(ii)      Any and all margin payments or other transfers made to a Prepetition MSFTA Counterparty pursuant to the terms of a Prepetition MSFTA with such party are and shall be treated as administrative expenses under section 503(b) of the Bankruptcy Code.

b.       In addition, the Debtors are authorized, but are not directed, to:

(i)       Enter into forward transactions for the purchase or sale of mortgage-backed and other securities and post margin as necessary pursuant to the Prepetition MSFTAs, provided that such forward transactions are entered into solely with the Prepetition MSFTA Counterparties on terms mutually acceptable to the Debtors and the Prepetition MSFTA Counterparties; and

(ii)      Meet any negative margin requirements in the ordinary course, consistent with the terms of an applicable Prepetition MSFTA.

c.       For the avoidance of doubt, all rights and obligations under each Prepetition MSFTA shall continue until such time as any such Prepetition MSFTA is assumed, rejected, or terminated in accordance with its terms.

## Provisions Relating to DIP Netting Agreement

10.      ***Authorizations Regarding the DIP Netting Agreement.*** Pursuant to sections 105(a) and 363(b) and, to the extent applicable, section 364(c) of the Bankruptcy Code, Stearns Lending is immediately authorized and empowered to (a) enter into and perform its obligations under the DIP Netting Agreement, (b) execute and deliver all other DIP Repo Documents required or advisable to effect the DIP Netting Agreement, and (c) take all actions which may be necessary or advisable for the performance by the Debtors under the DIP Netting Agreement. Furthermore, the DIP Repo Agent is hereby authorized and empowered to exercise

netting and setoff rights for the benefit of itself and the DIP Netting Parties in accordance with, and subject to, the terms and conditions set forth in the DIP Netting Agreement. For the avoidance of doubt, pursuant to sections 362(b)(27) and 561 of the Bankruptcy Code, the Prepetition Netting Agreements shall be deemed terminated and closed out, and the Prepetition Netting Liens and Prepetition Netting Collateral shall be deemed released and terminated upon (i) the indefeasible payment of the Prepetition Repo Facility Obligations, in full and in cash, pursuant to Paragraph 5 of this Interim Order and (ii) the assumption and assignment of outstanding trades under the Prepetition MSFTAs to Barclays and Nomura pursuant to Paragraph 7 of this Interim Order.

11.    ***Security for the DIP Netting Parties***.

a.    Effective immediately upon entry of this Interim Order, the Bankruptcy Court hereby grants valid, binding, enforceable, non-avoidable, automatically and properly perfected, postpetition first-priority liens and security interests, pursuant to section 364(c)(2) of the Bankruptcy Code (collectively, the "DIP Netting Liens" and, together with the DIP Repo Facility Backup Liens and the DIP MSFTA Liens, the "DIP Repo Liens") to the DIP Repo Agent, for the benefit of itself and the other DIP Netting Parties, in each case, to secure Stearns Lending's obligations under the DIP Netting Agreement, as applicable, in:[17]

(i)    each Deposit Account, Securities Account or other trust or custodial account maintained or required to be maintained under or in connection with any DIP Repo Document;

(ii)    all property (including Security Entitlements) now or hereafter credited to or held in any such account or otherwise held, or carried by or through, or

---

[17]    Capitalized terms used but not defined in items (i) – (v) of this subsection shall have the meanings set forth in the DIP Netting Agreement.

subject to the control of any DIP Netting Party or agent thereof in connection with a DIP Repo Document whether fully paid or otherwise;

(iii)    all rights under the DIP Repo Documents, including, without limitation, all rights of Stearns Lending in any obligations of any DIP Netting and all rights of Stearns Lending in or to any transaction (including Clearing Transactions), confirmations and agreements under the DIP Repo Documents;

(iv)    all Accounts, Chattel Paper, Commodity Accounts, Commodity Contracts, Documents, General Intangibles, Instruments, Investment Property, Letter-of-Credit Rights and Securities held under or constituting collateral or security under or pursuant to any DIP Repo Documents; and

(v)    All proceeds of the foregoing ((i) – (iv) collectively, the "<u>DIP Netting Collateral</u>," and, together with the DIP Repo Facility Backup Collateral and the DIP MSFTA Collateral, the "<u>DIP Repo Collateral</u>"); *provided*, however, that to the extent any DIP Repo Collateral also secures any Prepetition Obligations, no security interest in such DIP Repo Collateral shall attach until the indefeasible payment, in full and in cash, of such Prepetition Obligations on the DIP Closing Date, pursuant to Paragraphs 5 and 7 of this Interim Order; *and, provided further*, however, that no payment made on the DIP Closing Date in satisfaction of the Prepetition Obligations shall be deemed to be defeasible solely due to the fact that the Challenge Period has not expired.

b.    The DIP Netting Liens are granted on the DIP Netting Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or any other DIP Repo Party.  As set forth below in Paragraph 27 of this Interim Order, the DIP Repo Agent or any other DIP Repo Party may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the DIP Netting Liens, or possess or control the DIP Netting

43

Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

**DIP Superpriority Claims**

12.     Effective immediately upon entry of this Interim Order, the DIP Repo Agent, on behalf of itself and the DIP Repo Parties, the DIP Netting Parties, and any agents or custodians under the DIP Repo Documents, and the DIP MSFTA Counterparties are hereby granted the DIP Superpriority Claims.  The DIP Superpriority Claims against Stearns Lending shall be senior to all, and not subject to any, other administrative expense or other claims, including those arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code or any other superpriority claims that may be granted in these cases, including, for the avoidance of doubt, the Cash Flow DIP Superpriority Claims (as defined in the Cash Flow DIP Order) and shall ***not*** be subject to the Carve-Out (as defined in the Cash Flow DIP Order).  The DIP Superpriority Claims against Holdco shall be senior to all other administrative expense or other claims and any other superpriority claims that may be granted in these cases, other than the Cash Flow DIP Superpriority Claims, any superpriority claim granted to holders of the 9.375% Notes pursuant to section 507(b) of the Bankruptcy Code, and subject to the Carve-Out (as defined in the Cash Flow DIP Order) at Holdco.

13.     Notwithstanding anything to the contrary in any order or in any other document, in no event shall the Cash Flow DIP be paid down (by mandatory or voluntary prepayment) while any portion of the DIP Repo Obligations remain outstanding.

**Other Provisions Relating to the DIP Repo Documents**

14. ***Authorized Action***.  In furtherance of the foregoing, and without further approval of this Court, each Debtor is authorized and directed to perform all acts, and to make, execute and deliver all instruments and documents, that may be necessary or required for the performance by the Debtors under the DIP Repo Documents, including, without limitation, the creation and perfection of the DIP Repo Liens described in, provided for and perfected by this Interim Order and the DIP Repo Documents on or before the end of the Challenge Period.

15. ***Validity of DIP Repo Obligations***.  Upon entry of this Interim Order, the DIP Repo Documents shall represent valid, binding, and unavoidable obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms, subject to the terms of this Interim Order.  The DIP Repo Documents and this Interim Order constitute and evidence the validity and binding effect of the DIP Repo Obligations of the Debtors, which DIP Repo Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including any trustee or other estate representative appointed in the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases (each, a "Successor Case").  No obligation, payment or transfer to the DIP Repo Agent, any other DIP Repo Party, or any other party to the DIP Repo Documents under the DIP Repo Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including under sections 502(d), 544, 548, or 549 of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment, claim or counterclaim, except as otherwise expressly permitted herein.

16. ***Treatment of DIP Repo Liens***.  The DIP Repo Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted in the Chapter 11 Cases or any Successor Case.  The DIP Repo Liens shall be valid and enforceable

45

against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case. No lien or interest avoided and preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Repo Liens. Notwithstanding anything else herein to the contrary, in no event shall the Cash Flow DIP Collateral (as defined in the Cash Flow DIP Order) include, nor shall the Cash Flow DIP Security Interests (as defined in the Cash Flow DIP Order) or any other liens or interests attach to, the DIP Repo Collateral.

17.    ***No Obligation to Make Purchases***. The DIP Repo Parties shall have no obligation to make purchases, enter into transactions, or otherwise extend any financial accommodation under the DIP Facilities unless and until the DIP Closing Date has occurred and the conditions precedent to the making of such purchases, entry into such other transactions or other extension of financial accommodation, as the case may be, under the relevant DIP Repo Documents have been satisfied in full or waived in accordance with the terms of the relevant DIP Repo Documents.

18.    ***Use of DIP Proceeds.*** From and after the Petition Date, the Debtors are authorized, subject to the satisfaction of the terms and conditions set forth in this Interim Order and the DIP Repo Documents, to use proceeds of the DIP Facilities (a) to pay the Prepetition Obligations, (b) to effectuate the sale and repurchase of mortgage loans and related assets pursuant to the DIP Repo Facility, and (c) to pay customary fees and closing costs in connection with the DIP Facilities and DIP Repo Documents; *provided*, *that*, the use of such proceeds shall be restricted as provided for in Paragraph 25 of this Interim Order.

46

19. ***Costs, Fees, Expenses, Release, and Indemnification***.

a.     The Debtors are authorized and directed to execute, deliver, and perform under the Agent Fee Letter and the Master Fee Letter. The Debtors are authorized and directed to pay any and all reasonable and documented fees and expenses of the DIP Repo Parties and other parties to the DIP Repo Documents in connection with the DIP Repo Documents, the DIP Facilities, the Prepetition Repo Facility Parties in connection with the Prepetition Repo Facilities, the Prepetition MSFTAs, and the Prepetition Netting Agreements, including administrative agent fees, custodial fees, and the fees and expenses of attorneys (including Hunton Andrews Kurth LLP, as counsel to Barclays Bank PLC, Milbank LLP and Alston & Bird LLC, as counsel to Nomura Corporate Funding Americas, LLC , and Davis Polk & Wardwell LLP, as counsel to Bank of America, N.A.), advisors, accountants and other consultants, whether incurred before, on or after the Petition Date and whether or not the transactions contemplated hereby are consummated, including fees and expenses incurred in connection with (i) the preparation, negotiation and execution of this Interim Order, the DIP Repo Documents, any forbearance agreement, and all related documents; (ii) the syndication and funding of any of the DIP Facilities; (iii) the creation, perfection or protection of the DIP Repo Liens (including all search, filing and recording fees); (iv) the on-going administration of the DIP Repo Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Chapter 11 Cases (including the filing of any proofs of claim); (v) the enforcement of the DIP Repo Documents or this Interim Order and related documents; (vi) any refinancing or restructuring of the DIP Facilities; and (vii) any legal proceeding relating to or arising out of the

DIP Facilities or the other transactions contemplated by the DIP Repo Documents or this Interim Order, including the Chapter 11 Cases, in each of the foregoing cases solely to the extent set forth in the applicable DIP Repo Documents and Prepetition Agreements. Payment of all such professional fees and expenses shall be made upon delivery of an invoice (which need not contain any itemized details as to the relevant fees and expenses) and shall not be subject to allowance by the Bankruptcy Court or to the U.S. Trustee guidelines. Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

b.    The Debtors, on behalf of themselves and their respective estates, forever and irrevocably release, discharge, and acquit all former, current and future DIP Repo Parties, affiliates of the DIP Repo Parties, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, reasonable attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Repo Documents, the DIP Facilities, and the Debtors' use of the liquidity provided thereunder and

hereunder, including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Repo Parties.

c.       The DIP Repo Parties shall have no liability to any third party relating to the DIP Repo Documents, the DIP Facilities, and the Debtors' use of the liquidity provided thereunder and hereunder, and shall not, by virtue of entering into the transactions contemplated by the DIP Facilities or otherwise complying with the DIP Repo Documents or this Interim Order, be deemed to be in control of the operations of the Debtors, to owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates. The Debtors shall, and are hereby authorized to, indemnify and hold harmless the DIP Repo Parties and their respective affiliates and Representatives (the "Indemnified Parties") from and against all losses, liabilities, claims, damages, penalties, actions, judgments, suits, expenses or disbursements of any nature whatsoever arising out of or relating to the DIP Repo Documents or this Interim Order, including the syndication of any obligations thereunder, and the Debtors' use of the liquidity provided thereunder; *provided*, *however*, that the foregoing indemnity shall not apply to any actions of any Indemnified Parties determined in a final non-appealable judgment to constitute fraud or willful misconduct.  This indemnification shall survive and continue for the benefit of all such persons or entities.

20.       ***Modification of DIP Repo Documents***.  The Debtors and the DIP Repo Parties, as applicable, are authorized, subject to the DIP Repo Documents, to implement, in accordance with the terms of the respective DIP Repo Documents, any amendments, waivers, consents or other modifications to or under the DIP Repo Documents (including any change to

the number or composition of DIP Repo Facility Purchasers or DIP MSFTA Counterparties)
without further order of this Court unless such amendment, waiver, consent or other modification
(a) restricts, limits or prohibits any payments required pursuant to Paragraph 19 of this Interim
Order, or (b) shortens the maturity or the scheduled termination date thereunder.

21.    ***Chapter 11 Milestones***.  Subject to the Court's availability, the Debtors
shall comply with the milestones set forth below:[18]

(i)     On or before the date that is three (3) days following the Petition Date, the
Debtors shall have filed with the Bankruptcy Court the Bid Procedures Motion, an
Acceptable Plan, and a disclosure statement reasonably satisfactory to the DIP
Repo Agent (at the direction of the Required Purchasers) with respect to such
Acceptable Plan;

(ii)    On or before the earlier of the date that is thirty (30) days following entry this
Interim Order and the Cash Flow DIP Order or thirty five (35) days following the
Petition Date, the orders approving the relief granted in the Interim Order and the
Cash Flow DIP Order on a final basis shall have been entered by the Bankruptcy
Court, and such orders shall not have been  amended, modified or supplemented
(or any portions thereof reversed, stayed or vacated) other than as agreed in
writing by the DIP Repo Agent (at the direction of the Required Purchasers);

(iii)   On or before the date that is thirty (30) days following the Petition Date, the Bid
Procedures Order shall have been entered by the Bankruptcy Court, and such
order shall not have been amended, modified or supplemented (or any portions
thereof reversed, stayed or vacated) other than as agreed in writing by the DIP
Repo Agent (at the direction of the Required Purchasers);

(iv)    On or before the date that is sixty (60) days following the Petition Date, the
Debtors shall have obtained the Bankruptcy Court's approval of a disclosure
statement for an Acceptable Plan and solicitation procedures contemplating
completion of a confirmation hearing with respect to an Acceptable Plan no later
than one hundred fifteen (115) days following the Petition Date, which disclosure
statement and solicitation procedures must otherwise be in form and substance
reasonably acceptable to the Required Purchasers, and the Bankruptcy Court's
approval of such disclosure statement and solicitation procedures shall not have

---

[18]    Capitalized terms used but not defined in this subsection shall have the meanings set forth in the Master
Refinancing Agreement.

been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by the DIP Repo Agent (at the direction of the Required Purchasers);

(v)     On or before the date that is one hundred twenty (120) days following the Petition Date, the Debtors shall obtain entry of an order of the Bankruptcy Court confirming an Acceptable Plan, which order (i) shall be (x) in form and substance satisfactory to the Required Purchasers, to the extent relating to the termination of the commitments under the DIP Warehouse Facility Agreements, the payment in full in cash and full discharge of the obligations under the DIP Facilities, and releases and other exculpatory provisions for the Secured Parties and (y) otherwise in form and substance reasonably satisfactory to the Required Purchasers, and (ii) shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by the DIP Repo Agent (at the direction of the Required Purchasers); and

(vi)    On or before the date that is one hundred thirty five (135) days following the Petition Date, the effective date of an Acceptable Plan shall have occurred and all obligations under the DIP Facilities shall have been indefeasibly paid in full in cash.

22.     ***Rights and Remedies Following a DIP Termination Event***.

a.      **Events of Default**.  The occurrence of any of the following events (in addition to the events of default and rights and remedies set forth in any of the DIP Repo Documents) shall constitute an event of default (collectively, the "DIP Events of Default"): [19]

i.      Failure to Enter Interim DIP Orders.  Within five (5) Business Days following the Petition Date, the Bankruptcy Court fails to enter the Interim DIP Orders;

ii.     Failure to Draw.  Within five (5) Business Days following the Petition Date, either (a) the Seller fails to enter into a new Transaction under the DIP Warehouse Facility Agreements or (b) the Initial Term Loan Commitment (as defined in the Corporate DIP Facility) is unavailable for the Seller to draw;

iii.    Failure to Enter Final DIP Orders, Final Cash Management Order or Final OCB Order.  Within thirty-five (35) calendar days following the

---

[19]     Capitalized terms used but not defined in this subsection shall have the meanings set forth in the Master Refinancing Agreement.

entry of the Interim DIP Orders, the Bankruptcy Court fails to enter the Final DIP Orders, the Final Cash Management Order or the Final OCB Order;

iv. <u>Failure to Pay DIP Repo Agent for its own account or the account of any Purchaser</u>. Failure to (a) make any payment of Price Differential or Repurchase Price or make a payment of any other sum or amount which has become due, whether by acceleration or otherwise, under any of the DIP Warehouse Facility Agreements, including, without limitation, payment in full in cash by the Termination Date or (b) pay any Margin Deficit when due pursuant to any Repurchase Agreement;

v. <u>Breach of Representation</u>. Any representation or warranty of the the Seller under any DIP Warehouse Facility Agreement is materially incorrect;

vi. <u>Breach of Covenant</u>. A breach of any covenant or agreement of Seller under any DIP Warehouse Facility Agreement;

vii. <u>Breach of DIP Orders</u>. The occurrence of a breach or violation by the Debtors of the Interim Repo DIP Order or Interim Corporate DIP Order (or, after entry thereof, the Final Repo DIP Order or Final Corporate DIP Order) that has not been promptly cured or waived to the satisfaction of the DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion), or the termination or material reduction of the Commitments by the Corporate DIP Lenders under the Corporate DIP Facility;

viii. <u>Breach of OCB Orders or Cash Management Order</u>. The occurrence of a breach or violation by the Debtors of any Interim OCB Order (or, after entry thereof, any Final OCB Order) or the Interim Cash Management Order (or, after entry thereof, the Final Cash Management Order) in each case, that has not been promptly cured or waived to the satisfaction of the DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion);

ix. <u>Conversion of any of the Cases</u>. The conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code and the appointment of a chapter 7 trustee to effectuate the liquidation of the Debtors;

x. <u>Dismissal of any of the Cases</u>. The dismissal of any of the Cases;

xi. <u>Appointment of a Chapter 11 Trustee; Loss of Exclusivity</u>. (a) Appointment of a chapter 11 trustee in any of the Cases pursuant to section 1104 of the Bankruptcy Code or otherwise, or (b) any Debtor loses the exclusive right to file a chapter 11 plan or plans in any of the

Cases or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

xii.   <u>Chapter 11 Milestones</u>.  The Debtors fail to comply with any of the Chapter 11 Milestones in accordance with Article 8 of the Master Refinancing Agreement; *provided*, *however*, that no DIP Event of Default shall occur if the Debtors are unable to comply with any Chapter 11 Milestone due to the Court's unavailability;

xiii.  <u>Modification of DIP Orders or Certain Other Orders</u>.  Any reversal, revocation or modification of any of the following orders without the prior written consent of the DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion) (in the case of subclause (d) below, other than a modification that is not adverse to any of the rights, claims or interests of any Secured Party): (a) the Interim DIP Orders (or, after entry thereof, the Final DIP Orders), (b) any Interim OCB Order (or, after entry thereof, any Final OCB Order), (c) after entry thereof, any order referred to in clause (e) of the Chapter 11 Milestones, (d) after entry thereof, any of the other orders referred to in the Chapter 11 Milestones or (e) the Interim Cash Management Order (or, after entry thereof, the Final Cash Management Order);

xiv.   <u>Loss or Suspension of Servicer or Issuer Status</u>.  Any Agency (a) removes or suspends Seller's status as an approved servicer or issuer,(b) terminates of any of the GA Selling and Servicing Agreements, or (c) engages in any setoff against any Collateral;

xv.    <u>Order Granting Relief of Automatic Stay to Third Party</u>.  The entry of an order of the Bankruptcy Court granting any Person other than the Secured Parties (in their capacities as such) relief from the automatic stay in any of the Cases in a manner that is materially adverse to the rights, claims or interests of any of the Secured Parties;

xvi.   <u>Order Granting Lien or Claim to Third Party</u>.  The entry of an order of the Bankruptcy Court granting any Person other than the Secured Parties (in their capacities as such) a Lien or claim in or against (a) any of the Collateral, (b) any other material assets of the Seller, or any other Debtor (other than, solely with respect to assets that do not, and are not required to, constitute Collateral as to Liens existing as of the Petition Date granted to the secure the Prepetition Notes), or (ii) Liens permitted under the DIP Warehouse Facility Agreements or arising under the Corporate DIP Facility; provided that it shall constitute an Event of Default if the Seller or any other Debtor shall grant any Lien to secure any indebtedness or obligations referred to in clause (xvii) below);

53

xvii.  Additional Indebtedness.  The Seller or any other Debtor (a) issues or incurs, or files a motion to issue or incur, any additional secured or unsecured term loan debt, debt bonds, or other debt for borrowed money (other than as provided for in the Corporate DIP Facility), or (b) enters into, or files a motion to approve, any other debt arrangements similar to a DIP Warehouse Facility Agreement;

xviii.  Termination of the Equity Commitment Letter or Investment Agreement. The termination of the Equity Commitment Letter or the Investment Agreement, other than in connection with the execution of a Replacement Equity Commitment;

xix.  Chapter 11 Plan Filing.   The filing of any chapter 11 plan of reorganization (or a disclosure statement describing a chapter 11 plan of reorganization) in any of the Cases or any motion to approve a sale agreement, any plan support agreement or any other asset purchase agreement or similar agreement, in any such case, that does not provide that all obligations of the the Seller with respect to the DIP Warehouse Facility Agreements shall be indefeasibly paid in full in cash as per the terms of such agreements (other than with respect to any other asset purchase agreement or similar agreement relating to a sale or disposition on terms and conditions consented to by the Purchasers, subject to any applicable prepayment requirements set forth herein or in any other DIP Warehouse Facility Agreement);

xx.  Exercise of Remedies by Other Creditors.  Exercise by any holder of Prepetition Notes or any other creditor or any agent, trustee or other representative on behalf of any creditor (other than the DIP Repo Agent or the Required Purchasers in accordance with the Administration Agreement and other relevant DIP Warehouse Facility Agreements) of remedies (a) against any Collateral, or (b) in a manner that is materially adverse to the rights, claims or interests of any of the Secured Parties;

xxi.  Sale, Transfer or Disposition of Servicing Rights.  Any sale, transfer or other disposition of (i) any mortgage servicing rights with respect to any mortgage loans (including any manufactured housing loans) or rights to reimbursement for advances related thereto or (ii) any other assets of the Seller or any other Debtor and, in the case of this subclause (ii), the sale, transfer or other disposition of such other asset would materially impair the rights and claims of any of the Secured Parties (as determined by Required Purchasers in their sole discretion) in and to the Collateral (other than the sale, transfer or other disposition of such servicing rights or assets occurring in the ordinary course; provided that the outstanding Repurchase Price or other

54

Secured Obligations (including any accrued and unpaid interest and fees with respect thereto) owed to any of the Secured Parties with respect to such sold mortgage servicing rights or any rights to reimbursement for advances related thereto or, to the extent constituting Collateral, other sold assets shall be repaid no later than substantially concurrently with such sale, transfer or other disposition);

xxii.  <u>Failure to Pay at Maturity</u>.  The occurrence of a DIP Maturity Date Event of Default;

xxiii.  <u>MSFTA Cross Default</u>.  An "event of default" (as such term is defined in the applicable MSFTA) (in each case, subject to any applicable cure period) occurs under any MSFTA (as defined herein);

xxiv.  <u>Insolvency.</u>  An Act of Insolvency shall have occurred with respect to the Guarantor;

xxv.  <u>Inability to Perform</u>.  The Seller, the Guarantor, or any Debtor shall admit its inability to, or its intention not to, perform such Person's obligations under any of the DIP Warehouse Facility Agreements to which it is a party; <u>provided</u> <u>that</u> the filing of any of the Cases or any Specified Act of Insolvency with respect to the Debtors shall not, in and of itself, be deemed any admission of Person's inability to perform;

xxvi.  <u>Change in Control</u>.  The occurrence of a Change in Control;

xxvii.  <u>Failure to Transfer</u>.  The Seller fails to transfer the Purchased Assets to DIP Repo Agent or its designee on the applicable Purchase Date (provided that the applicable Purchasers (or the DIP Repo Agent, on behalf of the applicable Purchasers) have tendered the related Purchase Price);

xxviii.  <u>Judgment</u>.  A post-petition final judgment or judgments for the payment of money in excess of $5,000,000 in the aggregate shall be rendered against the Seller by one or more courts, administrative tribunals or other bodies having jurisdiction and the same shall not be satisfied, discharged (or provision shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within thirty (30) days from the date of entry thereof;

xxix.  <u>Government Action</u>.  Any Governmental Authority or any person, agency or entity acting or purporting to act under governmental or regulatory authority (i) shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any

55

substantial part of the property of the Seller or any Affiliate thereof, (ii) shall have taken any action to displace the management of the Seller or any Affiliate thereof or (iii) shall have taken any action to curtail its authority in any material respect in the conduct of the business of the Seller or any Affiliate thereof, or any enforcement action that either materially impairs the ability of the Seller, the Guarantor, or any other Debtor to perform its obligations under the DIP Warehouse Facility Agreements or prevents it from carrying on its business or a substantial part thereof, and, in the case of this subclause (iii), such action shall not have been discontinued or stayed within thirty (30) days;

xxx.    Servicer Default.  Any third party servicer of any Purchased Assets is in default of the applicable servicing agreement entered into between such servicer and the Seller, and the relevant Seller has not, within thirty (30) days of such default, (i) replaced such servicer with a successor servicer approved by the DIP Repo Agent in its sole discretion or (ii) repurchased all Purchased Assets subject to such servicing agreement or any other servicing agreement with such servicer;

xxxi.   Corporate Facility DIP Cross Default.  The occurrence of an "Event of Default" under the Corporate Facility DIP, as in effect on the date hereof;

xxxii.  Assignment.  Assignment or attempted assignment by the Seller, the Guarantor, or any Debtor of any DIP Warehouse Facility Agreement to which it is a party or any of its rights or obligations thereunder without first obtaining the specific written consent of the DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion), or the granting by the Seller of any Lien on any Purchased Assets to any person other than DIP Repo Agent or any custodian or agent acting on behalf of the DIP Repo Agent and relevant Purchasers;

xxxiii. Security Interest.  Any of the DIP Warehouse Facility Agreements shall for any reason cease to create a valid, first priority security interest in any material portion of the Collateral purported to be covered thereby, or if any of the Collateral covered by such security interest, or proceeds thereof, become subject to a security interest granted to a third party;

xxxiv.  Occurrence of any other Event of Default.  The occurrence of any other event of default under any DIP Warehouse Facility Agreement (beyond any grace period, and subject to any express notice requirement, set forth in such DIP Warehouse Facility Agreement that

is applicable to such event) that has not been promptly cured or waived to the satisfaction of the DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion);

xxxv.  Enforceability.  For any reason (i) the Seller, the Guarantor, or any other Debtor shall seek to disaffirm, terminate, limit, challenge, repudiate or reduce its obligations under any DIP Warehouse Facility Agreement (or the Guaranty, as applicable) or otherwise challenge the ability of DIP Repo Agent, any Purchasers or any other Secured Party to enforce its rights and remedies thereunder or (ii) any DIP Warehouse Facility Agreement or the DIP Guaranty, at any time shall fail to be in full force and effect in all material respects in accordance with its terms or shall not be enforceable in all material respects in accordance with its terms;

xxxvi.  Proposal of Chapter 11 Liquidating Plan.  The proposal by the Debtors or any other party in interest of a liquidating chapter 11 plan, which contemplates the liquidation rather than the reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

xxxvii.  Cash Collateral Termination Event.  To the extent the Court enters an order permitting the use of Cash Collateral (as defined in the Bankruptcy Code), the termination of the right to use Cash Collateral under such order (a "Cash Collateral Termination Event"); and

xxxviii.  Breach of DIP Guaranty.  A breach of any representation, covenant, or agreement of the DIP Guarantor under the DIP Guaranty.

An Event of Default shall be deemed to be continuing unless expressly waived by DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion) in written notice to the Seller.

b.      Upon the occurrence and during the continuance of a DIP Event of Default, the DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion) may: (a) deliver a notice of a DIP Event of Default; (b) terminate any pending Funding or other extension of credit under any DIP Warehouse Facility Agreement, declare the Secured Obligations to be due and payable, and/or place an administrative hold on any deposit account, securities account or other bank account that constitutes Collateral; and (c)(i)

immediately upon the occurrence of any Immediate Event of Default, and (ii) upon five (5) Business Days' written notice to the Seller in the case of any DIP Event of Default (other than an Immediate Event of Default as specified in the DIP Repo Documents) (such period, the "DIP Forbearance Period"), exercise all other rights and remedies available to the DIP Repo Agent (at the direction of the Required Purchasers in their sole discretion), any Purchaser and/or any other Secured Party pursuant to and in accordance with any of the DIP Warehouse Facility Agreements, DIP Guaranty, any other DIP Repo Document, the Repo DIP Orders, or any order of the Bankruptcy Court or otherwise.  In addition, any Purchaser, Secured Party, or any DIP Repo Party may exercise any rights to unilateral enforcement pursuant to the applicable DIP Repo Documents.

   c.  The rights and remedies set forth herein are non-exclusive may be exercised without presentment, demand, protest or other notice of any kind (except for any notice expressly required hereunder), all of which are hereby expressly waived by each of the Seller and any other Debtor.  For the avoidance of doubt, upon the occurrence and during the continuance of a DIP Event of Default, the interest rate that is used to calculate amounts due under the Repurchase Agreement (including Price Differential) shall automatically be the Default Rate without any further action required by DIP Repo Agent or any Purchaser party to any Repurchase Agreement.[20]

   d.  Notwithstanding anything herein to the contrary, (i) if a DIP Event of Default exists at the end of the DIP Forbearance Period, then the DIP Repo Parties shall be permitted to immediately exercise all of their other rights and remedies under the DIP Repo

---

[20] Capitalized terms used but not defined in this subsection shall have the meanings set forth in the Master Refinancing Agreement.

Documents, *provided* that nothing herein affects (x) the rights, duties and obligations of the parties to the Fannie Mae Lender Contract or (y) the rights, duties and obligations of the parties to the Freddie Mac Agreements or (z) the rights, duties and obligations of the parties under the Ginnie Mae Agreements; and (ii) the DIP Repo Parties shall not be required to permit any funding or other financial accommodation under the DIP Repo Documents during the DIP Forbearance Period unless and until the forgoing conditions shall have been satisfied during such period. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Bankruptcy Court, to permit the DIP Repo Parties to exercise all rights and remedies under the DIP Repo Documents and under this Interim Order, in accordance with the terms of this Interim Order.

e.    No failure on the part of the DIP Repo Agent or a DIP Repo Party to exercise, and no delay by the DIP Repo Agent or DIP Repo Party in exercising, any right, power or remedy under this Interim Order (including rights or remedies under the safe harbor protections of the Bankruptcy Code referenced in Paragraph J of this Interim Order) or the DIP Repo Documents shall operate as a waiver of any such right, power or remedy, nor shall any single or partial exercise by the DIP Repo Agent or a DIP Repo Party of any right, power or remedy under this Interim Order (including rights or remedies under the safe harbor protections of the Bankruptcy Code referenced in Paragraph J of this Interim Order) or the DIP Repo Documents preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

23.    ***Maintenance and Disposition of DIP Repo Collateral and Cash Management***. Until the indefeasible payment in full in cash of all DIP Repo Obligations and the

termination of the obligation of the DIP Repo Parties to extend liquidity pursuant to the DIP

Facilities, the Debtors shall maintain their cash management system as in effect as of the Petition

Date, (i) subject to the DIP Repo Documents, (ii) subject to the terms of this Interim Order, and

(iii) subject to any orders of the Bankruptcy Court with respect to the Debtors' cash management

system. The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion

of the DIP Repo Collateral (or the proceeds thereof) without the prior written consent of the DIP

Repo Agent or the DIP MSFTA Counterparties, as applicable, in accordance with the DIP Repo

Documents, as applicable (and no consent shall be implied from any other action, inaction, or

acquiescence by the DIP Repo Agent or the DIP MSFTA Counterparties, or from any order of

this Court), except as otherwise provided in the DIP Repo Documents or otherwise ordered by

the Bankruptcy Court.

24.    ***Rights of Access and Information***.  Without limiting the rights of access

and information afforded the DIP Repo Parties under the DIP Repo Documents, the Debtors

shall be, and hereby are, required to afford Representatives, agents and/or employees of the DIP

Repo Agent reasonable access to:  (a) the Debtors' premises, (b) knowledgeable officers of the

Debtors, (c) the Debtors' books and records, (d) the Debtors' properties and other collateral of

any Debtor against whom such parties are granted DIP Repo Liens under this Interim Order, (e)

all reports and information furnished to (x) the holders of the 9.375% Notes pursuant to Section

4.16 of the Indenture between Wilmington Trust, N.A., Holdings dated August 8, 2013 (or their

advisors); (y) the Cash Flow DIP Lender (or its advisors) under the Cash Flow DIP Documents

and the Cash Flow DIP Order; and (z) Blackstone, it its capacity as Plan Sponsor (as defined in

*Motion of Debtors for an Order (A) Approving the Plan Sponsor Selection Procedures; (B)*

*Establishing Notice Procedures; and (C) Granting Related Relief*) (or its advisors); and (f) all reports and information furnished to the Debtors by any joint venture parties, to the extent permissible under the relevant joint venture documentation.   The Debtors shall reasonably cooperate, consult with, and provide to the DIP Repo Agent and the DIP Repo Parties all such information as may be reasonably requested.

25.    ***Restrictions on Use of Proceeds of the DIP Repo Facility.***   None of the DIP Repo Facilities or any proceeds thereof, or any portion of the Carve-Out (as defined in the Cash Flow DIP Order), may be used to pay, directly or indirectly by the Debtors, non-Debtor affiliates, the Creditors' Committee, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other party (or to pay any professional fees, disbursements, costs, or expenses incurred in connection therewith) for any of the following actions or activities without the written consent of the DIP Repo Agent, the DIP MSFTA Counterparties, the Prepetition Repo Facility Parties, the Prepetition MSFTA Counterparties, and the Prepetition Netting Buyers, as applicable:  (a) to seek authorization to obtain liens or security interests on any asset of the Debtors that constitutes the DIP Repo Collateral or is otherwise subject to the DIP Repo Liens (other than Permitted Prior Liens) or claims that are senior to, or on parity with, the DIP Superpriority Claims (other than as provided here for in this Interim Order with respect to the DIP Superpriority Claims against Holdco); (b) to seek authorization to obtain claims against the Debtors or their property that are senior to, or *pari passu* with, the liens and claims identified in the preceding sub-clause (a); or (c) except as expressly set forth herein, directly or indirectly prepare, assert, join, commence, support, or prosecute any action for any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other

61

contested matter seeking any order, judgment, determination, or any other relief against, or adverse to the interests of, the Prepetition Repo Parties or the DIP Repo Parties and any of their respective Representatives with respect to any transaction, occurrence, omission, action, or other matter, including, without limitation, (i) any Avoidance Action, (ii) any "lender liability" claims and causes of action, (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Repo Liens, the DIP Superpriority Claims, or the DIP Repo Obligations, (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid, or subordinate, in whole or in part, any of the obligations identified in the preceding clause (iii), (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the parties hereunder or under any of the documents referred to herein, including claims, proceedings, or actions that might prevent, hinder, or delay any of such parties' assertions, enforcement, realizations, or remedies on or against their collateral and rights herein, or (vi) objecting to, contesting with, or interfering with, in any way, such parties' enforcement or realization upon any of their collateral or rights, once a DIP Event of Default has occurred; *provided* that the Debtors shall be permitted to challenge the validity of any alleged DIP Event of Default.

26.     ***No Direct Obligation to Pay Allowed Fees; No Waiver of Right to Object to Fees.***  The DIP Repo Parties shall not be responsible for payment or reimbursement of any fees or disbursement of any professional incurred in connection with these Chapter 11 Cases, any Successor Cases, or otherwise.  Nothing in this Interim Order or otherwise shall be construed: (a) to obligate the DIP Repo Parties in any way, to pay compensation to, or reimburse expenses of, any professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (b) as consent to the allowance of any fees and expenses of any professionals;

or (c) to affect the rights of the DIP Repo Parties, or any other party in interest to object to the allowance and payment of such fees and expenses.

27.    ***Automatic Perfection of DIP Repo Liens.***

a.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Repo Liens without the necessity of filing or recording financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, taking possession of or control over any assets, or taking any other action to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Repo Liens or to entitle the DIP Repo Parties to their respective priorities granted herein.

b.    Notwithstanding the foregoing, and without in any way limiting Paragraph 6 above, the DIP Repo Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law, financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over any assets, or take any other action, as they may elect, in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Repo Parties choose, in their sole discretion, to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over any assets, or otherwise confirm perfection of the liens and security interests granted to the DIP Repo Parties hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order) immediately upon entry of this Interim Order.

c.      The DIP Repo Parties may, but shall not be obligated to, obtain consents from any landlord, licensor, or any other party in interest to file mortgages, financing statements, notices of lien or similar instruments, or otherwise record or perfect their security interests and liens, in which case:  (i) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and (ii) no defect in any such act shall affect or impair the validity, perfection or enforceability of such liens.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Repo Parties to take all actions, as applicable, referenced in this sub-clause (c).

d.      The Debtors are authorized to execute and deliver promptly upon demand by the DIP Repo Parties all such financing statements, mortgages, notices and other documents as the DIP Repo Parties may reasonably request.  The Debtors are authorized to, and shall, execute and deliver to the DIP Repo Parties, such agreements, financing statements, mortgages, instruments and other documents as the DIP Repo Parties may reasonably request to evidence, confirm, validate, or perfect the DIP Repo Liens and the failure by the Debtors to execute or deliver any documentation relating to the DIP Repo Liens shall in no way affect the validity, enforceability, nonavoidability, perfection, or priority of such liens.

e.      In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Repo Parties may, but shall not be obligated to, file a true and complete copy of this Interim Order and, following entry of the Final Order, the Final Order, in any place at which any such instruments would or could be filed, together with a description of the DIP Repo Liens and DIP Repo Collateral, and such filings by the DIP Repo Parties shall have the same effect as if such mortgages, deeds of trust,

financing statements, notices of lien or similar instruments had been filed as of the entry of this Interim Order.

        f.     The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Bankruptcy Court, to permit the DIP Repo Parties to effectuate all the terms and provisions and exercise all rights and remedies under the DIP Repo Documents and this Interim Order.

        28.     ***Good Faith***.  The DIP Repo Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, in accordance with sections 363(m) and 364(e) of the Bankruptcy Code, as applicable, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of the Bankruptcy Court, or any other court, the DIP Repo Parties are entitled to the protections provided in sections 363(m) and 364(e) of the Bankruptcy Code, as applicable.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of the DIP Repo Obligations, the DIP Repo Liens, or the DIP Superpriority Claims.  Any liens or claims granted to the DIP Repo Parties hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

        29.     ***Proofs of Claim***.  None of the DIP Repo Parties or the Prepetition Repo Parties shall be required to file proofs of claim in the Chapter 11 Cases, including with respect to

other claims not the subject of this Interim Order, and the Debtors' stipulations in this Interim

Order or the Final Order shall be deemed to constitute a timely filed proof of claim.  Any order

entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim

(including without limitation administrative claims) in the Chapter 11 Cases or any Successor

Cases shall not apply to the DIP Repo Parties or the Prepetition Repo Parties.  Notwithstanding

the foregoing, or any subsequent order of the Court concerning proof of claim filing

requirements, the DIP Repo Agent and the Prepetition Repo Agents are authorized (but not

obligated) to file a single master proof of claim in the Chapter 11 Cases on behalf of themselves

and the DIP Repo Parties and the Prepetition Repo Parties, respectively, on account of their

claims arising under the DIP Repo Documents and the Prepetition Repo Documents or

otherwise.

        30.     ***Preservation of Netting Rights***. The Prepetition Repo Parties may net

prepetition amounts and obligations under the Prepetition Agreements (or other related

documents), against postpetition amounts and obligations under other Prepetition Agreements (or

other related documents) and postpetition repurchase and forward transactions with the Debtors

and vice versa. In this regard, there shall be no distinction between transactions entered into

prepetition and postpetition. To the extent necessary, the automatic stay of section 362 of the

Bankruptcy Code is hereby modified to permit the exercise by the Prepetition Repo Parties of all

such netting rights.

        31.     ***Stay or Modification of Interim Order***. If any or all of the provisions of

this Interim Order are stayed, modified in a manner adverse to Prepetition Repo Parties or

vacated, or this Interim Order otherwise terminates, such stay, modification, vacation or

66

termination will not affect (a) the validity or priority of any indebtedness, obligation or liability incurred by the Debtors to each of the Prepetition Repo Parties before the receipt of written notice by the Prepetition Repo Parties of the effective date of such stay, modification or vacation, (b) the validity, priority or enforceability of the security interests and netting and termination rights authorized or created hereby or pursuant to the Prepetition Agreements or any related documents, (c) the rights of the Prepetition Repo Parties to exercise remedies as set forth in the Prepetition Agreements, and each Prepetition Repo Party shall be entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code, and (d) the Prepetition Repo Parties shall be entitled to exercise any and all rights available to them under the Bankruptcy Code, including, without limitation, those contained in sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(f), 546(g), 546(j), 548(d)(2), 555, 556, 559, 560, and 561 thereof.

32.    ***Damages Measure for Prepetition Repo Parties***. Notwithstanding anything to the contrary in section 562 of the Bankruptcy Code, the determination of any damages, settlement payments, or termination payments owing under any Prepetition Agreement (including the timing of measurement or calculation of any such damages, settlement payments or termination payments) shall be made pursuant to the terms of such Prepetition Agreement.

33.    ***Certain Protections for Prepetition Repo Parties***.  To the extent any Prepetition Obligations under any Prepetition Agreements are the subject of a successful Challenge (as defined below) (the "Reinstated Obligations"), the Prepetition Repo Parties holding such Reinstated Obligations are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Repo Collateral (including cash collateral, as such term is defined in the Bankruptcy Code) to the fullest extent permissible under the Bankruptcy Code; provided, however, that in no event shall

any liens or claims granted in connection with such adequate protection be senior to or *pari passu* with the DIP Repo Liens or the DIP Superpriority Claims.

34. ***Prepetition Repo Investigation Rights***.    The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, the Creditors' Committee or any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors.  Notwithstanding the foregoing sentences or any other provisions of this Interim Order, the Creditors' Committee and any other party in interest (other than the Debtors) , in each case with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), are permitted, by no later than (a) with respect to parties in interest if no Creditors' Committee has been appointed, 75 calendar days after entry of the Final Order, and (b) with respect to the Creditors' Committee, 60 calendar days after entry of the Final Order (the "Challenge Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, to seek to obtain standing to challenge or assert claims, and, if standing is obtained, to challenge the Debtors' Stipulations contained herein, or any other stipulations or findings contained in this Interim Order or any Final Order (each, a "Challenge"); *provided* that if a Creditors' Committee is appointed, the Creditors' Committee shall be subject to a budget not to exceed $50,000 (which

shall be funded in all circumstances from the Cash Flow DIP) in connection with the investigation and prosecution of any Challenge hereunder (without duplication of the Investigation Budget as defined in and provided for under the Cash Flow DIP Order) (the "Investigation Budget"); *provided* that any fees, expenses or costs incurred by the Creditors' Committee in excess of the Investigation Budget shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code. The Challenge Period may only be extended:  (a) with the prior written consent of the Prepetition Repo Facility Parties, as applicable, with reference to such parties' respective liens and collateral only or (b) pursuant to an order of the Bankruptcy Court, entered after notice and a hearing, and upon a showing of good cause for such extension.  Except to the extent asserted in an adversary proceeding or contested matter filed during the Challenge Period, the expiration of such Challenge Period (to the extent not otherwise waived or barred), shall mean that (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in this Interim Order and any Final Order shall be irrevocably and forever binding on the Debtors, the Creditors' Committee and all parties in interest and any and all successors-in-interest as to any of the foregoing, including any chapter 7 trustee, without further action by any party or the Bankruptcy Court and all such parties shall be deemed to have absolutely and unconditionally released, waived, and forever discharged and acquitted the Prepetition Repo Parties and any of their respective controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing (the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts,

contracts, liabilities, actions and causes of action arising prior to or after the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, including, without limitation, any claims for recharacterization, subordination, or substantive consolidation, arising out of or relating to (as applicable) the Prepetition Repo Facilities, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that any of the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, whether such Released Claims are matured or unmatured or known or unknown; (iii) all of the Prepetition Repo Obligations shall be deemed allowed on a final basis, not subject to defense, claim, counterclaim, recharacterization, subordination, offset, or avoidance, for all purposes of the Chapter 11 Cases, and any subsequent chapter 7 case(s); (iv) the Prepetition Repo Liens on the Prepetition Repo Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, enforceable, perfected security interests and liens, not subject to recharacterization, subordination, avoidance pursuant to the Bankruptcy Code or other applicable non-bankruptcy law, or other defense; and (v) the Prepetition Obligations and Prepetition Repo Liens on the Prepetition Repo Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter

11 trustee or examiner appointed or elected for any of the Debtors), and any defenses, claims, causes of action, counterclaims, and offsets by any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Repo Parties and their Representatives arising out of or relating to any of the Prepetition Agreements shall be deemed forever waived, released, and barred. Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations, admissions, agreements, and releases contained in this Interim Order or any Final Order shall nonetheless remain binding on all other parties in interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge. Nothing in this Interim Order vests or confers on any person, including, without limitation, the Creditors' Committee or any other statutory or non-statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to directly or indirectly support or pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.

35. ***No Third Party Rights***.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

36.    ***Credit Bidding.***  No entity other than the DIP Repo Parties shall have a right to credit bid in connection with any sale that includes any DIP Repo Collateral whatsoever, unless the DIP Repo Obligations are indefeasibly paid in full in cash.

37.    ***U.S. Government***.  In determining to make any loan under the DIP Repo Documents or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Repo Documents, the DIP Repo Agent shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors, so long as the DIP Repo Parties' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*., as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Repo Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).  As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Repo Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have. Nothing in this Interim Order or the DIP Repo Documents shall be construed to limit the right of any governmental unit to take any action not subject to the automatic stay.

38.    ***Discharge Waiver***.  The Debtors expressly stipulate, and the Bankruptcy Court finds and adjudicates that, none of the obligations, liens or superpriority claims granted or approved by this Interim Order shall be discharged by the entry of an order confirming any plan

of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations, as applicable, have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.

39.    ***Modification of Automatic Stay***.    The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Bankruptcy Court, to permit the DIP Repo Parties to effectuate all the terms and provisions and exercise all rights and remedies under the DIP Repo Documents and this Interim Order.

40.    ***No Waiver by Failure to Seek Relief***.    The failure or delay of any DIP Repo Parties to seek relief or otherwise exercise their respective rights and remedies under this Interim Order or the documents governing such agreements or facilities, or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise.

41.    ***Binding Effect of Interim Order***.    Immediately upon entry by the Bankruptcy Court (notwithstanding any applicable Bankruptcy Rules or any other law or rule to the contrary), the terms and provisions of this Interim Order, including the liens granted herein, shall become valid and binding upon and inure to the benefit of all the parties hereto and their respective successors and assigns.   To the extent there is any applicable stay of this Interim Order, it is hereby waived.

42.    ***No Modification of Interim Order***.   The Debtors irrevocably waive the right to seek and shall not seek or consent, directly or indirectly without the prior written consent of the DIP Repo Agent and the DIP Repo Parties, which consent may be refused in their sole and absolute discretion: (a) any modification, stay, vacatur, amendment or extension of this Interim Order; and (b) the granting of a priority claim for any administrative expense or unsecured claim

73

against the Debtors in the Chapter 11 Cases or any Successor Case, equal or superior to any lien or superpriority claim granted pursuant to this Interim Order.

43.    ***Interim Order Controls***.   In the event of any inconsistency between the terms and conditions of the DIP Repo Documents, this Interim Order, the Cash Management Orders, or the Cash Flow DIP Order, the provisions of this Interim Order shall govern and control solely to the extent of the inconsistency.

44.    ***Survival***.   The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which the Bankruptcy Court abstains from hearing the Chapter 11 Cases or any Successor Case.   The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided in this Interim Order until all obligations related thereto have been paid in full.

45.    ***Preservation of Rights Granted Under this Interim Order***.

a.    Without in any way limiting the preceding Paragraph, if an order dismissing the Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, the Debtors shall request that such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the liens and superpriority claims granted pursuant to this Interim Order shall continue in full force and

effect, shall maintain their priority as provided in this Interim Order and shall, notwithstanding such dismissal, remain binding on all parties in interest until all obligations pertaining thereto shall have been indefeasibly paid in full in cash (with interest) and the related commitments shall have been terminated in accordance with their terms and (ii) the Bankruptcy Court shall retain non-exclusive jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and obligations.

b.      If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity and enforceability of any obligations incurred prior to the actual receipt by the affected parties of written notice of the effective date of such reversal, stay, modification or vacation and (ii) the validity and enforceability of the liens and superpriority claims authorized or created hereby.   Notwithstanding any such reversal, stay, modification or vacation, the obligations incurred by the Debtors hereunder and under the applicable documents, prior to the actual receipt of written notice of the effective date of such reversal, stay, modification or vacation, shall be governed in all respects by the original provisions of this Interim Order, and the parties shall be entitled to all the rights, remedies, privileges and benefits of sections 363(m) and 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the applicable documents.

46.      ***Final Hearing.***  The Final Hearing is scheduled for July 31, 2019 at 2:00 p.m. (Eastern Time) before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, the United States Bankruptcy Court for the Southern District of New York, Courtroom 623, One Bowling Green, New York, NY 10004.  Any objections to the entry of the Final Order shall be filed and served on the following parties so as to be received by July 24, 2019 at 4:00 p.m.

75

(Eastern Time):  (a) counsel to the Debtors, (b) the United States Trustee, (c) the Debtors' 50 largest unsecured non-insider creditors, (d) the Debtors' five largest secured creditors, (e) counsel to the indenture trustee for the Debtors' senior secured notes, (f) counsel to Pacific Investment Management Company LLC, Hogan Lovells US LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067 (Attn: Bennett L. Spiegel and Stacey Rosenberg), (g) counsel to Blackstone Capital Partners VI L.P., Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff), (h) counsel to Barclays Bank PLC, Hunton Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166 (Attn: Peter S. Partee, Sr. and Brian Clarke), (i) co-counsel to Nomura Corporate Funding Americas LLC, Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Mark Shinderman and Lauren C. Doyle) and Alston & Bird LLP, 90 Park Avenue, New York, NY 10016 (Attn: Karen Gelernt) (j) the Internal Revenue Service, (k) the United States Attorney's Office for the Southern District of New York, (l) counsel to Fannie Mae, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: Stephen H. Warren), (m) counsel to Freddie Mac, McKool Smith, 600 Travis Street, Suite 7000, Houston, TX 77002 (Attn: Paul D. Moak, Esq.), One Bryant Park, 47th Floor, New York, NY 10036 (Attn: Kyle A. Lonergan, Esq.), (n) counsel to Ginnie Mae, 451 7th Street SW, Room 9250, Washington, DC 20410 (Attn: Lisa Mulrain and Lynne Chandler) and Director, Monitoring & Asset Management to Ginnie Mae, 425 3rd Street SW, Suite 500, Washington, DC 20024 (Attn: Rene Mondonedo), (o) known creditors who have or that the Debtors reasonably believe may have a security interest in the Debtors' assets, and (p) counsel to Bank of America, N.A., Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Damian Schaible and Natasha Tsiouris).

47.    ***Retention of Jurisdiction***.    The Bankruptcy Court shall retain jurisdiction to enforce this Interim Order according to its terms to the fullest extent permitted by applicable law.

Dated: July 11, 2019
        New York, New York

/S/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE