**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **STEARNS HOLDINGS, LLC,** *et al.*, | **Case No. 19-12226 (SCC)** |
| **Debtors.**[1] | **(Jointly Administered)** |
|  | Related Docket No.  20 |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (A) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing and (G) Granting Related Relief* (the "Motion"), filed by Stearns Holdings, LLC ("Stearns Holdings") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking the entry of this interim order (this "Interim DIP Order") and a

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are: Stearns Holdings, LLC (8219); Stearns Co-Issuer Inc. (7096); Stearns Lending, LLC (1773); Stearns Ventures, LLC (2386); Protos Acquisition LLC (4941); bSNAP, LLC (2498); and Private Mortgage Advisors, LLC (7493). The address of Protos Acquisition LLC is 345 Park Avenue, New York, NY 10154. The address of the other Debtors is c/o Stearns Lending, LLC, 750 East Highway, 121 Bypass, Suite 150, Lewisville, TX 75067.

final order upon terms substantially similar to those contained in the Interim DIP Order (the

"Final DIP Order") providing for, among other things, the following relief:

(i)     authorizing, pursuant to sections 105(a), 363(b), 364(c), and 364(d), of title 11 of the United States Code (the "Bankruptcy Code"), the Debtors to execute, deliver, perform under, and enter into transactions under:

(a)     that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, to be dated on or about the DIP Closing Date,[2] attached as Exhibit B to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "Cash Flow DIP Credit Agreement," and all obligations or liabilities with respect to the Cash Flow DIP Credit Agreement, the "Cash Flow DIP Obligations") among (i) Stearns Holdings, (ii) Stearns Lending, LLC ("Stearns Lending"), as borrower, and (iii) Blackstone Capital Partners VI NQ/NF L.P. and Blackstone Family Investment Partnership VI-NQ - ESC L.P., collectively as lender (the "Cash Flow DIP Lender"); and

(b)     all other documents related thereto (collectively with the Cash Flow DIP Credit Agreement, the "Cash Flow DIP Documents"),[3] which provide for a maximum committed amount of up to $35 million (the "Cash Flow DIP Facility");

(ii)    granting, subject to the Carve-Out (as defined below) the priorities identified herein:

(a)     to the Cash Flow DIP Lender, superpriority claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, against the Debtors to secure the Cash Flow DIP Obligations on a joint and several basis, which shall be junior in all respects to the DIP Repo Superpriority Claim (as defined below) against Stearns Lending;

(b)     to the Cash Flow DIP Lender, the Cash Flow DIP Liens (as defined below), pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, to secure the Cash Flow DIP Obligations, on the

---

[2]    For purposes herein, the "DIP Closing Date" means the date on which the Cash Flow DIP Facility is entered into and becomes effective, which shall occur on the date that this Interim DIP Order is entered or as soon as practicable thereafter.

[3]    The Cash Flow DIP Documents include the Guaranty and Collateral Agreement (as it may be amended, modified, or supplemented) executed by Stearns Lending, and by each of the Debtors other than Stearns Lending and each other subsidiary of Stearns Holdings that becomes a Debtor and guarantor pursuant to the Cash Flow DIP Documents (the "Cash Flow DIP Guarantors").

Cash Flow DIP Collateral (as defined below), including (i) a first-priority lien on unencumbered property, (ii) a first-priming lien on Secured Notes Collateral (as defined below), and (iii) junior liens on encumbered property that is not Secured Notes Collateral; provided, however, that in no event shall the Cash Flow DIP Liens attach to the DIP Repo Collateral (as defined in the DIP Repo Motion); and

(c)     to the DIP Repo Guarantor, subject to satisfaction of the DIP Repo Guarantee Lien Condition (as defined below), first-priority priming liens and security interests, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, on the Cash Flow DIP Collateral and *pari passu* with the Cash Flow DIP Liens, to secure amounts actually advanced by the DIP Repo Guarantor under the DIP Repo Guarantee made by it for the benefit of the DIP Repo Facility Purchasers, in an amount up to the DIP Repo Guarantee Limit;[4]

(iii)     authorizing the Debtors, pursuant to sections 361, 362 and 363 of the Bankruptcy Code:

(a)     to use the collateral (including cash collateral, which for the avoidance of doubt shall not include the DIP Repo Collateral or any other Excluded Asset (as defined below)), the "Secured Notes Collateral") securing those certain 9.375% senior secured notes due 2020 (the "Secured Notes") issued by Stearns Holdings and

---

[4]     For purposes herein:

(a)     The "DIP Repo Facility" has the meaning ascribed to it in the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing the Debtors to Enter into Repurchase Agreement Facilities and Related Documents; (B) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (C) Granting Backup Liens and Superpriority Administrative Expense Claims; (D) Modifying the Automatic Stay; (E) Scheduling a Final Hearing; and (F) Granting Related Relief* (the "DIP Repo Motion").

(b)     The "DIP Repo Agent" has the meaning ascribed to it in the DIP Repo Motion.

(c)     "DIP Repo Parties" has the meaning ascribed to it in the DIP Repo Motion.

(d)     The "DIP Repo Facility Purchasers" means the buyers from time to time under the DIP Repo Facility, together with the DIP Repo Agent acting on their behalf.

(e)     "DIP Repo Superpriority Claims" means the superpriority administrative expense claims granted to the DIP Repo Parties pursuant to the Interim DIP Repo Order.

(f)     The "DIP Repo Guarantee" means that certain Limited Recourse Guarantee, to be dated on or about the DIP Closing Date, attached as Exhibit C to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the DIP Repo Agent and Blackstone Capital Partners VI NQ/NF L.P., as guarantor (the "DIP Repo Guarantor"), pursuant to which the DIP Repo Guarantor has agreed to provide a limited guaranty of Stearns Lending's obligations under the DIP Repo Facility.

(g)     The "DIP Repo Guarantee Limit" means an aggregate amount equal to 5.00% of the "Collateral" of the DIP Repo Facility.

Stearns Co-Issuer Inc., under that certain Indenture, dated as of August 8, 2013 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Secured Notes Indenture" and, together with all instruments, agreements and documents related thereto, the "Secured Notes Documents");

(b)    to provide adequate protection, subject to the Carve-Out and the priorities identified herein, to Wilmington Trust, National Association, as indenture trustee and collateral agent (in such capacities, the "Secured Notes Indenture Trustee") on behalf of the holders (in such capacities, the "Secured Noteholders," and, together with the Secured Notes Indenture Trustee, the "Secured Notes Parties") of the Secured Notes.

(iv)    upon entry of the Final DIP Order, authorizing the Debtors to waive:

(a)    any Debtors' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(b)    the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code; and

(c)    the equitable doctrine of marshaling or similar doctrines;

(v)    authorizing the Debtors to use the proceeds of the Cash Flow DIP Facility, in accordance with this Interim DIP Order and the Cash Flow DIP Documents;

(vi)    modifying the automatic stay to the extent set forth herein and in the Cash Flow DIP Documents; and

(vii)    scheduling a final hearing (the "Final Hearing") to consider final approval of the Cash Flow DIP Documents as set forth in the Motion.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, (i) the *Declaration of Stephen Smith in Support of Debtors' Cash Flow DIP Motion*, (ii) the *Declaration of Robert Campagna, Alvarez & Marsal North America, LLC, in Support of Debtors' Cash Flow DIP Motion*, (iii) the *Declaration of Paul Sheaffer in Support of Debtors' Cash Flow DIP Motion and DIP Repo Facility Motion*, and (iv) the *Declaration of Stephen Smith, President and Chief Financial Officer of Stearns Lending, LLC in Support of Chapter 11 Petitions and First Day Pleadings*, the Cash Flow DIP Documents, and the record made by the

4

Debtors at the interim hearing held before the Bankruptcy Court (the "Interim Hearing"); and

after due deliberation and consideration; and sufficient cause appearing therefore:

**THE BANKRUPTCY COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS**:

A.    ***Petition Date***. On July 9, 2019 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

B.    ***Joint Administration***. The Bankruptcy Court has entered an order approving the

joint administration of the Chapter 11 Cases.

C.    ***Debtors in Possession***. The Debtors continue to manage and operate their

businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.

D.    ***Committee Formation***. As of the date hereof, no trustee or examiner or official

committee of unsecured creditors (a "Creditors' Committee") or any other statutory committee

has been appointed in these Chapter 11 Cases.

E.    ***Jurisdiction and Venue***. The Bankruptcy Court has jurisdiction over the

Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). The Bankruptcy Court

may enter a final order consistent with Article III of the United States Constitution. Venue of the

Chapter 11 Cases and the Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and

507 of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Bankruptcy Rules for

the Southern District of New York (the "Local Bankruptcy Rules").

F.      *Notice*. Adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other further notice of the Motion or the entry of this Interim DIP Order shall be required, except as set forth in this Interim DIP Order.

G.      ***Debtors' Stipulations.*** After consultation with their attorneys and financial advisors, and the Debtors, without prejudice to the rights of any other party in interest, subject to the limitations thereon contained in paragraph 23 of this Interim DIP Order, on their behalf and on behalf of their estates, admit, acknowledge, agree, and stipulate as follows:

***Secured Notes Parties, the Secured Notes Liens, the Secured Notes Collateral and the Secured Notes Obligations.***

(i)      <u>Secured Notes Indenture.</u> As of the Petition Date, Stearns Holdings and Stearns Co-Issuer Inc. were issuers under the Secured Notes Indenture. The Secured Notes Obligations (defined below) outstanding under the Secured Notes Indenture are guaranteed by Stearns Lending and Stearns Ventures, LLC.

(ii)      <u>Secured Notes Obligations</u>. As of the Petition Date, the Debtors were indebted to the Secured Notes Parties, without defense, counterclaim or offset of any kind, in the aggregate amount of not less than approximately $182 million, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Secured Notes Documents), charges, indemnities, any amounts owing on account of call protections contained in the Secured Notes Documents, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in Secured Notes Documents (collectively, the "<u>Secured Notes Obligations</u>").

(iii)    *Secured Notes Liens and Secured Notes Collateral*. The Secured Notes Obligations are secured (the "Secured Notes Liens") by the Secured Notes Collateral.

(iv)    *Validity, Perfection, and Priority of Secured Notes and Secured Notes Obligations*. The Debtors hereby further acknowledge and agree that as of the Petition Date:

(A)    The Secured Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the Secured Notes Indenture;

(B)    The Secured Notes Liens on the Secured Notes Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the Indenture Trustee, for the benefit of itself and the Secured Noteholders, for fair consideration and reasonably equivalent value;

(C)    The Secured Notes Liens are senior in priority over any and all other liens on the Secured Notes Collateral, subject only to liens granted hereunder, certain liens senior by operation of law or otherwise permitted to be senior under the Secured Notes Indenture (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Secured Notes Liens as of the Petition Date) (the "Secured Notes Permitted Prior Liens");

(D)    No portion of the Secured Notes Liens, the Secured Notes Obligations, or any payments made to the Indenture Trustee or the Secured Noteholders or applied to or paid on account of the Secured Notes Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)    The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the Indenture Trustee, the Secured Noteholders, or any of their respective Representatives;

(F)    The Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors' estates, waived, discharged, and released any right to challenge any of the Secured Notes Obligations or the validity, extent and priority of the Secured Notes Liens;

(G)    The Secured Notes Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and

(H)    The Debtors have been and are in default of their obligations under the Secured Notes Indenture, including as a result of the Chapter 11 Cases, and an Event of Default (as defined in the Secured Notes Indenture) has occurred and is continuing.

H.    ***Findings Regarding the Cash Flow DIP Facility and Use of Cash Collateral***

(a)    ***Good Cause***. Good and sufficient cause has been shown for the entry of this Interim DIP Order.

(b)    ***Necessity of Cash Flow DIP Facility***. An immediate and critical need exists to obtain the Cash Flow DIP Facility and to use cash collateral in order to permit, among other things, the continued operation of the Debtors' businesses in the ordinary course, to administer and preserve the value of their estates, to maintain business relationships and to satisfy other working capital and operational needs. In the absence of the availability of funds in accordance with the terms of the Cash Flow DIP Documents and this Interim DIP Order, the continued operation of the Debtors' business would not be possible. The access of the Debtors to sufficient working capital and liquidity through the Cash Flow DIP Facility and the use of cash collateral is necessary and vital to avoid serious and irreparable harm to the Debtors and to achieve a successful reorganization. Consummation of the transactions contemplated by the Cash

Flow DIP Documents and this Interim DIP Order is therefore in the best interests of the Debtors'
estates.

        (c)    ***No Financing Available on More Favorable Terms***. Given their financial
condition and capital structure, and despite their diligent efforts, the Debtors are unable to
reasonably obtain from other sources sufficient postpetition liquidity, and the Cash Flow DIP
Facility is the only such corporate financing facility available at this time. The Debtors have also
been unable to obtain secured credit from other sources (i) having priority over that of
administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the
Bankruptcy Code; (ii) secured only by a lien on property of the Debtors and their estates that is
not otherwise subject to a lien; or (iii) secured solely by a junior lien on property of the Debtors
and their estates that is already subject to a lien. A loan facility in the amount provided by the
Cash Flow DIP Documents is not otherwise available to the Debtors without granting the Cash
Flow DIP Lender superpriority claims and superpriority priming liens and security interests,
pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this
Interim DIP Order and the Cash Flow DIP Documents. After considering the advantages and
disadvantages of the proposed Cash Flow DIP Facility, the Debtors have concluded, in the
exercise of their prudent business judgment, that moving forward with the proposed Cash Flow
DIP Facility is the best financing alternative reasonably available. The Cash Flow DIP Facility
will permit the Debtors to operate their businesses in the ordinary course, and prosecute their
proposed plan of reorganization, which will culminate in a going-concern transaction that will
preserve the Debtors' businesses, save the jobs of the Debtors' employees and maximize value
for the Debtors' estates and their stakeholders. Additionally, the terms of the Cash Flow DIP
Facility are fair and reasonable and reflect the Debtors' exercise of prudent business judgment
consistent with their fiduciary duties.

(d)      *Willingness to Provide Liquidity*. The Cash Flow DIP Lender has indicated a willingness to engage in the transactions contemplated by the Cash Flow DIP Documents and this Interim DIP Order in reliance on, among other things, (i) approval by the Bankruptcy Court of the terms and conditions of the Cash Flow DIP Documents with respect to the Cash Flow DIP Obligations, and (ii) entry of findings of the Bankruptcy Court that (A) the Cash Flow DIP Facility and the other financial accommodations pursuant to the Cash Flow DIP Documents are essential to the Debtors' estates and are being extended in good faith, and (B) the Cash Flow DIP Superpriority Claims and the Cash Flow DIP Liens (each as defined below) will have the protections provided for in section 364(e) of the Bankruptcy Code.

(e)      *Good Faith*. The Cash Flow DIP Documents have been negotiated in good faith and at arm's length among the Debtors, the Cash Flow DIP Lender, and their respective representatives. All of the Cash Flow DIP Obligations arising under, in respect of, or in connection with the Cash Flow DIP Facility and Cash Flow DIP Documents shall be deemed to have been extended by the Cash Flow DIP Lender in accordance with the Cash Flow DIP Documents and in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall therefore be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits, and privileges of this Interim DIP Order regardless of whether this Interim DIP Order is subsequently reversed, vacated, modified, or otherwise no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

(f)      *Adequate Protection*. The Secured Notes Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Secured Notes Collateral for, and equal in amount to, any diminution in the value of the Secured Notes Parties' interests in the Secured Notes Collateral pursuant to sections 361, 362, 363 and

364 of the Bankruptcy Code. As adequate protection, the Secured Notes Parties shall be granted, as set forth herein, superpriority administrative claims and adequate protection liens for, and in an amount equal to, any Diminution in Value (as defined below) of the Secured Notes Parties' interests in the Secured Notes Collateral, and the additional adequate protection specified in paragraph 15 herein (collectively, the "Forms of Adequate Protection"). Based on the Motion and on the record presented to the Bankruptcy Court, the Forms of Adequate Protection are fair and reasonable and reflect the Debtors' prudent exercise of business judgment.

(g)    *Consideration*. The Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the Cash Flow DIP Facility and all other financial accommodations provided under the Cash Flow DIP Facility, the Cash Flow DIP Documents, and this Interim DIP Order. The terms of the Cash Flow DIP Facility pursuant to the Cash Flow DIP Documents and the use of the Cash Flow DIP Collateral (including the cash collateral) pursuant to this Interim DIP Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and constitute reasonably equivalent value and fair consideration.

(h)    *Sections 506(c) and 552(b)*. The Cash Flow DIP Lender and Secured Notes Parties each shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. Because of (a) each Cash Flow DIP Lender's and Secured Notes Parties' agreement, as the case may be, to subordinate the Cash Flow DIP Liens, the Cash Flow DIP Superpriority Claims, the Adequate Protection Liens and the 507(b) Claims (each as defined below) to the payment of certain administrative expenses of the Debtors' estates pursuant to the Carve-Out, the Cash Flow DIP Lender and the Secured Notes Parties are each entitled to a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code subject to entry of the Final DIP Order such that the "equities of the case" exception under section

552(b) of the Bankruptcy Code shall not apply to the Cash Flow DIP Lender or the Secured

Notes Parties with respect to proceeds, products, offspring or profits of any of the Cash Flow

DIP Collateral (as defined below) and/or Secured Notes Collateral, as applicable. Similarly, upon

entry of the Final DIP Order, each of the Cash Flow DIP Lender and Secured Notes Parties are

entitled to a waiver of section 506(c) of the Bankruptcy Code.

(i)     ***No Marshaling/Applications of Proceeds***. Subject to and upon entry of

the Final DIP Order, neither the Cash Flow DIP Lender nor the Secured Notes Parties shall be

subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any

obligations, liens or collateral acknowledged or approved pursuant to this Interim DIP Order or

the Final DIP Order.

(j)     ***Immediate Entry***. The Debtors have requested immediate entry of this

Interim DIP Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Bankruptcy Rule 4001-2.

Absent the granting of the relief set forth in this Interim DIP Order, the Debtors will be

immediately and irreparably harmed. Entry of this Interim DIP Order is in the best interests of

the Debtors and their estates and creditors because it will, among other things, allow the Debtors

to continue to operate in the ordinary course of their businesses and thereby maximize the value

of their estates.

(k)     ***Final Hearing***. At the Final Hearing, the Debtors will seek final approval

of the proposed Cash Flow DIP Facility and the other financial accommodations pursuant to the

Cash Flow DIP Documents, and the waivers and protections set forth herein, pursuant to the

Final DIP Order, which shall be in form and substance acceptable to the Cash Flow DIP Lender

and the Debtors, in their sole and absolute discretion or as otherwise required under the relevant

documents governing the parties' respective rights. Notice of the Final Hearing and the Final

DIP Order will be provided in accordance with this Interim DIP Order, and no further notice, except as provided by this Interim DIP Order, shall be required.

I.        *Notice*. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, email overnight courier or hand delivery, to certain parties as set forth in the Motion. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and the Interim Hearing constitutes adequate notice thereof and complies with the Bankruptcy Rules and Local Bankruptcy Rules, and no further notice of the relief granted herein is necessary or required.

J.        On the Petition Date, the Debtors also filed the DIP Repo Motion, seeking, among other things, the entry of an Order granting the relief requested therein on an interim basis (the "Interim DIP Repo Order").

K.        *Government Sponsored Entities*.

a.        *Fannie Mae; Servicing Rights and Reservation*. Notwithstanding anything to the contrary contained in the Cash Flow DIP Documents, this Interim DIP Order, or the Interim DIP Repo Order, no lien or security interest granted by the Cash Flow DIP Documents or this Interim DIP Order shall (a) attach to, modify, include or otherwise affect mortgage servicing rights or servicer advance receivables with respect to mortgages which are now or hereafter serviced or subserviced by Stearns Lending (or any of its affiliates) for the Federal National Mortgage Association ("Fannie Mae"). Furthermore, notwithstanding anything to the contrary in the Cash Flow DIP Documents or this Interim DIP Order, no lien or administrative expense claim is granted with respect to (i) any right or asset of any Debtor or any non-Debtor affiliate under that certain Mortgage Selling and Servicing Contract between Stearns Lending and Fannie Mae effective April 15, 2002 (together with all supplements,

addendums, modifications, amendments, and related agreements, the "Fannie Mae Lender Contract") or (ii) any asset that is the subject of any lien or pledge for the benefit of Fannie Mae, except as expressly set forth in a written agreement hereafter executed by Fannie Mae, and in all cases subject to the terms of such Fannie Mae agreement. For the avoidance of doubt, and without limiting the foregoing, nothing in the Cash Flow DIP Documents or this Interim DIP Order subordinates, primes, grants a lien or administrative claim in, or otherwise impairs Fannie Mae's interest in, or rights to, any property or collateral held or required to be held by the Debtors, the non-Debtor affiliates, Fannie Mae, or any other party in connection with the Fannie Mae Lender Contract. Furthermore, none of the rights related to loans and mortgages covered by the Fannie Mae Lender Contract (including any principal, interest, and funds for the payment of property taxes and insurance premiums collected by Stearns Lending in connection with its performance of its servicing or subservicing obligations under the Fannie Mae Lender Contract) are property of the Debtors' estates under section 541 of the Bankruptcy Code and no lien is granted hereunder to any of the Debtors' pre-petition or post-petition lenders therein. Fannie Mae reserves all rights in and under all of its agreements with the Debtors and the non-Debtor affiliates, including the Fannie Mae Lender Contract, none of which is impaired by the Cash Flow DIP Documents or this Interim DIP Order.

a.    *Freddie Mac; Servicing Rights and Reservation*. Notwithstanding anything to the contrary contained in the Cash Flow DIP Documents, this Interim DIP Order, or the Interim DIP Repo Order, no lien, security interest, or administrative expense claim granted by the Cash Flow DIP Documents or this Interim DIP Order (including, without limitation, any Cash Flow DIP Liens (as defined below)) shall (a) attach to, modify, include or otherwise affect (i) mortgage servicing rights (if any) with respect to mortgage loans sold to the Federal Home

Loan Mortgage Corporation ("Freddie Mac"), (ii) any mortgage loan once it has moved to the

"Settlement Lock" status under the Cash Program (as defined in the Freddie Mac Guide (as

defined below)) or has entered the funding cycle under the Guarantor Program (as defined in the

Freddie Mac Guide), or (iii) the "Servicing Collateral" (as defined and referenced in, and except

as otherwise expressly authorized by that certain Third Amended, Restated and Supplemented

Acknowledgment Agreement dated September 27, 2017 amongst Freddie Mac, Stearns

Lending, LLC, Wilmington Trust National Association, and NexBank SSB, as may be amended

or modified pursuant to its express provisions, as expressly agreed to by Freddie Mac (the

"Freddie Mac Acknowledgment Agreement")), (b) attach to, modify, include or otherwise affect

any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie

Mac pursuant to any collateral pledge agreement or other security agreement between Stearns

Lending and Freddie Mac, or (c) impair Freddie Mac's rights, claims, remedies, powers,

interests, payment or lien priority, or prerogatives set forth in the Freddie Mac

Acknowledgment Agreement, that certain Customer Agreement between Freddie Mac and

Stearns Lending executed on or about March 2, 2018 (the "Freddie Mac Customer

Agreement"), the Freddie Mac Single-Family Seller/Servicer Guide (as amended from time to

time, the "Freddie Mac Guide"), the Master Securities Forward Transaction Agreement between

Freddie Mac and Stearns Lending, executed on or about July 2, 2019 (the "Freddie Mac

MSFTA"), the Purchase Documents (as defined in the Freddie Mac Guide), or any purchase

contracts memorialized through Freddie Mac's Loan Selling Advisor (or otherwise) (the

"Freddie Mac Purchase Contracts") (collectively, the "Freddie Mac Agreements").

Notwithstanding anything to the contrary in the Cash Flow DIP Documents or this Interim DIP

Order, no lien or administrative expense claim is granted with respect to any right or asset of the

Debtors or any non-Debtor affiliate under the Freddie Mac Agreements, except as expressly

provided in the Freddie Mac Acknowledgment Agreement and in all cases subject to the terms

of such agreement.

        b.    ***Ginnie Mae Reservation***. Notwithstanding anything to the contrary

contained in the Cash Flow DIP Documents, this Interim DIP Order, or the Interim DIP Repo

Order, no lien or security interest granted by the Cash Flow DIP Documents or this Interim DIP

Order shall (a) attach to, modify, include or otherwise affect the mortgages as defined in that

certain Ginnie Mae Mortgage-Backed Securities Guide (the "Ginnie Mae Guide" and, together

with all other agreements, amendments, memorandums and supplements thereto with the

Government National Mortgage Association ("Ginnie Mae"), the "Ginnie Mae Agreements"),

including, but not limited to, the related mortgage servicing rights with respect to mortgages

which are now or hereafter serviced by Stearns Lending (or any of their respective affiliates)

that back Ginnie Mae securities, except as expressly consented to by Ginnie Mae. For the

avoidance of doubt, and without limiting the foregoing, nothing in the Cash Flow DIP

Documents or this Interim DIP Order subordinates, primes, grants a lien or administrative claim

in, or otherwise impairs Ginnie Mae's interest in, or rights to, the mortgages backing the Ginnie

Mae securities and any related collateral, including, but not limited to, cash, accounts or

collateral held or required to be held by the Debtors, the non-Debtor affiliates, Ginnie Mae, or

any other party in connection with the Ginnie Mae Agreements. Ginnie Mae reserves all rights

pursuant to 12 U.S.C. § 1721(g), and all rights in all of its agreements with the Debtors and the

non-Debtor affiliates, including the Ginnie Mae Agreements, none of which is impaired by the

Cash Flow DIP Documents or the Interim DIP Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Bankruptcy Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. ***Motion Granted/Interim Financing Approved***. The interim relief sought by the Motion is granted on an interim basis subject to the terms set forth herein. The Debtors are hereby authorized to enter into the Cash Flow DIP Documents, and the Cash Flow DIP Documents are hereby approved as described further below.

2. All objections to and reservations of rights with respect to the interim relief sought in the Motion and to the entry of the Interim DIP Order to the extent not withdrawn or resolved are hereby denied and overruled on the merits in their entirety.

3. ***Effectiveness***. Subject to the terms hereof, this Interim DIP Order shall become immediately effective and enforceable *nunc pro tunc* to the Petition Date, upon the date this Interim DIP Order is signed by the Bankruptcy Court and entered on the docket in the Chapter 11 Cases (the "Interim Order Entry Date"), and there shall be no stay of execution or effectiveness of this Interim DIP Order.

4. ***Authorization of the Cash Flow DIP Facility***.

(a) Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are immediately authorized and empowered to (i) enter into and perform their obligations under the Cash Flow DIP Credit Agreement, (ii) execute and deliver all other Cash Flow DIP Documents required or advisable to effect the Cash Flow DIP Facility, and (iii) take all actions which may be necessary or advisable for the performance by the Debtors under the Cash Flow DIP Documents. The Debtors are hereby authorized on an interim basis to borrow up

to the aggregate principal amount of $25 million, all of which shall be used by the Debtors as permitted by the Cash Flow DIP Documents, including, without limitation, subject to the Approved Budget (as defined below).

(b)    In furtherance of the foregoing and without further approval of this Bankruptcy Court, the Debtors are authorized and empowered to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that the Cash Flow DIP Lender may reasonably determine is required or necessary for the Debtors' performance of their obligations under the Cash Flow DIP Facility, including, without limitation:

(i)    the execution, delivery, and performance of the Cash Flow DIP Documents, including, without limitation, the Cash Flow DIP Credit Agreement and any security and pledge agreements contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the Cash Flow DIP Documents, in each case in such form as the Debtors and other required parties may agree;

(iii)    the non-refundable payment or reimbursement of the reasonable and documented fees, costs and expenses referred to in the Cash Flow DIP Documents, including the fees and expenses of the Cash Flow DIP Lender, and costs and expenses payable under the Cash Flow DIP Documents; and

(iv)    the performance of all other acts required under or in connection with the Cash Flow DIP Documents.

18

(c)    ***Cash Flow DIP Obligations***. Upon execution of the Cash Flow DIP

Documents, the Cash Flow DIP Documents and Cash Flow DIP Obligations shall constitute

valid, binding and non-avoidable obligations of the Debtors enforceable against each person or

entity party to the Cash Flow DIP Documents (a "Cash Flow DIP Party") in accordance with the

terms thereof and the terms of this Interim DIP Order, and any of their successors and assigns,

including any trustee appointed in the Chapter 11 Cases or in any case under chapter 7 of the

Bankruptcy Code upon conversion of the Chapter 11 Cases, or in any other proceedings

superseding or related to any of the foregoing (collectively, the "Successor Cases"). No

obligation, payment, transfer, or grant of security hereunder or under the Cash Flow DIP

Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy

Code or under any applicable law (including under sections 502(d), 544, 547, or 550 of the

Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform

Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance,

reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable,

contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether

equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any

other applicable foreign or domestic law or regulation by any person or entity.

5.    ***Security for the Cash Flow DIP Obligations***.

(a)    Effective immediately upon entry of this Interim DIP Order, the

Bankruptcy Court hereby grants the following valid, binding, enforceable, non-avoidable,

automatically and properly perfected postpetition senior priming security interests and liens

(collectively, the "Cash Flow DIP Liens") to the Cash Flow DIP Lender, in each case to secure

the Debtors' obligations under the Cash Flow DIP Documents: a first-priority priming lien and

security interest, pursuant to section 364(c) and section 364(d) of the Bankruptcy Code, upon all

property identified in (i), (ii) and (iii) below and subject to the relevant priorities described below

and in the Interim DIP Repo Order (in each case, other than Excluded Assets (as defined below))

(collectively, the "Cash Flow DIP Collateral"). The Cash Flow DIP Liens on the Cash Flow DIP

Collateral shall be senior in all respects to the security interests in, and liens on, the Cash Flow

DIP Collateral of each of the Secured Notes Parties and subject only to (A) the Carve-Out,

(B) valid, perfected, and non-avoidable liens on Cash Flow DIP Collateral that are in existence

on the Petition Date, solely to the extent such liens are senior in priority to the Cash Flow DIP

Liens on Cash Flow DIP Collateral and (C) valid and non-avoidable liens on Cash Flow DIP

Collateral that are perfected subsequent to the Petition Date as permitted by section 546(b) of the

Bankruptcy Code solely to the extent such liens are senior in priority to the Cash Flow DIP Liens

on Cash Flow DIP Collateral.

               (i)       First Lien on Unencumbered Property. Pursuant to

section 364(c)(2) of the Bankruptcy Code, and subject and subordinate in all respects to the

Carve-Out, a valid, binding, continuing, enforceable, fully perfected, first priority lien on, and

security interest in, all tangible and intangible prepetition and postpetition property in which any

of the Debtors has an interest, whether existing on or after the Petition Date or thereafter

acquired, that is not subject to a valid, perfected, non-avoidable and enforceable lien or security

interest in existence on or as of the Petition Date (collectively, the "Unencumbered Property"),

including, without limitation, (i) any cash of the Debtors, (subject to the limitations on the Carve-

Out Account set forth herein) and any investment of such cash, inventory, accounts receivable,

other rights to payment whether arising before or on the Petition Date provided that such cash

shall not include any cash that constitutes DIP Repo Collateral, including without limitation the

warehouse related cash accounts at Stearns Lending, or any cash in the Unrestricted Account at

Stearns Lending, contracts, properties, plants, equipment, general intangibles, documents,

instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names,

other intellectual property, equity interests, and any claims and causes of the Debtors; (ii) any

commercial tort claims and causes of action of any of the Debtors and any claims or causes of

action against any directors or officers of the Debtors as well as any proceeds of, or property

recovered in connection with, any successful claims and causes of action against any directors or

officers of the Debtors; and (iii) the proceeds of all of the foregoing; provided that the

Unencumbered Property shall exclude the Excluded Assets, to the extent set forth in the

definition thereof;

        (ii)     Liens Junior to Certain Existing Liens. Pursuant to

section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the

Carve-Out, a valid, binding, continuing, enforceable, fully perfected, junior lien on, and security

interest in, all tangible and intangible prepetition and postpetition property in which any of the

Debtors has an interest (other than the property described below in paragraph 5(a)(iii)) whether

now existing or hereafter acquired and all proceeds thereof, that is subject to valid, perfected and

unavoidable liens or security interests in existence immediately prior to the Petition Date and to

valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected

after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the

"Non-Primed Liens"), which security interests and liens in favor of the Cash Flow DIP Lender

shall be immediately junior to the Non-Primed Liens; and

        (iii)     Liens Priming the Liens of the Secured Notes Parties. Pursuant to

section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the

Carve-Out, a valid, binding, continuing, enforceable, fully perfected, first priority, senior priming

lien on, and security interest in, all Secured Notes Collateral. The Cash Flow DIP Liens on the

Secured Notes Collateral shall be senior in all respects to the security interests in, and liens on,

the Secured Notes Collateral of each of the Secured Notes Parties (including the Adequate

Protection Liens), and subject only to (A) the Carve-Out, (B) valid, perfected, and non-avoidable

liens on Secured Notes Collateral that are in existence on the Petition Date (other than the

Secured Notes Liens), solely to the extent such liens are senior in priority to Secured Notes Liens

on Secured Notes Collateral and (C) valid and non-avoidable liens on Secured Notes Collateral

that are perfected subsequent to the Petition Date as permitted by section 546(b) of the

Bankruptcy Code solely to the extent such liens are senior in priority to the Secured Notes Liens

on Secured Notes Collateral.

(b)    The Cash Flow DIP Liens shall be effective immediately upon the Interim

Order Entry Date.

(c)    The Cash Flow DIP Liens are granted on the Cash Flow DIP Collateral

*nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or

recordation or other filing or notice) of security agreements, control agreements, pledge

agreements, financing statements, mortgages, schedules or other similar documents, or the

possession or control by the applicable agents or Cash Flow DIP Lender. As set forth below in

paragraph 20 of this Interim DIP Order, the Cash Flow DIP Lender may, but shall not be

obligated to, execute, record, file, or notice such security agreements, control agreements, pledge

agreements, financing statements, mortgages, schedules or other similar documents with respect

to the Cash Flow DIP Liens, or possess or control the Cash Flow DIP Collateral, and the

automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent
necessary to implement the foregoing.

6. ***Cash Flow DIP Superiority Claims***. The Cash Flow DIP Lender is hereby
granted superpriority administrative expense claims (the "Cash Flow DIP Superpriority Claims")
pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code against each of the
Debtors to secure such Debtor's Cash Flow DIP Obligations. The Cash Flow DIP Superpriority
Claims shall be senior to all other administrative expense or other claims, including those arising
under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726, 1113, and
1114 of the Bankruptcy Code. Notwithstanding the foregoing, the Cash Flow DIP Superpriority
Claims shall be subject and subordinate in all respects to the Carve-Out and to the DIP Repo
Superpriority Claim against Stearns Lending (which itself shall not be subject to the Carve-Out).

7. ***Security for the DIP Repo Guarantor***.

(a)    In order to provide credit support on behalf of the Debtors and to induce
the DIP Repo Parties to extend credit under the DIP Repo Facility, Blackstone Capital Partners
VI NQ/NF L.P., agreed to guarantee the obligations of Stearns Lending under the DIP Repo
Facility up to the DIP Repo Guarantee Limit. The provision of the DIP Repo Guarantee was a
material inducement to the DIP Repo Agent and the DIP Repo Facility Purchasers extending
postpetition warehouse financing to the Debtors pursuant to the DIP Repo Facility. Additionally,
absent the provision of the DIP Repo Guarantee, the DIP Repo Facility Purchasers would have
provided a lower advance rate under the DIP Repo Facility, which in turn would have increased
the funding need of the Debtors under the Cash Flow DIP Facility on a dollar-for-dollar basis.

(b)    Effective immediately upon entry of this Interim DIP Order, the
Bankruptcy Court hereby grants the following valid, binding, enforceable, non-avoidable,

23

automatically and properly perfected postpetition security interests and liens (collectively, the "DIP Repo Guarantee Liens") to the DIP Repo Guarantor, to secure amounts actually advanced by the DIP Repo Guarantor under the DIP Repo Guarantee[5] for the benefit of the DIP Repo Facility Purchasers up to the DIP Repo Guarantee Limit: a contingent first-priority lien and security interest, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, on the Cash Flow DIP Collateral, which shall arise only upon the full and indefeasible payment and satisfaction of the obligations under the DIP Repo Facility (the "DIP Repo Guarantee Lien Condition"). The DIP Repo Guarantee Liens shall be *pari passu* with the Cash Flow DIP Liens.

(c)        The DIP Repo Guarantee Liens are granted on the Cash Flow DIP Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or any other Cash Flow DIP Party. As set forth below in paragraph 20 of this Interim DIP Order, the DIP Repo Guarantor may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the DIP Repo Guarantee Liens, or possess or control the Cash Flow DIP Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

8.        ***Excluded Assets***. Notwithstanding anything to the contrary in this Interim DIP Order or the Cash Flow DIP Documents, the Cash Flow DIP Collateral shall not include (i) any leasehold interest of a Debtor to the extent the granting of liens on such interest would, after

---

[5]    As announced on the record at the Interim Hearing, as a concession made as part of a broader resolution of potential objections of PIMCO (as defined below) to the Cash Flow DIP Facility, the DIP Repo Guarantor has agreed to waive any fee in connection with the provision of the DIP Repo Guarantee.

giving effect to the Bankruptcy Code or this Interim DIP Order, nonetheless result in the
abandonment, invalidation or unenforceability of any right, title or interest under any lease
governing such leasehold interest or a breach or termination of such lease pursuant to its terms,
(ii) any escrow, fiduciary, or trust account (including funds held in such accounts unless and
until released or distributed to the Debtors), (iii) the Debtors' intellectual property that
constitutes "intent to use" trademarks, to the extent the assignment of the creation or a lien
thereon would violate applicable non-bankruptcy law unless such violation is excused or
permitted under applicable bankruptcy law, (iv) any amount in excess of 65% of the voting
equity interest in any non-U.S. subsidiary of a Debtor, (v) any DIP Repo Collateral (as defined in
the Interim DIP Repo Order), any collection or other accounts maintained under the DIP Repo
Facility, the Unrestricted Account at Stearns Lending, and any proceeds of the DIP Repo
Collateral or such accounts (other than, and solely after the Challenge Period (as defined in the
Interim DIP Repo Order), any excess collateral after deficiencies in respect of the DIP Repo
Facility and the guarantees by the Cash Flow DIP Lender or an affiliate thereof of the DIP Repo
Facility have been paid in full), and any collateral securing the Prepetition Repo Parties under the
Prepetition Agreements (as defined in the Interim DIP Repo Order), (vi) cash in an amount of up
to $75,000 held in a cash collateral account maintained by the Debtors that is pledged to Wells
Fargo Bank, N.A. ("Wells Fargo") to secure any obligations of the Debtors under or in
connection with the WellsOne Commercial Card Agreement, dated on or around January 4, 2017
(as amended, restated, supplemented or otherwise modified from time to time), between the
Debtors and Wells Fargo (vii) the Carve-Out Account (as defined below) (including funds held
in the Carve-Out Account), (viii) the Debtors' claims and causes of action arising under chapter
5 of the Bankruptcy Code (collectively, the "Avoidance Actions") or the proceeds of Avoidance

Actions, and (ix) the proceeds of any of the assets identified in the foregoing clauses (vii) and

(viii) until released or distributed to the Debtors; provided that, (x) subject to entry of the Final

DIP Order, the proceeds of Avoidance Actions shall not be an Excluded Asset (and shall be Cash

Flow DIP Collateral) and (y) the Cash Flow DIP Collateral shall include the Carve-Out Account

to the extent of any surplus, if any, in such account after satisfaction in full of all obligations of

professionals benefiting from the Carve-Out, pursuant to a final order not subject to appeal (the

assets described in the foregoing clauses (i) through (ix), subject to the foregoing proviso, the

"Excluded Assets").

9.    ***Carve-Out***.

a.    *Carve Out*. As used in this Interim DIP Order, the "Carve-Out" shall be

comprised of the following components:

(i)    Clerk and U.S. Trustee Fees. All fees required to be paid to the Clerk of
this Bankruptcy Court and to the Office of the United States Trustee (the
"U.S. Trustee") under section 1930(a) of title 28 of the United States Code
and 31 U.S.C. § 3717 (collectively, the "Clerk and UST Fees").

(ii)    Chapter 7 Trustee Fees. All reasonable fees and expenses up to $100,000
incurred by a trustee under section 726(b) of the Bankruptcy Code (the
"Chapter 7 Trustee Fee Cap").

(iii)    Allowed Claims of Fannie Mae under the Fannie Mae Lender Contract.
The amount of $2,000,000 (the "Fannie Mae Carve-Out") to be deposited
into a segregated account as follows: (1) $1,000,000 to be deposited
within 2 business days of the entry of this Interim DIP Order; and (2)
$1,000,000 to be deposited on the Fannie Mae Deposit Date (as defined
below) and released to Fannie Mae to satisfy allowed claims ("Allowed
Claims") under the Fannie Mae Agreements (as defined in the Interim DIP
Repo Order).

(iv)    Allowed Claims of Freddie Mac under the Freddie Mac Agreements. The
amount of $3,000,000 (the "Freddie Mac Carve-Out") to be deposited into
a segregated account as follows: (1) $1,500,000 to be deposited within 2
business days of the entry of this Interim DIP Order; and (2) $1,500,000 to
be deposited on the Freddie Mac Deposit Date (as defined below) and
released to Freddie Mac to satisfy Allowed Claims under the Freddie Mac
Agreements (as defined in the Interim DIP Repo Order).

     (v)    <u>Allowed Professional Fees Incurred Prior to a Carve-Out Trigger Notice.</u> To the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued and unpaid or paid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the date of delivery by the administrative agent under the Cash Flow DIP Facility (the "<u>Cash Flow DIP Agent</u>") of a Carve-Out Trigger Notice (as defined below), whether allowed by this Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, including the PJT Pre-Notice Restructuring Fee Amount (as defined below) (collectively, the "<u>Pre-Termination Amount</u>"). For purposes of the Carve-Out, Allowed Professional Fees shall exclude (a) any restructuring, sale, success or similar fee of any Professional Person (other than the PJT Restructuring Fee Amount (as defined below)) and (b) fees and expenses of any third party professionals employed by any individual member of the Creditors' Committee (if any).

     (vi)    <u>Allowed Professional Fees Incurred After a Carve-Out Trigger Notice.</u> Allowed Professional Fees of Professional Persons incurred on and after the first business day following delivery by the Cash Flow DIP Agent of the Carve-Out Trigger Notice, subject to an aggregate cap of $3 million *plus* the PJT Post-Notice Restructuring Fee Amount (as defined below) (collectively, the "<u>Post Trigger Notice Carve-Out Fee Cap</u>").

     b.    *Carve-Out Trigger Notice*. Upon the occurrence and during the continuance of any Cash Flow DIP Event of Default (as defined below), the Cash Flow DIP Agent may deliver a written notice invoking the Post Trigger Notice Carve-Out Fee Cap (the "<u>Carve-Out Trigger Notice</u>") to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee, and the lead counsel for the Creditors' Committee (if any), Fannie Mae, and Freddie Mac. The Carve-Out Trigger Notice may be delivered by email (or any other means permitted under the Cash Flow DIP Documents).

     c.    *Delivery of Fee Statements.* No later than five (5) business days after the delivery of a Carve-Out Trigger Notice, each Professional Person shall deliver a statement (each, a "<u>Fee Statement</u>") to the Debtors setting forth a good-faith estimate of the amount of fees and

expenses incurred and unpaid prior to the date of the Carve-Out Trigger Notice. In addition, the

Fee Statement delivered by PJT Partners shall include (i) each restructuring, sale, success and/or

similar fee (such amount, the "PJT Pre-Notice Restructuring Fee Amount") earned on or prior to

the delivery of the Carve-Out Trigger Notice, if any, and (ii) a good faith estimate of each

anticipated restructuring, sale, success and/or similar fee (such amount, the "PJT Post-Notice

Restructuring Fee Amount" and collectively with the PJT Pre-Notice Restructuring Fee Amount,

the "PJT Restructuring Fee Amount") to be earned following the delivery of the Carve-Out

Trigger Notice, if any.

        d.    *Carve-Out Account*. Promptly following the entry of this Interim DIP

Order, the Debtors shall establish a segregated account, which shall not be subject to control of

the Cash Flow DIP Agent (the "Carve-Out Account") but which shall be funded by the Cash

Flow DIP or available funds at Stearns Holdings and in no event from any Excluded Asset.

Amounts funded into the Carve-Out Account in accordance with clause e. below shall be held in

trust to pay the Carve-Out. Following delivery of a Carve-Out Trigger Notice, all Allowed

Professional Fees of Professional Persons shall be paid to the applicable Professional Person first

from the Carve-Out Account in accordance with the order or orders of the Bankruptcy Court

allowing such Allowed Professional Fees. Notwithstanding anything to the contrary in this or

any other Bankruptcy Court order, the Carve-Out Account and the amounts on deposit in the

Carve-Out Account shall be available and used only to satisfy obligations of Professionals

Persons benefitting from the Carve-Out. The failure of the Carve-Out Account to satisfy

Professional Fees in full shall not affect the priority of the Carve-Out. In no way shall the Carve-

Out, the Carve-Out Account, or anything else herein be construed as a cap or limitation on the

amount of Allowed Professional Fees due and payable by the Debtors or that may be allowed by

the Bankruptcy Court at any time (whether by interim order, final order or otherwise). The Cash Flow DIP Collateral shall include the Debtors' reversionary interest in funds held in the Carve-Out Account, if any, after all Allowed Professional Fees that are subject to the Carve-Out have been paid in full pursuant to a final order not subject to appeal.

       e.    *Carve-Out Funding After a Carve-Out Trigger Notice*. The following provisions with respect to the Carve-Out Account shall apply only upon delivery of a Carve-Out Trigger Notice:

      (i)    On the date of the Carve-Out Trigger Notice, the Carve-Out Trigger Notice shall be deemed to constitute a demand to the Debtors to utilize all cash on hand at Stearns Holdings or from the Cash Flow DIP and in no event from any Excluded Asset (the "Cash On Hand") as of such date to fund the Carve-Out Account in an amount equal to (A) the Clerk and UST Fees, (B) the Chapter 7 Trustee Fee Cap, (C) the Pre-Termination Amount (determined based upon the Fee Statements submitted to the Debtors in accordance with clause c. above), (D) the Post Trigger Notice Carve-Out Fee Cap (with respect to the PJT Restructuring Fee Amount, based upon the Fee Statement submitted to the Debtors by PJT Partners), (E) the Fannie Mae Carve-Out, and (F) the Freddie Mac Carve-Out (collectively, the "Aggregate Unfunded Amount") to be held in trust to pay all amounts included in the Carve-Out.

      (ii)    On or after the date of a Carve-Out Trigger Notice, no Cash Flow DIP Party, including the Cash Flow DIP Agent, shall foreclose on or sweep cash of the Debtors (including cash received as a result of the sale or other disposition of any assets and cash provided pursuant to the Cash Flow DIP Facility) until the Carve-Out Account has been fully funded.

      (iii)    All funds in the Carve-Out Account shall be used first to pay the obligations set forth in the definition of the Carve-Out set forth above until paid in full. All payments and reimbursements made from the Carve-Out Account shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

       f.    *Payment of Compensation*. Following delivery of a Carve-Out Trigger Notice, the Debtors shall be permitted to pay fees and expenses allowed and payable by order of the Bankruptcy Court (that has not been vacated or stayed, unless the stay has been vacated)

under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable from the Carve-Out Account.

g.      *Procedures for Funding and Release of the Fannie Mae Carve-Out.*

Within two business days following the entry of this Interim DIP Order, the Debtors shall (i) establish a segregated account (the "Fannie Mae Carve-Out Account"), which shall not be subject to control of the Cash Flow DIP Agent and which shall be separate from the Carve-Out Account, and (ii) deposit $1,000,000 into the Fannie Mae Carve-Out Account, which shall be funded from the Cash Flow DIP or from cash available at Stearns Holdings but in no event from any Excluded Asset. The Debtors shall fund an additional $1,000,000 into the Fannie Mae Carve-Out Account on the earlier of the following dates (the "Fannie Mae Deposit Date"): (i) delivery of the Carve-Out Trigger Notice; (ii) the confirmation of a plan by any of the Debtors (unless all Fannie Mae Agreements have been assumed and any cure claim satisfied); (iii) conversion or dismissal of any of the Debtors' respective bankruptcy cases; (iv) entry of an agreement or series of agreements by one or more of the Debtors to sell substantially all of the assets owned thereby outside of the ordinary course of business (unless all Fannie Mae Agreements have been assumed and any cure claim satisfied); (v) termination of the obligation or commitment of the Cash Flow DIP Lender to make incremental loans to the Debtors for any reason; (vi) the filing of a motion, pleading or other document that would have the effect of rejecting any of the Fannie Mae Agreements, if granted; and (vii) the occurrence of a post-petition payment default under any of the Fannie Mae Agreements that has not been cured after five (5) days' written notice. The Fannie Mae Carve-Out shall be held in trust and released to Fannie Mae to pay any Allowed Claims related to any of the Fannie Mae Agreements promptly upon such allowance. Notwithstanding any other provision of this Interim DIP Order or any

other Bankruptcy Court order, the Debtors shall not grant any party a lien or security interest in
the Fannie Mae Carve-Out Account. The Fannie Mae Carve-Out is not a cap on the amount of
any Allowed Claim under any of the Fannie Mae Agreements and all other rights related thereto
are reserved, including any priorities, collateral, third party claims and rights under the
Bankruptcy Code (including without limitation all rights accorded to repurchase agreements,
securities contracts or master netting agreements). To the extent that any surplus remains in the
Fannie Mae Carve-Out after resolution of all potential claims under any of the Fannie Mae
Agreements (which shall be deemed to have occurred if the Fannie Mae Agreements have been
assumed and all related cure claims have been paid), the balance of the Fannie Mae Carve-Out
shall be remitted as directed by the Cash Flow DIP Agent or order of the Bankruptcy Court.

        h.      *Procedures for Funding and Release of the Freddie Mac Carve-Out*.
Within two business days following the entry of this Interim DIP Order, the Debtors shall
(i) establish a segregated account (the "Freddie Mac Carve-Out Account"), which shall not be
subject to control of the Cash Flow DIP Agent and which shall be separate from the Carve-Out
Account, and (ii) deposit $1,500,000 into the Freddie Mac Carve-Out Account, which shall be
funded from the Cash Flow DIP or from cash available at Stearns Holdings but in no event from
any Excluded Asset. The Debtors shall fund an additional $1,500,000 into the Freddie Mac
Carve-Out Account on the earlier of the following dates (the "Freddie Mac Deposit Date"): (i)
delivery of the Carve-Out Trigger Notice; (ii) the confirmation of a plan by any of the Debtors
(unless all Freddie Mac Agreements have been assumed and any cure claim satisfied); (iii)
conversion or dismissal of any of the Debtors' respective bankruptcy cases; (iv) entry of an
agreement or series of agreements by one or more of the Debtors to sell substantially all of the
assets owned thereby outside of the ordinary course of business (unless all Freddie Mac

Agreements have been assumed and any cure claim satisfied); (v) termination of the obligation

or commitment of the Cash Flow DIP Lender to make incremental loans to the Debtors for any

reason; (vi) the filing of a motion, pleading or other document that would have the effect of

rejecting any of the Freddie Mac Agreements, if granted; and (vii) the occurrence of a post-

petition payment default under any of the Freddie Mac Agreements that has not been cured after

five (5) days' written notice. The Freddie Mac Carve-Out shall be held in trust and released to

Freddie Mac to pay any Allowed Claims related to any of the Freddie Mac Agreements promptly

upon such allowance. Notwithstanding any other provision of this Interim DIP Order or any

other Bankruptcy Court order, the Debtors shall not grant any party a lien or security interest in

the Freddie Mac Carve-Out Account. The Freddie Mac Carve-Out is not a cap on the amount of

any Allowed Claim under any of the Freddie Mac Agreements and all other rights related thereto

are reserved, including any priorities, collateral, third party claims and rights under the

Bankruptcy Code (including without limitation all rights accorded to repurchase agreements,

securities contracts or master netting agreements). To the extent that any surplus remains in the

Freddie Mac Carve-Out after resolution of all potential claims under any of the Freddie Mac

Agreements (which shall be deemed to have occurred if the Freddie Mac Agreements have been

assumed and all related cure claims have been paid), the balance of the Freddie Mac Carve-Out

shall be remitted as directed by the Cash Flow DIP Agent or order of the Bankruptcy Court.

10.    ***Fees and Expenses***. The Debtors are authorized and directed to pay any and all

reasonable and documented fees and expenses described in this paragraph 10 and paragraph 15

below no later than ten (10) days after receipt (via electronic mail) by (i) the Debtors, (ii) counsel

for the Debtors, (iii) the U.S. Trustee, and (iv) counsel for the Creditors' Committee (if any)

(collectively, the "Fee Notice Parties"), of an invoice (which need not contain any itemized

details as to the relevant fees and expenses), in connection with the Chapter 11 Cases, whether

incurred before, on or after the Petition Date and whether or not the transactions contemplated

hereby are consummated. The Debtors shall indefeasibly pay or reimburse the Cash Flow DIP

Lender for its respective reasonable fees and out-of-pocket costs, expenses and charges,

including, but not limited to, the reasonable fees, costs, and expenses of Simpson Thacher &

Bartlett LLP, as counsel to the Cash Flow DIP Lender, and any other advisors or professionals

retained by the Cash Flow DIP Lender. For the avoidance of doubt, none of the fees, costs, and

expenses of the Cash Flow DIP Lender, FTI Consulting, Inc. (financial advisor to PIMCO (as

defined below)), Hogan Lovells US LLP (counsel to PIMCO), the Secured Notes Indenture

Trustee, or Reed Smith LLP (counsel to the Secured Notes Indenture Trustee) shall be subject to

Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment

shall be required to file with respect thereto any interim or final fee application with the

Bankruptcy Court. Such fees and expenses shall not be subject to any offset, defense, claim,

counterclaim or diminution of any type, kind or nature whatsoever. All fees, costs and expenses

payable under the Cash Flow DIP Documents to the Cash Flow DIP Lender shall be included

and constitute part of the Cash Flow DIP Obligations and be secured by the Cash Flow DIP

Liens. For the avoidance of doubt, the Debtors shall be responsible to pay, subject to the

procedures outlined in this paragraph, all reasonable and documented fees and expenses incurred

by the Cash Flow DIP Lender in connection with any action taken in the Chapter 11 Cases,

including, but not limited to, acting as a plan sponsor pursuant to any plan of reorganization for

the Debtors. Further, the upfront fee payable by Stearns Lending other than from Excluded

Assets to the Cash Flow DIP Lender (equal to 2.00% of the commitment of the Cash Flow DIP

Lender under the Cash Flow DIP Facility), which is deemed fully earned and nonrefundable on

the Interim Order Entry Date, shall be payable pursuant to the terms of the Cash Flow DIP

Documents.

11. ***No Direct Obligation to Pay Professional Fees***. The Cash Flow DIP Lender shall

not be responsible for payment or reimbursement of any fees or disbursement of any Professional

Person incurred in connection with these Chapter 11 Cases, any Successor Cases, or otherwise.

Nothing in this Interim DIP Order or otherwise shall be construed: (a) to obligate the Cash Flow

DIP Lender in any way to pay compensation to, or reimburse the expenses of, any Professional

Person or to guarantee that the Debtors have sufficient funds to pay such compensation or

reimbursement; (b) as consent to the allowance of any fees and expenses of Professional Persons;

or (c) to affect the rights of the Cash Flow DIP Lender, or any other party in interest, to object to

the allowance and payment of such fees and expenses.

12. ***Restrictions on Use of Proceeds of Cash Flow DIP Facility***.

(a)    No portion of the Carve-Out, any cash collateral, any other Cash Flow DIP

Collateral, or any proceeds of the Cash Flow DIP Facility shall be used for the payment of

professional fees, disbursements, costs or expenses incurred by any person, including, without

limitation, the Debtors, the Creditors' Committee, any trustee or other estate representative

appointed in the Chapter 11 Cases or any Successor Case, or any other party, for any of the

following actions or activities without the written consent of the Cash Flow DIP Lender: (a) to

seek authorization to obtain liens or security interests on any asset of the Debtors that are senior

to, or on a parity with, the Cash Flow DIP Liens, the Cash Flow DIP Collateral, or the Cash Flow

DIP Superpriority Claims; (b) to seek authorization to obtain claims against the Debtors or their

property that are senior to, or *pari passu* with, the liens and claims identified in the preceding

sub-clause (a); or (c) except as expressly set forth herein, directly or indirectly prepare, assert,

join, commence, support, or prosecute any action for any claim, counterclaim, action,

proceeding, application, motion, objection, defense, or other contested matter seeking any order,

judgment, determination, or any other relief against, or adverse to the interests of, the Cash Flow

DIP Lender and any of its representatives with respect to any transaction, occurrence, omission,

action, or other matter, including, without limitation, (i) any Avoidance Action, (ii) any "lender

liability" claims and causes of action, (iii) any action with respect to the validity, enforceability,

priority and extent of, or asserting any defense, counterclaim, or offset to, the Cash Flow DIP

Liens, the Cash Flow DIP Superpriority Claims, or the Cash Flow DIP Obligations, (iv) any

action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid, or subordinate,

in whole or in part, any of the obligations identified in the preceding clause (iii), (v) any action

seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits

granted to the parties hereunder or under any of the documents referred to herein, including

claims, proceedings, or actions that might prevent, hinder, or delay any of such parties'

assertions, enforcement, realizations, or remedies on or against their collateral and rights herein,

or (vi) objecting to, contesting with, or interfering with, in any way, such parties' enforcement or

realization upon any of their collateral or rights, once a Cash Flow DIP Event of Default has

occurred; provided that the Debtors shall be permitted to challenge the validity of any alleged

Cash Flow DIP Event of Default.

13.    *Limitation of Liability*. The Cash Flow DIP Lender shall have no liability to any

third party relating to the Cash Flow DIP Documents and the Debtors' use of the liquidity

provided thereunder and shall not, by virtue of entering into the transactions contemplated by the

Cash Flow DIP Facility or otherwise complying with the Cash Flow DIP Documents or this

Interim DIP Order, be deemed to be in control of the operations of the Debtors, or to owe any

fiduciary duty to the Debtors, their respective creditors, shareholders, or estates. The Debtors

shall, and are hereby authorized to, indemnify and hold harmless the Cash Flow DIP Lender and its affiliates and representatives from and against all losses, liabilities, claims, damages, penalties, actions, judgments, suits, expenses or disbursements of any nature whatsoever arising out of or relating to the Cash Flow DIP Documents or this Interim DIP Order, including the syndication of any obligations thereunder, and the Debtors' use of the liquidity provided thereunder; provided, however, that the foregoing indemnity shall not apply to any actions of any indemnified parties determined in a final non-appealable judgment to constitute fraud or willful misconduct. This indemnification shall survive and continue for the benefit of all such persons or entities.

14.     ***No Obligation to Extend Credit***. The Cash Flow DIP Lender shall have no obligation to make any loan or advance under the Cash Flow DIP Documents, unless all of the conditions precedent listed in Section 6.01 of the Cash Flow DIP Credit Agreement have been satisfied in full or waived by the Cash Flow DIP Lender in its sole discretion.

15.     ***Adequate Protection of the Secured Notes Parties***. Subject to the Carve-Out in all respects, to the extent there is a postpetition diminution in value of the Secured Notes Collateral (including cash collateral), resulting from the use, sale, or lease by the Debtors of the Secured Notes Collateral (including cash collateral), the granting of the Cash Flow DIP Superpriority Claims, the granting of the Cash Flow DIP Liens, the subordination of the Secured Notes Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (collectively, the "Diminution in Value"), the Secured Note Parties are hereby granted, subject to the terms and conditions set forth below, the following Forms of Adequate Protection:

(a)      *Adequate Protection Liens*. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Secured Notes Indenture Trustee (on behalf of itself and the Secured Noteholders) is hereby granted a replacement security interest in and lien on (the "Adequate Protection Liens") the same property of the Debtors on which the Secured Notes Indenture Trustee (on behalf of itself and the Secured Noteholders) had a perfected, first-priority security interest and lien prior to the Petition Date pursuant to the Secured Notes Documents, whether arising prepetition or postpetition, which liens and security interests shall be subordinate only to (A) the Secured Notes Permitted Prior Liens to the extent any such Secured Notes Permitted Prior Liens are senior in priority under applicable non-bankruptcy law to the Secured Notes Liens, (B) the Cash Flow DIP Liens, (C) the DIP Repo Guarantee Liens, and (D) the Carve-Out.

(b)      *507(b) Superpriority Claims*. Pursuant to sections 361 and 364(c)(1) of the Bankruptcy Code, the Secured Notes Indenture Trustee, on behalf of itself and the Secured Noteholders, is hereby granted a superpriority administrative expense claim (the "507(b) Claims") against each of the Debtors solely to the extent of any Diminution in Value of the Secured Notes Collateral, as provided for in section 507(b) of the Bankruptcy Code, which administrative expense claim in the Chapter 11 Cases or any Successor Cases shall be senior to all other administrative expense or other claims, including those arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code; provided that the superpriority administrative expense claim granted to the Secured Notes Indenture Trustee shall be subject and subordinate in all respects to the Cash Flow DIP Superpriority Claims, the DIP Repo Superpriority Claims, and the Carve-Out.

(c)      *Payment of Professional Fees and Expenses.* In addition to the above adequate protection, the Debtors shall pay or reimburse (with funding from the Cash Flow DIP

37

Facility or available funds at Stearns Holdings and in no event from any Excluded Asset) the

reasonable and documented costs and out-of-pocket expenses incurred by the Secured Notes

Indenture Trustee and Pacific Investment Management Company LLC ("PIMCO") with respect

to the administration and proceeding of these Chapter 11 Cases (whether incurred prior to the

Petition Date or thereafter), including the reasonable and documented fees, costs and expenses of

(i) FTI Consulting, Inc. ("FTI"), financial advisor to PIMCO, (ii) Hogan Lovells US LLP

("Hogan Lovells"), counsel to PIMCO, (iii) the Secured Notes Indenture Trustee, and (iv) Reed

Smith LLP, counsel to the Secured Notes Indenture Trustee, for so long as PIMCO and the

Secured Notes Indenture Trustee, as the case may be, (1) are cooperating with the Debtors on

material issues and (2) are not taking positions in or out of Court adverse to the Debtors on

material issues, or encouraging others to do so. Such reasonable and documented professional

fees shall be subject to the process and procedures described in paragraph 10 hereof.[6]

(d)      *Reporting*. As additional adequate protection, the Debtors shall prepare

and deliver to the Secured Notes Indenture Trustee and FTI and Hogan Lovells (and upon

request, PIMCO) on behalf of PIMCO any documents provided to the Cash Flow DIP Lender

and/or the DIP Repo Agent for reporting purposes under the Cash Flow DIP Facility and/or the

DIP Repo Facility.

(e)      *Sufficiency of Adequate Protection*. The Secured Notes Parties are

adequately protected by the Forms of Adequate Protection set forth herein and through the Cash

Flow DIP Facility. The Cash Flow DIP Facility is necessary to allow the Debtors to continue the

operation of their businesses, maintain their value as a going concern, and achieve a successful

plan of reorganization, which will preserve and maximize the value of the Debtors and their

---

[6]      Nothing herein shall impair or prejudice the Secured Notes Indenture Trustee's charging lien or priority of
payment rights under the Secured Notes Documents.

estates for the benefit of the Debtors and all their stakeholders, including the Secured Notes

Parties. The grant of the Cash Flow DIP Liens accordingly will not cause a diminution in the

value of the Secured Notes Parties' interest in the Secured Notes Collateral. The grant of the DIP

Repo Guarantee Liens benefits the Secured Notes Parties because absent provision of the DIP

Repo Guarantee, the advance rates under the DIP Repo Facility would have been lower, which

would have necessitated commensurately higher borrowings under the Cash Flow DIP Facility.

Accordingly, the DIP Repo Guarantee Liens are contingent priming liens (contingent upon

funding actual amounts under the DIP Repo Guarantee and the full and indefeasible payment and

satisfaction of the obligations of Stearns Lending under the DIP Repo Facility) instead of actual

priming liens in respect of additional borrowings under the Cash Flow DIP Facility.

Additionally, the Forms of Adequate Protection are consistent with the Bankruptcy Code. The

Bankruptcy Court therefore finds that the foregoing adequate protection is reasonable and

sufficient to protect the interests of the Secured Notes Parties.

   16. ***Events of Default***.

    (a) Unless further extended or waived by written agreement among the

Debtors and the Cash Flow DIP Lender, the occurrence of any of the following events shall

constitute an event of default (each a "<u>Cash Flow DIP Event of Default</u>"): (i) the failure of the

Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants,

or obligations under this Interim DIP Order or any Final DIP Order; and (ii) an "Event of

Default" as defined under the Cash Flow DIP Documents shall have occurred and is continuing,

unless waived pursuant to the Cash Flow DIP Documents.

    (b) Upon the occurrence and during the continuation of a Cash Flow DIP

Event of Default, the Cash Flow DIP Lender shall (i) deliver a notice of Cash Flow DIP Event of

Default; (ii) declare the principal of and accrued interest, fees, expenses and other amounts under the Cash Flow DIP Documents to be due and payable; (iii) place an administrative hold on any deposit account or securities account that constitutes Cash Flow DIP Collateral; and (iv) upon five (5) business days' written notice to the Debtors (the "Cash Flow DIP Forbearance Period"), exercise all other rights and remedies available to the Cash Flow DIP Lender; provided, however, that, with respect to any Cash Flow DIP Event of Default for the failure to pay all obligations under the Cash Flow DIP Documents in full in cash by the maturity date as set forth in the Cash Flow DIP Credit Agreement (the "Cash Flow DIP Maturity Date"), the Cash Flow DIP Lender may exercise all rights and remedies immediately upon the occurrence of said default.

(c)     Notwithstanding anything herein to the contrary, (i) if a Cash Flow DIP Event of Default exists at the end of the Cash Flow DIP Forbearance Period, then the Cash Flow DIP Lender shall be permitted to immediately exercise all of its other rights and remedies under the Cash Flow DIP Documents, and (ii) the Cash Flow DIP Lender shall not be required to permit any funding or other financial accommodation under the Cash Flow DIP Documents during the Cash Flow DIP Forbearance Period unless and until the foregoing conditions shall have been satisfied during such period. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Bankruptcy Court, to permit the Cash Flow DIP Lender to exercise all rights and remedies under the Cash Flow DIP Documents and under this Interim DIP Order, in accordance with the terms of this Interim DIP Order.

17.     *Amendments, Consents, Waivers, and Modifications*. The Debtors and the Cash Flow DIP Lender are authorized, subject to the Cash Flow DIP Documents, to implement, in

accordance with the terms of the respective Cash Flow DIP Documents, any amendments, waivers, consents or other modifications to or under the Cash Flow DIP Documents without the need for further notice and hearing or any order of this Bankruptcy Court; provided, however, that, without the consent of this Bankruptcy Court after notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the Cash Flow DIP Maturity Date, (ii) increase the commitments thereunder or the rate of interest payable under the Cash Flow DIP Documents (other than imposition of the default rate) or (iii) amend the "Events of Default" or covenants in the Cash Flow DIP Documents to be materially more restrictive to the Debtors than those set forth in the form of Cash Flow DIP Credit Agreement as of the Interim Order Entry Date.

18.     ***Rights of Access and Information***. Without limiting the rights of access and information afforded the Cash Flow DIP Parties under the Cash Flow DIP Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the Cash Flow DIP Lender reasonable access to: (a) the Debtors' premises, (b) knowledgeable officers of the Debtors, (c) the Debtors' books and records, and (d) the Debtors' properties and other collateral of any Debtor against whom such parties are granted Cash Flow DIP Liens under this Interim DIP Order, and the Debtors shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.

19.     ***Approved Budget***. Attached hereto as Exhibit B is a copy of the initial approved budget (together with the permitted variance provisions set forth in the Cash Flow DIP Credit Agreement, the "Approved Budget") setting forth the Debtors' anticipated cash receipts and expenditures for the 13-week period following entry of this Interim DIP Order. The Approved Budget may be modified and amended, and shall be updated and provided to the Cash Flow DIP

41

Lender (x) solely for projection purposes, on the second Friday after the Petition Date and no later than each Friday thereafter, and (y) no later than the Tuesday prior to the end of the fourth week covered by the portion of the then effective Approved Budget, which updated budget pursuant to this clause (y) shall, upon approval by the Cash Flow DIP Lender, constitute the "Approved Budget" until the next update pursuant to this clause (y). Each such Approved Budget shall be accompanied by a Budget Certificate stating that the portions of such 13-week projection so delivered have been prepared on a reasonable basis and in good faith and are based on assumptions believed by the Debtors to be reasonable at the time made and from the best information then available to the Debtors in connection therewith. The Debtors shall file each Approved Budget with the Bankruptcy Court, and serve the same on the U.S. Trustee and the Creditors' Committee, no later than three (3) business days after it has been approved by the Cash Flow DIP Lender; provided that the Debtors reserve their rights to, in connection with entry of the Final DIP Order, request revised Approved Budget notice requirements.

20.    ***Automatic Perfection of Cash Flow DIP Liens***.

(a)    This Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Cash Flow DIP Liens without the necessity of filing or recording financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, taking possession of or control over any assets, or taking any other action to validate or perfect (in accordance with applicable non-bankruptcy law) the Cash Flow DIP Liens or to entitle the Cash Flow DIP Lender to its respective priorities granted herein.

(b)    Notwithstanding the foregoing, the Cash Flow DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of

or control over (including pursuant to a deposit account control agreement), or take any other action in order to validate and perfect, the liens and security interests granted to the Cash Flow DIP Lender hereunder, in each case, without the necessity to pay any mortgage recording fee or similar fee or tax. Whether or not the Cash Flow DIP Lender chooses to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be and hereby are deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination, whether in these Chapter 11 Cases or any Successor Case. The Debtors shall, if requested, execute and deliver to the Cash Flow DIP Lender all such agreements, financing statements, instruments and other documents as the Cash Flow DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the Cash Flow DIP Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(c)     The Debtors are authorized to execute and deliver promptly upon demand by the Cash Flow DIP Lender all such financing statements, mortgages, notices and other documents as the Cash Flow DIP Lender may reasonably request. The Debtors are authorized to, and shall, execute and deliver to the Cash Flow DIP Parties such agreements, financing statements, mortgages, instruments and other documents as the Cash Flow DIP Parties may reasonably request to evidence, confirm, validate, or perfect the Cash Flow DIP Liens, and the failure by the Debtors to execute or deliver any documentation relating to the Cash Flow DIP Liens shall in no way affect the validity, enforceability, non-avoidability, perfection, or priority of such liens.

(d)    In lieu of obtaining such documentation or instruments, a certified copy of the Interim DIP Order may be filed by the Cash Flow DIP Lender with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim DIP Order for filing and recording.

21.    *Automatic Stay Modified*. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Bankruptcy Court, to permit the Cash Flow DIP Lender to exercise all rights and remedies under this Interim DIP Order or the Cash Flow DIP Documents.

22.    *Proofs of Claim*. The Cash Flow DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases, and the Debtors' stipulations in this Interim DIP Order or the Final DIP Order shall be deemed to constitute a timely filed proof of claim. Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including, without limitation, administrative claims) in the Chapter 11 Cases or any Successor Cases shall not apply to the Cash Flow DIP Lender.

23.    *Challenge Period/Investigation Budget*.

(a)    Notwithstanding any other provisions of this Interim DIP Order, the Creditors' Committee and any other party-in-interest (other than the Debtors) are permitted, by no later than (a) with respect to parties-in-interest other than the Creditors' Committee, 75 calendar days after entry of the Final DIP Order, and (b) with respect to the Creditors' Committee, 60 calendar days after the appointment of the Creditors' Committee (as applicable, the "Chapter 11 Challenge Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, to seek to obtain standing to

44

challenge, and to challenge, if standing is obtained (each, a "Challenge") the Debtors'

Stipulations contained herein, or any other stipulations or findings contained in this Interim DIP

Order or any Final DIP Order with respect to the Cash Flow DIP Liens or Cash Flow DIP

Obligations, or the Secured Notes Liens or Secured Notes Obligations, including, without

limitation, any challenge to the validity, priority or enforceability thereof to assert any claim or

cause of action against the Cash Flow DIP Lender or Secured Notes Parties including, without

limitation, whether in nature of a setoff, counterclaim, or defense; provided, that if a Creditors'

Committee is appointed, the Creditors' Committee shall be subject to the Investigation Budget

(as defined below) in accordance with paragraph 23(b). If any of the Chapter 11 Cases are

converted to a case under chapter 7 of the Bankruptcy Code prior to the latest date by which the

Chapter 11 Challenge Period would end pursuant to this paragraph, then any chapter 7 trustee

appointed in such converted case shall have a maximum of thirty (30) calendar days (the

"Chapter 7 Challenge Period" and, together with the Chapter 11 Challenge Period, the

"Challenge Period") after the date that the Chapter 11 Case is converted to bring any such

Challenge.  The Challenge Period may only be extended: (a) with the prior written consent, as

the case may be, of the Cash Flow DIP Lender and the Secured Notes Indenture Trustee (acting

at the direction of the Secured Noteholders) or (b) pursuant to an order of the Bankruptcy Court,

entered after notice and a hearing, and upon a showing of good cause for such extension. Except

to the extent asserted in an adversary proceeding or contested matter filed during the Challenge

Period, the expiration of such Challenge Period (to the extent not otherwise waived or barred),

shall mean that (i) any and all Challenges or potential challenges shall be deemed to be forever

waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements

and stipulations contained in this Interim DIP Order and any Final DIP Order shall be

45

irrevocably and forever binding on the Debtors, the Creditors' Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 7 trustee, without further action by any party or the Bankruptcy Court and all such parties shall be deemed to have absolutely and unconditionally released, waived, and forever discharged and acquitted the Cash Flow DIP Lender and/or Secured Notes Parties and any of their respective controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing (the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, including, without limitation, any claims for recharacterization, subordination, or substantive consolidation, arising out of or relating to (as applicable) the Cash Flow DIP Facility or the Secured Notes, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that any of the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim DIP Order, whether such Released Claims are matured or unmatured or known or unknown; and (iii) all of the Cash Flow DIP Obligations and/or Secured Notes Obligations, as the case may be, shall be deemed allowed on a final basis and the Cash Flow DIP Liens and/or Secured Notes Liens shall

46

be deemed to constitute valid, binding and enforceable encumbrances, and not subject to

avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  Notwithstanding

anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations

contained in this Interim DIP Order or any Final DIP Order shall nonetheless remain binding on

all other parties-in-interest and preclusive except to the extent that such stipulations are expressly

and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their

rights to contest on any grounds any Challenge.  Nothing in this Interim DIP Order vests or

confers on any person, including, without limitation, the Creditors' Committee or any other

statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to

directly or indirectly support or pursue any cause of action, claim, defense, or other right

belonging to the Debtors or their estates.

(b)    ***Investigation Budget.*** If a Creditors' Committee is appointed, the

Creditors' Committee shall be subject to a budget not to exceed $50,000 in connection with the

investigation and prosecution of any challenge to the stipulations or findings contained in this

Interim DIP Order or any Final DIP Order with respect to the Cash Flow DIP Liens or Cash

Flow DIP Obligations, or the Secured Notes Liens or Secured Notes Obligations, including,

without limitation, any challenge to the validity, priority or enforceability thereof to assert any

claim or cause of action against the Cash Flow DIP Lenders and/or the Secured Notes Parties

including, without limitation, whether in nature of a setoff, counterclaim, or defense (the

"Investigation Budget"); provided, that any fees, expenses or costs incurred by the Creditors'

Committee in excess of the Investigation Budget shall not constitute an allowable administrative

expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

24.        *No Third Party Rights*. Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

25.        *Prohibition on Additional Liens*. Except as expressly provided in the Cash Flow DIP Documents or this Interim DIP Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the Cash Flow DIP Obligations have been indefeasibly paid in full in cash, granting liens on or security interests in the Cash Flow DIP Collateral, the Secured Notes Collateral, or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to or *pari passu* with the Cash Flow DIP Liens other than the Carve-Out, unless and until all Cash Flow DIP Obligations are indefeasibly paid in full in cash.

26.        *No Waiver*. This Interim DIP Order shall not be construed in any way as a waiver or relinquishment of any rights that the Cash Flow DIP Lender may have to bring or be heard on any matter brought before the Bankruptcy Court. Similarly, the failure of the Cash Flow DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim DIP Order, the Cash Flow DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Cash Flow DIP Lender.

27.        *Discharge Waiver*. The Debtors expressly stipulate, and the Bankruptcy Court finds and adjudicates, that none of the obligations, liens or superpriority claims granted or approved by this Interim DIP Order shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations, as applicable, have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.

28.    ***Interim DIP Order Controls***. In the event of any inconsistency between the terms and conditions of the Cash Flow DIP Documents and this Interim DIP Order, the provisions of this Interim DIP Order shall govern and control solely to the extent of the inconsistency.

29.    ***Survival***. The provisions of this Interim DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which the Bankruptcy Court abstains from hearing the Chapter 11 Cases or any Successor Case. The terms and provisions of this Interim DIP Order, including the claims, liens, security interests and other protections granted pursuant to this Interim DIP Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided in this Interim DIP Order until all obligations related thereto have been paid in full.

30.    ***Preservation of Rights Under this Interim DIP Order***.

(a)    Without in any way limiting the preceding paragraph, if an order dismissing the Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, the Debtors shall request that such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the liens and superpriority claims granted pursuant to this Interim DIP Order shall continue in full force and effect, shall maintain their priority as provided in this Interim DIP Order and shall, notwithstanding such dismissal, remain binding on all parties in interest until all obligations pertaining thereto shall have been indefeasibly paid in full in cash (with interest) and the related

commitments shall have been terminated in accordance with their terms and (ii) the Bankruptcy Court shall retain non-exclusive jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and obligations.

(b)    If any or all of the provisions of this Interim DIP Order are hereafter reversed, stayed, modified or vacated, such reversal, stay, modification or vacation shall not affect (i) the validity and enforceability of any obligations incurred prior to the actual receipt by the affected parties of written notice of the effective date of such reversal, stay, modification or vacation and (ii) the validity and enforceability of the liens and superpriority claims authorized or created hereby. Notwithstanding any such reversal, stay, modification or vacation, the obligations incurred by the Debtors hereunder and under the applicable documents, prior to the actual receipt of written notice of the effective date of such reversal, stay, modification or vacation, shall be governed in all respects by the original provisions of this Interim DIP Order, and the parties shall be entitled to all the rights, remedies, privileges and benefits of sections 363(m) and 364(e) of the Bankruptcy Code, this Interim DIP Order and pursuant to the applicable documents.

31.    ***Rights Under Sections 363(k) and 1129(b)***. Unless otherwise ordered by the Bankruptcy Court for cause, the Cash Flow DIP Lender shall have the right to credit-bid the full amount of the Cash Flow DIP Obligations in any sale or disposition of the Cash Flow DIP Collateral as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the Cash Flow DIP Documents, without the need for further Bankruptcy Court order authorizing the same and whether such sale is effectuated through section 363(k) and/or section 1129(b) of the Bankruptcy Code or otherwise because, among other things, the denial of

such rights would result in the Cash Flow DIP Obligations not receiving the indubitable equivalent of their claims.

32.     ***No Consent***. No action, inaction or acquiescence by the Cash Flow DIP Lender, including funding the Debtors' ongoing operations under this Interim DIP Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the Cash Flow DIP Lender to a charge against the Cash Flow DIP Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code.

33.     ***Binding Effect; Successors and Assigns***. The Cash Flow DIP Documents and the provisions of this Interim DIP Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the Cash Flow DIP Lender, the Creditors' Committee or any trustee or examiner appointed in these Chapter 11 Cases, and the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any Successor Cases, or upon any dismissal of any such chapter 11 or chapter 7 case, and shall inure to the benefit of the Cash Flow DIP Lender and the Debtors, and their respective successors and assigns.

34.     ***No Duty to Monitor Compliance***. The Cash Flow DIP Lender shall not (i) have any obligation with respect to any Debtor's use of cash collateral or the use of proceeds of the Cash Flow DIP Facility; (ii) be obligated to ensure or monitor any Debtor's compliance with any financial covenants, formula, or other terms and conditions of the Cash Flow DIP Documents; or (iii) be obligated to pay any expenses incurred or authorized to be incurred pursuant to the Cash Flow DIP Documents.

35.     *Final Hearing*. The Final Hearing is scheduled for July 31 2019 at 2:00 p.m. (Eastern Time) before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, the United States Bankruptcy Court for the Southern District of New York. Any objections to the entry of the Final DIP Order shall be filed and served on the following parties so as to be received seven days prior at 4:00 p.m. (Eastern Time): (a) counsel to the Debtors, (b) the U.S. Trustee, (c) the Debtors' 30 largest unsecured non-insider creditors, (d) the Debtors' five largest secured creditors, (e) counsel to the Secured Notes Indenture Trustee, Reed Smith LLP, 1201 N. Market Street, Suite 1500, Wilmington, DE 19801 (Attn:  Kurt F. Gwynne and Jason D. Angelo), (f) counsel to Pacific Investment Management Company LLC, Hogan Lovells US LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067 (Attn: Bennett L. Spiegel and Stacey Rosenberg), (g) counsel to the Cash Flow DIP Lender, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff and Jamie Fell), (h) counsel to Barclays Bank PLC, Hunton Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166 (Attn: Peter S. Partee, Sr., Brian Clarke), (i) co-counsel to Nomura Corporate Funding Americas LLC, Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Mark Shinderman and Lauren C. Doyle) and Alston & Bird LLP, 90 Park Avenue, New York, NY 10016 (Attn: Karen Gelernt), (j) counsel to Fannie Mae, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: Stephen H. Warren), (k) counsel to Freddie Mac, McKool Smith, P.C., 600 Travis Street, Suite 7000, Houston, TX 77002 (Attn: Paul D. Moak), and One Bryant Park, 47th Floor, New York, NY 10036 (Attn: Kyle A. Lonergan), (l) counsel to Ginnie Mae, 451 7th Street SW, Room 9250, Washington, DC 20410 (Attn: Lisa Mulrain and Lynne Chandler) and Director, Monitoring & Asset Management to Ginnie Mae, 425 3rd Street SW, Suite 500, Washington, DC 20024 (Attn: Rene Mondonedo), and (m) all parties required by Local Bankruptcy Rule 9013-1(b).

19-12226-scc    Doc 91    Filed 07/11/19    Entered 07/11/19 08:46:11    Main Document
Pg 53 of 174


36.     ***Retention of Jurisdiction***. This Bankruptcy Court has and shall retain jurisdiction

to enforce this Interim DIP Order according to its terms to the fullest extent permitted by law.


Dated: July 11, 2019
       New York, New York

                                        /S/ Shelley C. Chapman
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A to the Interim DIP Order</u>**

Cash Flow DIP Credit Agreement

EXECUTION VERSION

---

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
TERM LOAN AGREEMENT
DATED AS OF
JULY 11, 2019**

**AMONG**

**STEARNS HOLDINGS, LLC,
A DEBTOR-IN-POSSESSION,
AS HOLDINGS**

**STEARNS LENDING, LLC,
A DEBTOR-IN-POSSESSION,
AS BORROWER,**

**THE GUARANTORS PARTY HERETO FROM TIME TO TIME,**

**AND**

**BLACKSTONE CAPITAL PARTNERS VI NQ/NF L.P. AND BLACKSTONE FAMILY INVESTMENT
PARTNERSHIP VI-NQ - ESC L.P.,
AS THE LENDER**

---

# TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS AND ACCOUNTING MATTERS ................................................2

    Section 1.01    Terms Defined Above ...............................................................2
    Section 1.02    Certain Defined Terms ..............................................................2
    Section 1.03    Terms Generally; Rules of Construction ................................20
    Section 1.04    Accounting Terms and Determinations; GAAP ......................21

**ARTICLE II** THE CREDITS ................................................................................................21

    Section 2.01    Existing Loans and Commitments...........................................21
    Section 2.02    Loans .......................................................................................21
    Section 2.03    Requests for Loans .................................................................22
    Section 2.04    Funding of Loans....................................................................23
    Section 2.05    Termination of Commitments and Reduction of Delayed Draw
                  Commitments ..........................................................................23
    Section 2.06    Priority and Liens ...................................................................23
    Section 2.07    Payment of Obligations ..........................................................24
    Section 2.08    No Discharge; Survival of Claims...........................................24

**ARTICLE III** PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES .....24

    Section 3.01    Repayment of Loans................................................................24
    Section 3.02    Interest ....................................................................................24
    Section 3.03    Prepayments ...........................................................................25
    Section 3.04    Fees.........................................................................................25

**ARTICLE IV** PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS .............26

    Section 4.01    Payments Generally.................................................................26

**ARTICLE V** Taxes ...............................................................................................................26

    Section 5.01    Taxes.......................................................................................26
    Section 5.02    Mitigation Obligations............................................................30

**ARTICLE VI** CONDITIONS PRECEDENT ........................................................................30

    Section 6.01    Conditions Precedent to Effective Date...................................30
    Section 6.02    Each Credit Event....................................................................32

**ARTICLE VII** REPRESENTATIONS AND WARRANTIES ...................................................33

    Section 7.01    Organization; Powers ..............................................................33
    Section 7.02    Authority; Enforceability.........................................................33
    Section 7.03    Approvals; No Conflicts..........................................................33
    Section 7.04    Financial Condition; No Material Adverse Change ................34
    Section 7.05    Litigation ................................................................................34
    Section 7.06    Environmental Matters ...........................................................34
    Section 7.07    Compliance with Laws; No Defaults.......................................35

1

Section 7.08    Investment Company Act ........................................................................35
Section 7.09    Taxes .......................................................................................................35
Section 7.10    ERISA ......................................................................................................35
Section 7.11    Disclosure; No Material Misstatements ..................................................37
Section 7.12    Insurance .................................................................................................37
Section 7.13    Restriction on Liens .................................................................................37
Section 7.14    Subsidiaries .............................................................................................37
Section 7.15    Location of Business and Offices ............................................................37
Section 7.16    Properties; Titles, Etc. .............................................................................38
Section 7.17    Membership and Standing .......................................................................38
Section 7.18    Use of Loans ...........................................................................................38
Section 7.19    Anti-Corruption Laws, Sanctions, OFAC ...............................................38
Section 7.20    Foreign Corrupt Practices .......................................................................39

**ARTICLE VIII** AFFIRMATIVE COVENANTS ...................................................................39

Section 8.01    Financial Statements; Other Information .................................................39
Section 8.02    Notices of Material Events ......................................................................41
Section 8.03    Existence; Conduct of Business ..............................................................42
Section 8.04    Payment of Obligations ...........................................................................42
Section 8.05    Performance of Obligations under Loan Documents ...............................42
Section 8.06    Insurance .................................................................................................42
Section 8.07    Books and Records; Inspection Rights ....................................................43
Section 8.08    Compliance with Laws ............................................................................43
Section 8.09    Further Assurances ..................................................................................43
Section 8.10    Additional Collateral; Additional Guarantors .........................................44
Section 8.11    ERISA Compliance .................................................................................44
Section 8.12    Key Counterparties .................................................................................44
Section 8.13    Lender Call and Meetings .......................................................................45
Section 8.14    Debtors' Professionals; Sale Process .......................................................45

**ARTICLE IX** NEGATIVE COVENANTS ..........................................................................45

Section 9.01    Financial Covenants ................................................................................45
Section 9.02    Debt ........................................................................................................45
Section 9.03    Liens .......................................................................................................46
Section 9.04    Dividends, Distributions and Redemptions .............................................47
Section 9.05    Investments, Loans and Advances ...........................................................48
Section 9.06    Nature of Business ..................................................................................49
Section 9.07    Proceeds of Loans ...................................................................................49
Section 9.08    ERISA Compliance .................................................................................49
Section 9.09    Mergers, Etc. ...........................................................................................50
Section 9.10    Sale of Properties ....................................................................................51
Section 9.11    Environmental Matters ............................................................................52
Section 9.12    Transactions with Affiliates .....................................................................52
Section 9.13    Subsidiaries .............................................................................................52
Section 9.14    Negative Pledge Agreements; Dividend Restrictions ..............................52
Section 9.15    Superpriority Claims ...............................................................................53

2

**ARTICLE X** EVENTS OF DEFAULT; REMEDIES ................................................................53

    Section 10.01  Events of Default ......................................................................53

    Section 10.02  Remedies ..................................................................................57

**ARTICLE XI** MISCELLANEOUS .......................................................................................57

    Section 11.01  Notices .....................................................................................57

    Section 11.02  Waivers; Amendments ............................................................58

    Section 11.03  Expenses, Indemnity; Damage Waiver ...................................59

    Section 11.04  Successors and Assigns ...........................................................60

    Section 11.05  Survival; Revival; Reinstatement ...........................................61

    Section 11.06  Counterparts; Integration; Effectiveness .................................61

    Section 11.07  Severability ..............................................................................62

    Section 11.08  Right of Setoff .........................................................................62

    Section 11.09  Governing Law; Jurisdiction; Service of Process .....................62

    Section 11.10  Headings ..................................................................................63

    Section 11.11  Confidentiality .........................................................................64

    Section 11.12  Interest Rate Limitation ...........................................................64

    Section 11.13  Exculpation Provisions ............................................................65

    Section 11.14  No Third Party Beneficiaries ...................................................65

    Section 11.15  USA Patriot Act Notice ...........................................................65

**ARTICLE XII** GUARANTY ................................................................................................66

    Section 12.01  Guarantee .................................................................................66

    Section 12.02  Right of Contribution ..............................................................66

    Section 12.03  No Subrogation .......................................................................67

    Section 12.04  Guaranty Amendments, Etc. ...................................................67

    Section 12.05  Waivers ....................................................................................68

    Section 12.06  Guaranty Absolute and Unconditional ....................................68

    Section 12.07  Reinstatement .........................................................................69

    Section 12.08  Payments .................................................................................70

    Section 12.09  Releases ...................................................................................70

010395-1769-14324-Active.31181789

**ANNEXES, EXHIBITS AND SCHEDULES**

Annex I                 Commitments

Exhibit A           Form of Note
Exhibit B           Form of Borrowing Request
Exhibit C-1         Form of Effective Date Certificate
Exhibit C-2         Form of Section 8.01(d) Certificate
Exhibit D           Security Instruments
Exhibit E-1         Form of U.S. Tax Compliance Certificate (Foreign Lender/not
                    Partnership)
Exhibit E-2         Form of U.S. Tax Compliance Certificate (Foreign Lender/Partnership)
Exhibit F           Form of Interim DIP Order


Schedule 7.05       Litigation
Schedule 7.06       Environmental Matters
Schedule 7.14       Subsidiaries and Partnerships
Schedule 9.02       Existing Debt
Schedule 9.03       Existing Liens
Schedule 9.05       Investments
Schedule 9.12       Existing Affiliate Transactions

010395-1769-14324-Active.31181789

**THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT** (this "Agreement") dated as of July 11, 2019 is among: Stearns Holdings, LLC, a limited liability company duly formed and existing under the laws of the State of Delaware ("Holdings") which is a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), Stearns Lending, LLC, a limited liability company duly formed and existing under the laws of the State of California (the "Borrower") which is a debtor and debtor-in-possession in the Chapter 11 Cases, the other Guarantors (as defined below), each of which is each a debtor and debtor-in-possession in the Chapter 11 Cases, Blackstone Capital Partners VI NQ/NF L.P. ("BCP VI NQ") and Blackstone Family Investment Partnership VI-NQ - ESC L.P. ("BFIP VI-NQ"; BFIP VI-NQ and BCP VI NQ, collectively, the "Lender").

# R E C I T A L S

A.    On July 9, 2019 (the "Petition Date"), Holdings, the Borrower and certain of their Subsidiaries and Affiliates (collectively, the "Debtors") filed voluntary petitions to commence cases (the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and continued in the possession of their assets and in the management of their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    In connection with the Chapter 11 Cases, the Borrower has requested that the Lender provide a senior secured superpriority term loan facility (the "DIP Facility") in an aggregate principal amount not to exceed $35,000,000.

C.    The Lender has agreed to provide the DIP Facility upon the terms and conditions set forth herein.

D.    To provide guarantees and security for the repayment of the Loans and the payment of the other Secured Obligations of Holdings and the Borrower hereunder and under the other Loan Documents, the Loan Parties are providing to the Lender, pursuant to this Agreement and the other Loan Documents, the following (each as more fully described herein and in the other Loan Documents and subject to the qualifications set forth herein and in the other Loan Documents):

(i)    a guarantee from each of the Guarantors of the due and punctual payment and performance of the Secured Obligations of the Borrower hereunder;

(ii)    pursuant to Bankruptcy Code Section 364(c)(1), with respect to the Secured Obligations of the Loan Parties hereunder and under the other Loan Documents, the Superpriority Claims;

(iii)    pursuant to Bankruptcy Code Section 364(c)(2), subject and subordinate in all respects to the Carve-Out, a perfected first priority lien on, and security interest in, all present and after-acquired property of the Loan Parties not subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or to a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b) (including, after entry of the Final DIP Order, proceeds from the Debtors' avoidance actions under the Bankruptcy Code);

1

(iv)     pursuant to Bankruptcy Code Section 364(c)(3), subject and subordinate in all respects to the Carve-Out, a perfected junior lien on, and security interest in, all present and after-acquired property of the Debtors that is otherwise subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b) (other than the property described in the immediately following clause (v)); and

(v)     pursuant to Bankruptcy Code Section 364(d)(1), subject and subordinate in all respects to the Carve-Out, a perfected first priority priming lien on, and security interest in, all Prepetition Notes Collateral (other than any portion thereof that is otherwise subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date (other than the liens held by the Notes Trustee under the Notes Indenture) or a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b) and in either case, which valid and perfected lien or security interest is senior in priority to all or any portion of the liens held by the Notes Trustee under the Notes Indenture).

E.     All of the claims and the Liens granted hereunder and pursuant to the Loan Documents in the Chapter 11 Cases to the Lender shall be subject to the Carve-Out, but in each case only to the extent provided herein and in the DIP Order.

F.     Pursuant to the terms of the DIP Order, all Secured Obligations will be secured by valid perfected Liens on substantially all of Debtors' assets, having the priorities set forth in the DIP Order.

G.     In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01 Terms Defined Above.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02 Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"13-Week Projection" has the meaning assigned to such term in the definition of "Budget".

"Acceptable Plan" means a Chapter 11 Plan in form and substance reasonably satisfactory to the Lender as to the treatment of claims arising under this Agreement (including the form, structure and conditions effectuating any Sale Transaction if the Lender is the successful bidder in the Sale Transaction), and otherwise in form and substance reasonably satisfactory to the Lender.

2

"Acceptable Sale Order" means an order approving a Sale Transaction in form and substance reasonably satisfactory to the Lender, it being understood and agreed that (i) if the Lender is not the successful bidder in the Sale Transaction, any such order must satisfy the Minimum Repayment Condition to be an "Acceptable Sale Order" hereunder and (ii) if the Lender is the successful bidder in the Sale Transaction, the Sale Transaction will be effectuated pursuant to an Acceptable Plan.

"Acceptable Selection Procedures" means selection procedures approved pursuant to the Acceptable Selection Procedures Order for the Sale Transaction in form and substance reasonably satisfactory to the Lender, which selection procedures shall provide the right of the Lender to effectuate a Sale Transaction pursuant to an Acceptable Plan and Confirmation Order if the Lender is the successful bidder in the Sale Transaction.

"Acceptable Selection Procedures Order" means an order of the Bankruptcy Court approving the Acceptable Selection Procedures in form and substance reasonably satisfactory to the Lender, including mechanics for the designation of the Lender (or a designee thereof) as the "stalking horse" purchaser, which order may be the Disclosure Statement Order.

"Acknowledgment Agreement" means an acknowledgment agreement in the form prescribed by Fannie Mae or Freddie Mac, as applicable, that is required to be executed by the an owner of servicing rights under the Fannie Mae Selling and Servicing Guides or Freddie Mac Sellers' and Servicers' Guides, as applicable, as a condition to such owner pledging such servicing rights.

"Adequate Protection Liens" shall have the meaning assigned to such term in the DIP Order.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Disbursements" means all disbursements by the Borrower and its Subsidiaries, but excluding disbursements on account of restructuring and bankruptcy professional fees and expenses of any Person.

"Aggregate Receipts" means all cash or other collections received from operations in the ordinary course of business excluding proceeds of any Loans.

"Agreement" has the meaning assigned thereto in the preamble hereto.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Loan Parties from time to time concerning or relating to bribery or corruption.

"Applicable Rate" means, for any day, 10.00% per annum.

"Bankruptcy Code" has the meaning assigned to such term in the recitals to this Agreement.

"Bankruptcy Court" has the meaning assigned to such term in the recitals to this Agreement.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning assigned to such term in the preamble hereto.

"Borrowing Request" means a request by the Borrower for a Loan in accordance with Section 2.03.

"Budget" means (a) initially, a 13-week forecast of receipts and disbursements (a "13-Week Projection") (for the 13 weeks commencing on the Effective Date) of the Debtors on a consolidated basis, broken down by week, including (i) individual line items for "Aggregate Receipts," "Aggregate Disbursements" and "Aggregate Professional Expenses," and (ii) anticipated uses of the DIP Facility for such period delivered pursuant to Section 6.01(f), and (b) each proposed updated 13-Week Projection delivered pursuant to Section 8.01(l)(ii)(B).

"Budget Certificate" has the meaning assigned to such term in Section 8.01(l).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Capital Leases" means, in respect of any Person, all leases which are required to be, in accordance with GAAP, recorded as capital leases or financing leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder; provided, however, that all leases of such Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance on February 25, 2016 of the ASU 2016-02 (ASC 842, Leases) shall continue to be treated as operating leases (and any future lease that would have been treated as an operating lease for purposes of GAAP prior to the issuance of ASC 842 shall be treated as an operating lease), in each case for purposes of this Agreement.

"Carve-Out" has the meaning assigned to such term in the DIP Order.

"Cash Equivalents" means any Investment of the types described in Section 9.05(c) through Section 9.05(g).

"Cash Flow DIP Collateral" has the meaning assigned to such term in the DIP Order (and, for the avoidance of doubt, excludes Excluded Assets (as defined in the DIP Order)).

4

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of Holdings, the Borrower or any of their Subsidiaries having a Fair Market Value in excess of $5,000,000 in the aggregate for any calendar year.

"Change in Control" means the occurrence of any of the following events: (a) the adoption or the approval by the holders of Equity Interests of Holdings of a plan relating to the liquidation or dissolution of Holdings, (b) the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any "person" (as defined above), other than a Permitted Holder, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the voting Equity Interests of Holdings, measured by voting power rather than number of shares or (c) Holdings shall cease to Beneficially Own or control, of record, directly, 100% of the outstanding Equity Interests of the Borrower.

"Chapter 11 Cases" has the meaning assigned to such term in the Recitals to this Agreement.

"Chapter 11 Plan" means a plan of reorganization or liquidation with respect to any of the Debtors.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Commitment" means with respect to the Lender, the sum of the Lender's Initial Term Loan Commitment and Delayed Draw Commitment, as applicable, in effect at such time.

"Confirmation Order" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lender, confirming an Acceptable Plan.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Event" has the meaning assigned to such term in Section 6.02.

"Credit Exposure" means, at any time with respect to the Lender, the aggregate outstanding principal amount of the Lender's Loans.

"Debt" means, with respect for any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); (c) in respect of banker's acceptances; (d) in respect of Capital Lease obligations; (e) representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is

acquired or such services are completed; or (f) representing any Hedging Obligations.  In addition, the term "Debt" includes all Debt of others secured by a Lien on any asset of the specified Person (whether or not such Debt is assumed by the specified Person) and, to the extent not otherwise included, the guarantee by the specified Person of any Debt of any other Person. Debt shall be calculated without giving effect to the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Debt for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such indebtedness.

"Debtors" has the meaning assigned to such term in the recitals to this Agreement.

"Default" means any event or condition which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Delayed Draw Availability Period" means the period from and including the date of the entry of the Final DIP Order to the Termination Date.

"Delayed Draw Commitment" means the commitment of the Lender to make the Delayed Draw Loans hereunder set forth on Annex I under the caption "Delayed Draw Commitment" as the same may be reduced by the amount of any reductions of the Delayed Draw Commitments pursuant to Sections 2.01(b) and 2.05(b). The aggregate amount of the Lender's Delayed Draw Commitments on the Effective Date is $10,000,000 plus any unused Initial Term Loan Commitments converted to Delayed Draw Commitments on the date of entry of the Final DIP Order.

"Delayed Draw Loans" means the term loans made by the Lender pursuant to Section 2.01(b).

"DIP Facility" has the meaning assigned to such term in the preamble hereto.

"DIP Order" means collectively, the Interim DIP Order and, upon entry thereof, the Final DIP Order.

"Disclosure Statement Order" has the meaning assigned to such term in the definition of "Milestones."

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Equity Interest), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Equity Interest, in whole or in part, on or prior to the date that is 91 days after the date on which the Loans mature. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Capital Stock solely because the holders of the Equity Interest have the right to require Holdings, the Borrower or any of their Subsidiaries to repurchase such Equity Interest upon the occurrence of a Change of Control or an asset sale will not constitute Disqualified Capital Stock if the terms of such Capital Stock provide that Holdings, the Borrower or any of their Subsidiaries may not repurchase or redeem any such Equity Interests pursuant to such provisions prior to payment in full of the Obligations.  The

010395-1769-14324-Active.31181789

amount of Disqualified Capital Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that Holdings, the Borrower and their Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Capital Stock, exclusive of accrued dividends.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of Holdings that was formed under the laws of the United States of America or any state of the United States of America or the District of Columbia.

"Effective Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived by the Lender).

"Environmental Laws" means any and all federal, state, and local laws, regulations, judicial decisions, orders, decrees, rules, permits, licenses, and other legal restrictions and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.

"Environmental Liabilities" means, as to any Person, all liabilities, obligations, responsibilities, losses, damages, costs, and expenses (including, without limitation, all reasonable fees, disbursements and expenses of counsel, expert and consulting fees and costs of investigation and feasibility studies or other Remedial Actions), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any Environmental Law, permit or order, arising from environmental conditions or the Release or threatened Release of a Hazardous Material into the environment, resulting from the past, present, or future operations of such Person or its Affiliates.

"Environmental Permit" means any permit, registration, license, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder and any successor statute.

"ERISA Affiliate" means any corporation or trade or business (whether or not incorporated) which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Code) as Holdings, the Borrower or any Subsidiary or is under

7

common control (within the meaning of Section 414(c) of the Code and Sections 414(m) and (o) of the Code for purposes of the provisions relating to Section 412 of the Code) with Holdings, the Borrower or any Subsidiary.

"ERISA Event" means (a) a Reportable Event with respect to a Plan, (b) a withdrawal by Holdings, the Borrower or any Subsidiary or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations which is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by Holdings, the Borrower or any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent, (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Plan or Multiemployer Plan, (e) the occurrence of an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, (f) the imposition of any liability to the PBGC under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Holdings, the Borrower or any Subsidiary or any ERISA Affiliate, (g) the failure of Holdings, the Borrower or any Subsidiary or ERISA Affiliate to meet any funding obligations with respect to any Plan or Multiemployer Plan, or (h) a Plan becomes subject to the at-risk requirements in Section 303 of ERISA and Section 430 of the Code.

"Event of Default" has the meaning assigned such term in Section 10.01.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) with respect to the Lender (other than an assignee pursuant to a request by the Borrower under Section 5.02), any U.S. federal withholding tax that is imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) the Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 5.02) or (ii) the Lender changes its lending office, except in each case to the extent that, pursuant to Section 5.01, amounts with respect to such Taxes were payable either to the Lender's assignor immediately before the Lender became a party hereto or to the Lender immediately before it changed its lending office, (c) Taxes attributable to the Lender's failure to comply with Section 5.01(f), and (d) any U.S. withholding Tax that is imposed under FATCA.

"Existing Notes" means Holdings' Senior Secured Notes issued by Holdings under the Notes Indenture, as amended, amended and restated, supplemented or otherwise modified as of the Petition Date.

"Existing Notes Documents" means the Notes Indenture, and any other note documents entered into in connection therewith, any promissory notes, mortgages, deeds of trust, security agreements and instruments, guarantees, collateral or credit support documents, and any other agreements, instruments consents or certificates executed by Holdings, the Borrower or any Subsidiary in connection with, or as security for the payment or performance of, the Existing Notes, in each case, as amended, amended and restated, supplemented or otherwise modified as of the Petition Date.

"Fair Market Value" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the board of directors of Holdings.

"Fannie Mae" means the Federal National Mortgage Association or any successor thereof.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"FHA" means the Federal Housing Administration or any successor thereof.

"Final DIP Order" means the final order of the Bankruptcy Court authorizing and approving the Debtors' entry into under the DIP Facility on a final basis, including the granting of the Liens and Superiority Claims in respect of the DIP Facility in favor of the Lender, which shall be substantially in the form of the Interim DIP Order and include approval of the Delayed Draw Commitment in form and substance reasonably satisfactory to the Borrower and the Lender, with such changes as the Borrower and the Lender reasonably approve.

"Final DIP Order Entry Deadline" means the date that is thirty-five (35) days following the Petition Date, unless such date is extended with the consent of the Borrower and the Lender.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Statements" means the financial statement or statements of the Borrower and its Subsidiaries referred to in Section 7.04(a).

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Freddie Mac" means the Federal Home Loan Mortgage Corporation or any successor thereof.

9

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.04.

"GNMA" means the Government National Mortgage Association or any successor thereof.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over Holdings, the Borrower or any Subsidiary, any of their Properties or the Lender.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereinafter in effect, including, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"GSE" means a government sponsored enterprise of the United States of America, including, without limitation, Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, any Federal Home Loan Bank and any public or privately owned successor entity to any of the foregoing.

"Guaranteed Obligations" has the meaning assigned to such term in Section 12.01(a).

"Guarantors" means each of the Debtors as of the Petition Date (other than Protos Acquisition, LLC and the Borrower) and each other Subsidiary that becomes a Debtor and guarantees the Secured Obligations pursuant to Section 8.10.

"Guides" means, as of the time of reference, (a) the handbooks of HUD and the VA, (b) the Fannie Mae Selling and Servicing Guides, (c) the Freddie Mac Sellers' and Servicers' Guides and (d) the GNMA Mortgage Backed Securities Guides, as in effect at the relevant time.

"Hazardous Material" means any substance, product, waste, pollutant, material, chemical, contaminant, constituent, or other material which is or becomes listed, regulated, or addressed as hazardous, toxic, a pollutant, a contaminant or words of similar meaning under any Environmental Law, including, without limitation, asbestos, petroleum, and polychlorinated biphenyls.

"Hedging Obligations" means, with respect to any specified Person, the obligations of such Person under (a) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements, (b) other agreements or arrangements designed to manage interest rates or interest rate risk and (c) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

010395-1769-14324-Active.31181789

"Highest Lawful Rate" means, with respect to the Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Notes or on other Secured Obligations under laws applicable to the Lender which are presently in effect or, to the extent allowed by law, under such laws from time to time in effect.

"Holdings" has the meaning assigned to such term in the preamble hereto.

"HUD" means the United States Department of Housing and Urban Development or any successor thereof.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document, and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Term Loans" means the term loans made by the Lender pursuant to Section 2.01(a).

"Initial Term Loan Commitment" means the commitment of the Lender to make the Initial Term Loans hereunder in an aggregate amount not to exceed the amount set forth on Annex I under the caption "Initial Term Loan Commitment", as the same may be reduced by the amount of any reduction of the Initial Term Loan Commitment pursuant to Section 2.01(a). The aggregate amount of the Lender's Initial Term Loan Commitments on the Effective Date is $25,000,000.

"Interest Payment Date" means the last Business Day of each month.

"Interim DIP Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit F and otherwise reasonably satisfactory in form and substance to the Borrower and the Lender.

"Interim DIP Repo Order" means that certain Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing Debtors to Enter into Repurchase Agreement Facilities and Related Documents; (B) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course Of Business; (C) Granting Backup Liens and Superpriority Administrative Expense Claims; (D) Modifying the Automatic Stay; (E) Scheduling a Final Hearing; and (F) Granting Related Relief.

"Interim Period" means the period from and including the Effective Date to (but not including) the date that the Final DIP Order is entered by the Bankruptcy Court.

"Investment" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Debt, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. If Holdings or any Subsidiary of Holdings sells or otherwise disposes of any Equity

11

Interests of any direct or indirect Subsidiary of Holdings such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of Holdings, Holdings will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of Holdings' Investments in such Subsidiary that were not sold or disposed of.  The acquisition by Holdings or any Subsidiary of Holdings of a Person that holds an Investment in a third Person will be deemed to be an Investment by Holdings or such Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person.  Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"IRS" means the U.S. Internal Revenue Service.

"Key Counterparties" means any of (i) Fannie Mae, (ii) Freddie Mac, (iii) GNMA, (iv) any provider of Warehousing Indebtedness as of the Effective Date, (v) any offtake parties, servicing buyers or flow loan buyers of Holdings or any Subsidiary that are necessary to continuing conduct of business of Holdings and its Subsidiaries, taken as a whole, (vi) any Hedging Agreement counterparties of Holdings or any Subsidiary that are necessary to continuing conduct of business of Holdings and its Subsidiaries, taken as a whole and (vii) any joint venture or preferred partner of Holdings or any Subsidiary.

"Lender" has the meaning assigned to such term in the preamble hereto.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any option or other agreement to sell or give a security interest in any filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Liquidity" means the sum of (a) all unrestricted cash and Cash Equivalents of the Loan Parties and (b) amounts available to be drawn under the Commitments.

"Loan Documents" means this Agreement, the Note and the Security Instruments.

"Loan Parties" means Holdings, the Borrower and each other Guarantor.

"Loans" means the Initial Term Loans and the Delayed Draw Loans made by the Lender to the Borrower pursuant to this Agreement.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, Property or condition (financial or otherwise) of Holdings and its Subsidiaries, taken as a whole ((i) other than, in the case of the Debtors, (A) the filing of the Chapter 11 Cases and (B) those events which normally result from or relate to the commencement and continuation of a proceeding under Chapter 11 of the Bankruptcy Code and (ii) in the case of the Debtors, taking into account the effect of the automatic stay under the Bankruptcy Code), (b) the ability of the Loan Parties, taken as a whole, to perform any of their

010395-1769-14324-Active.31181789

obligations under any Loan Documents, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of or benefits available to the Lender under any Loan Document.

"Maturity Date" means the date that is six (6) months following the Petition Date.

"MERS" means Mortgage Electronic Registration Systems, Inc., or any successor thereto.

"Milestones" means the following milestones to be completed in each case in accordance with the applicable timing referred to below (or such later dates as may be approved by the Lender):

    (a)    within three (3) days following the Petition Date, the Interim DIP Order shall have been entered;

    (b)    within four (4) days following the Petition Date, the Borrower shall have refinanced the existing Warehousing Facilities of Holdings, the Borrower or any of its Subsidiaries with commitments and/or proceeds from that certain Master Refinancing Agreement, among Stearns Lending, as seller, Barclays Bank PLC, as administrative agent, the purchasers named therein and the other parties party thereto;

    (c)    within three (3) days following the Petition Date, (i) an Acceptable Plan and (ii) a motion to approve Acceptable Selection Procedures shall have been filed with the Bankruptcy Court;

    (d)    on or prior to the Final DIP Order Entry Deadline, the Final DIP Order shall have been entered;

    (e)    within 60 days after the Petition Date, a disclosure statement in form and substance reasonably satisfactory to the Lender with respect to an Acceptable Plan, including Acceptable Selection Procedures, shall have been approved by the Bankruptcy Court (the "Disclosure Statement Order");

    (f)    within 120 days after the Petition Date, an order in form and substance satisfactory to the Lender confirming the Acceptable Plan shall have been entered; and

    (g)    within 135 days of the Petition Date, the Sale Transaction pursuant to the Acceptable Sale Order shall have been consummated or, if the Lender is the successful bidder in the Sale Transaction, a Confirmation Order (as applicable) shall have been consummated and the effective date with respect to an Acceptable Plan shall have occurred.

"Minimum Repayment Condition" means with respect to a Sale Transaction (other than a Sale Transaction in which Lender is the successful bidder), the purchase agreement and sale order related thereto provide that on the sale closing date (which shall occur no later than 115 days after the Petition Date) all of the outstanding Secured Obligations in respect of the DIP Facility shall be indefeasibly paid in full in cash (or such other treatment with respect thereto

010395-1769-14324-Active.31181789

satisfactory to the Lender in its sole discretion), except for contingent indemnification obligations not yet due and payable.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgage Servicing Right" means, with respect to any Person, the right of such Person to receive cash flows in its capacity as servicer of any Receivable or pool of Receivables, together with any assets related thereto that are of the type customarily transferred in connection with securitization transactions or secondary market sales involving assets such as, or similar to, Mortgage Servicing Rights, and any collections or proceeds thereof, including all contracts and contract rights, security interests, financing statements or other documentation in respect of such Mortgage Servicing Rights, all general intangibles under or arising out of or relating to such Mortgage Servicing Rights and any guarantees, indemnities, warranties or other obligations in respect of such Mortgage Servicing Rights. For purposes of determining the amount of a Mortgage Servicing Right at any time, such amount shall be determined in accordance with GAAP, consistently applied, as of the most recent practicable date.

"Multiemployer Plan" means any employee pension plan as defined in Section 3(2) of ERISA covered by Title IV of ERISA that is a multiemployer plan as defined in Sections 3(37) or 4001 (a)(3) of ERISA, to which (a) the Borrower, Holdings, a Subsidiary or an ERISA Affiliate makes, or is obligated to make, contributions or during the preceding five plan years has made, or been obligated to make, contributions or (b) Holdings or a Subsidiary may have any liability or obligation, whether known or unknown, asserted or unasserted, determined or determinable, absolute or contingent, accrued or unaccrued and whether due or to become due.

"Note" means a note of the Borrower payable to the Lender in substantially the form of Exhibit A hereto.

"Notes Indenture" means that certain Indenture, dated as of August 8, 2013 (as supplemented by Supplemental Indenture No. 1, dated as of June 30, 2014 and Supplemental Indenture No. 2, dated as of August 20, 2015) for 9.375% senior secured notes due 2020, among Holdings, Stearns Co-Issuer Inc., the Guarantors party thereto and Wilmington Trust, National Association in its capacity as Trustee and Noteholder Collateral Agent.

"Notes Trustee" means Wilmington Trust, National Association, in its capacity as Trustee and Noteholder Collateral Agent under the Notes Indenture.

"Organizational Documents" means, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and limited liability company agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (e) in any other case, the functional equivalent of the foregoing.

14

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 5.02).

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Permitted Holders" means any of (a) Glenn B. Stearns, (b) any Related Stearns Party, (c) Blackstone Group, L.P. and its controlled affiliates and (d) any Person acting in the capacity of an underwriter in connection with a public or private offering of the Equity Interests of Holdings or any direct or indirect parent entity or securities convertible into or exchangeable or exercisable for such Equity Interests.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"Petition Date" has the meaning assigned to such term in the Recitals to this Agreement.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, other than a Multiemployer Plan, which (a) is currently or hereafter sponsored, maintained or contributed to by Holdings, a Subsidiary or an ERISA Affiliate or (b) Holdings or a Subsidiary may have any liability or obligation, whether known or unknown, asserted or unasserted, determined or determinable, absolute or contingent, accrued or unaccrued and whether due or to become due.

"Prepetition Notes Collateral" means the Loan Parties' assets constituting Collateral (as defined in the Existing Notes Documents).

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including cash, securities, accounts and contract rights.

"Receivables" means mortgage loans together with any assets related thereto that are of the type customarily transferred in connection with securitization transactions involving assets such as, or similar to, such Receivables, and any collections or proceeds of any of the foregoing, including all collateral securing such Receivables, all contracts and contract rights, security interests, financing statements or other documentation in respect of such Receivables, all general intangibles under or arising out of or relating to such Receivables and any guarantees, indemnities, warranties or other obligations in respect of such Receivables.

15

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt. "Redeem" has the correlative meaning thereto.

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Related Stearns Party" means (a) any immediate family member or heir of Glenn B. Stearns; or (b) any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or Persons beneficially holding an 80% or more controlling interest of which consist of Glenn B. Stearns and his immediate family members and heirs.

"Release" means, as to any Person, any release, spill, emission, leaking, pumping, injection, deposit, disposal, disbursement, leaching, or migration of Hazardous Materials into the environment, including, without limitation, the movement of Hazardous Materials through or in the air, soil, surface water or ground water.

"Remedial Action" means all actions required to (a) clean up, remove, treat, or otherwise address Hazardous Materials in the indoor or outdoor environment, (b) prevent the Release or threat of Release or minimize the further Release of Hazardous Materials so that they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"REO Asset" of a Person means a real estate asset owned by such Person and acquired as a result of the foreclosure or other enforcement of a Lien on such asset securing a Receivable or Servicing Advance Receivable.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Responsible Officer" means the chief executive officer, president, chief financial officer, or treasurer of Holdings, the Borrower or any Subsidiary or any Person designated by a Responsible Officer to act on behalf of a Responsible Officer; provided that such designated Person may not designate any other Person to be a Responsible Officer. Any document delivered hereunder that is signed by a Responsible Officer of Holdings, the Borrower or any Subsidiary shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of Holdings, the Borrower or any Subsidiary and such Responsible Officer shall be conclusively presumed to have acted on behalf of Holdings, the Borrower or such Subsidiary.

010395-1769-14324-Active.31181789

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in Holdings or any of its Subsidiaries, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Holdings or any of its Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in Holdings or any of its Subsidiaries.

"Sale Transaction" means the sale of all or substantially all of the assets of the Debtors pursuant to Section 1129 of the Bankruptcy Code pursuant to the Acceptable Selection Procedures.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC or the U.S. Department of State, (b) any Person organized or resident in a Sanctioned Country or (c) any Person owned fifty percent or more or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by OFAC or the U.S. Department of State.

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Secured Obligations" means, without duplication, any and all amounts owing or to be owing by the Borrower or any Guarantor whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising: (a) to the Lender under any Loan Document and (b) all renewals, extensions and/or rearrangements thereof.  Without limitation of the foregoing, the term "Secured Obligations" shall include the unpaid principal of and interest on the Loans (including interest accruing at the then applicable rate provided in this Agreement after the maturity of the Loans), fees, reimbursement obligations and unpaid amounts, fees, expenses, indemnities, costs, and all other obligations and liabilities of every nature of the Borrower, any Subsidiary or any Guarantor, whether absolute or contingent, due or to become due, now existing or hereafter arising under this Agreement or the other Loan Documents.

"Securitization" means a public or private transfer, sale or financing of Servicing Advances and/or mortgage loans, installment contracts, other loans and any other asset capable of being securitized (collectively, the "Securitization Assets") by which Holdings or any of its Subsidiaries directly or indirectly securitizes a pool of specified Securitization Assets including, without limitation,  any such transaction involving the sale of specified Servicing Advances or mortgage loans to a Securitization Entity.

17

"Securitization Assets" has the meaning assigned to such term in the definition of "Securitization."

"Securitization Entity" means (i) any Person (whether or not a Subsidiary of Holdings) established for the purpose of issuing asset-backed or mortgaged-backed or mortgage pass-through securities of any kind (including collateralized mortgage obligations and net interest margin securities) and (ii) any special purpose Subsidiary established for the purpose of selling, depositing or contributing Securitization Assets into a Person described in clause (i) or holding securities in any related Securitization Entity, regardless of whether such person is an issuer of securities; provided that such Person is not an obligor with respect to any Debt of the Borrower or any Guarantor.

"Security Instruments" means the DIP Order and other agreements, instruments or certificates, if any, described or referred to in Exhibit D, and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Borrower or any Guarantor and designated as a "Security Instrument" in connection with, or as security for the payment or performance of the Secured Obligations, as such agreements may be amended, modified, supplemented or restated from time to time.

"Servicing Advance Receivables" means rights to collections in respect of or other rights to reimbursement of Servicing Advances that Holdings or a Subsidiary of Holdings has made in the ordinary course of business and on customary industry terms.

"Servicing Advances" means advances made by Holdings or any of its Subsidiaries (or any joint ventures or preferred partners of Holdings or any Subsidiary) in its capacity as servicer of any mortgage-related receivables to fund principal, interest, escrow, foreclosure, insurance, tax or other payments or advances when the borrower on the underlying receivable is delinquent in making payments on such receivable; to enforce remedies, manage and liquidate REO Assets; or that Holdings or any of its Subsidiaries (or any joint ventures or preferred partners of Holdings or any Subsidiary) otherwise advances in its capacity as servicer, in each case on customary industry terms.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Subsidiary" means any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors, manager or other governing body of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned by Holdings or one or more of its Subsidiaries or by Holdings and one or more of its Subsidiaries.  Unless otherwise indicated herein, each reference to the term "Subsidiary" shall mean a Subsidiary of Holdings.

"Superpriority Claim" means a claim against a Loan Party in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any

18

sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) and/or 726 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, assessments, fees, charges or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) unless the Final DIP Order is entered on or prior to such date, the Final DIP Order Entry Deadline, (c) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of an Acceptable Plan, (d) the date of consummation of the sale of all or substantially all of the assets of Holdings and its Subsidiaries, including without limitation, the Sale Transaction and (e) the date of termination of the Commitments (including an  acceleration of the Secured Obligations pursuant to Section 10.02)  as otherwise provided for herein.

"Testing Date" has the meaning assigned to such term in Section 9.01(b).

"Testing Period" has the meaning assigned to such term in Section 9.01(b).

"Transactions" means, the execution, delivery and performance by the Loan Parties of this Agreement and each other Loan Document, the borrowing of Loans, the use of the proceeds thereof, the guaranteeing of Secured Obligations by the Guarantors, the grant of the security interests and provision of collateral under the DIP Order.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"unrestricted" means, as of any date of determination, all cash and/or Cash Equivalents on the consolidated balance sheet of Holdings which is not "restricted" for purposes of GAAP.

"U.S. Person" means any Person that is a "United States person" as defined in section 7701(a)(30) of the Code.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56), as amended.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 5.01(f)(ii)(B)(3).

 "VA" means the United States Department of Veterans Affairs or any successor thereof.

"Variance Report" means a report in a form and substance reasonably satisfactory to the Borrower and the Lender detailing any variance (whether plus or minus and expressed as a percentage) between (a) the "Aggregate Receipts" of Holdings and its Subsidiaries during the relevant Testing Period against the "Aggregate Receipts" set forth in the Budget for the relevant

010395-1769-14324-Active.31181789

Testing Period and (b) the "Aggregate Disbursements" made during the relevant Testing Period by Holdings and its Subsidiaries against the "Aggregate Disbursements" set forth in the Budget for the relevant Testing Period.

"Warehousing Facility" means any financing arrangement of any kind, including financing arrangements in the form of purchase facilities, repurchase facilities, loan agreements, note issuance facilities and commercial paper facilities (and excluding, in all cases, securitizations), including, in each case, any netting agreements and Hedging Obligations related thereto, with a financial institution or other lender or purchaser, in each case exclusively to (i) finance the purchase, origination or pooling of Receivables by Holdings or any Subsidiary (or any joint ventures or preferred partners of Holdings or any Subsidiary) prior to securitization or sale, (ii) finance Servicing Advances or (iii) finance the carrying of REO Assets related to Receivables; provided that, in each case, such purchase, origination, pooling, funding and carrying is in the ordinary course of business.

"Warehousing Indebtedness" means Debt in connection with a Warehousing Facility.

"Wholly-Owned Subsidiary" means any Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by Holdings or one or more of the Wholly-Owned Subsidiaries or are owned by Holdings and one or more of the Wholly-Owned Subsidiaries.

"Withholding Agent" means the Borrower or any Guarantor.

Section 1.03 Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

010395-1769-14324-Active.31181789

Section 1.04 <u>Accounting Terms and Determinations; GAAP</u>.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Lender hereunder shall be prepared in accordance with GAAP, applied on a basis consistent with the financial statements of Holdings except for changes in which Holdings' independent certified public accountants concur or which are disclosed to the Lender on the next date on which financial statements are required to be delivered to the Lender pursuant to Section 8.01(b); provided that, unless the Borrower and the Lender shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.

## ARTICLE II
## THE CREDITS

Section 2.01 <u>Existing Loans and Commitments</u>.

(a)    <u>Initial Term Loans</u>.    Subject to the terms and conditions set forth herein including the entry of the Interim DIP Order, the Lender agrees to make Initial Term Loans to the Borrower from time to time during the Interim Period (but in any event with respect to Initial Term Loans made pursuant to this Section 2.01(a), limited to a maximum of five (5) borrowings), on any Business Day in a principal amount equal to the amount requested by the Borrower in accordance with <u>Section 2.03(a)</u>, <u>provided</u>, that the Lender will not be required to make Initial Term Loans in an amount that would result in the aggregate amount of Initial Term Loans exceeding the Lender's Initial Term Loan Commitment.    The Initial Term Loan Commitment shall be permanently reduced by the amount of any Initial Term Loan when made during the Interim Period and any remaining Initial Term Loan Commitments shall be converted to Delayed Draw Commitments in accordance with the definition thereof. Amounts paid or prepaid in respect of the Initial Term Loans may not be reborrowed.

(b)    <u>Delayed Draw Loans</u>.    Subject to the terms and conditions set forth herein, including the entry of the Final DIP Order, the Lender agrees to make Delayed Draw Loans to the Borrower from time to time during the Delayed Draw Availability Period (but in any event with respect to Delayed Draw Loans made pursuant to this Section 2.01(b), limited to a maximum of five (5) borrowings), on any Business Day in a principal amount equal to the amount requested by the Borrower in accordance with <u>Section 2.03(b)</u>, <u>provided</u>, that the Lender will not be required to make Delayed Draw Loans in an amount that would result in the aggregate amount of Delayed Draw Loans exceeding the Lender's Delayed Draw Commitment. The Delayed Draw Commitment shall be permanently reduced by the amount of any Delayed Draw Loan when made and any remaining Delayed Draw Commitment shall terminate at the end of the Delayed Draw Availability Period. Amounts paid or prepaid in respect of the Delayed Draw Loans may not be reborrowed.

Section 2.02 <u>Loans</u>.

(a)    Loans.  Each Initial Term Loan and Delayed Draw Loan shall be made by the Lender in accordance with its Initial Term Loan Commitment and Delayed Draw Commitment, respectively.

(b)    Notes.  The Lender may request that the Loans made by it shall be evidenced by a Note of the Borrower, payable to the Lender in a principal amount equal to its Loans, and otherwise duly completed.  The date, amount, and interest rate of each Loan made by the Lender, and all payments made on account of the principal thereof, shall be recorded by the Lender on its books for its Note, and, prior to any transfer, may be endorsed by the Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by the Lender.  Failure to make any such notation or to attach a schedule shall not affect the Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by the Lender of its Note.

Section 2.03 Requests for Loans.

(a)    To request the Initial Term Loans during the Interim Period, the Borrower shall notify the Lender of such request not later than 11:00 a.m., New York City time (or such later time as the Lender may agree in its sole discretion), three Business Days before the date of the proposed borrowing (or such shorter time as the Lender may agree in its sole discretion) by submitting a Borrowing Request. There shall be no more than five (5) borrowings of Initial Term Loans during the Interim Period.  Each such Borrowing Request shall be irrevocable.  Each such written Borrowing Request shall be in substantially the form of Exhibit B and signed by the Borrower and shall specify the following information:

(i)    the aggregate amount of the requested Loans;

(ii)    the date of such borrowing, which shall be a Business Day;

(iii)    the total Credit Exposure on the date thereof (i.e., outstanding principal amount of Loans without regard to the Loans requested);

(iv)    pro forma total Credit Exposure on the date thereof (after giving effect to the Loans requested); and

(v)    the location and number of the Borrower's account to which funds are to be disbursed.

(b)    To request the Delayed Draw Loans, the Borrower shall notify the Lender of such request not later than 11:00 a.m., New York City time, three Business Days before the date of the proposed borrowing.  Each such Borrowing Request shall be irrevocable. There shall be no more than five (5) borrowings of Delayed Draw Loans during the Delayed Draw Availability Period.  Each such written Borrowing Request shall be in substantially the form of Exhibit B and signed by the Borrower and shall specify the following information:

(i)    the aggregate amount of the requested Loans;

(ii)    the date of such borrowing, which shall be a Business Day;

22

(iii)    the total Credit Exposure on the date thereof (i.e., outstanding principal amount of Loans without regard to the Loans requested);

(iv)    pro forma total Credit Exposure on the date thereof (after giving effect to the Loans requested); and

(v)    the location and number of the Borrower's account to which funds are to be disbursed.

(c)    Each Borrowing Request shall constitute a representation that the amount of the requested Loan shall not cause the total Credit Exposure to exceed the total Commitments.

Section 2.04 <u>Funding of Loans</u>.  The Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the account of the Borrower specified in the Borrowing Request.

Section 2.05 <u>Termination of Commitments and Reduction of Delayed Draw Commitments</u>.

(a)    <u>Scheduled Termination of Commitments</u>.    The Initial Term Loan Commitments shall be permanently reduced by the amount of each Initial Term Loan when made during the Interim Period and any remaining Initial Term Loan Commitments on the date of the entry of the Final DIP Order shall be converted to Delayed Draw Commitments in accordance with the definition thereof. The Delayed Draw Commitments shall be permanently reduced by the amount of each Delayed Draw Loan when made during the Delayed Draw Availability Period and any remaining Delayed Draw Commitments shall terminate upon the end of the Delayed Draw Availability Period.

(b)    Optional Termination and Reduction of Delayed Draw Commitments.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Delayed Draw Commitments; provided that each reduction of the Delayed Draw Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000.

(ii)    The Borrower shall notify the Lender of any election to terminate or reduce the Delayed Draw Commitments under Section 2.05(b)(i) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Each notice delivered by the Borrower pursuant to this Section 2.05(b)(ii) shall be irrevocable.  Any termination or reduction of the Delayed Draw Commitments shall be permanent and may not be reinstated.

Section 2.06 <u>Priority and Liens</u>.  The Loan Parties hereby covenant, represent and warrant that, upon entry of the DIP Order, the Secured Obligations of the Loan Parties hereunder and under the other Loan Documents shall have the priority and liens set forth in the DIP Order, in each case subject to the Carve-Out and other liens as further described in the DIP Order.

010395-1769-14324-Active.31181789

Section 2.07 <u>Payment of Obligations</u>. Subject to the DIP Order, upon the occurrence of the Termination Date (whether at maturity, by acceleration or otherwise), the Lender shall be entitled to immediate payment of the Secured Obligations without further application to or order of the Bankruptcy Court.

Section 2.08 <u>No Discharge; Survival of Claims</u>. The Borrower and each Guarantor agrees that (a) any Chapter 11 Plan or any related confirmation order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the Secured Obligations of the Loan Parties to the Lender under this Agreement and the related Loan Documents, other than after the payment in full in cash to the Lender of all Secured Obligations under the DIP Facility and the related Loan Documents on or before the effective date of a Chapter 11 Plan and termination of the Commitments and (b) to the extent its Secured Obligations hereunder and under the other Loan Documents are not satisfied in full, (i) its Secured Obligations arising hereunder shall not be discharged by the entry of such confirmation order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the DIP Order and the Liens granted to the Lender pursuant to the DIP Order shall not be affected in any manner by the entry of such confirmation order.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01 <u>Repayment of Loans</u>.  The Borrower hereby unconditionally promises to pay to the Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02 <u>Interest</u>.

(a)    <u>Interest</u>.  The Loans shall bear interest at the Applicable Rate, but in no event to exceed the Highest Lawful Rate.

(b)    <u>Post-Default Rate</u>.  If any Event of Default has occurred and is continuing, or if any principal of or interest on any Loan or any fee payable by the Borrower pursuant to Section 3.04 or any Guarantor hereunder or under any other Loan Document is not paid when due (after giving effect to any grace period applicable thereto), whether at stated maturity, upon acceleration or otherwise, then all Loans outstanding, and any overdue amount in the case of a failure to pay amounts when due, shall bear interest, after as well as before judgment, at a rate per annum equal to two (2%) plus the respective rates then in effect, but in no event to exceed the Highest Lawful Rate, until such Event of Default has been cured or waived or such amount is fully paid, as the case may be.

(c)    <u>Interest Payment Dates</u>.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; provided that (i) interest accrued pursuant to Section 3.02(b) shall be payable on the earlier of each Interest Payment Date and the date of demand therefor and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

010395-1769-14324-Active.31181789

(d)    Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year) and in each case for the initial borrowing of Loans hereunder, including the day of the borrowing, to but excluding the Interest Payment Date, and thereafter from the Interest Payment Date, to but excluding the next Interest Payment Date.

Section 3.03 Prepayments.  Subject to prior written notice in accordance with Section 3.03(b), the Borrower shall have the right at any time and from time to time to prepay the Loans prior to the Termination Date, in whole or in part, in a minimum aggregate amount of $1,000,000 or any integral multiple of $1,000,000 in excess thereof or, if less, the remaining balance of the Loans; provided that:

(a)    each payment made in accordance with this Section 3.03, or any refinancing, substitution, or replacement of any Loans (including pursuant to any amendment or waiver of this Agreement) that effectuates an optional prepayment pursuant to this Section 3.03, shall be accompanied by accrued interest on the Loans at such time which amount shall be due and payable on the date of the effectiveness of such payment, refinancing, substitution or replacement, and

(b)    the Borrower shall have notified the Lender in writing (which may be by e-mail) of any optional prepayment hereunder not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans or portion thereof to be prepaid; provided that a notice of optional prepayment delivered by the Borrower may state that such notice is conditioned upon the occurrence of any event or transaction, in which case such notice may be revoked by the Borrower (by notice to the Lender on or prior to the specified effective date) if such condition is not satisfied.

Section 3.04 Fees.

(a)    Unused Commitment Fees.  The Borrower agrees to pay to the Lender an unused commitment fee, which shall accrue at 1.00% per annum on the average daily unused amount of the Commitments of the Lender during the period from and including the date of this Agreement to but excluding the date of termination of the entirety of the Delayed Draw Commitment in accordance with the terms hereof.  Accrued unused commitment fees shall be payable in arrears on each Interest Payment Date and on the Termination Date, commencing on the first such date to occur after the date hereof.  All unused commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case such unused commitment fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    Upfront Fees.  The Borrower agrees to pay to the Lender an upfront fee in an amount equal to 2.00% of the Commitment of the Lender on the Effective Date, prior to giving effect to the funding of any Loans on the Effective Date, earned, due and payable on the Effective Date.

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01 <u>Payments Generally</u>.

(a)    <u>Payments by the Borrower</u>.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under Section 5.01 or otherwise) prior to 3:00 pm, New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim. Each payment (including each prepayment) by the Borrower on account of principal on the Loans shall be applied to the outstanding principal amount of the Loans then held by the Lender. Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Lender at its offices specified in writing by the Lender from time to time for such purpose.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)    <u>Application of Insufficient Payments</u>.  If at any time insufficient funds are received by and available to the Lender to pay fully all amounts of principal, interest, and fees then due hereunder, such funds shall be applied to the Secured Obligations in a manner determined by the Lender in its sole discretion.

## ARTICLE V
## TAXES

Section 5.01 <u>Taxes</u>.

(a)    <u>Defined Terms</u>. For purposes of this Section 5.01, the term "applicable law" includes FATCA.

(b)    <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower or a Guarantor, as applicable, shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 5.01) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

010395-1769-14324-Active.31181789

(c)      Payment of Other Taxes by the Borrower. The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender reimburse it for the payment of, any Other Taxes.

(d)      Indemnification by the Borrower. The Borrower shall indemnify the Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Lender on or with respect to any payment by or on account of any obligation of the Borrower or any Guarantor hereunder or in connection with any Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.01) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability under this Section 5.01 shall be delivered to the Borrower by the Lender, and any such certificate shall be conclusive absent manifest error.

(e)      Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or by the Borrower or a Guarantor to a Governmental Authority pursuant to this Section 5.01, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(f)      Status of Lender.

(i)      If the Lender is entitled to an exemption from or reduction of withholding tax with respect to payments under this Agreement or any other Loan Document, it shall deliver to the Borrower, at the time or times prescribed by applicable law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, the Lender, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not the Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.01(f)(ii)(A), Section 5.01(f)(ii)(B) and Section 5.01(f)(ii)(D) below) shall not be required if in the Lender's judgment such completion, execution or submission would subject the Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of the Lender.

(ii)      Without limiting the generality of the foregoing:

(A)      if the Lender is a U.S. Person, it shall deliver to the Borrower on or prior to the Effective Date (and from time to time thereafter at the time or times prescribed by applicable law or upon the reasonable request of the Borrower), executed originals of IRS Form W-9 (or any successor form) certifying that the Lender is exempt from U.S. federal backup withholding tax;

27

(B)      if the Lender is not a U.S. Person it shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or prior to the Effective Date (and from time to time thereafter at the time or times prescribed by applicable law or upon the reasonable request of the Borrower), whichever of the following is applicable:

(1)      in the case the Lender is claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS W-8BEN-E, as applicable (or any successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS W-8BEN-E, as applicable (or any successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      in the case the Lender is claiming that its extension of credit will generate U.S. effectively connected income, executed copies of IRS Form W-8ECI (or any successor form);

(3)      in the case the Lender is claiming the benefits of the exemption for portfolio interest under Section 881 (c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that (A) such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with a U.S. trade or business conducted by the Lender or are effectively connected but are not includible in the Lender's gross income for U.S. federal income tax purposes under an income tax treaty (a "U.S. Tax Compliance Certificate") and (y) executed copies of  IRS Form W-8BEN or IRS W-8BEN-E, as applicable (or any successor form); or

28

(4)      to the extent the Lender is a partnership and one or more direct or indirect partners of the Lender are claiming the portfolio interest exemption, the Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 on behalf of each such direct or indirect partner;

(C)      if the Lender is not a U.S. Person it shall, to the extent it is legally entitled to do so, deliver to the Borrower  (in such number of copies as shall be requested by the recipient) on or prior to the Effective Date (and from time to time thereafter at the time or times prescribed by applicable law or upon the reasonable request of the Borrower), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; and

(D)      if a payment made to the Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if the Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), the Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with their obligations under FATCA and to determine that the Lender has complied with the Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

The Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(g)      Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.01 (including by the payment of additional amounts pursuant to this Section 5.01), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 5.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) if such indemnified party is required to repay such refund to

29

such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Effect of Failure or Delay in Requesting Indemnification.  Failure or delay on the part of the Lender to demand indemnification pursuant to this Section 5.01 shall not constitute a waiver of the Lender's right to demand such indemnification; provided that the Borrower shall not be required to indemnify the Lender pursuant to this Section 5.01 for any Indemnified Taxes or Other Taxes incurred more than 180 days prior to the date that the Lender notifies the Borrower of the event giving rise to such Indemnified Taxes or Other Taxes and of the Lender's intention to claim indemnification therefor; provided further that, if the event giving rise to indemnification is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02 Mitigation Obligations.  If the Borrower is required to pay any additional amount to the Lender or any Governmental Authority for the account of the Lender pursuant to Section 5.01, then the Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of the Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 in the future, and (ii) would not subject the Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to the Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by the Lender in connection with any such designation or assignment.

**ARTICLE VI
CONDITIONS PRECEDENT**

Section 6.01 Conditions Precedent to Effective Date.  The obligations of the Lender to make Loans on or after the Effective Date shall not become effective until the date on which each of the following conditions is satisfied (or waived by the Lender):

(a)    Credit Agreement.  This Agreement and the Note (if requested by the Lender) shall be in form and substance reasonably satisfactory to the Borrower and the Lender and in connection therewith the Lender shall have received from each party hereto counterparts (in such number as may be requested by the Lender) of this Agreement signed on behalf of such party.

(b)    Filings, Registrations and Recordings. The Lender shall have received UCC financing statements required or reasonably requested by the Lender to be filed in order to

create in favor of the Lender a perfected Lien on the Cash Flow DIP Collateral, which shall be in proper form for filing, registration or recordation.

(c)    Chapter 11 Cases. (i) The Chapter 11 Cases shall have been commenced and (ii) the motion to approve the Interim DIP Order and the Final DIP Order, and all "first day motions", "first day orders" and all other orders filed or to be filed at the time of commencement of the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the Lender in all respects.

(d)    Interim DIP Order. The Lender shall have received a signed copy of the Interim DIP Order which shall have been entered by the Bankruptcy Court on or before the third Business Day after the Petition Date, and such Interim DIP Order shall not have been vacated, reversed, modified, amended or stayed.

(e)    Fees. All fees required to be paid to the Lender on or before the Effective Date shall have been paid. All reasonable and documented out-of-pocket expenses (including reasonable and documented fees and expenses of outside counsel) required to be paid to the Lender on or before the Effective Date shall have been paid to the extent invoiced at least one (1) day prior to the Effective Date.

(f)    Initial Budget. The Lender shall have received the initial Budget for the 13-week period following the Effective Date, which shall be in form and substance reasonably satisfactory to the Lender, together with a Budget Certificate.

(g)    No Conflicts. Except as authorized by the Interim DIP Order, there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default under any of the Borrower's, the Guarantors' or their respective subsidiaries' material debt instruments and other material agreements which would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h)    Patriot Act. To the extent requested at least ten (10) Business Days prior to the Effective Date, the Lender shall have received, at least three (3) Business Days prior to the Effective Date, "know your customer" and similar information.

(i)    Perfected Security Interest. The Lender shall have a valid and perfected security interest in the Cash Flow DIP Collateral pursuant to the Interim DIP Order.

(j)    Effective Date Liquidity. The Lender shall have received a certificate of a Responsible Officer of Holdings in form and substance reasonably satisfactory to the Lender certifying that after giving effect to any Loans made as of the Effective Date and any payments required to be made on the Effective Date, Holdings and the other Loan Parties have Liquidity of not less than $25,000,000 (provided that not less than $20,000,000 of such Liquidity shall be in the form of unrestricted cash and Cash Equivalents) on the Effective Date.

(k)    Effective Date Warehousing Availability. The Lender shall have received a certificate of a Responsible Officer of the Holdings in form and substance reasonably satisfactory to the Lender certifying that as of the Effective Date, Holdings, its Subsidiaries and any joint ventures or preferred partners of Holdings or any Subsidiary have, in the aggregate,

31

availability of not less than $1,800,000,000 on the Effective Date under the Warehousing Facilities then in effect.

(l)     Interim DIP Repo Order. The Lender shall have received a signed copy of the Interim DIP Repo Order, and such Interim DIP Repo Order shall not have been vacated, reversed, modified, amended or stayed.

(m)     Key Counterparties.  Holdings and its Subsidiaries shall be continuing to do business with and shall not have received any notice of the intent to cease engaging in business from any Key Counterparties.

(n)     Secretary's Certificates.  The Lender shall have received a certificate of a Responsible Officer of each Loan Party setting forth (i) resolutions of its board of directors or other appropriate governing body with respect to the authorization of such Loan Party to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of such Loan Party (A) who are authorized to sign the Loan Documents to which such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers and (iv) the articles or certificate of incorporation and by-laws or other applicable organizational documents of such Loan Party, certified by a Responsible Officer as being true and complete.  The Lender may conclusively rely on such certificate until the Lender receives notice in writing from such Loan Party to the contrary.

Section 6.02 Each Credit Event.  The obligation of the Lender to make a Loan (the making of each such Loan, a 'Credit Event') is subject to the satisfaction of the following conditions:

(a)     After giving effect to such Credit Event, there shall exist no Default.

(b)     The representations and warranties of Holdings, the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct on and as of the date of such Credit Event, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Credit Event, such representations and warranties shall continue to be true and correct as of such specified earlier date.

(c)     (i) For the Initial Term Loans, the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Lender or (ii) for the Delayed Draw Loans, the Final DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Lender.

(d)     The receipt by the Lender of a Borrowing Request in accordance with Section 2.03(b).

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

Holdings and the Borrower represent and warrants to the Lender that:

Section 7.01 <u>Organization; Powers</u>.    Subject to any restrictions arising on account of Holdings' or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and entry of the Interim DIP Order and the Final DIP Order, each of Holdings and the Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all corporate or equivalent requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to be in good standing or to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02 <u>Authority; Enforceability</u>.    Upon entry of the Interim DIP Order  and subject to any restrictions arising on account of Holdings' or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, the Transactions are within the Borrower's and each Guarantor's corporate or equivalent powers and have been duly authorized by all necessary corporate or equivalent action including any action required to be taken by any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions. Upon entry of the Interim DIP Order, each Loan Document to which a Loan Party is a party has been duly executed and delivered by Holdings, the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of Holdings, the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to entry of the Interim DIP Order and the Final DIP Order and subject to any restrictions arising on account of Holdings' or any Subsidiaries' status under the Bankruptcy Code.

Section 7.03 <u>Approvals; No Conflicts</u>.    Except as otherwise provided in the Interim DIP Order, the Transactions (a) do not require, as a condition thereto, any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including members, shareholders or any class of directors or managers, whether interested or disinterested, of Holdings or any other Person) to be obtained or made by Holdings or any Subsidiary pursuant to any statutory law or regulation applicable to it, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document against the Borrower or any Guarantor as herein provided or the consummation of the transactions contemplated thereby, except such as have been obtained or made and are in full force and effect other than (i) the recording and filing of the UCC-1 financing statements as required by this Agreement and the Interim DIP Order and the Final DIP Order and (ii) those third party approvals or consents which if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation or the Organizational Documents of Holdings or any Subsidiary or any order of any Governmental Authority applicable to Holdings or any Subsidiary, (c) will not violate or result in a default under any indenture or other material instrument binding upon Holdings or any Subsidiary or its Properties, give rise to a right thereunder to require any

payment to be made by Holdings or such Subsidiary or to the extent there is a cap on the amount of first lien loans in any such indenture will not exceed such cap and (d) will not result in the creation or imposition of any consensual Lien by Holdings or any Subsidiary on any Property of Holdings or any Subsidiary (other than the Liens created by the Loan Documents).

Section 7.04    Financial Condition; No Material Adverse Change.

(a)    Holdings has heretofore furnished to the Lender (i) its consolidated balance sheet and statements of income, stockholders equity and cash flows as of and for the fiscal year ended December 31, 2018, reported on by Ernst & Young LLP or other independent public accountants and (ii) its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2019.  The financial statements described in clause (i) of the preceding sentence present fairly, in all material respects, the financial position and results of operations and cash flows of Holdings and its Subsidiaries as of such dates and for such periods in accordance with GAAP, except as therein provided and subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(b)    Since the Petition Date, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

Section 7.05 Litigation.

(a)    Except as set forth on Schedule 7.05, there are no unstayed actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Holdings or the Borrower, threatened in writing against Holdings or any Subsidiary (i) not fully covered by insurance (except for normal deductibles), that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases, or (ii) that involve any Loan Document or the Transactions.

(b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed in Schedule 7.05 that, individually or in the aggregate, has resulted in, or could be reasonably expected to result in, a Material Adverse Effect.

Section 7.06 Environmental Matters.  Except for such matters as set forth on Schedule 7.06 or that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect on Holdings and its Subsidiaries:

(a)    Holdings and its Subsidiaries and each of their respective Properties and operations thereon are, and within all applicable statute of limitation periods have been, in compliance with all applicable Environmental Laws;

(b)    Holdings and its Subsidiaries have obtained all Environmental Permits required for their respective operations and each of their Properties, with all such Environmental Permits being currently in full force and effect, and none of Holdings or its Subsidiaries has received any written notice or otherwise has knowledge that any such existing Environmental

34

Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be denied; and

(c)    None of Holdings or its Subsidiaries has any knowledge of any conditions or circumstances associated with the currently or previously owned or leased Properties or operations of Holdings and its Subsidiaries that could reasonably be expected to give rise to Holdings incurring any material Environmental Liabilities.

Section 7.07 Compliance with Laws; No Defaults.

(a)    Each of Holdings and each Subsidiary (i) is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and (ii) subject to any restrictions arising on account of Holdings' or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and to the entry of the Interim DIP Order and the Final DIP Order, possesses all licenses, permits, franchises, exemptions, approvals and other authorizations granted by Governmental Authorities necessary for the ownership of its Property and the conduct of its business, except in either case where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    No Default has occurred and is continuing.

Section 7.08 Investment Company Act. Neither Holdings nor any Subsidiary is an "investment company" within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09 Taxes.  Each of Holdings and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which Holdings or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP, (b) to the extent not required to be paid pursuant to the Bankruptcy Code or an order of the Bankruptcy Court or (c) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The charges, accruals and reserves on the books of Holdings and its Subsidiaries in respect of Taxes and other governmental charges are, in the reasonable opinion of Holdings, adequate.

Section 7.10 ERISA.

(a)    Except for such noncompliance as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Borrower, Holdings, the Subsidiaries and each ERISA Affiliate have complied with ERISA and, where applicable, the Code regarding each Plan.

(b)    Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Plan is, and has been, established and maintained in substantial compliance with its terms, ERISA and, where applicable, the Code.

010395-1769-14324-Active.31181789

(c)     Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, no act, omission or transaction has occurred which could result in imposition on the Borrower, Holdings, any Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i) or (l) of Section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under Section 409 of ERISA.

(d)     No Plan (other than a defined contribution plan) or any trust created under any such Plan has been terminated in a distress termination under Section 4041(c) of ERISA since January 1, 2000.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect,  (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) neither the Borrower, Holdings, any Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither the Borrower, Holdings, any Subsidiary nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

(e)     Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, full payment when due has been made of all amounts which Borrower, Holdings or any of the Subsidiaries is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof, and no failure of a Plan to meet the minimum funding standards under Section 303 of ERISA or Section 430 of the Code , whether or not waived, exists with respect to any Plan.

(f)     Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the actuarial present value of the benefit liabilities under each Plan which is subject to Title IV of ERISA does not, as of the end of Holdings's most recently ended fiscal year, exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities.

(g)     Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, neither Borrower, Holdings nor any of the Subsidiaries sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in Section 3(1) of ERISA, including any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by Borrower, Holdings or a Subsidiary in its sole discretion at any time.

(h)     Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, neither Holdings nor any of the Subsidiaries sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any Multiemployer Plan.

Section 7.11 <u>Disclosure; No Material Misstatements</u>.  No reports, financial statements, certificates or other written information furnished by or on behalf of Holdings or any Subsidiary to the Lender or any of its Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other written information so furnished, and taken as a whole) contain any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; <u>provided</u> that, with respect to projected financial information, Holdings and the Borrower represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 7.12 <u>Insurance</u>.  Holdings maintains, and has caused to be maintained for each of its Subsidiaries, with financially sound and reputable insurance companies, which may be Affiliates, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations. Holdings will endeavor after the Effective Date in accordance with 8.01(f) to ensure the loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Secured Obligations are endorsed in favor of and made payable to the Lender as its interests may appear, and such policies name the Lender as "additional insureds" and provide that the insurer will endeavor to give at least 10 days prior notice of any cancellation to the Lender.

Section 7.13 <u>Restriction on Liens</u>.  Subject to any restrictions on account of Holdings' or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, neither Holdings nor any of the Subsidiaries is a party to any material agreement or arrangement effective after the Petition Date (other than Capital Leases creating Liens permitted by Section 9.03(c), but then only on the Property subject of such Capital Lease and Warehousing Indebtedness creating Liens permitted by Section 9.03(f)), or, other than as a result of the Chapter 11 Cases, subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Lender on or in respect of their Properties to secure the Secured Obligations and the Loan Documents, except, in each case, as provided in Section 9.14.

Section 7.14 <u>Subsidiaries</u>.  Except as set forth on Schedule 7.14 or as disclosed in writing to the Lender, which shall be a supplement to Schedule 7.14, Holdings has no other Subsidiaries and Holdings has no Foreign Subsidiaries.  Each Subsidiary on such schedule is a Wholly-Owned Subsidiary unless otherwise indicated thereon.

Section 7.15 <u>Location of Business and Offices</u>.  Holdings' jurisdiction of organization is Delaware, the name of Holdings as listed in the public records of its jurisdiction of organization is Stearns Holdings, LLC; and the organizational identification number of Holdings in its jurisdiction of organization is 5898115. The Borrower's jurisdiction of organization is California records of its jurisdiction of organization is Stearns Lending, LLC; and the organizational identification number of the Borrower in its jurisdiction of organization is 201418110250 (or, in each case, as set forth in a notice delivered to the Lender pursuant to Section 8.01(i) in accordance with Section 11.01).  Holdings and the Borrower's principal places of business and chief executive offices are located at the address specified in Section 11.01 (or as

set forth in a notice delivered pursuant to Section 8.01(i) and Section 11.01(c)). Each Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.14 (or as set forth in a notice delivered pursuant to Section 8.01(i)).

Section 7.16 <u>Properties; Titles, Etc.</u>  Other than as a result of the Chapter 11 Cases and subject to any necessary order or authorization of the Bankruptcy Court, Holdings and its Subsidiaries have good and indefeasible title to or valid leasehold interests in the Collateral and its other Properties material to its business, including the Collateral, and none of the Collateral of Holdings is subject to any Lien, except for Liens permitted pursuant hereto.

Section 7.17 <u>Membership and Standing</u>.  The Borrower is an approved member in good standing of the MERS System. The Borrower is an approved servicer, seller/servicer or issuer, as applicable, of mortgage loans for Fannie Mae.  Neither Holdings nor the Borrower have received notice from any Governmental Authority that it intends to terminate or restrict the Borrower's status as an approved servicer in its programs for which the Borrower is registered, approved or authorized.

Section 7.18 <u>Use of Loans</u>.  The proceeds of the Loans shall be used (or shall be deemed to be used) to (a) to provide for working capital and other general corporate purposes of the Debtors, including paying interest and margin payments under Warehousing Indebtedness and Hedging Obligations, capital expenditures authorized and required by the DIP Order, in each case in accordance with the Budget and (b) for fees and expenses related to the Transactions in accordance with the Budget.  No portion of the Loans or the Cash Flow DIP Collateral (including any cash collateral) shall be used in violation of paragraph 12(a) of the Interim DIP Order.  Holdings and its Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of any Loan will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 7.19 <u>Anti-Corruption Laws, Sanctions, OFAC</u>.

(a)    <u>Implementation of Policies and Procedures</u>.  Holdings and the Borrower have implemented and maintain in effect policies and procedures designed to achieve compliance by Holdings, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

(b)    <u>Compliance</u>.  Holdings, the Subsidiaries and, to the knowledge of Holdings and the Borrower, their respective directors, officers, employees and agents are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in Holdings or any Subsidiary being designated as a Sanctioned Person.

(c)    <u>Dealings With Sanctioned Persons</u>.  None of (i) Holdings, the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (ii) to the

38

knowledge of Holdings, the Borrower, any agent of Holdings or the Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  The Borrower will not, in violation of applicable Sanctions, directly or, to its knowledge, indirectly use the proceeds from the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person currently subject to any applicable Sanctions.

Section 7.20 Foreign Corrupt Practices.  Neither Holdings, the Borrower nor any the Subsidiaries, nor any director, officer, agent, employee or Affiliate of Holdings or any of its Subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a material violation by such Persons of the FCPA, including without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA; and, Holdings, the Borrower, its Subsidiaries and its and their Affiliates have conducted their business in material compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest, if applicable, on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents (other than contingent indemnification obligations for which no claim has been made) shall have been paid in full, Holdings and the Borrower covenant and agree with the Lender that:

Section 8.01 Financial Statements; Other Information.  Holdings will furnish to the Lender:

(a)    [Reserved].

(b)    Quarterly Financial Statements.  As soon as available, but in any event in accordance with then applicable law and within the time periods specified in the SEC's rules and regulations applicable to non-accelerated filers, all quarterly financial statements prepared in accordance with GAAP.

(c)    Monthly Operating Reports.  Substantially concurrently with the filing thereof with the Bankruptcy Court, the monthly operating report of the Debtors required to be filed with the Bankruptcy Court.

(d)    Certificate of Financial Officer – Compliance.  Concurrently with any delivery of financial statements under Section 8.01(b), a certificate of a Financial Officer in substantially the form of Exhibit C-2 hereto (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to

39

be taken with respect thereto, (ii) certifying that the Borrower has been in compliance with Section 9.01 as of such times as required therein and in connection therewith setting forth reasonably detailed calculations demonstrating compliance with Section 9.01 and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04(a) that would affect the preparation of the financial statements most-recently required to be delivered in accordance with Section 8.01(b) or the computation of any matter in Section 9.01 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(e)      [Reserved].

(f)      Certificate of Insurer – Insurance Coverage.  Promptly after the Effective Date, a certificate of insurance coverage from each insurer or one or more insurance agencies with respect to the insurance required by Section 8.06, in form and substance reasonably satisfactory to the Lender, and, if requested by the Lender, copies of the applicable policies.

(g)      Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished by Holdings to any holder of debt securities of Holdings or any Subsidiary pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement (including any documents evidencing any Warehousing Indebtedness or the Existing Notes Documents), other than this Agreement and not otherwise required to be furnished to the Lender pursuant to any other provision of this Section 8.01.

(h)      Notice of Casualty Events.  Prompt written notice, and in any event within three Business Days (or if under the circumstances the Lender determines a longer period is reasonable, such longer period) following the knowledge thereof by, a Responsible Officer of Holdings, of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event.

(i)      Information Regarding Borrower and Guarantors.  Prompt written notice (and in any event within ten (10) Business Days thereafter (or such longer period as is acceptable to the Lender,)) of any change (i) in the Borrower's or any Guarantor's company or corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Borrower's or any Guarantor's chief executive office or principal place of business, (iii) in the Borrower's or any Guarantor's identity or company or corporate structure or in the jurisdiction in which such Person is incorporated, organized or formed, (iv) in the Borrower's or any Guarantor's organizational identification number in its jurisdiction of organization, and (v) in the Borrower's or any Guarantor's federal taxpayer identification number.

(j)      Notices of Certain Changes.  Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to any documents evidencing any Warehousing Indebtedness or the Existing Notes Documents or to the Organizational Documents, any preferred stock designation or any other organic document of Holdings or any Subsidiary.

40

(k)    Other Requested Information.  Promptly following any request therefor, (i) such other information regarding the operations, business affairs and financial condition of Holdings or any Subsidiary (including any Plan or Multiemployer Plan and any reports or other information required to be filed under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Lender may reasonably request and (ii) information and documentation reasonably requested by the Administrative Agent or the Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(l)    13-Week Projection; Variance Reports.  (i) On the second Friday after the Petition Date and no later than each Friday thereafter, the Borrower shall provide to the Lender (A) a 13-Week Projection solely for reporting purposes, covering the subsequent thirteen-week period, which period shall commence on the following Monday of each week thereafter and (B) a Variance Report for (1) the one-week period ending on the preceding Friday and (2) the cumulative period covered by the portion of the then effective Budget through the preceding Friday and (ii) no later than the Tuesday prior to the end of the fourth week covered by the portion of the then effective Budget, the Borrower shall provide to the Lender, (A) an updated 13-Week Projection and (B) a certificate of a Financial Officer of the Borrower stating that the portions of such 13-Week Projection so delivered have been prepared on a reasonable basis and in good faith and are based on assumptions believed by the Borrower to be reasonable at the time made and from the best information then available to the Borrower in connection therewith (such certificate, a "Budget Certificate") and such updated 13-Week Projection (the form and substance of which shall be reasonably satisfactory to the Lender), shall, upon approval of the Lender, become the Budget with respect to the line items covered thereby for all purposes herein. Until such time as such updated 13-Week Projection becomes the Budget pursuant to the foregoing, the then existing Budget shall continue in effect for all purposes under this Agreement for the line items covered by such updated 13-Week Projection.

(m)    Motions, etc.  To the extent reasonably practicable at least two days prior to, and in any event no later than one day prior to, such filing or distribution, copies of all pleadings and motions to be filed by or on behalf of the Borrower or any of the Guarantors with the Bankruptcy Court in the Chapter 11 Cases relating to this Agreement, the Sale Transaction or a Chapter 11 Plan, or otherwise seeking a material form of relief (other than emergency pleadings or motions where, despite the Debtors' commercially reasonable efforts, such notice is not feasible).

Documents required to be delivered pursuant to Section 8.01 (b), (g) or (h), to the extent any such documents are included in materials otherwise filed with the SEC or the Bankruptcy Court, may be delivered electronically and shall be deemed to have been delivered to the Lender on the date on which Holdings or the Borrower posts such documents or provides a link thereto on Holdings or the Borrower's website on the Internet at the website address listed in Section 11.01; or such documents are posted on Holdings or the Borrower's behalf on an Internet or intranet website, if any, to which Lender has access.

Section 8.02 Notices of Material Events.  The Borrower will furnish to the Lender prompt written notice of the following:

010395-1769-14324-Active.31181789

(a)    the occurrence of any Default or Event of Default;

(b)    the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting Holdings or any Subsidiary not previously disclosed in writing to the Lender or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lender), in either case, that could reasonably be expected to result in a Material Adverse Effect;

(c)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings and its Subsidiaries in an aggregate amount exceeding $5,000,000; and

(d)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03 Existence; Conduct of Business.  Holdings and the Borrower will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and its rights, licenses and franchises; provided, however, that neither Holdings nor the Borrower shall be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the board of directors or other governing body of Holdings shall determine that the preservation thereof is no longer desirable in the conduct of the business of Holdings and its Subsidiaries, taken as a whole.

Section 8.04 Payment of Obligations.  Except where such payment is not required to be paid pursuant to the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, Holdings and the Borrower will, and will cause each Subsidiary to, pay its obligations, including Tax liabilities of Holdings and all of its Subsidiaries before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate actions, (b) Holdings or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any material Property of Holdings or any Subsidiary.

Section 8.05 Performance of Obligations under Loan Documents.  The Borrower will pay the Loans and other Secured Obligations in respect of the DIP Facility in accordance with the terms hereof, and Holdings will, and will cause each Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including this Agreement, at the time or times and in the manner specified.

Section 8.06 Insurance  Holdings will maintain, for itself and each Subsidiary, insurance with financially sound and reputable insurance companies or associations in such amounts and covering such risks and with such deductibles as is usually carried by companies

010395-1769-14324-Active.31181789

engaged in similar businesses in the same or similar locations in which Holdings and its Subsidiaries operate, including customary directors' and officers' liability insurance.

Section 8.07 <u>Books and Records; Inspection Rights</u>.  Holdings and the Borrower will, and will cause each Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Holdings and the Borrower will, and will cause each Subsidiary to, permit any representatives designated by the Lender, upon reasonable prior notice and during normal business hours, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested, in each case, subject to applicable safety standards, applicable privilege and confidentiality restrictions, and restrictions of owners of such records or properties who are neither Holdings nor any Subsidiary.

Section 8.08 <u>Compliance with Laws</u>.  Subject to any necessary order or authorization of the Bankruptcy Court, Holdings and the Borrower will, and will cause each Subsidiary to, comply in all material respects with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property (including Environmental Laws), except where (i) such law, rule, regulation or order is being contested in good faith by appropriate actions diligently conducted or (ii) the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Holdings and the Borrower will maintain in effect and enforce policies and procedures designed to achieve compliance by it and its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

Section 8.09 <u>Further Assurances</u>.

(a)    Each of Holdings and the Borrower at its sole expense will, and will cause each other Loan Party to, promptly execute and deliver to the Lender all such Security Instruments and other documents, agreements and instruments reasonably requested by the Lender (including using commercially reasonable efforts to obtain any Acknowledgment Agreements reasonably requested by the Lender) to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of Holdings or any other Loan Party, as the case may be, in the Loan Documents, including the Note, or to further evidence and more fully describe the collateral intended as security for the Secured Obligations, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents (including using commercially reasonable efforts to obtain any Acknowledgment Agreements requested by the Lender), all as may be reasonably necessary or appropriate, in the reasonable discretion of the Lender, to ensure that the Lender has a perfected security interest in substantially all of the Cash Flow DIP Collateral. In addition, at the Lender's written request, each of Holdings and the Borrower, at its sole expense, shall enter into any Security Instruments or other documents (including using commercially reasonable efforts to obtain any Acknowledgment Agreements reasonably requested by the Lender), to evidence the Liens on the Cash Flow DIP Collateral and provide any information so requested to identify any Cash Flow DIP Collateral, exhibits to mortgages in form and substance reasonably satisfactory to

43

the Lender (which such exhibits shall be in recordable form for the applicable jurisdiction) or any other information requested in connection with the identification of any Cash Flow DIP Collateral, including without limitation, delivery of collateral documents, for recordation with the applicable recording offices.

(b)    Holdings and the Borrower hereby authorize the Lender to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Cash Flow DIP Collateral.

Section 8.10 <u>Additional Collateral; Additional Guarantors</u>.  If any Domestic Subsidiary becomes a Debtor, then Holdings shall promptly (and, in any event, within thirty (30) days after such date) cause such Subsidiary to guarantee the Secured Obligations pursuant to a joinder to this Agreement.  In connection with any such guaranty, Holdings shall, or shall cause such Subsidiary to, (i) execute and deliver a joinder to this Agreement executed by such Subsidiary, (ii) pledge all of the Equity Interests of such new Subsidiary (including delivery (if applicable) of original certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (iii) execute and deliver such other additional closing documents and certificates as shall reasonably be requested by the Lender.

Section 8.11 <u>ERISA Compliance</u>.  Holdings and the Borrower will promptly furnish, and will cause the Subsidiaries to promptly furnish, to the Lender (i) promptly after receipt of a written request by the Lender, copies of the most recent annual and other report with respect to each Plan or any trust created thereunder, filed with the United States Secretary of Labor, the Internal Revenue Service or the PBGC, (ii) immediately upon becoming aware of the occurrence of any ERISA Event or of any "prohibited transaction," as described in Section 406 of ERISA or in Section 4975 of the Code, in connection with any Plan or any trust created thereunder that could reasonably be expected to result in a Material Adverse Effect, a written notice signed by the Chief Executive Officer or the principal Financial Officer, the Subsidiary or the ERISA Affiliate, as the case may be, specifying the nature thereof, what action Holdings, the Subsidiary or the ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service, the United States Department of Labor or the PBGC with respect thereto, and (iii) promptly upon receipt thereof, copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Plan.  With respect to each Plan (other than a Multiemployer Plan), Holdings and the Borrower will, and, to the extent applicable, will cause each Subsidiary and ERISA Affiliate to, (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any lien, all of the contribution and funding requirements of Section 412 of the Code  and of Section 302 of ERISA , and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any late payment or underpayment charge or penalty, all premiums required pursuant to Sections 4006 and 4007 of ERISA.

Section 8.12 <u>Key Counterparties</u>. Neither Holdings nor any of its Subsidiaries shall have ceased to do business with, nor have received any notice of the intent to cease engaging in business from any Key Counterparties.

Section 8.13 <u>Lender Call and Meetings</u>.  From time to time upon reasonable request of the Lender, Holdings shall conduct and participate in status calls with the Lender to discuss (i) the Budget or the Variance Reports and/or any other reports or information delivered pursuant to Section 8.01 or otherwise, (ii) the financial operations and performance of the Loan Parties' business, or (iii) such other matters relating to the Loan Parties as the Lender (or its agents or advisors) shall reasonably request.

Section 8.14 <u>Debtors' Professionals; Sale Process</u>.  Holdings and its Subsidiaries shall continue to retain PJT Partners Inc. and Alvarez & Marsal North America, LLC, as their financial advisors, or any Person reasonably satisfactory to the Lender which replaces either of the foregoing. Holdings and its Subsidiaries will use reasonable best efforts and work in good faith to consummate a Sale Transaction that complies with the Acceptable Selection Procedures and that satisfies the Minimum Repayment Condition.

## ARTICLE IX
## NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest, if applicable, on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents (other than contingent indemnification obligations for which no claim has been made) have been paid in full, Holdings and the Borrower covenant and agrees with the Lender that:

Section 9.01 <u>Financial Covenants</u>.

(a)    <u>Minimum Liquidity</u>.  Holdings and its Subsidiaries shall not permit Liquidity to be less than $25,000,000 (<u>provided</u> that not less than $20,000,000 of such Liquidity shall be in the form of unrestricted cash and Cash Equivalents) as of the Friday after the two full calendar weeks ending after the Petition Date and on each second Friday thereafter.

(b)    <u>Budget Variance</u>.  As of the Friday after the fourth calendar week ending after the Petition Date and on each second Friday thereafter (each a "<u>Testing Date</u>" and each such four week period, commencing on the Petition Date and ending on the relevant Testing Date, a "<u>Testing Period</u>"), Holdings shall not permit (i) the Aggregate Receipts of Holdings and its Subsidiaries during such Testing Period to be less than 85% of the Aggregate Receipts as set forth in the Budget for such Testing Period or (ii) the Aggregate Disbursements made by Holdings and its Subsidiaries during such Testing Period to be greater than 115% of the Aggregate Disbursements as set forth in the Budget for such Testing Period.

Section 9.02 <u>Debt</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, incur, create, assume or suffer to exist any Debt, except:

(a)    The Secured Obligations or any guaranty of or suretyship arrangement for the Secured Obligations.

(b)    Warehousing Indebtedness.

45

(c)      Accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, incurred from time to time from and after the Petition Date in the ordinary course of business by the Loan Parties which are not greater than ninety (90) days past the date of invoice or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP.

(d)      Intercompany Debt between Holdings, the Borrower and any Subsidiary Guarantor or between Subsidiary Guarantors to the extent permitted by Section 9.05(h); provided that (i) such Debt is not held, assigned, transferred, negotiated or pledged to any Person other than Holdings or one of its Wholly-Owned Subsidiaries that is a Guarantor and (ii) any such Debt owed by either the Borrower or a Guarantor shall be subordinated to the Secured Obligations on terms set forth in Article XII.

(e)      Endorsements of negotiable instruments for collection in the ordinary course of business.

(f)      Guarantees of the Borrower and any Guarantor in respect of Debt otherwise permitted hereunder.

(g)      [Reserved].

(h)      Cash deposits securing obligations to any GSE and set forth on Schedule 9.02.

(i)      The incurrence by Holdings or any of the Subsidiaries of Hedging Obligations in the ordinary course of business and not for speculative purposes.

(j)      To the extent otherwise constituting Debt, obligations arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of Mortgage Servicing Rights, loans and other mortgage-related receivables purchased or originated by Holdings or any Subsidiary arising in the ordinary course of business.

(k)      Debt of Holdings and its Subsidiaries outstanding on the Petition Date (including any interest and fees accrued thereon after the Petition Date) and set forth in Schedule 9.02.

(l)      Other Debt incurred in the ordinary course of business pursuant to an order entered by the Bankruptcy Court.

Section 9.03 Liens.   Holdings and the Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)      Liens granted under the Loan Documents securing the payment of any Secured Obligations.

010395-1769-14324-Active.31181789

(b)    Valid, perfected and non-avoidable Liens in existence on the Petition Date or a Lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b).

(c)    Liens existing on the Petition Date and listed in Schedule 9.03.

(d)    The Secured Notes Liens subject to, and as defined in the DIP Order and other Liens existing in respect of the Notes Indenture and the Existing Notes Documents.

(e)    Adequate Protection Liens subject to the conditions set forth in the DIP Order.

(f)    Liens securing Warehousing Indebtedness.

(g)    The Carve-Out.

(h)    Liens incurred in the ordinary course of business and not securing Debt for borrowed money pursuant to an order entered by the Bankruptcy Court.

(i)    Liens on cash deposits securing obligations to any GSE permitted pursuant to Section 9.02(h).

(i)    Liens arising from the recourse that a GSE may have with respect to any Mortgage Servicing Right arising under the Guides or any Acknowledgment Agreement.

(k)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor.

Section 9.04 <u>Dividends, Distributions and Redemptions</u>. Holdings and the Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except:

(a)    Holdings may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock).

(b)    Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests.

(c)    Holdings may make Restricted Payments or other payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Debtors that have been approved by an order of the Bankruptcy Court reasonably satisfactory to the Lender.

Section 9.05 <u>Investments, Loans and Advances</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)    Investments existing on the Effective Date and set forth in Schedule 9.05.

(b)    Accounts receivable arising in the ordinary course of business.

(c)    Direct obligations of the United States or any agency thereof, or obligations guaranteed or insured by the United States or any agency thereof, in each case maturing within one year from the date of acquisition thereof.

(d)    Commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within six months after the date of acquisition.

(e)    Deposits maturing within one year from the date of acquisition thereof with, including certificates of deposit issued by, the Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $500,000,000 (as of the date of such bank or trust company's most recent financial reports) and a Thomson Bank Watch Rating of "B" or better.

(f)    repurchase obligations with a term of not more than seven days for underlying securities of the types described in Section 9.05(c) and Section 9.05(e).

(g)    Deposits in money market funds at least 95% of the assets of which constitute Investments described in Section 9.05(c), Section 9.05(d), Section 9.05(e) or Section 9.05(f).

(h)    Investments (i) made by Holdings or the Borrower in or to any Subsidiary that is a Guarantor, or (ii) made by any Subsidiary in or to Holdings, the Borrower or any Guarantor.

(i)    Any Investment consisting of Mortgage Servicing Rights, Receivables or REO Assets, in each case made in the ordinary course of business, and any Investment represented by Servicing Advances, residential or commercial mortgage loans and Securitization Assets made in the ordinary course of business.

(j)    Investments by Holdings or any Subsidiary in the form of loans extended to non-Affiliate borrowers in connection with any loan origination business of Holdings or such Subsidiary in the ordinary course of business.

(k)    Other Investments in the ordinary course of business not to exceed $500,000 in the aggregate at any time.

(l)    Loans or advances to employees, officers or directors in the ordinary course of business of Holdings or any of its Subsidiaries, in each case only as permitted by

010395-1769-14324-Active.31181789

applicable law, including Section 402 of the Sarbanes Oxley Act of 2002, and outstanding on the Effective Date.

(m)    Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to the Borrower or any other Loan Party as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of the Borrower or any other Loan Party; provided that the Borrower shall give the Lender prompt written notice if the aggregate amount of all Investments held at any one time under this Section 9.05(m) exceeds $500,000.

(n)    (i) Guarantees permitted by Section 9.02, and (ii) guarantees by Holdings or any Subsidiary for the performance or payment obligations of the Borrower or any Guarantor, which obligations were incurred in the ordinary course of business and do not constitute Secured Obligations.

Section 9.06 Nature of Business.  Holdings and the Borrower will not, and will not permit any Subsidiary to, allow any material change to be made in the character of its business from the businesses in which it is engaged as of the date hereof and businesses reasonably related thereto.

Section 9.07 Proceeds of Loans.  Holdings and the Borrower will not permit the proceeds of the Loans to be used for any purpose other than those permitted by Section 7.18. Neither Holdings, the Borrower nor any Person acting on behalf of Holdings or the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board or to violate Section 7 of the Exchange Act or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Lender, the Borrower will furnish to the Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.  The Borrower will not request any Borrowing, and the Borrower shall not directly or, to the knowledge of the Borrower, indirectly use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not directly or, to the knowledge of such Person, indirectly use, the proceeds of any Borrowing (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, each to the extent in violation of applicable Sanctions, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.08 ERISA Compliance.  Except as could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, Holdings will not, and will not permit any Subsidiary to, at any time:

(a)    engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which the Borrower, Holdings, a Subsidiary or any ERISA Affiliate could be

010395-1769-14324-Active.31181789

subjected to either a civil penalty assessed pursuant to subsections (c), (i) or (l) of Section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code;

(b)    terminate, or permit any ERISA Affiliate to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability of the Borrower, Holdings, a Subsidiary or any ERISA Affiliate to the PBGC;

(c)    fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, Holdings, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto.

(d)    permit to exist, or allow any ERISA Affiliate to permit to exist, the failure of a Plan to meet the minimum funding standards under Section 303 of ERISA or Section 430 of the Code, whether or not waived, with respect to any Plan;

(e)    permit, or allow any ERISA Affiliate to permit, the actuarial present value of the benefit liabilities under any Plan maintained by the Borrower, Holdings, a Subsidiary or any ERISA Affiliate which is regulated under Title IV of ERISA to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities;

(f)    contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan;

(g)    acquire, or permit any ERISA Affiliate to acquire, an interest in any Person that causes such Person to become an ERISA Affiliate with respect to the Borrower, Holdings or a Subsidiary or with respect to any ERISA Affiliate of the Borrower, Holdings or a Subsidiary if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (i) any Multiemployer Plan, or (ii) any other Plan that is subject to Title IV of ERISA under which the actuarial present value of the benefit liabilities under such Plan exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities; or

(h)    incur, or permit any ERISA Affiliate to incur, a liability to or on account of a Plan under Sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA.

Section 9.09 Mergers, Etc. Holdings and the Borrower will not, and will not permit any Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; except any Loan Party may transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to, or may be merged into or consolidated or amalgamated with, any other Loan Party; provided that (i) if the Borrower is party to such transaction, then the Borrower is the surviving

010395-1769-14324-Active.31181789

entity, and (ii) all actions necessary or desirable to preserve, protect and maintain the security interest and Lien of the Lender in any Cash Flow DIP Collateral held by any Loan Party involved in any such transaction are taken to the reasonable satisfaction of the Lender.

Section 9.10 <u>Sale of Properties</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Property except for:

(a)     The sale or transfer of equipment that is no longer useful or necessary for the business of the Borrower or any other Loan Party or is replaced by equipment of at least comparable value or use.

(b)     The grant by the Loan Parties in the ordinary course of business of any non-exclusive license of patents, trademarks, registrations therefor and other similar intellectual property.

(c)     Any disposition of assets pursuant to (i) a condemnation, appropriation, seizure or similar taking or proceeding by a Governmental Authority, (ii) the requirement of, or at the direction of, a Governmental Authority or (iii) a Casualty Event.

(d)     Dispositions of Property to the Borrower or any Guarantor.

(e)     The sale of advances, loans, customer receivables, mortgage related securities or other assets in the ordinary course of business, including pursuant to Warehousing Indebtedness, the sale of accounts receivable or other assets that by their terms convert into cash in the ordinary course of business, any sale of Mortgage Servicing Rights in connection with the origination of the associated mortgage loan in the ordinary course of business or any sale of securities in respect of additional fundings under reverse mortgage loans in the ordinary course of business.

(f)     Sales of Mortgage Servicing Rights to the extent permitted under the Notes Indenture.

(g)     Any disposition of REO Assets.

(h)     Sales and other Dispositions of Property having a fair market value not to exceed $500,000 during the term hereof.

(i)     The grant by the Loan Parties in the ordinary course of business in respect of any licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Loan Parties, in each case so long as no such grant otherwise affects the Lender's security interest in the asset or property subject thereto.

(j)     Holdings and its Subsidiaries may make any such dispositions, purchases or acquisitions in the ordinary course of business pursuant to an order entered by the Bankruptcy Court.

Section 9.11 <u>Environmental Matters</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, conduct any activity or use any of its Properties or assets in any manner that violates any Environmental Law where such violation could reasonably be expected to have a Material Adverse Effect on Holdings and its Subsidiaries.

Section 9.12 <u>Transactions with Affiliates</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, enter into any transaction, including any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than transactions among the Loan Parties) unless such transactions are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; provided that the foregoing restriction shall not apply to transactions as follows: (i) any Restricted Payment permitted by Section 9.04(a); (ii) Investments permitted under Section 9.05 (h); (iii) loans and advances permitted under Section 9.05(l); (iv) the performance of employment, equity award, equity option or equity appreciation agreements, plans or other similar compensation or benefit plans or arrangements (including vacation plans, health and insurance plans, deferred compensation plans and retirement or savings plans) entered into by the Borrower or any other Loan Party in the ordinary course of its business with its employees, officers and directors; (v) the performance of any agreement set forth under Schedule 9.12 and existing on the date hereof or as otherwise in a form as provided on such Schedule, together with each extension, renewal, amendment or modification to the extent it does not expand the scope of undertakings provided thereby on more restrictive or onerous terms than as in effect on the date hereof; and (vi) fees and compensation to, and indemnity provided on behalf of, officers, directors, and employees of the Borrower or any Guarantor in their capacity as such, to the extent such fees and compensation are customary.

Section 9.13 <u>Subsidiaries</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, create or acquire any additional Subsidiary unless the Borrower gives written notice to the Lender of such creation or acquisition and complies with Section 8.10.  Holdings and the Borrower shall not, and shall not permit any Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in any Subsidiary except in compliance with Section 9.10. Neither Holdings nor any Subsidiary shall have any Foreign Subsidiaries.

Section 9.14 <u>Negative Pledge Agreements; Dividend Restrictions</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to enter into any contract, agreement or understanding which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Lender or restricts any Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, except for restrictions and conditions:

(a)    imposed by law (including orders of the Bankruptcy Court);

(b)    of a customary nature contained in agreements relating to the disposition of a Subsidiary otherwise permitted under this Agreement pending such disposition; provided such restrictions and conditions apply only to the Subsidiary that is to be disposed of;

(c)    contained in the documentation relating to any Warehousing Facilities or any Hedging Agreements;

(d)    contained in joint venture agreements or other similar agreements entered into in the ordinary course of business and approved by an order of the Bankruptcy Court reasonably satisfactory to the Lender in respect to the disposition or distribution of assets of such joint venture;

(e)    in any negative pledge incurred or provided in favor of any holder of a Lien permitted by Section 9.03(c) or (e) solely to the extent such negative pledge relates to the property the subject of such Debt or Lien; or

(f)    contained in customary provisions in leases, licenses and similar contracts restricting the assignment, encumbrance, sub-letting or transfer thereof.

Section 9.15 Superpriority Claims.  Holdings and the Borrower will not, and will not permit any Subsidiary to, incur, create, assume, suffer to exist or permit any other Superpriority Claim *pari passu* with or senior to the claims of the Lender against the Debtors except with respect to the Carve-Out and the DIP Repo Superpriority Claim (as defined in, and subject to the priorities set forth in, the Interim DIP Order) against the Borrower.

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01  Events of Default.  The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of Holdings or any Subsidiary herein or in any Loan Document, or in any report, certificate, financial statement or other document furnished by or on behalf of Holdings or any Subsidiary pursuant to or in connection with any Loan Document, shall prove to have been materially incorrect when made or deemed made;

(d)    Holdings or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.01(m), Section 8.02, Section 8.03, Section 8.12, Section 8.13, Section 8.14 or in Article IX;

(e)    Holdings or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01 (a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document (i) with respect to Section 8.01(f) or Section 8.04 with respect to Taxes and such failure shall continue unremedied for a period of five days after the earlier to occur of (A) notice thereof from the Lender to the

53

Borrower (which notice will be given at the request of the Lender) or (B) a Responsible Officer of Holdings or such Subsidiary otherwise becoming aware of such default or (ii) with respect to any other provisions of this Agreement and such failure shall continue unremedied for a period of fifteen days after the earlier to occur of (A) notice thereof from the Lender to the Borrower (which notice will be given at the request of the Lender) or (B) a Responsible Officer of Holdings or such Subsidiary otherwise becoming aware of such default;

(f)     Holdings or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any post-Petition Date Debt in excess of $5,000,000, when and as the same shall become due and payable, subject to any applicable grace periods set forth in any documents governing such post-Petition Date Debt;

(g)     any event or condition occurs that results in any post-Petition Date Debt, in excess of $5,000,000 becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Debt or any trustee or agent on its or their behalf to cause any such Debt to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require Holdings or any Subsidiary to make an offer in respect thereof; provided that this Section 10.01(g) shall not apply to Debt that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Debt, if such sale or transfer is permitted hereunder and Holdings repays such Debt in full upon receipt of the net cash proceeds from such sale or transfer;

(h)     after the commencement of the Chapter 11 Cases, (i) one or more judgments for the payment of money in an aggregate amount in excess of $5,000,000 (to the extent not covered by independent third party insurance provided by financially sound and reputable insurers as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against Holdings, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 15 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of Holdings or any Subsidiary to enforce any such judgment; provided that, in each case, the entry of an order allowing any general unsecured claim arising prior to the Petition Date against any of the Debtors shall not be an Event of Default;

(i)     any material provision of any Loan Document after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto as represented and warranted pursuant to Section 7.02 or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the Borrower or any Guarantor shall so state in writing;

(j)     an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(k)    a Change in Control shall occur;

(l)    (i) the entry of an order dismissing the Chapter 11 Cases (which dismissal does not require as a condition to such dismissal the termination of the DIP Facility and the payment in full in cash of all Secured Obligations (other than contingent indemnification obligations not due and payable)) or converting the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (ii) the entry of an order appointing a Chapter 11 trustee in the Chapter 11 Cases, (iii) the entry of an order in the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) and (iv) the filing of any pleading by any Loan Party seeking or otherwise consenting to, any of the matters set forth in Sections 10.01(l)(i) through (iii) above;

(m)    (i) any Chapter 11 Plan other than the Acceptable Plan is filed by, or with the support of, a Loan Party without the consent of the Lender, (ii) the Loan Parties shall have commenced or supported any solicitation in respect of a proposed plan or reorganization other than the Acceptable Plan, (iii) an amendment, supplement or other modification shall have been made to, or a consent or waiver shall have been granted with respect to any departure by any person from the provisions of, the Acceptable Plan (without giving effect to such amendment, supplement, modification, consent or waiver), (iv) after its filing, the Acceptable Plan is withdrawn without the consent of the Lender, (v) the Bankruptcy Court shall terminate or reduce the period pursuant to Section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a Chapter 11 Plan and solicit acceptances thereof, (vi) the Bankruptcy Court shall grant relief that is inconsistent with the Sale Transaction, the Acceptable Plan or the Acceptable Selection Procedures in any material respect and that is adverse to the Lender's interests or inconsistent with the Loan Documents in any material respect or (vii) any of the Loan Parties or any Affiliate thereof Controlled by the Loan Parties shall file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the Sale Transaction, the Acceptable Plan or the Acceptable Selection Procedures and such motion or pleading has not been withdrawn prior to the earlier of (A) three (3) Business Days of the Borrower receiving notice from the Lender and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

(n)    there shall be a breach by any Loan Party of any provisions of the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Lender;

(o)    the entry of an order in the Chapter 11 Cases charging any of the Cash Flow DIP Collateral (in an amount greater than $100,000) under Section 506(c) of the Bankruptcy Code against the Lender under which any person takes action against the Cash Flow DIP Collateral and that becomes a final non-appealable order, or the commencement of other actions that are materially adverse to the Lender or its respective rights and remedies under the DIP Facility in any of the Chapter 11 Cases or materially inconsistent with the Loan Documents;

010395-1769-14324-Active.31181789

(p)    the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) against any asset with a value in excess of $5,000,000;

(q)    the payment of any pre-Petition Date claims (other than as permitted by the Interim DIP Order, the Final DIP Order or pursuant to an order entered in the Chapter 11 Cases that grants the relief set forth in any "first day" motion that was previously delivered and not objected to, by the Lender or that is supported, or not objected to, by the Lender);

(r)    any lien securing, or Superpriority Claim in respect of, the obligations under the DIP Facility shall cease to be valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Interim DIP Order and the Final DIP Order, as applicable.

(s)    except as expressly provided herein, the DIP Order or the Loan Documents, (i) the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the DIP Facility, or (ii) the existence of (x) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (y) any Lien on the Cash Flow DIP Collateral having a priority senior to or *pari passu* with the Liens and security interests granted in the DIP Order;

(t)    the Loan Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Lender relating to the DIP Facility other than matters for which the Borrower's rights with respect thereto are expressly reserved in the DIP Order;

(u)    failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone;

(v)    after the entry thereof by the Bankruptcy Court, the Acceptable Sale Order, Acceptable Selection Procedures Order, Acceptable Selection Procedures or Confirmation Order shall cease to be in full force and effect, or any Loan Party shall fail to comply in any material respect with the Acceptable Sale Order, Acceptable Selection Procedures Order, Confirmation Order or Acceptable Selection Procedures, or any of the Acceptable Sale Order, Acceptable Selection Procedures Order, Confirmation Order or Acceptable Selection Procedures shall have been revoked, remanded, vacated, reversed, rescinded or modified or amended, in the case of any modification or amendment, without the prior written consent of the Lender.

(w)    except as otherwise consented to by the Lender, Holdings or any Subsidiary shall have sold or otherwise disposed of all or a material portion of the Cash Flow DIP Collateral;

(x)    the termination or suspension of the Borrower or the failure of the Borrower to be in good standing as an approved seller, servicer, seller/servicer and/or issuer, as

applicable, of mortgage loans for Fannie Mae, Freddie Mac, GNMA, FHA or VA or the termination or suspension of the subservicer or the failure of the subservicer to be in good standing as an approved servicer/subservicer of mortgage loans for Fannie Mae, Freddie Mac, GNMA, FHA or VA; or

(y)    any payment of or grant of adequate protection with respect to any Debt existing prior to the Petition Date, other than in accordance with the DIP Order without the consent of the Lender and approval of the Bankruptcy Court.

Section 10.02  Remedies.

(a)    In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, and without further order of the Bankruptcy Court, the Lender, shall, by notice to the Borrower in accordance with the DIP Order (with a copy to counsel for any statutory committee appointed in the Bankruptcy Case and to the United States Trustee for the Southern District of New York), take either or both of the following actions, at the same or different times:  (i) terminate the Commitments and thereupon the Commitments shall terminate immediately, and (ii) declare the principal amount of the Loans then outstanding, and accrued interest, fees, and other similar amounts thereon, to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor. In the case of the occurrence of an Event of Default and at any time thereafter during the continuation of such Event of Default, the Lender will have all other rights and remedies available at law and equity, as set forth in the DIP Order; provided that prior to any exercise thereof against the Cash Flow DIP Collateral, the Lender shall provide five (5) Business Days' prior notice thereof to the Borrower (with a copy to counsel for any statutory committee appointed in the Cases and to the United States Trustee for the Southern District of New York).

(b)    All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall be applied in the manner directed by the Lender.

## ARTICLE XI
## MISCELLANEOUS

Section 11.01  Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 11.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email, as follows:

(i)    if to Holdings or the Borrower, to it at:

010395-1769-14324-Active.31181789

c/o Stearns Lending, LLC
750 East Highway, 121 Bypass, Suite 150
Lewisville, Texas 75067
Attention: Steve Smith
Telephone: 714-513-7060
Facsimile: 714-513-7061
E-mail: ssmith@stearns.com

(ii)    if to the Lender, to it at:

Blackstone Capital Partners VI NQ/NF L.P. and Blackstone Family
Investment Partnership VI-NQ - ESC L.P.
345 Park Avenue, 16th Floor
New York, NY 10154
Attention: Gregory Perez
Telephone: 212-390-2251
Email: gregory.perez@blackstone.com

(b)    Notices and other communications to the Lender and Borrower hereunder may be delivered or furnished by electronic communications.

(c)    Any party hereto may change its address or telephone number or email address for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 11.02  Waivers; Amendments.

(a)    No failure on the part of the Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Lender hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 11.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any provision hereof nor any Security Instrument or any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Lender.

58

Section 11.03  Expenses, Indemnity; Damage Waiver.

(a)     Holdings and the Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Lender, including the reasonable and documented fees, charges and disbursements of (A) a single counsel to the Lender and (B) other outside consultants for the Lender, the costs to the Lender of a third party servicer or data servicer in the course of its administration of the Secured Obligations in respect of the DIP Facility and the Loan Documents on its behalf, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, and the cost of environmental audits and surveys and appraisals in connection with the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Lender as to the rights and duties of the Lender with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein and (iii) following the occurrence and continuation of any Event of Default, all out-of-pocket expenses incurred by the Lender (without limitation of the expenses of the Lender payable pursuant to clause (i)), including the reasonable and documented fees, charges and disbursements of any counsel for the Lender in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 11.03, or in connection with the Loans made (or deemed made) hereunder, including all such out-of-pocket expenses incurred in anticipation of, or on and after the occurrence of any Default.

(b)     Holdings and the Borrower shall indemnify the Lender, and each related party of the Lender (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of one firm of counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or the parties to any other Loan Document of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or by any other Loan Document, (ii) the failure of any Loan Party to comply with the terms of any Loan Document, including this Agreement, (iii) any inaccuracy of any representation or any breach of any warranty or covenant of the Borrower or any guarantor set forth in any of the Loan Documents or any instruments, documents or certifications delivered in connection therewith, (iv) any Loan or the use of the proceeds therefrom, (v) any other aspect of the Loan Documents, (vi) the operations of the business of holdings and its Subsidiaries by Holdings and its Subsidiaries, (vii) any assertion that the Lender was not entitled to receive the proceeds received pursuant to the security instruments, (viii) [reserved], (ix) the breach or non-compliance by Holdings or any Subsidiary with any environmental law applicable to holdings or any subsidiary, (x) [reserved], (xi) the presence, use, release, storage, treatment, disposal, generation, threatened Release, transport, arrangement for transport or arrangement for disposal of oil, oil and gas wastes, solid wastes or Hazardous Substances on or at any of the Properties owned or operated by Holdings or any Subsidiary or any actual or alleged presence or Release of Hazardous Materials on or from any Property owned

59

or operated by Holdings or any of its Subsidiaries, (xii) [reserved], (xiii) any other environmental, health or safety condition in connection with the Loan Documents, or (xiv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, and such indemnity shall extend to each Indemnitee notwithstanding the sole or concurrent negligence of every kind or character whatsoever, whether active or passive, whether an affirmative act or an omission, including all types of negligent conduct identified in the Restatement (Second) of Torts of one or more of the Indemnitees or by reason of strict liability imposed without fault on any one or more of the Indemnitees; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of, or violation of law by, such Indemnitee. Notwithstanding the foregoing, no indemnification shall be given to the extent it arises (y) by reason of a claim by one or more Indemnitees against one or more other Indemnitees, or (z) from a claim brought by Holdings or the Borrower against an Indemnitee for (1) such Indemnitee's material breach of its obligations hereunder or under any other Loan Document or (2) bad faith of such Indemnitee hereunder or under any other Loan Document, in either case if Holdings or the Borrower has obtained a final non nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. So long as no Event of Default is continuing, no Indemnitee may settle any claim to be indemnified hereunder without the prior written consent of Holdings or the Borrower, which consent will not be unreasonably or untimely withheld. This Section 11.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    To the extent permitted by applicable law, Holdings and the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, and Holdings and the Borrower shall not be liable to any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(d)    All amounts due under this Section 11.03 shall be payable within 30 days following receipt by the Borrower of a reasonably detailed statement therefor.

Section 11.04  Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) each of Holdings the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by Holdings or the Borrower without such consent shall be null and void) and (ii) the Lender may not assign or otherwise transfer its rights or obligations hereunder without the prior written consent of each of Holdings and the Borrower (and any attempted assignment or transfer by the Lender without such consent shall be null and void); provided that Lender may at any time pledge or assign a security interest in all or any portion of its rights

60

under this Agreement to secure obligations of the Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 11.04(a) shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Notwithstanding any other provisions of this Section 11.04, no transfer or assignment of the interests or obligations of the Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 11.05  Survival; Revival; Reinstatement.

(a)    All covenants, agreements, representations and warranties made by Holdings and the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making (or deemed making) of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 3.04, Section 5.01 and Section 11.03 shall survive, on an unsecured and non-guaranteed basis, and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)    To the extent that any payments on the Secured Obligations or proceeds of any Cash Flow DIP Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Secured Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and Holdings and the Borrower shall take such action as may be reasonably requested by the Lender to effect such reinstatement.

Section 11.06  Counterparts; Integration; Effectiveness.

010395-1769-14324-Active.31181789

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)    This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  To the extent there are any inconsistencies between the terms of this Agreement or any Loan Document and the DIP Order, the provisions of the DIP Order shall govern.

(c)    Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.07 <u>Severability</u>.    Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 11.08 <u>Right of Setoff</u>.    Subject to the DIP Order, an Event of Default shall have occurred and be continuing, each of the Lender and its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Lender or Affiliate to or for the credit or the account of the Borrower or any Subsidiary against any of and all the obligations of Holdings or any Subsidiary owed to the Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not the Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured.  The rights of the Lender under this Section 11.08 are in addition to other rights and remedies (including other rights of setoff) which the Lender or its Affiliates may have.

Section 11.09 <u>Governing Law; Jurisdiction; Service of Process</u>.

(a)    This Agreement and the Note shall be governed by, and construed in accordance with, the laws of the State of New York.

62

(b)    Each party hereto hereby irrevocably and unconditionally: submits (and Holdings and the Borrower shall cause each other Loan Party to submit) for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not have (or abstains from) jurisdiction, in any of the courts of the State of New York and the United States of America for the Southern District of New York and appellate courts from any thereof; provided, that nothing contained herein or in any other Loan Document will prevent the Lender from bringing any action to enforce any award or judgment or exercise any right under the security instruments or against any Cash Flow DIP Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established. Each party hereby irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non convenien*s, which it may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

(c)    Each party irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at the address specified in Section 11.01 or such other address as is specified pursuant to Section 11.01 (or its assignment and assumption), such service to become effective thirty (30) days after such mailing. Nothing herein shall affect the right of a party or any holder of a note to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against another party in any other jurisdiction.

(d)    **EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE, OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 11.09.**

Section 11.10  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

010395-1769-14324-Active.31181789

Section 11.11 <u>Confidentiality</u>. The Lender and each other party hereto or to any other Loan Document, agrees to maintain, and agrees to cause each of its Affiliates to maintain, the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, partners and investors and their directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by the Bankruptcy Court or any regulatory authority purporting to have jurisdiction over it, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (and in each such case, such Person shall, if permitted by law, notify the Borrower of such occurrence as soon as reasonably practicable following the service of any such process on such Person), (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.11. For the purposes of this Section 11.11, "Information" means all information received from Holdings or any Subsidiary relating to Holdings or any Subsidiary and their businesses other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry. Any Person required to maintain the confidentiality of Information as provided in this Section 11.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 11.12 <u>Interest Rate Limitation</u>. It is the intention of the parties hereto that the Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby would be usurious as to the Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Loans, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to the Lender that is contracted for, taken, reserved, charged or received by the Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by the Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by the Lender to the Borrower); and (ii) if the maturity of the Loans or any other Secured Obligations is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by the Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by the

64

Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by the Lender to the Borrower). All sums paid or agreed to be paid to the Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to the Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (i) the amount of interest payable to the Lender on any date shall be computed at the Highest Lawful Rate applicable to the Lender pursuant to this Section 11.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Lender would be less than the amount of interest payable to the Lender computed at the Highest Lawful Rate applicable to the Lender, then the amount of interest payable to the Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to the Lender until the total amount of interest payable to the Lender shall equal the total amount of interest which would have been payable to the Lender if the total amount of interest had been computed without giving effect to this Section 11.12.

Section 11.13 <u>Exculpation Provisions</u>. Each of the parties hereto specifically agrees that it has a duty to read this Agreement and the other Loan Documents and agrees that it is charged with notice and knowledge of the terms of this Agreement and the other Loan Documents; that it has in fact read this Agreement and is fully informed and has full notice and knowledge of the terms, conditions and effects of this Agreement; that it has been represented by independent legal counsel of its choice throughout the negotiations preceding its execution of this Agreement and the other Loan Documents; and has received the advice of its attorney in entering into this Agreement and the other Loan Documents; and that it recognizes that certain of the terms of this Agreement and the other Loan Documents result in one party assuming the liability inherent in some aspects of the transaction and relieving the other party of its responsibility for such liability. Each party hereto agrees and covenants that it will not contest the validity or enforceability of any exculpatory provision of this Agreement and the other Loan Documents on the basis that the party had no notice or knowledge of such provision or that the provision is not "conspicuous."

Section 11.14 <u>No Third Party Beneficiaries</u>. This Agreement, the other Loan Documents, and the agreement of the Lender to make Loans hereunder are solely for the benefit of the Loan Parties, and no other Person (including any Subsidiary of the Borrower that is not a Guarantor, obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Lender for any reason whatsoever. There are no third party beneficiaries, other than to the extent contemplated by the last sentence of Section 11.04(a).

Section 11.15 <u>USA Patriot Act Notice</u>. The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name and address of the Borrower and the Guarantors and other information that will allow the Lender to identify the Borrower and the Guarantors in accordance with the USA Patriot Act.

## ARTICLE XII
## GUARANTY

Section 12.01  <u>Guarantee</u>.

(a)    Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Lender, and each of its successors, indorsees, transferees and permitted assigns, the prompt and complete payment in cash when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Obligations (collectively, the "<u>Guaranteed Obligations</u>").  This is a guarantee of payment and not collection and the liability of each Guarantor is primary and not secondary.

(b)    Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Loan Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in Section 12.02).

(c)    Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Article XII or affecting the rights and remedies of the Lender hereunder.

(d)    Each Guarantor agrees that if the maturity of the Guaranteed Obligations is accelerated by bankruptcy or otherwise, such maturity shall also be deemed accelerated for the purpose of this guarantee without demand or notice to such Guarantor.  The guarantee of each Guarantor contained in this Article XII shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lender, and its respective successors and permitted assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

(e)    No payment made by any Guarantor, any other guarantor or any other Person or received or collected by the Lender from the Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Guaranteed Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Guaranteed Obligations or any payment received or collected from such Guarantor in respect of the Guaranteed Obligations), remain liable for the Guaranteed Obligations up to the maximum liability of such Guarantor hereunder.

Section 12.02  <u>Right of Contribution</u>.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each

66

Guarantor's right of contribution shall be subject to the terms and conditions of Section 12.03. The provisions of this Section 12.02 shall in no respect limit the obligations and liabilities of any Guarantor to the Lender, and each Guarantor shall remain liable to the Lender for the full amount guaranteed by such Guarantor hereunder.

Section 12.03  No Subrogation; Subordination.  Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the Lender, no Guarantor shall be entitled to exercise its rights to be subrogated to any of the rights of the Lender against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by the Lender for the payment of the Guaranteed Obligations, nor shall any Guarantor seek any indemnity, exoneration, participation, contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time, such amount shall be held by such Guarantor in trust for the Lender, and shall, forthwith upon receipt by such Guarantor, be turned over to the Lender in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Lender, if required), to be applied against the Guaranteed Obligations in accordance with the DIP Order.  Any Liens securing payments of the debts and obligations of the Borrower or any Guarantor to any other Loan Party, whether such debts and obligations now exist or are hereafter incurred or arise, or whether the obligation of the debtor thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or obligations be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or obligations may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by, shall be subordinate to any Liens securing payment of the Secured Obligations, regardless of whether such encumbrances in favor of such Loan Party or the Lender presently exist or are hereafter created or attach, and after an Event of Default has occurred and is continuing, if the Lender so requests, any such debts and obligations shall be collected, enforced and received by such Guarantor for the benefit of the Lender and be paid over to the Lender s on account of the Guaranteed Obligations, but without affecting or impairing in any manner the liability of such Guarantor under the other provisions of this Article XII.

Section 12.04  Guaranty Amendments, Etc.  With respect to the Guaranteed Obligations, each Guarantor shall remain obligated hereunder, and such Guarantor's obligations hereunder shall not be released, discharged or otherwise affected, notwithstanding that, without any reservation of rights against any Guarantor and without notice to, demand upon or further assent by any Guarantor (which notice, demand and assent requirements are hereby expressly waived by such Guarantor): (a) any demand for payment of any of the Guaranteed Obligations made by the Lender may be rescinded by the Lender or otherwise and any of the Guaranteed Obligations continued; (b) the Guaranteed Obligations, the liability of any other Person upon or for any part thereof or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by, or any indulgence or forbearance in respect thereof granted by, the Lender; (c) any Loan Document may be amended, modified, supplemented or terminated, in whole or in part, as the Lender may deem advisable from time to time; (d) any collateral security, guarantee or right of offset at any time held by the Lender for the payment of the Guaranteed Obligations may be sold, exchanged, waived, surrendered or

67

released; (e) any additional guarantors, makers or endorsers of the Guaranteed Obligations may from time to time be obligated on the Guaranteed Obligations or any additional security or collateral for the payment and performance of the Guaranteed Obligations may from time to time secure the Guaranteed Obligations; or (f) any other event shall occur which constitutes a defense or release of sureties generally (other than a defense of payment or performance). The Lender shall not have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Secured Obligations or for the guarantee contained in this Article XII or any Property subject thereto.

Section 12.05 Waivers. Each Guarantor hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by the Lender upon the guarantee contained in this Article XII or acceptance of the guarantee contained in this Article XII; the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Article XII and no notice of creation of the Guaranteed Obligations or any extension of credit already or hereafter contracted by or extended to the Borrower need be given to any Guarantor; and all dealings between the Borrower and any of the Guarantors, on the one hand, and the Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Article XII. Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Guarantors with respect to the Guaranteed Obligations.

Section 12.06 Guaranty Absolute and Unconditional.

(f)    Each Guarantor understands and agrees that the guarantee contained in this Article XII is, and shall be construed as, a continuing, completed, absolute and unconditional guarantee of payment, and each Guarantor hereby waives any defense of a surety or guarantor or any other obligor on any obligations arising in connection with or in respect of any of the following and hereby agrees that its obligations hereunder shall not be discharged or otherwise affected as a result of any of the following:

(i)    the invalidity or unenforceability of any Loan Document, any of the Guaranteed Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Lender;

(ii)    any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against the Lender;

(iii)    the insolvency, bankruptcy arrangement, reorganization, adjustment, composition, liquidation, disability, dissolution or lack of power of the Borrower or any other Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations, including any discharge of, or bar or stay against collecting, any Guaranteed Obligation (or any part of them or interest therein) in or as a result of such proceeding;

010395-1769-14324-Active.31181789

(iv)     any sale, lease or transfer of any or all of the assets of the Borrower or any other Guarantor, or any changes in the shareholders of the Borrower or any other Guarantor;

(v)     any change in the corporate existence (including its constitution, laws, rules, regulations or power), structure or ownership of any Guarantor or in the relationship between the Borrower and any Guarantor;

(vi)     the fact that any Cash Flow DIP Collateral or Lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other Lien, it being recognized and agreed by each of the Guarantors that it is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the Cash Flow DIP Collateral for the Guaranteed Obligations;

(vii)     the absence of any attempt to collect the Guaranteed Obligations or any part of them from any Grantor; or

(viii)     any other circumstance or act whatsoever, including any action or omission of the type described in Section 12.04 (with or without notice to or knowledge of the Borrower or such Guarantor), which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower for the Guaranteed Obligations, or of such Guarantor under the guarantee contained in this Article XII, in bankruptcy or in any other instance (other than a defense of payment or performance).

(g)     When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Lender may, but shall be under no obligation to, join or make a similar demand on or otherwise pursue or exhaust such rights and remedies as it may have against the Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Guaranteed Obligations or any right of offset with respect thereto, and any failure by the Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Lender against any Guarantor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

Section 12.07 <u>Reinstatement</u>.    The guarantee contained in this Article XII shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Guaranteed Obligations is rescinded or must otherwise be restored or returned by any Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any

69

Guarantor or any substantial part of its Property, or otherwise, all as though such payments had not been made.

Section 12.08 <u>Payments</u>.  Each Guarantor hereby guarantees that payments hereunder will be paid to the Lender in accordance with the terms and conditions of the DIP Order, without set-off, deduction or counterclaim, in dollars, in immediately available funds, at the offices of the Lender.

Section 12.09 <u>Releases</u>.   All guarantees provided for herein, and all Lien rights, powers and interests and guarantee benefits with respect thereto shall automatically terminate and be null and void immediately upon the date that the Commitments have expired or terminated and the principal of and interest, if applicable, on each Loan and all fees payable hereunder and any other Secured Obligations and all other amounts payable under the Loan Documents (other than contingent indemnification obligations for which no claim has been made) have been paid in full, and the Lender, at the written request and expense of the Borrower, will promptly take all steps and actions requested by the Borrower to evidence and more fully effect the foregoing termination, including the declaration of all such guarantees to be of no further force or effect.

[SIGNATURES BEGIN NEXT PAGE]

010395-1769-14324-Active.31181789

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:                           STEARNS LENDING, LLC

                                    By: _____
                                    Name:  David Schneider
                                    Title:   Chief Executive Officer

HOLDINGS:                              STEARNS HOLDINGS, LLC

                                       By: _____
                                       Name:  David Schneider
                                       Title:   Chief Executive Officer

GUARANTORS:                                  STEARNS CO-ISSUER INC.


By: _____
Name:  David Schneider
Title:   Chief Executive Officer

GUARANTORS:

STEARNS VENTURES, LLC

By: _____

Name:  David Schneider
Title:   Chief Executive Officer


BSNAP, LLC

By: _____

Name:  David Schneider
Title:   Chief Executive Officer

PRIVATE MORTGAGE ADVISORS, LLC

By: _____

Name: John Dutra
Title:   President

LENDER:

BLACKSTONE CAPITAL PARTNERS VI
NQ/NF L.P., as the Lender

By its General Partner:
BLACKSTONE MANAGEMENT ASSOCIATES
VI-NQ L.L.C.

By its Sole Member:
BMA VI-NQ L.L.C.

By: _____
Name: Martin Brand
Title: Senior Managing Director

BLACKSTONE FAMILY INVESTMENT
PARTNERSHIP VI-NQ - ESC L.P., as the Lender

By its General Partner:
BCP VI-NQ SIDE-BY-SIDE GP L.L.C.

By: _____
Name: Martin Brand
Title: Senior Managing Director

[Signature page Senior Secured DIP Term Loan Agreement]

# ANNEX I
# LIST OF COMMITMENTS

| Name of Lender | Initial Term Loan Commitment[1] | Delayed Draw Commitment[2] |
|---|---|---|
| Blackstone Capital Partners VI NQ/NF L.P. | $24,938,750.00 | $9,975,500.00 |
| Blackstone Family Investment Partnership VI-NQ - ESC L.P. | $61,250.00 | $24,500.00 |
| **TOTAL** | $25,000,000.00 | $10,000,000.00 |

---

[1] To be effective upon entry of Interim DIP Order.
[2] To be effective upon entry of Final DIP Order.

## EXHIBIT A
## FORM OF NOTE

$[    ]                                                                [      ], 20[      ]

    FOR VALUE RECEIVED, Stearns Lending, LLC, a California limited liability company (the "Borrower"), hereby promises to pay to [      ] or its registered assigns (the "Lender"), at its principal office, the principal sum of [          ] Dollars ($[          ]) (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the Credit Agreement (as hereinafter defined)), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

    The date, amount and maturity of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, may be endorsed by the Lender on the schedules attached hereto or any continuation thereof or on any separate record maintained by the Lender. Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of this Note.

    This Note is one of the Notes referred to in the Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated as of July 11, 2019, among Stearns Holdings, LLC, the Borrower, the Guarantors from time to time party thereto, Blackstone Capital Partners VI NQ/ NF L.P. and Blackstone Family Investment Partnership VI-NQ - ESC L.P., and evidences Loans made by the Lender thereunder (such Term Loan Agreement as the same may be amended, supplemented or restated from time to time, the "Credit Agreement"). Capitalized terms used in this Note have the respective meanings assigned to them in the Credit Agreement.

    This Note is issued pursuant to, and is subject to the terms and conditions set forth in, the Credit Agreement and is entitled to the benefits provided for in the Credit Agreement and the other Loan Documents. The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events, for prepayments of Loans upon the terms and conditions specified therein and other provisions relevant to this Note.

    THIS NOTE AND ANY CLAIMS, CONTROVERSY, DISPUTES OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED ON, ARISING OUT OF OR RELATING HERETO SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

STEARNS LENDING, LLC

By: _____
Name: _____

Title: _____

**EXHIBIT B**
**FORM OF BORROWING REQUEST**

[                    ], 20[    ]

Stearns Lending, LLC, a California limited liability company (the "Borrower"), pursuant to Section 2.03 of the Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated as of July 11, 2019 (together with all amendments, restatements, supplements or other modifications thereto, the 'Credit Agreement'), among Stearns Holdings, LLC, a Delaware limited liability company, the Borrower, the Guarantors from time to time party thereto, Blackstone Capital Partners VI NQ/NF L.P. and Blackstone Family Investment Partnership VI-NQ - ESC L.P. (unless otherwise defined herein, each capitalized term used herein is defined in the Credit Agreement), hereby requests a Loan as follows:

(i)     Aggregate amount of the requested Loan is $[          ];

(ii)    Date of the borrowing of such Loan is [                ], 20[    ];

(iii)   Total Credit Exposure on the date hereof (i.e., outstanding principal amount of Loans without regard to the Loans requested hereby) is $[                    ];

(iv)    Pro forma total Credit Exposure on the date hereof (after giving effect to the requested Loans) is $[        ]; and

(v)     Location and number of the Borrower's account to which funds are to be disbursed is as follows:

[_____]
[_____]
[_____]
[_____]
[_____]

The undersigned certifies that the undersigned is the [          ] of the Borrower, and that as such the undersigned is authorized to execute this certificate on behalf of the Borrower.  The undersigned further certifies, represents and warrants on behalf of the Borrower that the Borrower is entitled to receive the requested Loan under the terms and conditions of the Credit Agreement.

STEARNS LENDING, LLC

By: _____

Name: _____

Title: _____

**EXHIBIT C-1**
**FORM OF**
**EFFECTIVE DATE CERTIFICATE**

**JULY 11, 2019**

The undersigned hereby certifies that the undersigned is the [      ] of Stearns Holdings, LLC, a Delaware limited liability company ("Holdings"), and that as such the undersigned is authorized to execute this certificate on behalf of Holdings.  Pursuant to Sections 6.01(j), 6.01 (k), 6.02(a) and 6.02(b) of the Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated as of July 11, 2019 (together with all amendments, restatements, supplements or other modifications thereto, the "Credit Agreement"), among Holdings, Stearns Lending, LLC, a California limited liability company, as borrower, the Guarantors from time to time party thereto, Blackstone Capital Partners VI NQ/NF L.P. and Blackstone Family Investment Partnership VI-NQ - ESC L.P., the undersigned represents and warrants, on behalf of Holdings and not individually, as follows (each capitalized term used herein having the same meaning given to it in the Agreement unless otherwise specified):

(a)     The representations and warranties of Holdings, the Borrower and the Guarantors set forth in the Credit Agreement and in the other Loan Documents are true and correct on and as of the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, such representations and warranties continue to be true and correct as of such specified earlier date.

(b)     On the date hereof, immediately after giving effect to such Credit Event, no Default shall exist.

(c)     Immediately after giving effect to the Transactions and any payments required to be made on the date hereof, Holdings and the other Loan Parties have Liquidity of not less than $25,000,000 (and not less than $20,000,000 of such Liquidity is in the form of unrestricted cash and Cash Equivalents) on the date hereof.

(d)     Immediately after giving effect to the Transactions, Holdings, its Subsidiaries and any joint ventures or preferred partners of Holdings or any Subsidiary have, in the aggregate, availability of not less than $1,800,000,000 on the date hereof under Warehousing Facilities in effect on the date hereof.

[Signature page follows]

*Exhibit C-1 - 1*

EXECUTED AND DELIVERED as of the first date written above.

STEARNS HOLDINGS, LLC

By: _____
        Name:
        Title:

*Exhibit C-1 - 2*

EXHIBIT C-2
FORM OF SECTION 8.01(d) CERTIFICATE

The undersigned hereby certifies that he/she is the [          ] of Stearns Lending, LLC, a California limited liability company (the "Borrower"), and that as such he/she is authorized to execute this certificate on behalf of the Borrower.  With reference to the Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated as of July 11, 2019 (together with all amendments, restatements, supplements or other modifications thereto, the "Credit Agreement"), among Stearns Holdings, LLC, the Borrower, the Guarantors from time to time party thereto, Blackstone Capital Partners VI NQ/NF L.P. and Blackstone Family Investment Partnership VI-NQ - ESC L.P. which are or become a party thereto, the undersigned represents and warrants as follows (each capitalized term used herein having the same meaning given to it in the Agreement unless otherwise specified):

(a)      There exists no Default or Event of Default [or specify Default and describe].

(b)      Attached hereto are the detailed computations necessary to determine whether the Borrower is in compliance with Section 9.01 as of the end of and during the fiscal quarter ending [        ].

(d)      [Select one of the following as applicable:]  [There has been no change in GAAP or in the application thereof, in each case as GAAP was applied in the Financial Statements, (i) in the preparation of the Borrower's financial statements most-recently required to be delivered in accordance with Section 8.01(b) or (ii) that would affect the computation of any matter in Section 9.01] or [There has been one or more changes in GAAP or in the application thereof, in each case as GAAP was applied in the Financial Statements, (i) in the preparation of the Borrower's financial statements most-recently required to be delivered in accordance with Section 8.01(b) or (ii) that would affect the computation of any matter in Section 9.01, as follows and with the following effects: [specify].

EXECUTED AND DELIVERED this [        ] day of [          ].

STEARNS LENDING, LLC


By: _____
Name: _____
Title: _____

*Exhibit C-2 - 1*

**EXHIBIT D**
**SECURITY INSTRUMENTS**

1) UCC Security Agreement.

2) Acknowledgment Agreements from each of Fannie Mae and Freddie Mac.

3) Mortgages in respect of any fee-owned real property of the Borrower or any Guarantor with a fair market value (per real property) in excess of $5,000,000.

4) Copyright Security Agreements.

5) Trademark Security Agreements.

6) Patent Security Agreements.

**EXHIBIT E-1**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Lenders that are not U.S. Persons That Are Not Partnerships for U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated as of July 11, 2019 (together with all amendments, restatements, supplements or other modifications thereto, the "Credit Agreement"), among Stearns Holdings, LLC, the Borrower, the Guarantors from time to time party thereto, Blackstone Capital Partners VI NQ/NF L.P. ("BCP VI NQ") and Blackstone Family Investment Partnership VI-NQ - ESC L.P. ("BFIP VI-NQ"; BFIP and BCP VI NQ, collectively, the "Lender").

Pursuant to the provisions of Section 5.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent (10%) shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) the interest payments in question are not effectively connected with a U.S. trade or business conducted by the undersigned or are effectively connected but are not includible in the undersigned's gross income for U.S. federal income tax purposes under an income tax treaty.

The undersigned has furnished the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or any successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and (2) the undersigned shall have at all times furnished the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.


[NAME OF LENDER]


By: _____
Name: _____
Title: _____



Date: _____

*Exhibit E-1 - 1*

**EXHIBIT E-2**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Lenders that are not U.S. Persons That Are Partnerships for U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated as of July 11, 2019 (together with all amendments, restatements, supplements or other modifications thereto, the "Credit Agreement"), among Stearns Holdings, LLC, the Borrower, the Guarantors from time to time party thereto, Blackstone Capital Partners VI NQ/NF L.P. ("BCP VI NQ") and Blackstone Family Investment Partnership VI-NQ - ESC L.P. ("BFIP VI-NQ"; BFIP and BCP VI NQ, collectively, the "Lender").

Pursuant to the provisions of Section 5.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent (10%) shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) the interest payments in question are not effectively connected with a U.S. trade or business conducted by the undersigned or are effectively connected but are not includible in the undersigned's gross income for U.S. federal income tax purposes under an income tax treaty.

The undersigned has furnished the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or any successor form), or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or any successor form) from each such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower, and (2) the undersigned shall have at all times furnished the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By: _____

Name: _____
Title: _____


Date: _____

**EXHIBIT F**
**FORM OF INTERIM DIP ORDER**

**<u>Term Loan Agreement Schedules</u>**

Schedule 7.05 Litigation

Schedule 7.06 Environmental Matters

Schedule 7.14 Subsidiaries and Partnerships

Schedule 9.02 Existing Debt

Schedule 9.03 Existing Liens

Schedule 9.05 Investments

Schedule 9.12 Existing Affiliate Transactions

**Schedule 7.05**

**Litigation**

None.

## **Schedule 7.06**

### **Environmental Matters**

None.

### Schedule 7.14

**Subsidiaries and Partnerships**

1. Stearns Co-Issuer Inc., a Delaware corporation
2. Stearns Management Investors I, LLC, a Delaware limited liability company
3. Stearns Lending, LLC, a California limited liability company
4. bSNAP, LLC, a Delaware limited liability company
5. Stearns Ventures, LLC, a Delaware limited liability company
6. Private Mortgage Advisors, LLC, a Delaware limited liability company
7. Citywide Home Loans, LLC, a Utah limited liability company – 51% owned
8. Certainty Home Loans, LLC, a Delaware limited liability company – 50.8% owned

**Schedule 9.02**

**Existing Debt**

| Entity (Borrower) | Counterparty (Lender) | Description | Amount |
|---|---|---|---|
| Stearns Lending, LLC | Barclays Bank PLC, as Administrative Agent | Master Repurchase Facility | $1,500,000,000 |

Indebtedness under the Existing Notes.

Indebtedness under any capital leases set forth on Schedule 9.03.

Any Debt of the Loan Parties arising under that certain Limited Recourse Guarantee, to be dated on or about the Effective Date (the "DIP Repo Guarantee"), as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, made by Blackstone Capital Partners VI NQ/NF L.P., as guarantor to and for the benefit of Barclays Bank PLC, as administrative agent.

**Schedule 9.03**

**Existing Liens**

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|--------|---------------|--------------|---------------------------|
| Certainty Home Loans, LLC (originally filed under W.R. Starkey Mortgage, LLP) | Wachovia Bank, N.A. c/o Wells Fargo Securities, LLC | DE SoS | All of the Debtor's right, title and interest in, to and under the Collateral (as defined below), whether now owned or hereafter acquired, now existing or hereafter created and wherever located, including, without limitation, all "accounts," "chattel paper", "general intangibles", "instruments" or "investment property" (in each case as defined in the Uniform Commercial Code as in effect from time to time) constituting or relating to the Collateral, and any and all substitutions and exchanges for, and products and proceeds of, the foregoing. |
| Certainty Home Loans, LLC (originally filed under W.R. Starkey Mortgage, LLP) | Comerica Bank, individually and as Administrative Agent | DE SoS | The Collateral shall consist of all right, title and interest of Debtor, of every kind and nature, in and to all of the following property, assets and rights of the Debtor, wherever located, whether now existing or hereafter arising, and whether now or hereafter owned or acquired or owing to Debtor, and all proceeds and products thereof: a) all Pledged Mortgage Loans, b) all rights of Debtor under all commitments from investors or purchasers covering any part of the foregoing Collateral, c) all rights to service, administer and/or collect any of the foregoing Collateral, d) all rights of Debtor in, to and under any agreements or other arrangements entered into by Debtor to protect itself against changes in interest rates or market value of any Collateral, e) all files, documents, instruments, surveys, appraisals, bonds, certificates, correspondence, computer programs, tapes, discs, cards, accounting records and other books, records, agreements, |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | information and data of Debtor relating to any of the foregoing Collateral, f) all Accounts Receivable, g) all inventory, h) all Software, i) all investment property, j) all goods, instruments (including, without limit, promissory notes), documents (including, without limit, negotiable documents), policies and certificates of insurance, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party (or a third party on behalf of Secured Party), or as to which Secured Party now or later controls possession by documents or otherwise, k) the Lock Box and the Cash Collateral Account and all deposit accounts established with Secured Party or any lender, all funds on deposit in such deposit accounts, all obligations of Secured Party or lenders to Debtor arising out of such deposit accounts, and l) all additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind (including but not limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the Collateral described above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Debtor. |
| Certainty Home Loans, LLC (originally filed under W.R. Starkey Mortgage, LLP) | Branch Banking and Trust Company | DE SoS | All of the Debtor's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located:  a) all Other Assets of the Debtor, b) all accessions or additions to and any substitutions for |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | any of such Other Assets together with all renewals and replacements of any such Other Assets, all other rights and interests now owned or hereafter acquired by the Debtor in, under or relating to any of such Other Assets, and c) all products and proceeds of the foregoing. |
| Certainty Home Loans, LLC (originally filed under W.R. Starkey Mortgage, LLP) | Branch Banking and Trust Company | DE SoS | All of Debtor's/Seller's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located:  a) Purchased Loans: 1) all Purchased Loans, 2) all Purchased Loans Support, 3) all rights to deliver Purchased Loans to investors and other purchasers and all proceeds resulting from the disposition of Purchased Loans pursuant thereto, including Seller's right and entitlement to receive the entire purchase price paid for Purchased Loans sold, 4) all Hedging Arrangements, 5) all Servicing Rights, 6) all of the Seller's rights now or hereafter existing in, to or under any MBS secured by, created from or representing any interest in any of the Purchased Loans, whether now owned or hereafter acquired by the Seller; b) Related Accounts, Payment Intangibles, General Intangibles; c) Deposit Accounts; d) Custodial Account; e) Purchased Loans Records; f) all rights to have and receive any of the Purchased Loans described above, all accessions or additions to and substitutions for any of such Purchased Loans, together with all renewals and replacements of any of such Purchased Loans, all other rights and interests now owned or hereafter acquired by the Seller in, under or relating to any of such Purchased Loans or referred to above and all products and proceeds of |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | any of the foregoing; g) all Claims and Causes of Action; and h) all products and proceeds of the foregoing. |
| Certainty Home Loans, LLC (originally filed under W.R. Starkey Mortgage, LLP) | Dell Financial Services L.L.C. | DE SoS | Leased computer equipment. |
| Certainty Home Loans, LLC (originally filed under W.R. Starkey Mortgage, LLP) | VAR Technology Finance | DE SoS | Leased equipment, including all existing and future accessions, accessories, attachments, replacements, replacement parts, additions, substitutions and repairs thereto, software programs embedded therein, and all proceeds (cash and non-cash), including the proceeds of all insurance policies, thereof. |
| Stearns Holdings, LLC | Wilmington Trust, National Association | DE SoS | All of the right, title and interest of the Debtor in, to and under, all assets of the Debtor whether now owned or hereafter acquired (excluding any Excluded Property, but including any proceeds and products of any Excluded Property to the extent not constituting Excluded Property) wherever located (collectively, the "Collateral"), as more particularly described in, and subject to the limitations set forth in, Exhibit A hereto. |
| Stearns Co-Issuer, Inc. | Wilmington Trust, National Association | DE SoS | All assets of the Debtor whether now owned or hereafter acquired or arising and all proceeds thereof. |
| Stearns Ventures, LLC | Wilmington Trust, National Association | DE SoS | All of the right, title and interest of the Debtor in, to and under, all assets of the Debtor whether now owned or hereafter acquired (excluding any Excluded Property, but including any proceeds and products of any Excluded Property to the extent not constituting Excluded Property) wherever located (collectively, the "Collateral"), as more |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | particularly described in, and subject to the limitations set forth in, Exhibit A hereto. |
| Private Mortgage Advisors, LLC | Wells Fargo Bank, N.A. (c/o Wells Fargo Securities, Mortgage Banker Finance Group) | DE SoS | All of Debtor's right, title and interest in the Collateral, and any and all replacements, or substitutions for, distributions on or proceeds of any and all of the foregoing, all as more particularly described in Exhibit A attached hereto and incorporated herein by reference. |
| Stearns Lending, Inc. | Texas Capital Bank | CA SoS | All right, title and interest of Debtor, of every kind and nature, in and to all of the following property, assets and rights of Debtor, wherever located, whether now existing or hereafter arising, and whether now or hereafter owned or acquired by or accruing or owing to Debtor, and all proceeds and products thereof: A. Any and all Instruments, Certificated Securities, Uncertificated Securities, General Intangibles and Investment Property of Debtor in the actual or constructive possession of Secured Party or any Person designated as a bailee ("Bailee"), or in transit to or from Secured Party or Bailee, constituting or relating to Mortgage Notes in which Secured Party has purchased a participation interest, until final payment is made for such Mortgage Notes and any and all agreement and documents related to any thereof including without limitation, all Mortgage Notes and Mortgages delivered or to be delivered, to Secured Party or Bailee or to be held by Debtor in trust for Secured Party or Bailee, including, without limitation: i) any and all rights, titles and interests Debtor may now have or hereafter have in and to any and all promissory notes, Mortgages, guaranties, bonds, insurance |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
|  |  |  | policies, commitments, and other Instruments, documents, or agreements ever executed and delivered in connection with its mortgage lending business relating to such Mortgage Notes and Mortgages; (ii) any and all present and future Accounts, Chattel Paper, documents, Instruments, General Intangibles, Payment Intangibles and other personal property now owned or hereafter acquired by Debtor arising from or by virtue of any transactions related to its mortgage lending business and related to such Mortgage Notes and Mortgages; (iii) any and all proceeds from the sale, financing or other disposition of the items described in (1) and (ii) above; and (iv) ail Software, files, surveys, certificates, correspondence, appraisals, computer programs, tapes, discs, cards, accounting records, and other records, information, and data of Debtor relating to the Mortgage Loans (including without limitation ail information, data, programs, tapes, discs and cards necessary to administer and service such Mortgage Loans). (b) All Take-Out Commitments relating to the Mortgage Notes described in subparagraph (a) above. (c) All right, title. and interest of Debtor under all agreements between Debtor and Persons other than Debtor pursuant to which Debtor undertakes to service Mortgage Loans, including without limitation, the rights off Debtor to income and reimbursement thereunder, (d) All purchase agreements, credit agreements or other agreements pursuant to which Debtor acquired such Mortgage Loans and all promissory notes, security agreements and other instruments and documents executed by Debtor pursuant thereto or in. connection therewith, insofar as such |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | agreements, instruments and documents relate to the Mortgage Notes and Mortgages described in subparagraph (a) above. (e) All right, title and interest of Debtor in and to any other asset of Debtor which. has been or hereafter at any time is delivered to Secured Party or Bailee hereunder. (I) All proceeds of whatever kind or nature from any of such collateral described in subparagraphs (a), (b), (c), (d) and (e) above. |
| Stearns Lending, Inc.; Bank of America NA; Alliance Bancorp; Countrywide Home Loans, Inc.; Financial Title Company; Reconstruct Company, N.A.; CTC Real Estate Services Inc.; Mortgage Electronic Registration System, Inc (MERS); First American Title Company; Carriage Escrow Corporation; GMAC Mortgage Corporation; Old Republic Title Co; Executive Trustee Services Inc.; Fidelity National Title; | Joel R. Vendiola | CA SoS | All inventory fixtures, products, improvements, maintenance, and other expenditures, located at: 24944 TULIP AVENUE – LOMA LINDA, CALIFORNIA [92354]. |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| Financial Title Company; BAC Home Loans Services LP; | | | |
| Stearns Lending, Inc. | Fannie Mae | CA SoS | The collateral (the "Collateral") that is the subject of this Financing Statement is as follows: (1) all those Loans that Debtor ("Leader") has assigned, transferred, and/or sold (collectively "transferred", 'transfers", or "transfer" as appropriate.) previously to Secured Party ("Fannie Mae"), and (ii) all those Loans that Lender transfers to Fannie Mae in the future. However, any such Loan ceases to be Collateral effective if and when Fannie Mae transfers such. Loan to Lender, or to any entity that is currently servicing such Loan for Fannie Mae or that previously serviced such Loan for Fannie Mae. |
| Stearns Lending, Inc. | Bank of America, N.A. | CA SoS | Purchased Assets: All now existing and hereafter arising right, title and interest of Seller in, under and to the following: (a) all Mortgage Loans, now owned and hereafter acquired, including all Mortgage Notes and Mortgages evidencing such Mortgage Loans and the related Mortgage Loan Documents, for which a Transaction has been entered into between Buyer and Seller hereunder and for which the Repurchase Price has not been paid in fall and all Mortgage Loans, including all Mortgage Notes and Mortgages evidencing such Mortgage Loans and the related Mortgage Loan Documents, which, from time to time, are delivered, or caused to be delivered, to Buyer (including delivery to a custodian or other third party on behalf of Buyer) as additional security for the performance of Seller's obligations hereunder; (b) all |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | Mortgage-Backed Securities, now owned or hereafter acquired by Seller, that are supported by any Mortgage Loan constituting Purchased Assets hereunder, all right to the payment of monies in non-cash distributions on account thereof and all new, substituted and additional securities at any time issued with respect thereto; (c) all rights of Seiler under all Purchase Commitments, now existing and hereafter arising, covering any part of the Purchased Assets, all rights to deliver such Mortgage Loans and Mortgage-Backed Securities to permanent investors and other purchasers pursuant thereto and all Proceeds resulting from the disposition of such Purchased Assets thereto; (d) all now existing and hereafter established accounts maintained with broker-dealers by Seller for the purpose of carrying out transactions under Purchase Commitments relating to any part of the Purchased Assets; (e) all now existing and hereafter arising rights of Seller to service, administer and/or collect on the Mortgage Loans included as Purchased Assets hereunder and any arid all rights to the payment or monies on account thereof; ti) all now existing and hereafter arising accounts, contract rights and general intangibles constituting or relating to any of the Purchased Assets; (g) all mortgage insurance and all commitments issued by Insurers to insure or guaranty any Mortgage Loans included as Purchased Assets, including, without. limitation., the right to receive all insurance proceeds and condemnation awards that may be payable in respect of the premises encumbered by any Mortgage; and all other documents or instruments delivered to Buyer in respect of the |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | Mortgage Loans included as Purchased Assets; (h) All documents, files, surveys, certificates, correspondence, appraisals, computer programs, tapes, discs, cards, accounting records and other information and data of Seller relating to Mortgage Loans included as Purchased Assets; (i) All rights, but not any obligations or liabilities, of Seller with respect to the Approved Investors; (j) property of Seller, in any form or capacity now or at any time hereafter in the possession or control of Buyer, including, without limitation, all deposit accounts and any funds at any time held therein, into which Proceeds of the foregoing Purchased Assets are at any time deposited; (k) All products and Proceeds of the foregoing Purchased Assets; and (1) Any funds of Seller at any time deposited or held in the Over/Under Account. |
| Stearns Lending, Inc. | Bank of America, N.A. | CA SoS | All of the Debtor's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located:  i) all Participation Certificates; ii) all of the servicing rights with respect to the Related Mortgage Loans; iii) the Custodial Account and all amounts on deposit therein; iv) the Related Mortgage Loans subject to each Participation Certificate; v) all documents, records (including Servicing Records), instruments and data evidencing the Related Mortgage Loans and the servicing thereof; vi) the Securities to be issued as contemplated under the Purchase and Sale Agreement and all proceeds thereof; viii) the Takeout Commitments; and viii) the proceeds of any and all of the foregoing. |
| Stearns Lending, | Wilmington | CA SoS | All of the right, title and interest of the |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| Inc. | Trust, National Association, as collateral agent | | Debtor in, to and under, all assets of the Debtor whether now owned or hereafter acquired (excluding any Excluded Property, but including any proceeds and products of any Excluded Property to the extent not constituting Excluded Property) wherever located (collectively, the "Collateral"), as more particularly described in, and subject to the limitations set forth in, Exhibit A hereto. |
| Stearns Lending, Inc. | Everbank | CA SoS | All of the Seller/Debtor's right, title and Interest In the Purchased Mortgage Loans and the other Repurchase Assets, and any and all replacements, or substitutions for, distributions on or proceeds of any and all of the foregoing, all as more particularly described on Annex A attached hereto and Incorporated by reference. |
| Stearns Lending, Inc. | Hewlett-Packard Financial Services Company | CA SoS | Leased equipment. |
| Stearns Lending, Inc. | Bank of America, N.A. | CA SoS | All of the Debtor's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located:  a) all Mortgage Loans, including all Mortgage Notes and Mortgages and related Mortgage Loan Documents; b) all Mortgage-Backed Securities; c) all rights of Seller under all Purchase Commitments; d) all established accounts maintained with broker-dealers; e) all rights of Seller to service, administer and/or collect on the Mortgage Loans included as Purchased Assets and all rights to the payment of monies on account thereof; f) all account, contract rights and general |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | intangibles constituting or relating to any of the Purchased Assets; g) all mortgage insurance and all commitments issued by Insurers; h) all documents, files, surveys, certificates, correspondence, appraisals, computer programs, discs, cards, accounting records and other information and data of Seller relating to Mortgage Loans and included as Purchased Assets; i) all rights of Seller with respect to Approved Investors; j) all property of Seller including, without limitation, all deposit accounts and any funds at any time held therein, into which Proceeds of the foregoing Purchased Assets are at any time deposited; k) all products and Proceeds of the foregoing Purchased Assets; and l) any funds of Seller at any time deposited or held in the Over/Under Account. |
| Stearns Lending, LLC | Bank of America, N.A. | CA SoS | All of the Debtor's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located (but excluding any and all obligations of the Debtor thereunder) (collectively, the "Collateral"): (i) the Participation Certificates; (ii) all of the servicing rights with respect to the Related Mortgage Loans; (iii) the Custodial Account and all amounts on deposit therein; (iv) the Related Mortgage Loans subject to each Participation Certificate; (v) all documents, records (including Servicing Records), instruments and data evidencing the Related Mortgage Loans and the servicing thereof; (vi) the Securities to be issued as contemplated under the Purchase and Sale Agreement and all proceeds thereof; (vii) the Takeout |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|--------|---------------|--------------|---------------------------|
| | | | Commitments; and (viii) the proceeds of any and all of the foregoing. |
| Stearns Lending, Inc. | Cisco Systems Capital Corporation | CA SoS | Leased equipment. |
| Stearns Lending, LLC | Cisco Systems Capital Corporation | CA SoS | Leased equipment. |
| Stearns Lending, LLC | Cisco Systems Capital Corporation | CA SoS | Leased equipment. |
| Stearns Lending, LLC | Cisco Systems Capital Corporation | CA SoS | Leased equipment. |
| Stearns Lending, LLC | Bank of America, N.A. | CA SoS | All of the Debtor's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located:  a) all Mortgage Loans, including all Mortgage Notes and Mortgages and related Mortgage Loan Documents; b) all Mortgage-Backed Securities; c) all rights of Seller under all Purchase Commitments; d) all established accounts maintained with broker-dealers; e) all rights of Seller to service, administer and/or collect on the Mortgage Loans included as Purchased Assets and all rights to the payment of monies on account thereof; f) all account, contract rights and general intangibles constituting or relating to any of the Purchased Assets; g) all mortgage insurance and all commitments issued by Insurers; h) all documents, files, surveys, certificates, correspondence, appraisals, computer programs, discs, cards, accounting records and other information and data of Seller relating to Mortgage Loans and included as Purchased Assets; i) all |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | rights of Seller with respect to Approved Investors; j) all property of Seller including, without limitation, all deposit accounts and any funds at any time held therein, into which Proceeds of the foregoing Purchased Assets are at any time deposited; k) all products and Proceeds of the foregoing Purchased Assets; and l) any funds of Seller at any time deposited or held in the Over/Under Account. |
| Stearns Lending, LLC | Bank of America, N.A. | CA SoS | All of the Debtor's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located (but excluding any and all obligations of the Debtor thereunder) (collectively, the "Collateral"): (i) the Participation Certificates; (ii) all of the servicing rights with respect to the Related Mortgage Loans; (iii) the Custodial Account and all amounts on deposit therein; (iv) the Related Mortgage Loans subject to each Participation Certificate; (v) all documents, records (including Servicing Records), instruments and data evidencing the Related Mortgage Loans and the servicing thereof; (vi) the Securities to be issued as contemplated under the Purchase and Sale Agreement and all proceeds thereof; (vii) the Takeout Commitments; and (viii) the proceeds of any and all of the foregoing. |
| Stearns Lending, LLC | Barclays Bank PLC and Barclays Capital Inc. | CA SoS | All of the Debtor's right, title and interest in and to all accounts, chattel paper, documents, general intangibles, instruments, or investment property constituting Total Collateral, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located. |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|--------|---------------|--------------|---------------------------|
| Stearns Lending, LLC | Barclays Bank PLC | CA SoS | Pursuant to the Mortgage Loan Participation Purchase and Sale Agreement (the "Agreement"), dated as of November 8, 2016, between Barclays Bank PLC, as administrative agent and purchaser (the "Purchaser") and Stearns Lending, LLC, as Seller (the "Seller"), as amended or restated from time to time, the Seller has granted to the Purchaser a security interest in the Participation Certificates purchased by Purchaser under the Agreement, and all of Seller's interest in all of the servicing rights with respect to the Related Mortgage Loans, the Custodial Account and all amounts on deposit therein, the Related Mortgage Loans subject to each Participation Certificate, all documents, records (including Servicing Records), instruments and data evidencing the Related Mortgage Loans and the servicing thereof, the Securities to be issued as contemplated under the Agreement, all principal and interest collected thereon and all proceeds thereof, the Takeout Commitments and the proceeds of any and all of the foregoing (collectively, the "Collateral") |
| Stearns Lending, LLC | Barclays Bank PLC | CA SoS | The financing statement to which this Exhibit A is attached and made a part covers all of the Debtor's right, title and interest in and to all Purchased Assets, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located. |
| Stearns Lending, LLC | Wells Fargo Bank, N.A. (C/O Wells Fargo Securities, Mortgage Banker Finance Group) | CA SoS | All of the Debtor's right, title and interest in, to and under the Collateral (as defined below), whether now owned or hereafter acquired, now existing or hereafter created and wherever located, including, without limitation, all "accounts," "chattel paper", "general intangibles", "instruments" or "investment property" (in each case as |

| Debtor | Secured Party | Jurisdiction | Description of Collateral |
|---|---|---|---|
| | | | defined in the Uniform Commercial Code as in effect from time to time) constituting or relating to the Collateral, and any and all substitutions and exchanges for, and products and proceeds of, the foregoing. |
| Citywide Home Loan, a Utah Corporation | Customers Bank | UT SoS | All of Seller/Debtor's right, title and interest in, to and under each of the following items of property, whether now owned or hereafter acquired after the date of the Agreement:  a) all Mortgage Loans; b) all mortgage files relating to the Mortgage Loans, including without limitation all promissory notes; c) all servicing records and any other collateral pledged or otherwise relating to such Mortgage Loans; d) all mortgage guaranties and insurance and any mortgage insurance certificate or other document evidencing such mortgage guaranties or insurance relating to any Mortgage Loan; e) all servicing and other rights of Seller relating to the Mortgage Loans; f) all of Seller's rights as the owner of the Mortgage Loans; g) all deposit accounts; and h) all "general intangibles," "accounts," "chattel paper," "deposit accounts" and "investment property" as defined in the UCC as in effect from time to time relating to or constituting any and all of the foregoing, and any and all replacements, substitutions, distributions on or proceeds of any and all of the foregoing. |

Any Liens on the property of the Loan Parties arising in connection with the DIP Repo Guarantee (as defined in Schedule 9.02) and permitted pursuant to the DIP Order.

Liens in favor of, or held for the benefit of, Wells Fargo so long as such liens are subject to an Intercreditor Agreement with Barclays Bank PLC in connection with the payoff of Warehousing Indebtedness.

## Schedule 9.05

**Investments**

1. Compass Home Loans, LLC, a Delaware limited liability company – 47.5% owned
2. Gibraltar Mortgage Services, LLC, a Delaware limited liability company – 50% owned
3. Home Mortgage Alliance, LLC, a Delaware limited liability company – 50% owned
4. Premia Mortgage, LLC, a Delaware limited liability company –50% owned
5. William Lyon Mortgage, LLC, a Delaware limited liability company – 50% owned
6. Results Mortgage, LLC, a Delaware limited liability company – 50% owned
7. KBHS Home Loans, LLC, a Delaware limited liability company – 50% owned
8. SoFi Mortgage, LLC, a Delaware limited liability company – 50% owned
9. BKCO Mortgage, LLC, a Delaware limited liability company – 50% owned

## **Schedule 9.12**

## **Existing Affiliate Transactions**

None.

## Exhibit B to the Interim DIP Order

Approved Budget

**STEARNS LENDING, LLC**
**Cash Flow Forecast**

| General Assumptions |
|---|

The following describes the assumptions and conditions supporting the current cash flow forecast

**DIP Warehouse Facility**
- Facility Capacity: $1.5 billion
- All loans and activity held at former warehouse facilities assumed to transfer to the new facility on the filing date
- Effective advance rate for the new facility assumed to be 95.0%
- Effective warehouse interest rate of approximately 4.5%

**Cash DIP Financing**

- Cash DIP assumes $25mm available at filing, increasing to $35mm with the Final DIP Order (assumed three weeks post-filing)
- Cash DIP assumes a delayed draw structure
- Cash DIP commitment fee based on 2% of facility size
- Warehouse DIP guarantee reflects 1% annual rate on 5% of warehouse balance

**Origination and Settlement Related Receipts and Disbursements**
- Monthly originations from latest thinking management forecast and on current loan lock volume trends
- Settlements assume that prior month origination volume is sold out of warehouse facilities
- Include the following items:

    Gain on Sales - Calculated as percentage of total settlement volume based upon historical analysis

    Return of Equity Haircut - Assumes equity haircut is recovered based on prior month's advance rates

    Equity Haircut on New Financings - Equity funded by Stearns with each new warehouse funding

    Commissions - Based upon expected originations by channel and historical experience

    WH Interest - Based upon rates noted above

**Other Receipts**

Other Receipts include the following:
- Ongoing sales of mortgage servicing rights, with 90% paid up front and 10% three months following initial sale
- Activity associated with loan servicing
- End of month collections of unconsolidated JVs related to shared services
- Fees on loans originated but sold to third-parties

**Other Corporate Disbursements**

- Reflects ongoing payroll and other corporate disbursements based upon historical experience

**Financing Activities**

- Reflects ongoing advances and distributions from JVs and Preferred Partners

**STEARNS LENDING, LLC**
**DIP Budget Forecast**
*($ in millions)*

| | FILING | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Week Number: | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 |
| Week Ended: | 7/12/2019 | 7/19/2019 | 7/26/2019 | 8/2/2019 | 8/9/2019 | 8/16/2019 | 8/23/2019 | 8/30/2019 | 9/6/2019 | 9/13/2019 | 9/20/2019 | 9/27/2019 | 10/4/2019 |
| **Receipts:** | | | | | | | | | | | | | |
| Origination and Settlement Related Receipts | $ 18.3 | $ 26.5 | $ 23.3 | $ 45.8 | $ 30.1 | $ 29.0 | $ 29.4 | $ 36.6 | $ 35.6 | $ 32.9 | $ 25.2 | $ 25.0 | $ 40.0 |
| Other Receipts | - | - | - | 3.5 | - | - | - | 3.5 | - | - | - | - | 3.5 |
| **TOTAL RECEIPTS** | $ 18.3 | $ 26.5 | $ 23.3 | $ 49.3 | $ 30.1 | $ 29.0 | $ 29.4 | $ 40.1 | $ 35.6 | $ 32.9 | $ 25.2 | $ 25.0 | $ 43.5 |
| **Disbursements:** | | | | | | | | | | | | | |
| Origination and Settlement Related Disbursements | $ (35.2) | $ (28.6) | $ (29.0) | $ (24.1) | $ (33.1) | $ (22.9) | $ (26.8) | $ (27.3) | $ (22.7) | $ (30.5) | $ (21.2) | $ (25.0) | (18.8) |
| Other Corporate Disbursements | (6.1) | (0.8) | (0.8) | (6.3) | (1.3) | (7.1) | (1.3) | (6.0) | (1.3) | (6.7) | (1.3) | (1.3) | (5.7) |
| Restructuring Disbursements | (0.1) | - | - | - | - | - | - | - | - | - | - | - | 0.1 |
| **TOTAL DISBURSEMENTS** | $ (41.3) | $ (29.3) | $ (29.7) | $ (30.4) | $ (34.4) | $ (30.0) | $ (28.1) | $ (33.3) | $ (24.0) | $ (37.2) | $ (22.5) | $ (26.2) | (24.4) |
| Professional Fees | (1.6) | - | - | - | - | - | - | - | - | (1.6) | (4.7) | - | - |
| Total Financing Activity | 1.1 | 1.7 | 1.5 | (8.8) | 2.0 | (3.0) | 3.0 | (5.2) | 3.6 | (1.5) | 1.5 | (0.7) | (0.4) |
| **NET CASH FLOW** | $ (23.5) | $ (1.1) | $ (5.0) | $ 10.1 | $ (2.3) | $ (4.0) | $ 4.3 | $ 1.6 | $ 13.6 | $ (10.5) | $ 4.2 | $ (1.9) | 18.6 |
| **Cash Balance** | | | | | | | | | | | | | |
| **Beginning Cash Balance** | $ 56.6 | $ 33.1 | $ 32.0 | $ 27.0 | $ 44.9 | $ 42.6 | $ 38.6 | $ 42.9 | $ 44.5 | $ 58.1 | $ 47.6 | $ 51.9 | 49.9 |
| Net Cash Flow | (23.5) | (1.1) | (5.0) | 10.1 | (2.3) | (4.0) | 4.3 | 1.6 | 13.6 | (10.5) | 4.2 | (1.9) | 18.6 |
| DIP Draws / (Paydowns) | - | - | - | 7.8 | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | $ 33.1 | $ 32.0 | $ 27.0 | $ 44.9 | $ 42.6 | $ 38.6 | $ 42.9 | $ 44.5 | $ 58.1 | $ 47.6 | $ 51.9 | $ 49.9 | 68.5 |
| **DIP Financing** | | | | | | | | | | | | | |
| **Beginning DIP Balance** | $ - | $ - | $ - | $ - | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | 7.8 |
| DIP Draw / (Paydown) | - | - | - | 7.8 | - | - | - | - | - | - | - | - | - |
| **Ending Balance** | $ - | $ - | $ - | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | $ 7.8 | 7.8 |
| **DIP Availability** | $ 25.0 | $ 25.0 | $ 25.0 | $ 27.2 | $ 27.2 | $ 27.2 | $ 27.2 | $ 27.2 | $ 27.2 | $ 27.2 | $ 27.2 | $ 27.2 | 27.2 |
| **Total Liquidity** | $ 58.1 | $ 57.0 | $ 52.0 | $ 72.1 | $ 69.8 | $ 65.7 | $ 70.1 | $ 71.7 | $ 85.3 | $ 74.8 | $ 79.0 | $ 77.1 | 95.7 |