**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **STEARNS HOLDINGS, LLC,** *et al.*, | **Case No. 19-12226 (SCC)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| | **Related Docket No. 91** |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (A) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing and (G) Granting Related Relief* (the "Motion"), filed by Stearns Holdings, LLC ("Stearns Holdings") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking the entry of an interim order (the "Interim DIP Order") and final order (this "Final DIP Order") providing for, among other things, the following relief:

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are: Stearns Holdings, LLC (8219); Stearns Co-Issuer Inc. (7096); Stearns Lending, LLC (1773); Stearns Ventures, LLC (2386); Protos Acquisition LLC (4941); bSNAP, LLC (2498); and Private Mortgage Advisors, LLC (7493). The address of Protos Acquisition LLC is 345 Park Avenue, New York, NY 10154. The address of the other Debtors is c/o Stearns Lending, LLC, 750 East Highway, 121 Bypass, Suite 150, Lewisville, TX 75067.

    (i)      authorizing, pursuant to sections 105(a), 363(b), 364(c), and 364(d), of title 11 of the United States Code (the "Bankruptcy Code"), the Debtors to execute, deliver, perform under, and enter into transactions under:

        (a)      that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, to be dated on or about the DIP Closing Date,[2] attached as Exhibit B to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "Cash Flow DIP Credit Agreement," and all obligations or liabilities with respect to the Cash Flow DIP Credit Agreement, the "Cash Flow DIP Obligations") among (i) Stearns Holdings, (ii) Stearns Lending, LLC ("Stearns Lending"), as borrower, and (iii) Blackstone Capital Partners VI NQ/NF L.P. and Blackstone Family Investment Partnership VI-NQ - ESC L.P., collectively as lender (the "Cash Flow DIP Lender"); and

        (b)      all other documents related thereto (collectively with the Cash Flow DIP Credit Agreement, the "Cash Flow DIP Documents"),[3] which provide for a maximum committed amount of up to $35 million (the "Cash Flow DIP Facility");

    (ii)      granting, subject to the Carve-Out (as defined below) the priorities identified herein:

        (a)      to the Cash Flow DIP Lender, superpriority claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, against the Debtors to secure the Cash Flow DIP Obligations on a joint and several basis, which shall be junior in all respects to the DIP Repo Superpriority Claim (as defined below) against Stearns Lending;

        (b)      to the Cash Flow DIP Lender, the Cash Flow DIP Liens (as defined below), pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, to secure the Cash Flow DIP Obligations, on the Cash Flow DIP Collateral (as defined below), including (i) a first-priority lien on unencumbered property, (ii) a first-priority priming lien on Secured Notes Collateral (as defined below), and (iii) junior liens on encumbered property that is not Secured Notes Collateral; provided, however, that in no event shall the Cash Flow

---

[2]    For purposes herein, the "DIP Closing Date" means the date on which the Cash Flow DIP Facility was entered into and became effective, which occurred on July 11, 2019.

[3]    The Cash Flow DIP Documents include the Guaranty and Collateral Agreement (as it may be amended, modified, or supplemented) executed by Stearns Lending, and by each of the Debtors other than Stearns Lending and each other subsidiary of Stearns Holdings that becomes a Debtor and guarantor pursuant to the Cash Flow DIP Documents (the "Cash Flow DIP Guarantors").

DIP Liens attach to the DIP Repo Collateral (as defined in the DIP Repo Motion); and

(c)    to the DIP Repo Guarantor, subject to satisfaction of the DIP Repo Guarantee Lien Condition (as defined below), first-priority priming liens and security interests, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, on the Cash Flow DIP Collateral and *pari passu* with the Cash Flow DIP Liens, to secure amounts actually advanced by the DIP Repo Guarantor under the DIP Repo Guarantee made by it for the benefit of the DIP Repo Facility Purchasers, in an amount up to the DIP Repo Guarantee Limit;[4]

(iii)    authorizing the Debtors, pursuant to sections 361, 362 and 363 of the Bankruptcy Code:

(a)    to use the collateral (including cash collateral, which for the avoidance of doubt shall not include the DIP Repo Collateral or any other Excluded Asset (as defined below)), the "Secured Notes Collateral") securing those certain 9.375% senior secured notes due 2020 (the "Secured Notes") issued by Stearns Holdings and Stearns Co-Issuer Inc., under that certain Indenture, dated as of August 8, 2013 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Secured Notes Indenture" and, together with all instruments,

---

[4]    For purposes herein:

(a)    The "DIP Repo Facility" has the meaning ascribed to it in the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing the Debtors to Enter into Repurchase Agreement Facilities and Related Documents; (B) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (C) Granting Backup Liens and Superpriority Administrative Expense Claims; (D) Modifying the Automatic Stay; (E) Scheduling a Final Hearing; and (F) Granting Related Relief* (the "DIP Repo Motion").

(b)    The "DIP Repo Agent" has the meaning ascribed to it in the DIP Repo Motion.

(c)    "DIP Repo Parties" has the meaning ascribed to it in the DIP Repo Motion.

(d)    The "DIP Repo Facility Purchasers" means the buyers from time to time under the DIP Repo Facility, together with the DIP Repo Agent acting on their behalf.

(e)    "DIP Repo Superpriority Claims" means the superpriority administrative expense claims granted to the DIP Repo Parties pursuant to the Interim DIP Repo Order and the Final DIP Repo Order.

(f)    The "DIP Repo Guarantee" means that certain Limited Recourse Guarantee, to be dated on or about the DIP Closing Date, attached as Exhibit C to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the DIP Repo Agent and Blackstone Capital Partners VI NQ/NF L.P., as guarantor (the "DIP Repo Guarantor"), pursuant to which the DIP Repo Guarantor has agreed to provide a limited guaranty of Stearns Lending's obligations under the DIP Repo Facility.

(g)    The "DIP Repo Guarantee Limit" means an aggregate amount equal to 5.00% of the "Collateral" of the DIP Repo Facility.

agreements and documents related thereto, the "<u>Secured Notes Documents</u>");

(b)    to provide adequate protection, subject to the Carve-Out and the priorities identified herein, to Wilmington Trust, National Association, as indenture trustee and collateral agent (in such capacities, the "<u>Secured Notes Indenture Trustee</u>") on behalf of the holders (in such capacities, the "<u>Secured Noteholders</u>," and, together with the Secured Notes Indenture Trustee, the "<u>Secured Notes Parties</u>") of the Secured Notes.

(iv)    authorizing the Debtors to waive:

(a)    any Debtors' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(b)    the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code; and

(c)    the equitable doctrine of marshaling or similar doctrines;

(v)    authorizing the Debtors to use the proceeds of the Cash Flow DIP Facility, in accordance with this Final DIP Order and the Cash Flow DIP Documents;

(vi)    modifying the automatic stay to the extent set forth herein and in the Cash Flow DIP Documents; and

(vii)    scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the Cash Flow DIP Documents as set forth in the Motion.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, (i) the *Declaration of Stephen Smith in Support of Debtors' Cash Flow DIP Motion*, (ii) the *Declaration of Robert Campagna, Alvarez & Marsal North America, LLC, in Support of Debtors' Cash Flow DIP Motion*, (iii) the *Declaration of Paul Sheaffer in Support of Debtors' Cash Flow DIP Motion and DIP Repo Facility Motion*, and (iv) the *Declaration of Stephen Smith, President and Chief Financial Officer of Stearns Lending, LLC in Support of Chapter 11 Petitions and First Day Pleadings*, the Cash Flow DIP Documents, and the record made by the Debtors at the interim hearing held before the Bankruptcy Court (the "<u>Interim Hearing</u>"); and the Bankruptcy Court having (i) entered in the Interim DIP Order and (ii) scheduling a Final Hearing

on the Motion on July 31, 2019 at 2:00 pm to consider entry of this Final DIP Order; and notice

of the Final Hearing having been given in accordance with Rules 2002, 4001(b) (c), and (d) of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Final Hearing

having been held and conducted, and all objections, if any, to the final relief requested in the

Motion having been withdrawn, resolved or overruled after due consideration thereof; and after

due deliberation and consideration; and sufficient cause appearing therefor:

**THE BANKRUPTCY COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS**:

A.      *Petition Date*. On July 9, 2019 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

B.      *Joint Administration*. The Bankruptcy Court has entered an order approving the

joint administration of the Chapter 11 Cases.

C.      *Debtors in Possession*. The Debtors continue to manage and operate their

businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.

D.      *Committee Formation*. As of the date hereof, no trustee or examiner or official

committee of unsecured creditors (a "Creditors' Committee") or any other statutory committee

has been appointed in these Chapter 11 Cases.

E.      *Jurisdiction and Venue*. The Bankruptcy Court has jurisdiction over the

Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). The Bankruptcy Court

may enter this Final DIP Order consistent with Article III of the United States Constitution.

Venue of the Chapter 11 Cases and the Motion is proper in this district under 28 U.S.C. §§ 1408

and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363,

364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014,

and Rule 4001-2 of the Bankruptcy Rules for the Southern District of New York (the "Local

Bankruptcy Rules").

F.       ***Debtors' Stipulations.*** After consultation with their attorneys and financial

advisors, and the Debtors, without prejudice to the rights of any other party in interest, subject to

the limitations thereon contained in paragraph 23 of this Final DIP Order, on their behalf and on

behalf of their estates, admit, acknowledge, agree, and stipulate as follows:

> ***Secured Notes Parties, the Secured Notes Liens, the Secured Notes Collateral and the Secured Notes Obligations.***

(i)       <u>Secured Notes Indenture.</u> As of the Petition Date, Stearns Holdings

and Stearns Co-Issuer Inc. were issuers under the Secured Notes Indenture. The Secured Notes

Obligations (defined below) outstanding under the Secured Notes Indenture are guaranteed by

Stearns Lending and Stearns Ventures, LLC.

(ii)       <u>Secured Notes Obligations.</u> As of the Petition Date, the Debtors

were indebted to the Secured Notes Parties, without defense, counterclaim or offset of any kind,

in the aggregate amount of not less than approximately $182 million, plus accrued and unpaid

interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and

financial advisors' fees, in each case, that are chargeable or reimbursable under the Secured

Notes Documents), charges, indemnities, any amounts owing on account of call protections

contained in the Secured Notes Documents, and other obligations incurred in connection

therewith (whether arising before or after the Petition Date) as provided in Secured Notes

Documents (collectively, the "<u>Secured Notes Obligations</u>").

(iii)       *Secured Notes Liens and Secured Notes Collateral.* The Secured

Notes Obligations are secured (the "<u>Secured Notes Liens</u>") by the Secured Notes Collateral.

(iv)     *Validity, Perfection, and Priority of Secured Notes and Secured Notes Obligations.* The Debtors hereby further acknowledge and agree that as of the Petition Date:

(A)     The Secured Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the Secured Notes Indenture;

(B)     The Secured Notes Liens on the Secured Notes Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the Indenture Trustee, for the benefit of itself and the Secured Noteholders, for fair consideration and reasonably equivalent value;

(C)     The Secured Notes Liens are senior in priority over any and all other liens on the Secured Notes Collateral, subject only to liens granted hereunder, certain liens senior by operation of law or otherwise permitted to be senior under the Secured Notes Indenture (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Secured Notes Liens as of the Petition Date) (the "Secured Notes Permitted Prior Liens");

(D)     No portion of the Secured Notes Liens, the Secured Notes Obligations, or any payments made to the Indenture Trustee or the Secured Noteholders or applied to or paid on account of the Secured Notes Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)     The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the Indenture Trustee, the Secured Noteholders, or any of their respective Representatives;

(F)     The Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors' estates, waived, discharged, and released any right to challenge any of the Secured Notes Obligations or the validity, extent and priority of the Secured Notes Liens;

(G)     The Secured Notes Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and

(H)     The Debtors have been and are in default of their obligations under the Secured Notes Indenture, including as a result of the Chapter 11 Cases, and an Event of Default (as defined in the Secured Notes Indenture) has occurred and is continuing.

G.    ***Findings Regarding the Cash Flow DIP Facility and Use of Cash Collateral***

(a)     ***Good Cause***. Good and sufficient cause has been shown for the entry of this Final DIP Order.

(b)     ***Necessity of Cash Flow DIP Facility***. An immediate and critical need exists to obtain the Cash Flow DIP Facility and to use cash collateral in order to permit, among other things, the continued operation of the Debtors' businesses in the ordinary course, to administer and preserve the value of their estates, to maintain business relationships and to satisfy other working capital and operational needs. In the absence of the availability of funds in accordance with the terms of the Cash Flow DIP Documents and this Final DIP Order, the continued operation of the Debtors' business would not be possible. The access of the Debtors to sufficient working capital and liquidity through the Cash Flow DIP Facility and the use of cash collateral is necessary and vital to avoid serious and irreparable harm to the Debtors and to achieve a successful reorganization. Consummation of the transactions contemplated by the Cash

Flow DIP Documents and this Final DIP Order is therefore in the best interests of the Debtors' estates.

        (c)     ***No Financing Available on More Favorable Terms***. Given their financial condition and capital structure, and despite their diligent efforts, the Debtors are unable to reasonably obtain from other sources sufficient postpetition liquidity, and the Cash Flow DIP Facility is the only such corporate financing facility available at this time. The Debtors have also been unable to obtain secured credit from other sources (i) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (ii) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (iii) secured solely by a junior lien on property of the Debtors and their estates that is already subject to a lien. A loan facility in the amount provided by the Cash Flow DIP Documents is not otherwise available to the Debtors without granting the Cash Flow DIP Lender superpriority claims and superpriority priming liens and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this Final DIP Order and the Cash Flow DIP Documents. After considering the advantages and disadvantages of the proposed Cash Flow DIP Facility, the Debtors have concluded, in the exercise of their prudent business judgment, that moving forward with the proposed Cash Flow DIP Facility is the best financing alternative reasonably available. The Cash Flow DIP Facility will permit the Debtors to operate their businesses in the ordinary course, and prosecute their proposed plan of reorganization, which will culminate in a going-concern transaction that will preserve the Debtors' businesses, save the jobs of the Debtors' employees and maximize value for the Debtors' estates and their stakeholders. Additionally, the terms of the Cash Flow DIP Facility are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(d)        *Willingness to Provide Liquidity*. The Cash Flow DIP Lender has

indicated a willingness to engage in the transactions contemplated by the Cash Flow DIP

Documents and this Final DIP Order in reliance on, among other things, (i) approval by the

Bankruptcy Court of the terms and conditions of the Cash Flow DIP Documents with respect to

the Cash Flow DIP Obligations, and (ii) entry of findings of the Bankruptcy Court that (A) the

Cash Flow DIP Facility and the other financial accommodations pursuant to the Cash Flow DIP

Documents are essential to the Debtors' estates and are being extended in good faith, and (B) the

Cash Flow DIP Superpriority Claims and the Cash Flow DIP Liens (each as defined below) will

have the protections provided for in section 364(e) of the Bankruptcy Code.

(e)        *Final DIP Repo Order.* On the Petition Date, the Debtors also filed the

DIP Repo Motion, seeking, among other things, the entry of an Order granting the relief

requested therein on an interim (the "Interim DIP Repo Order") and final basis (the "Final DIP

Repo Order").

(f)        *Good Faith*. The Cash Flow DIP Documents have been negotiated in good

faith and at arm's length among the Debtors, the Cash Flow DIP Lender, and their respective

representatives. All of the Cash Flow DIP Obligations arising under, in respect of, or in

connection with the Cash Flow DIP Facility and Cash Flow DIP Documents shall be deemed to

have been extended by the Cash Flow DIP Lender in accordance with the Cash Flow DIP

Documents and in good faith as that term is used in section 364(e) of the Bankruptcy Code and

in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and

shall therefore be entitled to the full protection of section 364(e) of the Bankruptcy Code and the

terms, conditions, benefits, and privileges of this Final DIP Order regardless of whether this

Final DIP Order is subsequently reversed, vacated, modified, or otherwise no longer in full force

and effect or the Chapter 11 Cases are subsequently converted or dismissed.

(g)    *Adequate Protection*. The Secured Notes Parties are entitled, pursuant to

sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the

Secured Notes Collateral for, and equal in amount to, any diminution in the value of the Secured

Notes Parties' interests in the Secured Notes Collateral pursuant to sections 361, 362, 363 and

364 of the Bankruptcy Code. As adequate protection, the Secured Notes Parties shall be granted,

as set forth herein, superpriority administrative claims and adequate protection liens for, and in

an amount equal to, any Diminution in Value (as defined below) of the Secured Notes Parties'

interests in the Secured Notes Collateral, and the additional adequate protection specified in

paragraph 15 herein (collectively, the "Forms of Adequate Protection"). Based on the Motion

and on the record presented to the Bankruptcy Court, the Forms of Adequate Protection are fair

and reasonable and reflect the Debtors' prudent exercise of business judgment.

(h)    *Consideration*. The Debtors will receive and have received fair

consideration and reasonably equivalent value in exchange for access to the Cash Flow DIP

Facility and all other financial accommodations provided under the Cash Flow DIP Facility, the

Cash Flow DIP Documents, and this Final DIP Order. The terms of the Cash Flow DIP Facility

pursuant to the Cash Flow DIP Documents and the use of the Cash Flow DIP Collateral

(including the cash collateral) pursuant to this Final DIP Order are fair and reasonable, reflect the

Debtors' exercise of prudent business judgment, and constitute reasonably equivalent value and

fair consideration.

H.    *Notice and Final Hearing*. The Final Hearing was held pursuant to Bankruptcy

Rule 4001(b)(2) and (c)(2) on July 31 2019 at 2:00 p.m. (Eastern Time) before the Honorable

Shelley C. Chapman, United States Bankruptcy Judge, the United States Bankruptcy Court for

the Southern District of New York. Adequate and sufficient notice of the Final Hearing and the

final relief requested in the Motion has been provided by the Debtors, whether by facsimile,

email overnight courier or hand delivery, to: (a) the U.S. Trustee, (b) the Debtors' 30 largest

unsecured non-insider creditors, (c) the Debtors' five largest secured creditors, (d) counsel to the

Secured Notes Indenture Trustee, Reed Smith LLP, 1201 N. Market Street, Suite 1500,

Wilmington, DE 19801 (Attn:  Kurt F. Gwynne and Jason D. Angelo), (e) counsel to Pacific

Investment Management Company LLC, Hogan Lovells US LLP, 1999 Avenue of the Stars,

Suite 1400, Los Angeles, CA 90067 (Attn: Bennett L. Spiegel and Stacey Rosenberg), (f)

counsel to the Cash Flow DIP Lender, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue,

New York, NY 10017 (Attn: Elisha Graff and Jamie Fell), (g) counsel to Barclays Bank PLC,

Hunton Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166 (Attn: Peter S. Partee, Sr.,

Brian Clarke), (h) co-counsel to Nomura Corporate Funding Americas LLC, Milbank LLP, 55

Hudson Yards, New York, NY 10001 (Attn: Mark Shinderman and Lauren C. Doyle) and Alston

& Bird LLP, 90 Park Avenue, New York, NY 10016 (Attn: Karen Gelernt), (i) counsel to Fannie

Mae, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: Stephen

H. Warren), (j) counsel to Freddie Mac, McKool Smith, P.C., 600 Travis Street, Suite 7000,

Houston, TX 77002 (Attn: Paul D. Moak), and One Bryant Park, 47th Floor, New York, NY

10036 (Attn: Kyle A. Lonergan), (k) counsel to Ginnie Mae, 451 7th Street SW, Room 9250,

Washington, DC 20410 (Attn: Lisa Mulrain and Lynne Chandler) and Director, Monitoring &

Asset Management to Ginnie Mae, 425 3rd Street SW, Suite 500, Washington, DC 20024 (Attn:

Rene Mondonedo), and (l) all parties required by Local Bankruptcy Rule 9013-1(b).  Under the

circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and

the Final Hearing constitutes adequate notice thereof and complies with the Bankruptcy Rules

and Local Bankruptcy Rules, and no further notice of the relief granted herein is necessary or required.

I.       *Government Sponsored Entities*.

a.       *Fannie Mae; Servicing Rights and Reservation*. Notwithstanding anything to the contrary contained in the Cash Flow DIP Documents, this Final DIP Order, or the Final DIP Repo Order, no lien or security interest granted by the Cash Flow DIP Documents or this Final DIP Order shall (a) attach to, modify, include or otherwise affect mortgage servicing rights or servicer advance receivables with respect to mortgages which are now or hereafter serviced or subserviced by Stearns Lending (or any of its affiliates) for the Federal National Mortgage Association ("Fannie Mae"). Furthermore, notwithstanding anything to the contrary in the Cash Flow DIP Documents or this Final DIP Order, no lien or administrative expense claim is granted with respect to (i) any right or asset of any Debtor or any non-Debtor affiliate under that certain Mortgage Selling and Servicing Contract between Stearns Lending and Fannie Mae effective April 15, 2002 (together with all supplements, addendums, modifications, amendments, and related agreements, the "Fannie Mae Lender Contract") or (ii) any asset that is the subject of any lien or pledge for the benefit of Fannie Mae, except as expressly set forth in a written agreement hereafter executed by Fannie Mae, and in all cases subject to the terms of such Fannie Mae agreement. For the avoidance of doubt, and without limiting the foregoing, nothing in the Cash Flow DIP Documents or this Final DIP Order subordinates, primes, grants a lien or administrative claim in, or otherwise impairs Fannie Mae's interest in, or rights to, any property or collateral held or required to be held by the Debtors, the non-Debtor affiliates, Fannie Mae, or any other party in connection with the Fannie Mae Lender Contract. Furthermore, none of the rights related to loans and mortgages covered

by the Fannie Mae Lender Contract (including any principal, interest, and funds for the payment

of property taxes and insurance premiums collected by Stearns Lending in connection with its

performance of its servicing or subservicing obligations under the Fannie Mae Lender Contract)

are property of the Debtors' estates under section 541 of the Bankruptcy Code and no lien is

granted hereunder to any of the Debtors' pre-petition or post-petition lenders therein. Fannie

Mae reserves all rights in and under all of its agreements with the Debtors and the non-Debtor

affiliates, including the Fannie Mae Lender Contract, none of which is impaired by the Cash

Flow DIP Documents or this Final DIP Order.

      a.    ***Freddie Mac; Servicing Rights and Reservation***. Notwithstanding

anything to the contrary contained in the Cash Flow DIP Documents, this Final DIP Order, or

the Final DIP Repo Order, no lien, security interest, or administrative expense claim granted by

the Cash Flow DIP Documents or this Final DIP Order (including, without limitation, any Cash

Flow DIP Liens (as defined below)) shall (a) attach to, modify, include or otherwise affect

(i) mortgage servicing rights (if any) with respect to mortgage loans sold to the Federal Home

Loan Mortgage Corporation ("Freddie Mac"), (ii) any mortgage loan once it has moved to the

"Settlement Lock" status under the Cash Program (as defined in the Freddie Mac Guide (as

defined below)) or has entered the funding cycle under the Guarantor Program (as defined in the

Freddie Mac Guide), or (iii) the "Servicing Collateral" (as defined and referenced in, and except

as otherwise expressly authorized by that certain Third Amended, Restated and Supplemented

Acknowledgment Agreement dated September 27, 2017 amongst Freddie Mac, Stearns

Lending, LLC, Wilmington Trust National Association, and NexBank SSB, as may be amended

or modified pursuant to its express provisions, as expressly agreed to by Freddie Mac (the

"Freddie Mac Acknowledgment Agreement")), (b) attach to, modify, include or otherwise affect

any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie

Mac pursuant to any collateral pledge agreement or other security agreement between Stearns

Lending and Freddie Mac, or (c) impair Freddie Mac's rights, claims, remedies, powers,

interests, payment or lien priority, or prerogatives set forth in the Freddie Mac

Acknowledgment Agreement, that certain Customer Agreement between Freddie Mac and

Stearns Lending executed on or about March 2, 2018 (the "Freddie Mac Customer

Agreement"), the Freddie Mac Single-Family Seller/Servicer Guide (as amended from time to

time, the "Freddie Mac Guide"), the Master Securities Forward Transaction Agreement between

Freddie Mac and Stearns Lending, executed on or about July 2, 2019 (the "Freddie Mac

MSFTA"), the Purchase Documents (as defined in the Freddie Mac Guide), or any purchase

contracts memorialized through Freddie Mac's Loan Selling Advisor (or otherwise) (the

"Freddie Mac Purchase Contracts") (collectively, the "Freddie Mac Agreements").

Notwithstanding anything to the contrary in the Cash Flow DIP Documents or this Final DIP

Order, no lien or administrative expense claim is granted with respect to any right or asset of the

Debtors or any non-Debtor affiliate under the Freddie Mac Agreements, except as expressly

provided in the Freddie Mac Acknowledgment Agreement and in all cases subject to the terms

of such agreement.

       b.    ***Ginnie Mae Reservation***. Notwithstanding anything to the contrary

contained in the Cash Flow DIP Documents, this Final DIP Order, or the Final DIP Repo Order,

no lien or security interest granted by the Cash Flow DIP Documents or this Final DIP Order

shall (a) attach to, modify, include or otherwise affect the mortgages as defined in that certain

Ginnie Mae Mortgage-Backed Securities Guide (the "Ginnie Mae Guide" and, together with all

other agreements, amendments, memorandums and supplements thereto with the Government

National Mortgage Association ("Ginnie Mae"), the "Ginnie Mae Agreements"), including, but not limited to, the related mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Stearns Lending (or any of their respective affiliates) that back Ginnie Mae securities, except as expressly consented to by Ginnie Mae. For the avoidance of doubt, and without limiting the foregoing, nothing in the Cash Flow DIP Documents or this Final DIP Order subordinates, primes, grants a lien or administrative claim in, or otherwise impairs Ginnie Mae's interest in, or rights to, the mortgages backing the Ginnie Mae securities and any related collateral, including, but not limited to, cash, accounts or collateral held or required to be held by the Debtors, the non-Debtor affiliates, Ginnie Mae, or any other party in connection with the Ginnie Mae Agreements. Ginnie Mae reserves all rights pursuant to 12 U.S.C. § 1721(g), and all rights in all of its agreements with the Debtors and the non-Debtor affiliates, including the Ginnie Mae Agreements, none of which is impaired by the Cash Flow DIP Documents or the Final DIP Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Bankruptcy Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      ***Motion Granted/Interim Financing Approved***. The Motion is granted on a final basis, and the financing described herein is authorized and approved on a final basis and subject to the terms set forth in the Cash Flow DIP Documents and this Final DIP Order.

2.      All objections to and reservations of rights with respect to the final relief sought in the Motion and to the entry of this Final DIP Order, to the extent not withdrawn, waived, settled or resolved are hereby denied and overruled on the merits in their entirety.

3.        *Effectiveness*. Subject to the terms hereof, this Final DIP Order shall become immediately effective and enforceable *nunc pro tunc* to the Petition Date, upon the date this Final DIP Order is signed by the Bankruptcy Court and entered on the docket in the Chapter 11 Cases (the "Final Order Entry Date"), and there shall be no stay of execution or effectiveness of this Final DIP Order.

4.        ***Authorization of the Cash Flow DIP Facility***.

(a)        Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, and in addition to the authority granted in the Interim DIP Order, the Debtors are immediately authorized and empowered to (i) enter into and perform their obligations under the Cash Flow DIP Credit Agreement, (ii) execute and deliver all other Cash Flow DIP Documents required or advisable to effect the Cash Flow DIP Facility, and (iii) take all actions which may be necessary or advisable for the performance by the Debtors under the Cash Flow DIP Documents. The Debtors are hereby authorized to borrow up to the aggregate principal amount of $35 million under the Cash Flow DIP Facility, all of which shall be used by the Debtors as permitted by the Cash Flow DIP Documents, including, without limitation, subject to the Approved Budget (as defined below).

(b)        In furtherance of the foregoing and without further approval of this Bankruptcy Court, the Debtors are authorized and empowered to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that the Cash Flow DIP Lender may reasonably determine is required or necessary for the Debtors' performance of their obligations under the Cash Flow DIP Facility, including, without limitation:

(i)      the execution, delivery, and performance of the Cash Flow DIP Documents, including, without limitation, the Cash Flow DIP Credit Agreement and any security and pledge agreements contemplated thereby;

(ii)      the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the Cash Flow DIP Documents, in each case in such form as the Debtors and other required parties may agree;

(iii)      the non-refundable payment or reimbursement of the reasonable and documented fees, costs and expenses referred to in the Cash Flow DIP Documents, including the fees and expenses of the Cash Flow DIP Lender, and costs and expenses payable under the Cash Flow DIP Documents; and

(iv)      the performance of all other acts required under or in connection with the Cash Flow DIP Documents.

(c)      ***Cash Flow DIP Obligations***. Upon execution and delivery of the Cash Flow DIP Documents, the Cash Flow DIP Documents and Cash Flow DIP Obligations shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each person or entity party to the Cash Flow DIP Documents (a "Cash Flow DIP Party") in accordance with the terms thereof and the terms of this Final DIP Order, and any of their successors and assigns, including any trustee appointed in the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon conversion of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). No obligation, payment, transfer, or grant of security hereunder or under the Cash Flow DIP Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, or 550

of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform

Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance,

reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable,

contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether

equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any

other applicable foreign or domestic law or regulation by any person or entity.

5.    ***Security for the Cash Flow DIP Obligations***.

(a)    The Bankruptcy Court hereby grants the following valid, binding,

enforceable, and non-avoidable postpetition senior priming security interests and liens, effective

and automatically and properly perfected as of the Interim Order Entry Date (collectively, the

"Cash Flow DIP Liens") to the Cash Flow DIP Lender, in each case to secure the Debtors'

obligations under the Cash Flow DIP Documents: a first-priority priming lien and security

interest, pursuant to section 364(c) and section 364(d) of the Bankruptcy Code, upon all property

identified in (i), (ii) and (iii) below and subject to the relevant priorities described below and in

the Final DIP Repo Order (in each case, other than Excluded Assets (as defined below))

(collectively, the "Cash Flow DIP Collateral"). The Cash Flow DIP Liens on the Cash Flow DIP

Collateral shall be senior in all respects to the security interests in, and liens on, the Cash Flow

DIP Collateral of each of the Secured Notes Parties and subject only to (A) the Carve-Out,

(B) valid, perfected, and non-avoidable liens on Cash Flow DIP Collateral that are in existence

on the Petition Date, solely to the extent such liens are senior in priority to the Cash Flow DIP

Liens on Cash Flow DIP Collateral and (C) valid and non-avoidable liens on Cash Flow DIP

Collateral that are perfected subsequent to the Petition Date as permitted by section 546(b) of the

Bankruptcy Code solely to the extent such liens are senior in priority to the Cash Flow DIP Liens

on Cash Flow DIP Collateral.

(i)    <u>First Lien on Unencumbered Property.</u> Pursuant to

section 364(c)(2) of the Bankruptcy Code, and subject and subordinate in all respects to the

Carve-Out, a valid, binding, continuing, enforceable, fully perfected, first priority lien on, and

security interest in, all tangible and intangible prepetition and postpetition property in which any

of the Debtors has an interest, whether existing on or after the Petition Date or thereafter

acquired, that is not subject to a valid, perfected, non-avoidable and enforceable lien or security

interest in existence on or as of the Petition Date (collectively, the "<u>Unencumbered Property</u>"),

including, without limitation, (i) any cash of the Debtors, (subject to the limitations on the Carve-

Out Account set forth herein) and any investment of such cash, inventory, accounts receivable,

other rights to payment whether arising before or on the Petition Date <u>provided</u> that such cash

shall not include any cash that constitutes DIP Repo Collateral, including without limitation the

warehouse related cash accounts at Stearns Lending, or any cash in the Unrestricted Account at

Stearns Lending, contracts, properties, plants, equipment, general intangibles, documents,

instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names,

other intellectual property, equity interests, and any claims and causes of the Debtors; (ii) any

commercial tort claims and causes of action of any of the Debtors and any claims or causes of

action against any directors or officers of the Debtors as well as any proceeds of, or property

recovered in connection with, any successful claims and causes of action against any directors or

officers of the Debtors; and (iii) the proceeds of all of the foregoing; <u>provided</u> that the

Unencumbered Property shall exclude the Excluded Assets, to the extent set forth in the

definition thereof;

(ii)     <u>Liens Junior to Certain Existing Liens.</u> Pursuant to

section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the

Carve-Out, a valid, binding, continuing, enforceable, fully perfected, junior lien on, and security

interest in, all tangible and intangible prepetition and postpetition property in which any of the

Debtors has an interest (other than the property described below in paragraph 5(a)(iii)) whether

now existing or hereafter acquired and all proceeds thereof, that is subject to valid, perfected and

unavoidable liens or security interests in existence immediately prior to the Petition Date and to

valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected

after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the

"<u>Non-Primed Liens</u>"), which security interests and liens in favor of the Cash Flow DIP Lender

shall be immediately junior to the Non-Primed Liens; and

(iii)     <u>Liens Priming the Liens of the Secured Notes Parties.</u> Pursuant to

section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the

Carve-Out, a valid, binding, continuing, enforceable, fully perfected, first priority, senior priming

lien on, and security interest in, all Secured Notes Collateral. The Cash Flow DIP Liens on the

Secured Notes Collateral shall be senior in all respects to the security interests in, and liens on,

the Secured Notes Collateral of each of the Secured Notes Parties (including the Adequate

Protection Liens), and subject only to (A) the Carve-Out, (B) valid, perfected, and non-avoidable

liens on Secured Notes Collateral that are in existence on the Petition Date (other than the

Secured Notes Liens), solely to the extent such liens are senior in priority to Secured Notes Liens

on Secured Notes Collateral and (C) valid and non-avoidable liens on Secured Notes Collateral

that are perfected subsequent to the Petition Date as permitted by section 546(b) of the

Bankruptcy Code solely to the extent such liens are senior in priority to the Secured Notes Liens on Secured Notes Collateral.

(b)    The Cash Flow DIP Liens shall be effective immediately upon the Interim Order Entry Date.

(c)    The Cash Flow DIP Liens are granted on the Cash Flow DIP Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or Cash Flow DIP Lender. As set forth below in paragraph 20 of this Final DIP Order, the Cash Flow DIP Lender may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the Cash Flow DIP Liens, or possess or control the Cash Flow DIP Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

6.    ***Cash Flow DIP Superiority Claims***. The Cash Flow DIP Lender is hereby granted superpriority administrative expense claims (the "Cash Flow DIP Superpriority Claims") pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code against each of the Debtors to secure such Debtor's Cash Flow DIP Obligations. The Cash Flow DIP Superpriority Claims shall be senior to all other administrative expense or other claims, including those arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code. Notwithstanding the foregoing, the Cash Flow DIP Superpriority

Claims shall be subject and subordinate in all respects to the Carve-Out and to the DIP Repo

Superpriority Claim against Stearns Lending (which itself shall not be subject to the Carve-Out).

7.    ***Security for the DIP Repo Guarantor***.

(a)    In order to provide credit support on behalf of the Debtors and to induce

the DIP Repo Parties to extend credit under the DIP Repo Facility, Blackstone Capital Partners

VI NQ/NF L.P., agreed to guarantee the obligations of Stearns Lending under the DIP Repo

Facility up to the DIP Repo Guarantee Limit. The provision of the DIP Repo Guarantee was a

material inducement to the DIP Repo Agent and the DIP Repo Facility Purchasers extending

postpetition warehouse financing to the Debtors pursuant to the DIP Repo Facility. Additionally,

absent the provision of the DIP Repo Guarantee, the DIP Repo Facility Purchasers would have

provided a lower advance rate under the DIP Repo Facility, which in turn would have increased

the funding need of the Debtors under the Cash Flow DIP Facility on a dollar-for-dollar basis.

(b)    The Bankruptcy Court hereby grants the following valid, binding,

enforceable and non-avoidable postpetition security interests and liens, effective and

automatically and properly perfected as of the Interim Order Entry Date (collectively, the "DIP

Repo Guarantee Liens"), to the DIP Repo Guarantor, to secure amounts actually advanced by the

DIP Repo Guarantor under the DIP Repo Guarantee[5] for the benefit of the DIP Repo Facility

Purchasers up to the DIP Repo Guarantee Limit: a contingent first-priority lien and security

interest, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, on the Cash Flow DIP

Collateral, which shall arise only upon the full and indefeasible payment and satisfaction of the

obligations under the DIP Repo Facility (the "DIP Repo Guarantee Lien Condition"). The DIP

Repo Guarantee Liens shall be *pari passu* with the Cash Flow DIP Liens.

---

[5]    As announced on the record at the Interim Hearing, as a concession made as part of a broader resolution of potential objections of PIMCO (as defined below) to the Cash Flow DIP Facility, the DIP Repo Guarantor has agreed to waive any fee in connection with the provision of the DIP Repo Guarantee.

(c)    The DIP Repo Guarantee Liens are granted on the Cash Flow DIP

Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the

Debtors (or recordation or other filing or notice) of security agreements, control agreements,

pledge agreements, financing statements, mortgages, schedules or other similar documents, or

the possession or control by the applicable agents or any other Cash Flow DIP Party. As set forth

below in paragraph 20 of this Final DIP Order, the DIP Repo Guarantor may, but shall not be

obligated to, execute, record, file, or notice such security agreements, control agreements, pledge

agreements, financing statements, mortgages, schedules or other similar documents with respect

to the DIP Repo Guarantee Liens, or possess or control the Cash Flow DIP Collateral, and the

automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent

necessary to implement the foregoing.

8.    ***Excluded Assets***. Notwithstanding anything to the contrary in this Final DIP

Order or the Cash Flow DIP Documents, the Cash Flow DIP Collateral shall not include (i) any

leasehold interest of a Debtor to the extent the granting of liens on such interest would, after

giving effect to the Bankruptcy Code or this Final DIP Order, nonetheless result in the

abandonment, invalidation or unenforceability of any right, title or interest under any lease

governing such leasehold interest or a breach or termination of such lease pursuant to its terms,

(ii) any escrow, fiduciary, or trust account (including funds held in such accounts unless and

until released or distributed to the Debtors), (iii) the Debtors' intellectual property that

constitutes "intent to use" trademarks, to the extent the assignment of the creation or a lien

thereon would violate applicable non-bankruptcy law unless such violation is excused or

permitted under applicable bankruptcy law, (iv) any amount in excess of 65% of the voting

equity interest in any non-U.S. subsidiary of a Debtor, (v) any DIP Repo Collateral (as defined in

the Final DIP Repo Order), any collection or other accounts maintained under the DIP Repo

Facility, the Unrestricted Account at Stearns Lending, and any proceeds of the DIP Repo

Collateral or such accounts (other than, and solely after the Challenge Period (as defined in the

Final DIP Repo Order), any excess collateral after deficiencies in respect of the DIP Repo

Facility and the guarantees by the Cash Flow DIP Lender or an affiliate thereof of the DIP Repo

Facility have been paid in full), and any collateral securing the Prepetition Repo Parties under the

Prepetition Agreements (as defined in the Final DIP Repo Order), (vi) cash in an amount of up to

$75,000 held in a cash collateral account maintained by the Debtors that is pledged to Wells

Fargo Bank, N.A. ("Wells Fargo") to secure any obligations of the Debtors under or in

connection with the WellsOne Commercial Card Agreement, dated on or around January 4, 2017

(as amended, restated, supplemented or otherwise modified from time to time), between the

Debtors and Wells Fargo (vii) the Carve-Out Account (as defined below) (including funds held

in the Carve-Out Account), (viii) the Debtors' claims and causes of action arising under chapter

5 of the Bankruptcy Code (collectively, the "Avoidance Actions"), and (ix) the proceeds of any

of the assets identified in the foregoing clauses (vii) and (viii) until released or distributed to the

Debtors; provided that, (x) the proceeds of Avoidance Actions shall not be an Excluded Asset

(and shall be Cash Flow DIP Collateral) and (y) the Cash Flow DIP Collateral shall include the

Carve-Out Account to the extent of any surplus, if any, in such account after satisfaction in full

of all obligations of professionals benefiting from the Carve-Out, pursuant to a final order not

subject to appeal (the assets described in the foregoing clauses (i) through (ix), subject to the

foregoing proviso, the "Excluded Assets").

9.     *Carve-Out*.

a.     *Carve Out*. As used in this Final DIP Order, the "Carve-Out" shall be

comprised of the following components:

(i)     Clerk and U.S. Trustee Fees. All fees required to be paid to the Clerk of
this Bankruptcy Court and to the Office of the United States Trustee (the
"U.S. Trustee") under section 1930(a) of title 28 of the United States Code
and 31 U.S.C. § 3717 (collectively, the "Clerk and UST Fees").

(ii)    Chapter 7 Trustee Fees. All reasonable fees and expenses up to $100,000
incurred by a trustee under section 726(b) of the Bankruptcy Code (the
"Chapter 7 Trustee Fee Cap").

(iii)   Allowed Claims of Fannie Mae under the Fannie Mae Lender Contract.
The amount of $2,000,000 (the "Fannie Mae Carve-Out") to be deposited
into a segregated account as follows: (1) $1,000,000 deposited within 2
business days of the entry of the Interim DIP Order; and (2) $1,000,000 to
be deposited on the Fannie Mae Deposit Date (as defined below) and
released to Fannie Mae to satisfy allowed claims ("Allowed Claims")
under the Fannie Mae Agreements (as defined in the Final DIP Repo
Order).

(iv)    Allowed Claims of Freddie Mac under the Freddie Mac Agreements. The
amount of $3,000,000 (the "Freddie Mac Carve-Out") to be deposited into
a segregated account as follows: (1) $1,500,000 deposited within 2
business days of the entry of the Interim DIP Order; and (2) $1,500,000 to
be deposited on the Freddie Mac Deposit Date (as defined below) and
released to Freddie Mac to satisfy Allowed Claims under the Freddie Mac
Agreements (as defined in the Final DIP Repo Order).

(v)     Allowed Professional Fees Incurred Prior to a Carve-Out Trigger Notice.
To the extent allowed at any time, whether by interim order, final order,
procedural order, or otherwise, all accrued and unpaid or paid fees and
expenses (the "Allowed Professional Fees") incurred by persons or firms
retained by the Debtors pursuant to section 327, 328 or 363 of the
Bankruptcy Code (the "Debtor Professionals") and the Creditors'
Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy
Code (the "Committee Professionals" and, together with the Debtor
Professionals, the "Professional Persons") at any time before or on the
date of delivery by the administrative agent under the Cash Flow DIP
Facility (the "Cash Flow DIP Agent") of a Carve-Out Trigger Notice (as
defined below), whether allowed by this Bankruptcy Court prior to or after
delivery of a Carve-Out Trigger Notice, including the PJT Pre-Notice
Restructuring Fee Amount (as defined below) (collectively, the "Pre-
Termination Amount"). For purposes of the Carve-Out, Allowed

Professional Fees shall exclude (a) any restructuring, sale, success or similar fee of any Professional Person (other than the PJT Restructuring Fee Amount (as defined below)) and (b) fees and expenses of any third party professionals employed by any individual member of the Creditors' Committee (if any).

(vi)     <u>Allowed Professional Fees Incurred After a Carve-Out Trigger Notice.</u> Allowed Professional Fees of Professional Persons incurred on and after the first business day following delivery by the Cash Flow DIP Agent of the Carve-Out Trigger Notice, subject to an aggregate cap of $3 million *plus* the PJT Post-Notice Restructuring Fee Amount (as defined below) (collectively, the "<u>Post Trigger Notice Carve-Out Fee Cap</u>").

b.     *Carve-Out Trigger Notice.* Upon the occurrence and during the continuance of any Cash Flow DIP Event of Default (as defined below), the Cash Flow DIP Agent may deliver a written notice invoking the Post Trigger Notice Carve-Out Fee Cap (the "<u>Carve-Out Trigger Notice</u>") to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee, and the lead counsel for the Creditors' Committee (if any), Fannie Mae, and Freddie Mac. The Carve-Out Trigger Notice may be delivered by email (or any other means permitted under the Cash Flow DIP Documents).

c.     *Delivery of Fee Statements.* No later than five (5) business days after the delivery of a Carve-Out Trigger Notice, each Professional Person shall deliver a statement (each, a "<u>Fee Statement</u>") to the Debtors setting forth a good-faith estimate of the amount of fees and expenses incurred and unpaid prior to the date of the Carve-Out Trigger Notice. In addition, the Fee Statement delivered by PJT Partners shall include (i) each restructuring, sale, success and/or similar fee (such amount, the "<u>PJT Pre-Notice Restructuring Fee Amount</u>") earned on or prior to the delivery of the Carve-Out Trigger Notice, if any, and (ii) a good faith estimate of each anticipated restructuring, sale, success and/or similar fee (such amount, the "<u>PJT Post-Notice Restructuring Fee Amount</u>" and collectively with the PJT Pre-Notice Restructuring Fee Amount,

the "PJT Restructuring Fee Amount") to be earned following the delivery of the Carve-Out

Trigger Notice, if any.

       d.    *Carve-Out Account*. To the extent not already satisfied, the Debtors shall

establish the segregated account in accordance with the Interim DIP Order, which shall not be

subject to control of the Cash Flow DIP Agent (the "Carve-Out Account") but which shall be

funded by the Cash Flow DIP or available funds at Stearns Holdings and in no event from any

Excluded Asset. Amounts funded into the Carve-Out Account in accordance with clause e.

below shall be held in trust to pay the Carve-Out. Following delivery of a Carve-Out Trigger

Notice, all Allowed Professional Fees of Professional Persons shall be paid to the applicable

Professional Person first from the Carve-Out Account in accordance with the order or orders of

the Bankruptcy Court allowing such Allowed Professional Fees. Notwithstanding anything to the

contrary in this or any other Bankruptcy Court order, the Carve-Out Account and the amounts on

deposit in the Carve-Out Account shall be available and used only to satisfy obligations of

Professionals Persons benefitting from the Carve-Out. The failure of the Carve-Out Account to

satisfy Professional Fees in full shall not affect the priority of the Carve-Out. In no way shall the

Carve-Out, the Carve-Out Account, or anything else herein be construed as a cap or limitation on

the amount of Allowed Professional Fees due and payable by the Debtors or that may be allowed

by the Bankruptcy Court at any time (whether by interim order, final order or otherwise). The

Cash Flow DIP Collateral shall include the Debtors' reversionary interest in funds held in the

Carve-Out Account, if any, after all Allowed Professional Fees that are subject to the Carve-Out

have been paid in full pursuant to a final order not subject to appeal.

e.      *Carve-Out Funding After a Carve-Out Trigger Notice*. The following provisions with respect to the Carve-Out Account shall apply only upon delivery of a Carve-Out Trigger Notice:

(i)      On the date of the Carve-Out Trigger Notice, the Carve-Out Trigger Notice shall be deemed to constitute a demand to the Debtors to utilize all cash on hand at Stearns Holdings or from the Cash Flow DIP and in no event from any Excluded Asset (the "<u>Cash On Hand</u>") as of such date to fund the Carve-Out Account in an amount equal to (A) the Clerk and UST Fees, (B) the Chapter 7 Trustee Fee Cap, (C) the Pre-Termination Amount (determined based upon the Fee Statements submitted to the Debtors in accordance with clause c. above), (D) the Post Trigger Notice Carve-Out Fee Cap (with respect to the PJT Restructuring Fee Amount, based upon the Fee Statement submitted to the Debtors by PJT Partners), (E) the Fannie Mae Carve-Out, and (F) the Freddie Mac Carve-Out (collectively, the "<u>Aggregate Unfunded Amount</u>") to be held in trust to pay all amounts included in the Carve-Out.

(ii)      On or after the date of a Carve-Out Trigger Notice, no Cash Flow DIP Party, including the Cash Flow DIP Agent, shall foreclose on or sweep cash of the Debtors (including cash received as a result of the sale or other disposition of any assets and cash provided pursuant to the Cash Flow DIP Facility) until the Carve-Out Account has been fully funded.

(iii)      All funds in the Carve-Out Account shall be used first to pay the obligations set forth in the definition of the Carve-Out set forth above until paid in full. All payments and reimbursements made from the Carve-Out Account shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

f.      *Payment of Compensation*. Following delivery of a Carve-Out Trigger Notice, the Debtors shall be permitted to pay fees and expenses allowed and payable by order of the Bankruptcy Court (that has not been vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable from the Carve-Out Account.

g.      *Procedures for Funding and Release of the Fannie Mae Carve-Out*. To the extent not already satisfied, the Debtors shall (i) establish a segregated account in accordance with the Interim DIP Order (the "<u>Fannie Mae Carve-Out Account</u>"), which shall not be subject to

control of the Cash Flow DIP Agent and which shall be separate from the Carve-Out Account, and (ii) deposit $1,000,000 into the Fannie Mae Carve-Out Account in accordance with the Interim DIP Order, which account shall have been funded from the Cash Flow DIP Facility or from cash available at Stearns Holdings but in no event from any Excluded Asset. The Debtors shall fund an additional $1,000,000 into the Fannie Mae Carve-Out Account on the earlier of the following dates (the "Fannie Mae Deposit Date"): (i) delivery of the Carve-Out Trigger Notice; (ii) the confirmation of a plan by any of the Debtors (unless all Fannie Mae Agreements have been assumed and any cure claim satisfied); (iii) conversion or dismissal of any of the Debtors' respective bankruptcy cases; (iv) entry of an agreement or series of agreements by one or more of the Debtors to sell substantially all of the assets owned thereby outside of the ordinary course of business (unless all Fannie Mae Agreements have been assumed and any cure claim satisfied); (v) termination of the obligation or commitment of the Cash Flow DIP Lender to make incremental loans to the Debtors for any reason; (vi) the filing of a motion, pleading or other document that would have the effect of rejecting any of the Fannie Mae Agreements, if granted; and (vii) the occurrence of a post-petition payment default under any of the Fannie Mae Agreements that has not been cured after five (5) days' written notice. The Fannie Mae Carve-Out shall be held in trust and released to Fannie Mae to pay any Allowed Claims related to any of the Fannie Mae Agreements promptly upon such allowance. Notwithstanding any other provision of this Final DIP Order or any other Bankruptcy Court order, the Debtors shall not grant any party a lien or security interest in the Fannie Mae Carve-Out Account. The Fannie Mae Carve-Out is not a cap on the amount of any Allowed Claim under any of the Fannie Mae Agreements and all other rights related thereto are reserved, including any priorities, collateral, third party claims and rights under the Bankruptcy Code (including without limitation all rights

accorded to repurchase agreements, securities contracts or master netting agreements). To the extent that any surplus remains in the Fannie Mae Carve-Out after resolution of all potential claims under any of the Fannie Mae Agreements (which shall be deemed to have occurred if the Fannie Mae Agreements have been assumed and all related cure claims have been paid), the balance of the Fannie Mae Carve-Out shall be remitted as directed by the Cash Flow DIP Agent or order of the Bankruptcy Court.

    h.    *Procedures for Funding and Release of the Freddie Mac Carve-Out*. To the extent not already satisfied, the Debtors shall (i) establish a segregated account in accordance with the Interim DIP Order (the "Freddie Mac Carve-Out Account"), which shall not be subject to control of the Cash Flow DIP Agent and which shall be separate from the Carve-Out Account, and (ii) deposit $1,500,000 into the Freddie Mac Carve-Out Account, which shall be funded from the Cash Flow DIP or from cash available at Stearns Holdings but in no event from any Excluded Asset. The Debtors shall fund an additional $1,500,000 into the Freddie Mac Carve-Out Account on the earlier of the following dates (the "Freddie Mac Deposit Date"): (i) delivery of the Carve-Out Trigger Notice; (ii) the confirmation of a plan by any of the Debtors (unless all Freddie Mac Agreements have been assumed and any cure claim satisfied); (iii) conversion or dismissal of any of the Debtors' respective bankruptcy cases; (iv) entry of an agreement or series of agreements by one or more of the Debtors to sell substantially all of the assets owned thereby outside of the ordinary course of business (unless all Freddie Mac Agreements have been assumed and any cure claim satisfied); (v) termination of the obligation or commitment of the Cash Flow DIP Lender to make incremental loans to the Debtors for any reason; (vi) the filing of a motion, pleading or other document that would have the effect of rejecting any of the Freddie Mac Agreements, if granted; and (vii) the occurrence of a post-petition payment default under

any of the Freddie Mac Agreements that has not been cured after five (5) days' written notice.

The Freddie Mac Carve-Out shall be held in trust and released to Freddie Mac to pay any

Allowed Claims related to any of the Freddie Mac Agreements promptly upon such allowance.

Notwithstanding any other provision of this Final DIP Order or any other Bankruptcy Court

order, the Debtors shall not grant any party a lien or security interest in the Freddie Mac Carve-

Out Account. The Freddie Mac Carve-Out is not a cap on the amount of any Allowed Claim

under any of the Freddie Mac Agreements and all other rights related thereto are reserved,

including any priorities, collateral, third party claims and rights under the Bankruptcy Code

(including without limitation all rights accorded to repurchase agreements, securities contracts or

master netting agreements). To the extent that any surplus remains in the Freddie Mac Carve-Out

after resolution of all potential claims under any of the Freddie Mac Agreements (which shall be

deemed to have occurred if the Freddie Mac Agreements have been assumed and all related cure

claims have been paid), the balance of the Freddie Mac Carve-Out shall be remitted as directed

by the Cash Flow DIP Agent or order of the Bankruptcy Court.

10. ***Fees and Expenses***. The Debtors are authorized and directed to pay any and all

reasonable and documented fees and expenses described in this paragraph 10 and paragraph 15

below no later than ten (10) days after receipt (via electronic mail) by (i) the Debtors, (ii) counsel

for the Debtors, (iii) the U.S. Trustee, and (iv) counsel for the Creditors' Committee (if any)

(collectively, the "Fee Notice Parties"), of an invoice (which need not contain any itemized

details as to the relevant fees and expenses), in connection with the Chapter 11 Cases, whether

incurred before, on or after the Petition Date and whether or not the transactions contemplated

hereby are consummated. The Debtors shall indefeasibly pay or reimburse the Cash Flow DIP

Lender for its respective reasonable fees and out-of-pocket costs, expenses and charges,

including, but not limited to, the reasonable fees, costs, and expenses of Simpson Thacher &
Bartlett LLP, as counsel to the Cash Flow DIP Lender, and any other advisors or professionals
retained by the Cash Flow DIP Lender. For the avoidance of doubt, none of the fees, costs, and
expenses of the Cash Flow DIP Lender, FTI Consulting, Inc. (financial advisor to PIMCO (as
defined below)), Hogan Lovells US LLP (counsel to PIMCO), the Secured Notes Indenture
Trustee, or Reed Smith LLP (counsel to the Secured Notes Indenture Trustee) shall be subject to
Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment
shall be required to file with respect thereto any interim or final fee application with the
Bankruptcy Court. Such fees and expenses shall not be subject to any offset, defense, claim,
counterclaim or diminution of any type, kind or nature whatsoever. All fees, costs and expenses
payable under the Cash Flow DIP Documents to the Cash Flow DIP Lender shall be included
and constitute part of the Cash Flow DIP Obligations and be secured by the Cash Flow DIP
Liens. For the avoidance of doubt, the Debtors shall be responsible to pay, subject to the
procedures outlined in this paragraph, all reasonable and documented fees and expenses incurred
by the Cash Flow DIP Lender in connection with any action taken in the Chapter 11 Cases,
including, but not limited to, acting as a plan sponsor pursuant to any plan of reorganization for
the Debtors. Further, the upfront fee payable by Stearns Lending other than from Excluded
Assets to the Cash Flow DIP Lender (equal to 2.00% of the commitment of the Cash Flow DIP
Lender under the Cash Flow DIP Facility), which is deemed fully earned and nonrefundable on
the Interim Order Entry Date, shall be payable pursuant to the terms of the Cash Flow DIP
Documents.

   11. ***No Direct Obligation to Pay Professional Fees***. The Cash Flow DIP Lender shall
not be responsible for payment or reimbursement of any fees or disbursement of any Professional

Person incurred in connection with these Chapter 11 Cases, any Successor Cases, or otherwise. Nothing in this Final DIP Order or otherwise shall be construed: (a) to obligate the Cash Flow DIP Lender in any way to pay compensation to, or reimburse the expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (b) as consent to the allowance of any fees and expenses of Professional Persons; or (c) to affect the rights of the Cash Flow DIP Lender, or any other party in interest, to object to the allowance and payment of such fees and expenses.

12.    ***Restrictions on Use of Proceeds of Cash Flow DIP Facility***.

(a)    No portion of the Carve-Out, any cash collateral, any other Cash Flow DIP Collateral, or any proceeds of the Cash Flow DIP Facility shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person, including, without limitation, the Debtors, the Creditors' Committee, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other party, for any of the following actions or activities without the written consent of the Cash Flow DIP Lender: (a) to seek authorization to obtain liens or security interests on any asset of the Debtors that are senior to, or on a parity with, the Cash Flow DIP Liens, the Cash Flow DIP Collateral, or the Cash Flow DIP Superpriority Claims; (b) to seek authorization to obtain claims against the Debtors or their property that are senior to, or *pari passu* with, the liens and claims identified in the preceding sub-clause (a); or (c) except as expressly set forth herein, directly or indirectly prepare, assert, join, commence, support, or prosecute any action for any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or any other relief against, or adverse to the interests of, the Cash Flow DIP Lender and any of its representatives with respect to any transaction, occurrence, omission,

action, or other matter, including, without limitation, (i) any Avoidance Action, (ii) any "lender

liability" claims and causes of action, (iii) any action with respect to the validity, enforceability,

priority and extent of, or asserting any defense, counterclaim, or offset to, the Cash Flow DIP

Liens, the Cash Flow DIP Superpriority Claims, or the Cash Flow DIP Obligations, (iv) any

action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid, or subordinate,

in whole or in part, any of the obligations identified in the preceding clause (iii), (v) any action

seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits

granted to the parties hereunder or under any of the documents referred to herein, including

claims, proceedings, or actions that might prevent, hinder, or delay any of such parties'

assertions, enforcement, realizations, or remedies on or against their collateral and rights herein,

or (vi) objecting to, contesting with, or interfering with, in any way, such parties' enforcement or

realization upon any of their collateral or rights, once a Cash Flow DIP Event of Default has

occurred; provided that the Debtors shall be permitted to challenge the validity of any alleged

Cash Flow DIP Event of Default.

13.    ***Limitation of Liability***. The Cash Flow DIP Lender shall have no liability to any

third party relating to the Cash Flow DIP Documents and the Debtors' use of the liquidity

provided thereunder and shall not, by virtue of entering into the transactions contemplated by the

Cash Flow DIP Facility or otherwise complying with the Cash Flow DIP Documents or this

Final DIP Order, be deemed to be in control of the operations of the Debtors, or to owe any

fiduciary duty to the Debtors, their respective creditors, shareholders, or estates. The Debtors

shall, and are hereby authorized to, indemnify and hold harmless the Cash Flow DIP Lender and

its affiliates and representatives from and against all losses, liabilities, claims, damages,

penalties, actions, judgments, suits, expenses or disbursements of any nature whatsoever arising

out of or relating to the Cash Flow DIP Documents or this Final DIP Order, including the syndication of any obligations thereunder, and the Debtors' use of the liquidity provided thereunder; provided, however, that the foregoing indemnity shall not apply to any actions of any indemnified parties determined in a final non-appealable judgment to constitute fraud or willful misconduct. This indemnification shall survive and continue for the benefit of all such persons or entities.

14.    ***No Obligation to Extend Credit***. The Cash Flow DIP Lender shall have no obligation to make any loan or advance under the Cash Flow DIP Documents, unless all of the conditions precedent listed in Section 6.01 of the Cash Flow DIP Credit Agreement have been satisfied in full or waived by the Cash Flow DIP Lender in its sole discretion.

15.    ***Adequate Protection of the Secured Notes Parties***. Subject to the Carve-Out in all respects, to the extent there is a postpetition diminution in value of the Secured Notes Collateral (including cash collateral), resulting from the use, sale, or lease by the Debtors of the Secured Notes Collateral (including cash collateral), the granting of the Cash Flow DIP Superpriority Claims, the granting of the Cash Flow DIP Liens, the subordination of the Secured Notes Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (collectively, the "Diminution in Value"), the Secured Note Parties are hereby granted, subject to the terms and conditions set forth below, the following Forms of Adequate Protection:

(a)    ***Adequate Protection Liens***. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Secured Notes Indenture Trustee (on behalf of itself and the Secured Noteholders) is hereby granted (effective upon the Interim Order Entry Date) a replacement security interest in and lien on (the "Adequate Protection Liens") the same property of the

Debtors on which the Secured Notes Indenture Trustee (on behalf of itself and the Secured

Noteholders) had a perfected, first-priority security interest and lien prior to the Petition Date

pursuant to the Secured Notes Documents, whether arising prepetition or postpetition, which

liens and security interests shall be subordinate only to (A) the Secured Notes Permitted Prior

Liens to the extent any such Secured Notes Permitted Prior Liens are senior in priority under

applicable non-bankruptcy law to the Secured Notes Liens, (B) the Cash Flow DIP Liens, (C) the

DIP Repo Guarantee Liens, and (D) the Carve-Out.

(b)    ***507(b) Superpriority Claims***. Pursuant to sections 361 and 364(c)(1) of

the Bankruptcy Code, the Secured Notes Indenture Trustee, on behalf of itself and the Secured

Noteholders, is hereby granted a superpriority administrative expense claim (the "507(b)

Claims") against each of the Debtors solely to the extent of any Diminution in Value of the

Secured Notes Collateral, as provided for in section 507(b) of the Bankruptcy Code, which

administrative expense claim in the Chapter 11 Cases or any Successor Cases shall be senior to

all other administrative expense or other claims, including those arising under sections 105, 326,

328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy

Code; provided that the superpriority administrative expense claim granted to the Secured Notes

Indenture Trustee shall be subject and subordinate in all respects to the Cash Flow DIP

Superpriority Claims, the DIP Repo Superpriority Claims, and the Carve-Out.

(c)    ***Payment of Professional Fees and Expenses.*** In addition to the above

adequate protection, the Debtors shall pay or reimburse (with funding from the Cash Flow DIP

Facility or available funds at Stearns Holdings and in no event from any Excluded Asset) the

reasonable and documented costs and out-of-pocket expenses incurred by the Secured Notes

Indenture Trustee and Pacific Investment Management Company LLC ("PIMCO") (incurred on

or following the date of entry of this Final Order), including the reasonable and documented fees,

costs and expenses of (i) FTI Consulting, Inc. ("FTI"), financial advisor to PIMCO, (ii) Hogan

Lovells US LLP ("Hogan Lovells"), counsel to PIMCO, (iii) the Secured Notes Indenture

Trustee, and (iv) Reed Smith LLP, counsel to the Secured Notes Indenture Trustee, for so long as

PIMCO and the Secured Notes Indenture Trustee, as the case may be, (1) are cooperating with

the Debtors on material issues in these Chapter 11 Cases and (2) are not taking positions in or out

of Court adverse to the Debtors on material issues in these Chapter 11 Cases, or encouraging

others to do so.  For the avoidance of doubt, work relating to (x) actions such as submitting

comments to the Debtors with respect to proposed orders and other documents shall not result in

a violation of the immediately preceding sentence, but (y) actions (i) pursuing such comments

other than through discussions with the Debtors, (ii) challenging the Debtors' business judgment

in connection with the plan sponsor selection process, including, but not limited to, the Debtors'

selection of a plan sponsor, and (iii) contesting the approval of the Debtors' disclosure statement

or the confirmation of the Debtors' plan of reorganization, in each of clauses (y)(i)-(iii)

including, but not limited to, the consideration, preparation, and filing of any objection, seeking

discovery, or otherwise litigating disputes, or encouraging others to do so, shall result in a

violation of the immediately preceding sentence.[6] Such reasonable and documented professional

fees shall be subject to the process and procedures described in paragraph 10 hereof; provided,

however, that no such fees or expenses shall be reimbursed for any work done in connection with

---

[6]    The actions described in clause (y) are merely examples of, and not limitations on, the types of actions for
which the Debtors shall not be obligated to pay or reimburse the fees and expenses of the Secured Notes
Indenture Trustee or PIMCO.

PIMCO evaluating or considering a bid and/or in its capacity as a bidder in these Chapter 11 Cases.[7]

(d)    ***Reporting***. As additional adequate protection, the Debtors shall prepare and deliver to the Secured Notes Indenture Trustee and FTI and Hogan Lovells (and upon request, PIMCO) on behalf of PIMCO any documents provided to the Cash Flow DIP Lender and/or the DIP Repo Agent for reporting purposes under the Cash Flow DIP Facility and/or the DIP Repo Facility.

(e)    ***Sufficiency of Adequate Protection***. The Secured Notes Parties are adequately protected by the Forms of Adequate Protection set forth herein and through the Cash Flow DIP Facility. The Cash Flow DIP Facility is necessary to allow the Debtors to continue the operation of their businesses, maintain their value as a going concern, and achieve a successful plan of reorganization, which will preserve and maximize the value of the Debtors and their estates for the benefit of the Debtors and all their stakeholders, including the Secured Notes Parties. The grant of the Cash Flow DIP Liens accordingly will not cause a diminution in the value of the Secured Notes Parties' interest in the Secured Notes Collateral. The grant of the DIP Repo Guarantee Liens benefits the Secured Notes Parties because absent provision of the DIP Repo Guarantee, the advance rates under the DIP Repo Facility would have been lower, which would have necessitated commensurately higher borrowings under the Cash Flow DIP Facility. Accordingly, the DIP Repo Guarantee Liens are contingent priming liens (contingent upon funding actual amounts under the DIP Repo Guarantee and the full and indefeasible payment and satisfaction of the obligations of Stearns Lending under the DIP Repo Facility) instead of actual priming liens in respect of additional borrowings under the Cash Flow DIP Facility.

---

[7]    Nothing herein shall impair or prejudice the Secured Notes Indenture Trustee's charging lien or priority of payment rights under the Secured Notes Documents.

Additionally, the Forms of Adequate Protection are consistent with the Bankruptcy Code. The Bankruptcy Court therefore finds that the foregoing adequate protection is reasonable and sufficient to protect the interests of the Secured Notes Parties.

16.    ***Events of Default***.

(a)    Unless further extended or waived by written agreement among the Debtors and the Cash Flow DIP Lender, the occurrence of any of the following events shall constitute an event of default (each a "Cash Flow DIP Event of Default"): (i) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Final DIP Order; and (ii) an "Event of Default" as defined under the Cash Flow DIP Documents shall have occurred and is continuing, unless waived pursuant to the Cash Flow DIP Documents.

(b)    Upon the occurrence and during the continuation of a Cash Flow DIP Event of Default, the Cash Flow DIP Lender shall (i) deliver a notice of Cash Flow DIP Event of Default; (ii) declare the principal of and accrued interest, fees, expenses and other amounts under the Cash Flow DIP Documents to be due and payable; (iii) place an administrative hold on any deposit account or securities account that constitutes Cash Flow DIP Collateral; and (iv) upon five (5) business days' written notice to the Debtors (the "Cash Flow DIP Forbearance Period"), exercise all other rights and remedies available to the Cash Flow DIP Lender; provided, however, that, with respect to any Cash Flow DIP Event of Default for the failure to pay all obligations under the Cash Flow DIP Documents in full in cash by the maturity date as set forth in the Cash Flow DIP Credit Agreement (the "Cash Flow DIP Maturity Date"), the Cash Flow DIP Lender may exercise all rights and remedies immediately upon the occurrence of said default.

(c)        Notwithstanding anything herein to the contrary, (i) if a Cash Flow DIP Event of Default exists at the end of the Cash Flow DIP Forbearance Period, then the Cash Flow DIP Lender shall be permitted to immediately exercise all of its other rights and remedies under the Cash Flow DIP Documents, and (ii) the Cash Flow DIP Lender shall not be required to permit any funding or other financial accommodation under the Cash Flow DIP Documents during the Cash Flow DIP Forbearance Period unless and until the foregoing conditions shall have been satisfied during such period. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Bankruptcy Court, to permit the Cash Flow DIP Lender to exercise all rights and remedies under the Cash Flow DIP Documents and under this Final DIP Order, in accordance with the terms of this Final DIP Order.

17.        ***Amendments, Consents, Waivers, and Modifications***. The Debtors and the Cash Flow DIP Lender are authorized, subject to the Cash Flow DIP Documents, to implement, in accordance with the terms of the respective Cash Flow DIP Documents, any amendments, waivers, consents or other modifications to or under the Cash Flow DIP Documents without the need for further notice and hearing or any order of this Bankruptcy Court; provided, however, that, without the consent of this Bankruptcy Court after notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the Cash Flow DIP Maturity Date, (ii) increase the commitments thereunder or the rate of interest payable under the Cash Flow DIP Documents (other than imposition of the default rate) or (iii) amend the "Events of Default" or covenants in the Cash Flow DIP Documents to be materially more restrictive to the Debtors than those set forth in the form of Cash Flow DIP Credit Agreement as of the Final Order Entry Date.

18. ***Rights of Access and Information***. Without limiting the rights of access and information afforded the Cash Flow DIP Parties under the Cash Flow DIP Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the Cash Flow DIP Lender reasonable access to: (a) the Debtors' premises, (b) knowledgeable officers of the Debtors, (c) the Debtors' books and records, and (d) the Debtors' properties and other collateral of any Debtor against whom such parties are granted Cash Flow DIP Liens under this Final DIP Order, and the Debtors shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.

19. ***Approved Budget***. Attached hereto as <u>Exhibit B</u> is a copy of the initial approved budget (together with the permitted variance provisions set forth in the Cash Flow DIP Credit Agreement, the "<u>Approved Budget</u>") setting forth the Debtors' anticipated cash receipts and expenditures for the 13-week period following entry of the Interim DIP Order. The Approved Budget may be modified and amended, and shall be updated and provided to the Cash Flow DIP Lender (x) solely for projection purposes, on the second Friday after the Petition Date and no later than each Friday thereafter, and (y) no later than the Tuesday prior to the end of the fourth week covered by the portion of the then effective Approved Budget, which updated budget pursuant to this clause (y) shall, upon approval by the Cash Flow DIP Lender, constitute the "Approved Budget" until the next update pursuant to this clause (y). Each such Approved Budget shall be accompanied by a Budget Certificate stating that the portions of such 13-week projection so delivered have been prepared on a reasonable basis and in good faith and are based on assumptions believed by the Debtors to be reasonable at the time made and from the best information then available to the Debtors in connection therewith. The Debtors shall file each Approved Budget with the Bankruptcy Court, and serve the same on the U.S. Trustee and the

Creditors' Committee, no later than three (3) business days after it has been approved by the

Cash Flow DIP Lender; provided that the Debtors reserve their rights to, in connection with entry

of the Final DIP Order, request revised Approved Budget notice requirements.

20.     ***Automatic Perfection of Cash Flow DIP Liens***.

(a)     The Interim DIP Order and/or this Final DIP Order shall be sufficient and

conclusive evidence of the validity, perfection, and priority of the Cash Flow DIP Liens without

the necessity of filing or recording financing statements, intellectual property filings, mortgages,

notices of lien or similar instruments in any jurisdiction, taking possession of or control over any

assets, or taking any other action to validate or perfect (in accordance with applicable non-

bankruptcy law) the Cash Flow DIP Liens or to entitle the Cash Flow DIP Lender to its

respective priorities granted herein.

(b)     Notwithstanding the foregoing, the Cash Flow DIP Lender is hereby

authorized, but not required, to file or record financing statements, trademark filings, copyright

filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of

or control over (including pursuant to a deposit account control agreement), or take any other

action in order to validate and perfect, the liens and security interests granted to the Cash Flow

DIP Lender hereunder, in each case, without the necessity to pay any mortgage recording fee or

similar fee or tax. Whether or not the Cash Flow DIP Lender chooses to file such financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments,

or take possession of or control over, or otherwise confirm perfection of the liens and security

interests granted to them hereunder, such liens and security interests shall be and hereby are

deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge,

dispute or subordination, whether in these Chapter 11 Cases or any Successor Case, as of and on

the Interim Order Entry Date. The Debtors shall, if requested, execute and deliver to the Cash

Flow DIP Lender all such agreements, financing statements, instruments and other documents as

the Cash Flow DIP Lender may reasonably request to more fully evidence, confirm, validate,

perfect, preserve, and enforce the Cash Flow DIP Liens. All such documents will be deemed to

have been recorded and filed as of the Petition Date.

(c)    The Debtors are authorized to execute and deliver promptly upon demand

by the Cash Flow DIP Lender all such financing statements, mortgages, notices and other

documents as the Cash Flow DIP Lender may reasonably request. The Debtors are authorized to,

and shall, execute and deliver to the Cash Flow DIP Parties such agreements, financing

statements, mortgages, instruments and other documents as the Cash Flow DIP Parties may

reasonably request to evidence, confirm, validate, or perfect the Cash Flow DIP Liens, and the

failure by the Debtors to execute or deliver any documentation relating to the Cash Flow DIP

Liens shall in no way affect the validity, enforceability, non-avoidability, perfection, or priority

of such liens.

(d)    In lieu of obtaining such documentation or instruments, a certified copy of

the Interim DIP Order and/or this Final DIP Order may be filed by the Cash Flow DIP Lender

with or recorded in filing or recording offices in addition to or in lieu of such financing

statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby

directed to accept such certified copy of this Final DIP Order for filing and recording.

21.    ***Automatic Stay Modified***. The automatic stay provisions of section 362 of the

Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for

any further order of the Bankruptcy Court, to permit the Cash Flow DIP Lender to exercise all

rights and remedies under this Final DIP Order or the Cash Flow DIP Documents.

22.    ***Proofs of Claim***. The Cash Flow DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases, and the Debtors' stipulations in this Final DIP Order shall be deemed to constitute a timely filed proof of claim. Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including, without limitation, administrative claims) in the Chapter 11 Cases or any Successor Cases shall not apply to the Cash Flow DIP Lender.

23.    ***Challenge Period/Investigation Budget***.

(a)    Notwithstanding any other provisions of this Final DIP Order, the Creditors' Committee and any other party-in-interest (other than the Debtors) are permitted, by no later than (a) with respect to parties-in-interest other than the Creditors' Committee, 75 calendar days after entry of this Final DIP Order, and (b) with respect to the Creditors' Committee, 60 calendar days after the appointment of the Creditors' Committee (as applicable, the "Chapter 11 Challenge Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, to seek to obtain standing to challenge, and to challenge, if standing is obtained (each, a "Challenge") the Debtors' Stipulations contained herein, or any other stipulations or findings contained in the Interim DIP Order and/or this Final DIP Order with respect to the Cash Flow DIP Liens or Cash Flow DIP Obligations, or the Secured Notes Liens or Secured Notes Obligations, including, without limitation, any challenge to the validity, priority or enforceability thereof to assert any claim or cause of action against the Cash Flow DIP Lender or Secured Notes Parties including, without limitation, whether in nature of a setoff, counterclaim, or defense; provided, that if a Creditors' Committee is appointed, the Creditors' Committee shall be subject to the Investigation Budget (as defined below) in accordance with paragraph 23(b). If any of the Chapter 11 Cases are

converted to a case under chapter 7 of the Bankruptcy Code prior to the latest date by which the

Chapter 11 Challenge Period would end pursuant to this paragraph, then any chapter 7 trustee

appointed in such converted case shall have a maximum of thirty (30) calendar days (the

"Chapter 7 Challenge Period" and, together with the Chapter 11 Challenge Period, the

"Challenge Period") after the date that the Chapter 11 Case is converted to bring any such

Challenge.  The Challenge Period may only be extended: (a) with the prior written consent, as

the case may be, of the Cash Flow DIP Lender and the Secured Notes Indenture Trustee (acting

at the direction of the Secured Noteholders) or (b) pursuant to an order of the Bankruptcy Court,

entered after notice and a hearing, and upon a showing of good cause for such extension. Except

to the extent asserted in an adversary proceeding or contested matter filed during the Challenge

Period, the expiration of such Challenge Period (to the extent not otherwise waived or barred),

shall mean that (i) any and all Challenges or potential challenges shall be deemed to be forever

waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements

and stipulations contained in the Interim DIP Order and/or this Final DIP Order shall be

irrevocably and forever binding on the Debtors, the Creditors' Committee and all parties-in-

interest and any and all successors-in-interest as to any of the foregoing, including any chapter 7

trustee, without further action by any party or the Bankruptcy Court and all such parties shall be

deemed to have absolutely and unconditionally released, waived, and forever discharged and

acquitted the Cash Flow DIP Lender and/or Secured Notes Parties and any of their respective

controlling persons, affiliates or successors or assigns, and each of the respective officers,

directors, employees, agents, attorneys, or advisors of each of the foregoing (the "Released

Parties") from any and all obligations and liabilities to the Debtors (and their successors and

assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts,

liabilities, actions and causes of action arising prior to the Petition Date (collectively, the

"Released Claims") of any kind, nature or description, whether known or unknown, foreseen or

unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under

any state or federal law or otherwise, including, without limitation, any claims for

recharacterization, subordination, or substantive consolidation, arising out of or relating to (as

applicable) the Cash Flow DIP Facility or the Secured Notes, the obligations owing and the

financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby,

and the obligations and financial obligations made thereunder, in each case that any of the

Debtors at any time had, now have or may have, or that their successors or assigns hereafter can

or may have against any of the Released Parties for or by reason of any act, omission, matter,

cause or thing whatsoever arising at any time on or prior to the date of this Final DIP Order,

whether such Released Claims are matured or unmatured or known or unknown; and (iii) all of

the Cash Flow DIP Obligations and/or Secured Notes Obligations, as the case may be, shall be

deemed allowed on a final basis and the Cash Flow DIP Liens and/or Secured Notes Liens shall

be deemed to constitute valid, binding and enforceable encumbrances, and not subject to

avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  Notwithstanding

anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations

contained in the Interim DIP Order and/or this Final DIP Order shall nonetheless remain binding

on all other parties-in-interest and preclusive except to the extent that such stipulations are

expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all

of their rights to contest on any grounds any Challenge.  Nothing in this Final DIP Order vests or

confers on any person, including, without limitation, the Creditors' Committee or any other

statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to

directly or indirectly support or pursue any cause of action, claim, defense, or other right

belonging to the Debtors or their estates.

(b)     ***Investigation Budget.*** If a Creditors' Committee is appointed, the

Creditors' Committee shall be subject to a budget not to exceed $50,000 in connection with the

investigation and prosecution of any challenge to the stipulations or findings contained in the

Interim DIP Order and/or this Final DIP Order with respect to the Cash Flow DIP Liens or Cash

Flow DIP Obligations, or the Secured Notes Liens or Secured Notes Obligations, including,

without limitation, any challenge to the validity, priority or enforceability thereof to assert any

claim or cause of action against the Cash Flow DIP Lenders and/or the Secured Notes Parties

including, without limitation, whether in nature of a setoff, counterclaim, or defense (the

"Investigation Budget"); provided, that any fees, expenses or costs incurred by the Creditors'

Committee in excess of the Investigation Budget shall not constitute an allowable administrative

expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

24.     ***No Third Party Rights***. Except as explicitly provided for herein, this Final DIP

Order does not create any rights for the benefit of any third party, creditor, equity holder, or any

direct, indirect or incidental beneficiary.

25.     ***Prohibition on Additional Liens***. Except as expressly provided in the Cash Flow

DIP Documents or this Final DIP Order, the Debtors shall be enjoined and prohibited from, at

any time during the Chapter 11 Cases until such time as the Cash Flow DIP Obligations have

been indefeasibly paid in full in cash, granting liens on or security interests in the Cash Flow DIP

Collateral, the Secured Notes Collateral, or any portion thereof to any other entities, pursuant to

section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to or *pari passu* with

the Cash Flow DIP Liens other than the Carve-Out, unless and until all Cash Flow DIP

Obligations are indefeasibly paid in full in cash.

26.    ***No Waiver***. This Final DIP Order shall not be construed in any way as a waiver or

relinquishment of any rights that the Cash Flow DIP Lender may have to bring or be heard on

any matter brought before the Bankruptcy Court. Similarly, the failure of the Cash Flow DIP

Lender to seek relief or otherwise exercise its rights and remedies under this Final DIP Order, the

Cash Flow DIP Documents, or applicable law, as the case may be, shall not constitute a waiver

of any of the rights hereunder, thereunder, or otherwise of the Cash Flow DIP Lender.

27.    ***Discharge Waiver***. The Debtors expressly stipulate, and the Bankruptcy Court

finds and adjudicates, that none of the obligations, liens or superpriority claims granted or

approved by this Final DIP Order shall be discharged by the entry of an order confirming any

plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy

Code, unless such obligations, as applicable, have been indefeasibly paid in full in cash on or

before the effective date of a confirmed plan of reorganization.

28.    ***Sections 506(c) and 552(b)***. The Cash Flow DIP Lender and Secured Notes

Parties each shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy

Code. Because of (a) each Cash Flow DIP Lender's and Secured Notes Parties' agreement, as the

case may be, to subordinate the Cash Flow DIP Liens, the Cash Flow DIP Superpriority Claims,

the Adequate Protection Liens and the 507(b) Claims to the payment of certain administrative

expenses of the Debtors' estates pursuant to the Carve-Out, the Cash Flow DIP Lender and the

Secured Notes Parties are each entitled to a waiver of any "equities of the case" claims under

section 552(b) of the Bankruptcy Code such that the "equities of the case" exception under

section 552(b) of the Bankruptcy Code shall not apply to the Cash Flow DIP Lender or the

Secured Notes Parties with respect to proceeds, products, offspring or profits of any of the Cash

Flow DIP Collateral and/or Secured Notes Collateral, as applicable. Similarly, each of the Cash

Flow DIP Lender and Secured Notes Parties are entitled to a waiver of section 506(c) of the

Bankruptcy Code, and except to the extent of the Carve Out, no costs or expenses of

administration of these Chapter 11 Cases or any future proceeding that may result therefrom

shall be charged against or recovered from the Cash Flow DIP Collateral and/or Secured Notes

Collateral pursuant to section 506(c) of the Bankruptcy Code.

29.     ***No Marshaling/Applications of Proceeds***. The Cash Flow DIP Lender and the

Secured Notes Parties shall not be subject to the equitable doctrine of "marshaling" or any other

similar doctrine with respect to any obligations, liens or collateral acknowledged or approved

pursuant to this Final DIP Order.

30.     ***Final DIP Order Controls***. In the event of any inconsistency between the terms

and conditions of the Cash Flow DIP Documents, the Interim DIP Order, and this Final DIP

Order, the provisions of this Final DIP Order shall govern and control solely to the extent of the

inconsistency.

31.     ***Survival***. The provisions of this Final DIP Order and any actions taken pursuant

hereto shall survive entry of any order which may be entered: (a) confirming any plan of

reorganization in the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case

under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any

Successor Case; or (d) pursuant to which the Bankruptcy Court abstains from hearing the

Chapter 11 Cases or any Successor Case. The terms and provisions of this Final DIP Order,

including the claims, liens, security interests and other protections granted pursuant to this Final

DIP Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases,

in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor

Case, and shall maintain their priority as provided in this Final DIP Order until all obligations

related thereto have been paid in full.

32.    ***Preservation of Rights Under this Final DIP Order***.

(a)    Without in any way limiting the preceding paragraph, if an order

dismissing the Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or

otherwise is at any time entered, the Debtors shall request that such order shall provide (in

accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the liens and

superpriority claims granted pursuant to this Final DIP Order shall continue in full force and

effect, shall maintain their priority as provided in this Final DIP Order and shall, notwithstanding

such dismissal, remain binding on all parties in interest until all obligations pertaining thereto

shall have been indefeasibly paid in full in cash (with interest) and the related commitments shall

have been terminated in accordance with their terms and (ii) the Bankruptcy Court shall retain

non-exclusive jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such

claims and obligations.

(b)    If any or all of the provisions of this Final DIP Order are hereafter

reversed, stayed, modified or vacated, such reversal, stay, modification or vacation shall not

affect (i) the validity and enforceability of any obligations incurred prior to the actual receipt by

the affected parties of written notice of the effective date of such reversal, stay, modification or

vacation and (ii) the validity and enforceability of the liens and superpriority claims authorized

or created hereby. Notwithstanding any such reversal, stay, modification or vacation, the

obligations incurred by the Debtors hereunder and under the applicable documents, prior to the

actual receipt of written notice of the effective date of such reversal, stay, modification or

vacation, shall be governed in all respects by the original provisions of this Final DIP Order, and

the parties shall be entitled to all the rights, remedies, privileges and benefits of sections 363(m)

and 364(e) of the Bankruptcy Code, this Final DIP Order and pursuant to the applicable

documents.

33.     ***Rights Under Sections 363(k) and 1129(b)***. Unless otherwise ordered by the

Bankruptcy Court for cause, the Cash Flow DIP Lender shall have the right to credit-bid the full

amount of the Cash Flow DIP Obligations in any sale or disposition of the Cash Flow DIP

Collateral as provided for in section 363(k) of the Bankruptcy Code, in accordance with the

terms of the Cash Flow DIP Documents, without the need for further Bankruptcy Court order

authorizing the same and whether such sale is effectuated through section 363(k) and/or

section 1129(b) of the Bankruptcy Code or otherwise because, among other things, the denial of

such rights would result in the Cash Flow DIP Obligations not receiving the indubitable

equivalent of their claims.

34.     ***No Consent***. No action, inaction or acquiescence by the Cash Flow DIP Lender,

including funding the Debtors' ongoing operations under this Final DIP Order, shall be deemed

to be or shall be considered as evidence of any alleged consent by the Cash Flow DIP Lender to

a charge against the Cash Flow DIP Collateral pursuant to sections 506(c), 552(b) or 105(a) of

the Bankruptcy Code.

35.     ***Binding Effect; Successors and Assigns***. The Cash Flow DIP Documents and the

provisions of this Final DIP Order, including all findings herein, shall be binding upon all parties

in interest in the Chapter 11 Cases, including, without limitation, the Cash Flow DIP Lender, the

Creditors' Committee or any trustee or examiner appointed in these Chapter 11 Cases, and the

Debtors, and their respective successors and assigns (including any trustee or fiduciary

hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any Successor Cases, or upon any dismissal of any such chapter 11 or chapter 7 case, and shall inure to the benefit of the Cash Flow DIP Lender and the Debtors, and their respective successors and assigns.

36.     ***No Duty to Monitor Compliance***. The Cash Flow DIP Lender shall not (i) have any obligation with respect to any Debtor's use of cash collateral or the use of proceeds of the Cash Flow DIP Facility; (ii) be obligated to ensure or monitor any Debtor's compliance with any financial covenants, formula, or other terms and conditions of the Cash Flow DIP Documents; or (iii) be obligated to pay any expenses incurred or authorized to be incurred pursuant to the Cash Flow DIP Documents.

37.     ***Taxing Authorities.***    Notwithstanding any other provisions included in the Interim DIP Order and/or this Final DIP Order, or any agreements approved hereby, any statutory liens (collectively, the "Tax Liens"), including business personal property liens, of The County of Bell Tax Appraisal District, Texas and The County of Denton, Texas (collectively, "The Texas Taxing Jurisdictions") shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims, liens asserted by the Texas Taxing Authorities are fully preserved.

38.    ***Insurance.***  Nothing, including the Cash Flow DIP Documents and/or this Final

DIP Order, shall operate to alter or modify the terms and conditions of any insurance policies or

related agreements issued by ACE American Insurance Company, Federal Insurance Company

and/or any of their affiliates or successors.

39.    ***Retention of Jurisdiction***. This Bankruptcy Court has and shall retain jurisdiction

to enforce this Final DIP Order according to its terms to the fullest extent permitted by law.


Dated: August 1, 2019
         New York, New York

                                        /S/ Shelley C. Chapman_____
                                        HONORABLE SHELLEY C. CHAPMAN
                                        UNITED STATES BANKRUPTCY JUDGE