SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Evan A. Hill
Edward P. Mahaney-Walter
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **STEARNS HOLDINGS, LLC,** *et al.*, | **Case No. 19-12226 (SCC)** |
| **Debtors.**[1] | **Jointly Administered** |
|  | **Related Docket Nos. 30, 31, 32, 98, 116 & 208** |

**NOTICE OF FILING OF DISCLOSURE STATEMENT WITH RESPECT**
**TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF STEARNS HOLDINGS, LLC ET AL.**

**PLEASE TAKE NOTICE** that on July 9, 2019 the above-captioned debtors and

debtors in possession (the "Debtors") filed the following:

1.    *Joint Chapter 11 Plan of Reorganization of Stearns Holdings, LLC, et al.*

[Docket No. 30] (the "Plan");

2.    *Disclosure Statement With Respect to the Joint Chapter 11 Plan of*

*Reorganization of Stearns Holdings, LLC et al.* [Docket No. 31] (the "Disclosure Statement");

and

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are: Stearns Holdings, LLC (8219); Stearns Co-Issuer Inc. (7096); Stearns Lending, LLC (1773); Stearns Ventures, LLC (2386); Protos Acquisition LLC (4941); bSNAP, LLC (2498); and Private Mortgage Advisors, LLC (7493). The address of Protos Acquisition LLC is 345 Park Avenue, New York, NY 10154. The address of the other Debtors is c/o Stearns Lending, LLC, 750 East Highway, 121 Bypass, Suite 150, Lewisville, TX 75067.

3.      *Debtors' Motion for Order Scheduling the Disclosure Statement Hearing, Approving the Form and Manner of Notice of the Disclosure Statement Hearing, and Granting Related Relief* [Docket No. 32].

**PLEASE TAKE FURTHER NOTICE** that a hearing was held on July 10, 2019 (the "First Day Hearing") and following the First Day Hearing the Court entered an *Order Scheduling the Disclosure Statement Hearing, Approving the Form and Manner of Notice of the Disclosure Statement Hearing, and Granting Related Relief* [Docket No. 98] (the "Disclosure Statement Hearing Order").  The Disclosure Statement Hearing Order scheduled a hearing on the approval of the Disclosure Statement to be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 623, New York, New York 10004 (the "Bankruptcy Court"), on **August 22, 2019 at 10:00 a.m. (Eastern Time)** (the "Hearing"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the Disclosure Statement must be made in writing and (a) filed with the Bankruptcy Court no later than **August 9, 2019 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline") and (b) served so as to be actually received the following parties by the Objection Deadline:

(i) Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: Jay Goffman, Mark McDermott, and Shana Elberg;

(ii) counsel to any statutory committee appointed by the United States Trustee, or until such time as any committee is appointed, the entities listed on the consolidated list of 30 largest unsecured creditors filed by the Debtors in these Chapter 11 Cases;

(iii) counsel to Blackstone, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attention: Elisha Graff;

(iv) counsel to Barclays Bank PLC, Hunton Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166, Attention: Peter S. Partee, Sr., Brian Clarke;

(v) co-counsel to Nomura Corporate Funding Americas LLC, Milbank LLP, 55 Hudson Yards, New York, NY 10001, Attention: Mark Shinderman and Lauren C. Doyle and Alston & Bird LLP, 90 Park Avenue, New York, NY 10016, Attention: Karen Gelernt; and

(vi) William K. Harrington, United States Trustee For Region 2, United States Department of Justice, Office of the United States Trustee, 201 Varick Street, Room 1006, New York, New York 10014, Attention: Brian Masumoto and Andy Velez-Rivera.

**PLEASE TAKE FURTHER NOTICE** that on August 1, 2019 the Debtors filed the *Debtors' Motion for Order (I) Approving the Disclosure Statement; (II) Scheduling Hearing on Confirmation of the Plan; (III) Establishing Deadlines and Procedures for Filing Objections to Confirmation of the Plan; (IV) Establishing Deadlines and Procedures for Voting on the Plan; (V) Approving Solicitation Procedures; (VII) Establishing Procedures for Tabulation of Votes; and (VII) Granting Related Relief* [Docket No. 208], in further support of the Disclosure Statement and Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file an updated draft of the Disclosure Statement, a copy of which is attached hereto as Exhibit 1.

**PLEASE TAKE FURTHER NOTICE** that a redline version of the updated Disclosure Statement marked against the version filed on July 9, 2019 is attached hereto as Exhibit 2.

Dated: New York, New York
       August 8, 2019

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Jay M. Goffman*
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Evan A. Hill
Edward P. Mahaney-Walter
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel to Debtors*
*and Debtors-in-Possession*

**EXHIBIT 1**

**Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **STEARNS HOLDINGS, LLC**, *et al.*, | **Case No. 19-12226 (SCC)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF STEARNS HOLDINGS, LLC, ET AL.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Evan A. Hill
Edward P. Mahaney-Walter
4 Times Square
New York, NY 10036
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Debtors and Debtors in Possession*

Dated: August 8, 2019
           New York, New York

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are: Stearns Holdings, LLC (8219); Stearns Co-Issuer Inc. (7096); Stearns Lending, LLC (1773); Stearns Ventures, LLC (2386); Protos Acquisition LLC (4941); bSNAP, LLC (2498); and Private Mortgage Advisors, LLC (7493). The address of Protos Acquisition LLC is 345 Park Avenue, New York, NY 10154. The address of the other Debtors is c/o Stearns Lending, LLC, 750 East Highway, 121 Bypass, Suite 150, Lewisville, TX 75067.

**DISCLAIMER**

THIS DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF STEARNS HOLDINGS, LLC AND ITS AFFILIATED DEBTORS CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.

THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETIES BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER,

BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS, WHICH WILL BE FILED AS A SUPPLEMENT TO THIS DISCLOSURE STATEMENT PRIOR TO THE DISCLOSURE STATEMENT HEARING, WILL BE PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.

THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS ARE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

PLEASE REFER TO ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

## VOTING

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY PRIME CLERK LLC ("PRIME CLERK"), THE DEBTORS' CLAIMS, NOTICING, AND SOLICITATION AGENT, NO LATER THAN 4:00 P.M. (EASTERN TIME) ON SEPTEMBER 20, 2019 (THE "VOTING DEADLINE"). SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT AND IN THE SOLICITATION PROCEDURES ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

## CONFIRMATION

THE CONFIRMATION HEARING WILL COMMENCE ON OCTOBER 3, 2019 AT 10:00 A.M. (EASTERN TIME), BEFORE THE HONORABLE SHELLEY C. CHAPMAN, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS SEPTEMBER 24, 2019 AT 4:00 P.M. (EASTERN TIME). ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

THE PLAN, THIS DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT AND EXHIBITS, ONCE FILED, AND OTHER DOCUMENTS AND MATERIALS RELATED THERETO MAY BE OBTAINED BY: (A) ACCESSING THE DEBTORS' RESTRUCTURING WEBSITE AT HTTPS://CASES.PRIMECLERK.COM/STEARNS, (B) EMAILING STEARNSINFO@PRIMECLERK.COM, (C) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT (844) 234-1461, OR (D) ACCESSING THE BANKRUPTCY COURT'S WEBSITE AT HTTP://WWW.NYSB.USCOURTS.GOV. COPIES OF SUCH DOCUMENTS AND MATERIALS MAY ALSO BE EXAMINED BETWEEN THE HOURS OF 8:00 AM AND 4:00 PM, MONDAY THROUGH FRIDAY, EXCLUDING FEDERAL HOLIDAYS, AT THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     OVERVIEW OF THE DEBTORS' BUSINESS AND CAPITAL STRUCTURE ............4
        A.    The Debtors' Operations................................................................................4
        B.    Employees.....................................................................................................5
        C.    Debtors' Organizational Structure ................................................................5
        D.    Regulation of the Company's Business .........................................................6
        E.    Capital Structure ..........................................................................................6

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
        STATEMENT AND PLAN...........................................................................................7
        A.    What Is Chapter 11?......................................................................................7
        B.    Why Are the Debtors Sending Me this Disclosure Statement? ......................7
        C.    What Happens to My Recovery If the Plan Is Not Confirmed or Does Not
              Become Effective? ........................................................................................8
        D.    If the Plan Provides that I Get a Distribution, Do I Get It Upon
              Confirmation or When the Plan Becomes Effective, and What Is Meant By
              "Confirmation," "Effective Date," and "Consummation"? ...................................8
        E.    Is There Potential Litigation Related to the Plan? .................................................8
        F.    Will There Be Releases and Exculpation Granted to Parties in Interest as
              Part of the Plan?...........................................................................................8
        G.    What Is the Deadline to Vote on the Plan?....................................................9
        H.    How Do I Vote for or Against the Plan?........................................................9
        I.    Why Is the Bankruptcy Court Holding a Confirmation Hearing and When
              Will It Occur? ............................................................................................10
        J.    What Is the Effect of the Plan on the Debtors' Ongoing Business? ..............10
        K.    Who Will Serve as the Directors or Officers of the Reorganized Debtors? ..........10
        L.    Who Do I Contact If I Have Additional Questions With Respect to This
              Disclosure Statement or the Plan? ..............................................................11
        M.    Do the Debtors Recommend Voting in Favor of the Plan? ...........................11

IV.     EVENTS LEADING TO THE CHAPTER 11 FILINGS.................................................11
        A.    The Declining Mortgage Market .................................................................11
        B.    Negotiations with Stakeholders ..................................................................12
        C.    Plan Sponsorship Proposal..........................................................................13

V.      THE CHAPTER 11 CASES ..........................................................................................14
        A.    First Day Papers.........................................................................................14
        B.    Executory Contracts and Unexpired Leases ................................................17
        C.    Schedules and Statements ...........................................................................17

VI.     THE PLAN OF REORGANIZATION.........................................................................17
        A.    Plan's Release ............................................................................................18

B.      Plan's Exculpation and Injunction ..........................................................19

VII.    RISK FACTORS TO BE CONSIDERED .................................................................19
A.      General ...................................................................................................20
B.      Bankruptcy Specific Risk Factors ..........................................................20
C.      Industry-Specific Risk Factors ...............................................................23
D.      Forward Looking Statements ..................................................................25
E.      Disclosure Statement Disclaimer ...........................................................26
F.      Liquidation Under Chapter 7 ..................................................................27

VIII.   SOLICITATION AND VOTING PROCEDURES ....................................................28
A.      Voting Status of Each Class ....................................................................28
B.      Classes Entitled to Vote ..........................................................................28
C.      Voting Procedures ...................................................................................28

IX.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .................31
A.      The Confirmation Hearing ......................................................................31
B.      Confirmation Standards ..........................................................................31
C.      Liquidation Analysis ...............................................................................33
D.      Financial Feasibility ...............................................................................33
E.      Acceptance by Impaired Classes ............................................................34
F.      Confirmation Without Acceptance by All Impaired Classes..................34

X.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ......................................................................................................35
A.      Continuation of the Chapter 11 Cases ....................................................35
B.      Alternative Plans of Reorganization .......................................................36
C.      Liquidation Under Chapter 7 or Chapter 11 ...........................................36

XI.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES....................................37
A.      Certain Consequences to the Debtors .....................................................38
B.      Consequences to Holders of Go-Forward Trade Claims ........................38
C.      Information Reporting and Withholding ..................................................40

XII.    PLAN SUPPLEMENT ......................................................................................40

XIII.   RECOMMENDATION AND CONCLUSION..............................................................42

## EXHIBITS[2]

**Exhibit A**    Joint Chapter 11 Plan of Reorganization of Stearns Holdings, LLC, et al.

**Exhibit B**    Liquidation Analysis[3]

---

[2]    Each Exhibit is incorporated herein by reference.

[3]    The Debtors have requested authority to file their liquidation analysis with their Plan Supplement following the completion of the Auction (as defined below).

**Exhibit C**    Financial Projections

**Exhibit D**    Organizational Chart

## I.    INTRODUCTION

On July 9, 2019 (the "Petition Date"), Stearns Holdings, LLC ("Stearns") and certain of its affiliates, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company"), each commenced a case (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors and debtors in possession under Bankruptcy Code section 1107(a) and 1108.

The Debtors submit this disclosure statement (as amended, modified, or supplemented, the "Disclosure Statement") pursuant to Bankruptcy Code section 1125 in connection with the solicitation of votes with respect to the *Joint Chapter 11 Plan of Stearns Holdings, LLC, et al.* dated July 9, 2019 (as amended, modified, or supplemented, the "Plan").[4] The Plan is annexed hereto as Exhibit A and is incorporated herein by reference.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Debtors' proposed Plan, as attached hereto. The Debtors reserve the right to modify the Plan consistent with Bankruptcy Code section 1127, Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and section 11.1 of the Plan.

The Plan provides for an equitable distribution of recoveries to the Debtors' creditors, preserves the value of the Debtors' business as a going concern, and preserves the jobs of employees. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation and costs, job loss, and/or lesser recoveries. **For these reasons, the Debtors urge you to return your ballot accepting the Plan.**

**WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g)). Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" unless (a) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

**There is one creditor group entitled to vote on the Plan whose votes are being solicited: holders of Go-Forward Trade Claims.**

---

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

**THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS WHO ACCEPT THE PLAN AND HOLDERS OF IMPAIRED CLAIMS WHO DO NOT VOTE TO ACCEPT OR REJECT THE PLAN AND DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN. IF HOLDERS OF IMPAIRED CLAIMS REJECT THE PLAN, THEY WILL NOT BE DEEMED TO HAVE ACCEPTED THE RELEASES. FOR THE SAKE OF CLARITY, THE HOLDERS OF CLAIMS WHO ARE RELEASING PARTIES SHALL NOT INCLUDE PERSONS IN CLASSES 1, 2, 3, 5, 6, 7, 8, 9, AND 10 THAT ARE PRESUMED TO EITHER ACCEPT THE PLAN OR REJECT THE PLAN AND/OR SUCH PERSONS' RELATED PARTIES.**

The following table summarizes (a) the treatment of any claim under Bankruptcy Code section 101(5) ("Claims") and any equity interest in the Debtors under Bankruptcy Code section 101(16) ("Interests") under the Plan, (b) which classes of Claims and Interests classified pursuant to Bankruptcy Code sections 1122 and 1123(a)(1) ("Classes") are impaired by the Plan, (c) which Classes are entitled to vote on the Plan, and (d) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article VI—The Plan of Reorganization below.

Pursuant to the Plan, a Plan Sponsor (as defined below) will inject a new money investment into the Debtors to fund recoveries to holders of the 9.375% senior secured notes due August 15, 2020 pursuant to an indenture (the "Notes"). The Plan provides that holders of claims in Class 1 (Priority Non-Tax Claims), Class 2 (Notes Secured Claims), and Class 3 (Other Secured Claims) will receive payment in full in cash on the effective date of the Plan or reinstatement or such other treatment that the Debtors elect that results in holders of claims being unimpaired. Claims in Class 5 (General Unsecured Claims), Class 6 (Artemis Note Claims), and Class 8 (Existing Stearns Holding Interests) will not receive any distributions under the Plan and are therefore deemed to have rejected the Plan. Claims in Class 7 (Intercompany Claims) are reinstated; cancelled, released, waived, and discharged; or otherwise settled in the Debtors' sole discretion. Class 9 (Intercompany Interests), and Class 10 (Protos Interests) are reinstated for administrative convenience purposes.

Holders of Claims in Class 4 (Go-Forward Trade Claims) are impaired and therefore entitled to vote on the Plan. For the reasons stated herein, the Debtors urge the holders of Claims in Class 4 to accept the Plan.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|-------|-------------------|-----------|------------------------|----------------------------------|
| 1 | Priority Non-Tax Claims<br><br>**Estimated Recovery: 100% Estimated Amount of Claims: $31,000[5]** | Except to the extent that a holder of an allowed Priority Non-Tax Claim agrees to a less favorable treatment, the holder of an allowed Priority Non-Tax Claim, at the sole option of | Unimpaired | Presumed to Accept |

---

[5]    All estimated amount values and classifications are based on current information available to the Debtors as of the date of filing of the Disclosure Statement and are subject to change.

| | | | | |
|---|---|---|---|---|
| | | the Debtors or the Reorganized Debtors (as applicable): (A) will be paid in full in cash; (B) will have such claim reinstated; or (C) will receive such other treatment so that the claim is unimpaired. | | |
| 2 | Notes Secured Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount of**<br>**Claims: To be determined**<br>**based on the results of the**<br>**Auction, if it occurs** | Except to the extent that a holder of an allowed Notes Secured Claim agrees to a less favorable treatment, holders of allowed Notes Secured Claims will receive cash (exclusive of such cash as may be necessary to pay the Allowed Cash Flow DIP Claim) to be paid by the Plan Sponsor on the effective date of the Plan in accordance with the Plan Sponsor Selection Procedures. | Unimpaired | Presumed to Accept |
| 3 | Other Secured Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount of**<br>**Claims: $58,000** | Except to the extent that a holder of an allowed Other Secured Claim against the Debtors agrees to a less favorable treatment, allowed Other Secured Claims will receive (a) payment in full in cash; (b) reinstatement of their claims; or (c) such other treatment that results in not impairing such claims. | Unimpaired | Presumed to Accept |
| 4 | Go-Forward Trade Claims<br><br>**Estimated Recovery: 95%**<br>**Estimated Amount of**<br>**Claims: $4,399,000** | Except to the extent that holders of allowed Go-Forward Trade Claims agree to a less favorable treatment, allowed Go-Forward Trade Claims will receive cash in an amount equal to 95% of their allowed claim amount. | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims<br><br>**Estimated Recovery: 0%** | General Unsecured Claims will not receive any distribution under the Plan. | Impaired | Deemed to Reject |
| 6 | Artemis Note Claims<br><br>**Estimated Recovery: 0%** | Artemis Note Claims will not receive any distribution under the Plan. | Impaired | Deemed to Reject |
| 7 | Intercompany Claims<br><br>**Estimated Recovery: N/A** | Intercompany Claims will be, at the debtors' discretion, (a) reinstated; (b) cancelled; or (c) otherwise settled. | Unimpaired | Presumed to Accept |
| 8 | Existing Stearns Holdings Interests<br><br>**Estimated Recovery: 0%** | Existing Stearns Holdings Interests will be cancelled. | Impaired | Deemed to Reject |
| 9 | Intercompany Interests<br><br>**Estimated Recovery: N/A** | Intercompany Interests will be reinstated. | Unimpaired | Presumed to Accept |
| 10 | Protos Interests | Protos Interests will be reinstated. | Unimpaired | Presumed to Accept |

| | Estimated Recovery: N/A | | | |
|---|---|---|---|---|

## II.    OVERVIEW OF THE DEBTORS' BUSINESS AND CAPITAL STRUCTURE

### A.    The Debtors' Operations

The Debtors are a leading private, independent mortgage company that originates residential mortgage loans through its national platform. The Company is the 20th largest mortgage lender in the United States, and has maintained disciplined lending standards with a focus on high credit standards and mortgage loan quality. The primary source of the Debtors' revenue is mortgage loan production, which generates income primarily through gains upon the sale of mortgage loans. The Debtors employ approximately 2,700 people, including employees of their joint ventures and preferred partners. They originate loans in all 50 states.[6]

The primary source of the Debtors' revenue is mortgage loan production, which generates income primarily through gains upon the sale of mortgage loans. The Debtors' primary production channels are wholesale, retail, joint venture, and preferred partners. The wholesale channel consists of mortgage loans that are sourced and submitted to the Debtors by independent mortgage brokers on behalf of borrowers. The retail channel originates mortgage loans directly with borrowers through over 100 branch offices nationwide. The joint venture channel is comprised of nine (9) joint ventures. The Debtors own 47.5% of the interests in one of those joint ventures and they own 50% of the interests in all the others. The preferred partner channel consists of two independent mortgage banks. The Debtors own 50.8% of the interests in one of the preferred partners, and 51% of the interests in the other. During the twelve months ended December 31, 2018, the wholesale, retail, joint venture and preferred partner channels represented 55%, 14%, 23% and 5% of the Debtors' mortgage loan production, respectively.

Like almost all other mortgage companies that originate mortgages to borrowers with high credit ratings, the Debtors sell the loans they originate. Between 80% and 85% of the Debtors' loans are sold to, or securitized through, the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae"). Such sales are made pursuant to industry-standard forms of agreement and guidelines that require the loans to meet detailed eligibility criteria. The balance of the Debtors' loans are sold to other loan aggregators and investors, including JPMorgan Chase Bank. As described further below, the Debtors largely exited the business of servicing loans. Accordingly, they sell over 99% of their loans on a "servicing-released" or "flow servicing sale basis," meaning that the Debtors do not retain the right to service the loans after they are sold.

Prior to 2018, the Debtors had a substantial loan servicing division which generated net servicing income from their mortgage servicing rights ("MSR") portfolio. The net servicing income consisted of servicing fees and other servicing compensation less the fees paid to sub

---

[6]    Stearns Lending, LLC and Private Mortgage Advisors, LLC employs approximately 1,099 and 16 employees, respectively. The remaining employees are employed by the joint venture affiliates and other non-debtor entities, all of whom would be severely harmed by the failure of the Debtors.

servicers. On January 31, 2018, the Debtors entered into an agreement with Freedom Mortgage Corporation to sell MSR's for a significant portion of the Debtors' serviced mortgage loan portfolio. Total gross proceeds were anticipated to be approximately $224.6 million. On February 1, 2018, the Debtors received $159.1 million of the proceeds. On May 1, 2018, the Debtors received an additional $42.3 million. An additional $10 million of proceeds was received on December 12, 2018 and another $8.8 million was received in June 2019. The outstanding proceeds will come due post-petition upon delivery of the remaining servicing documents.

### B.    Employees

The Debtors employ approximately 2,700 people, including employees of their joint ventures and preferred partners. As of the Petition Date, one of the Debtors, Stearns Lending (as defined below) employs approximately 1,099 full time employees ("Stearns Full Time Employees"), 8 part time employees ("Stearns Part Time Employees", together with Stearns Full Time Employees, "Stearns Eligible Employees"), and 8 temporary employees (the "Stearns Temporary Employees", together with Stearns Eligible Employees, the "Stearns Employees"). In addition to Stearns Employees, the Debtors rely upon approximately 50 independent contractors, temporary employees, and temporary staffing agencies to provide consulting services pertaining to accounts payable, information technology, accounting, payroll, and for clerical support. Another Debtor, Private Mortgage Advisors, LLC, employs approximately 16 full time employees.

### C.    Debtors' Organizational Structure

Funds managed by Blackstone's private equity group own approximately 70% of the interests in the Debtors. Mr. Glenn Stearns, the Debtors' founder, owns approximately 29%, and three other shareholders own the balance. The Blackstone managed funds acquired their ownership position from Mr. Stearns in December 2015. Stearns is a Delaware limited liability company. It owns 100% of the equity interests in the primary operating entity, Stearns Lending, LLC ("Stearns Lending") a Delaware limited liability company. Further, the Company, through Debtor Stearns Ventures, LLC, a Delaware limited liability company, owns interests in various joint ventures and preferred partners. These joint ventures and preferred partners include real estate companies, builders, relocation service providers, and financial service companies. Stearns Lending owns the interests in one of the preferred partners, while Stearns Ventures, LLC owns the interests in the other. The joint ventures and the preferred partners independently originate mortgage loans utilizing their own separate sources of financing. The Debtors provide critical back-office support to the joint ventures and preferred partners and, in some cases, fulfillment services in exchange for arms'-length fees. None of the joint ventures or preferred partners is a debtor in these Chapter 11 Cases. The Debtors will continue providing back-office and other support to ensure that the joint ventures and preferred partners continue their operations in the ordinary course without interruption.

The organizational chart, attached hereto as Exhibit D, illustrates the Debtors' organizational structure, as of the Petition Date.

###### D.    Regulation of the Company's Business

The regulatory dynamics in the mortgage industry continue to evolve and become more stringent in nature. The residential mortgage industry is highly regulated and these regulations directly impact the Debtors' business. Increased regulatory and compliance requirements in the mortgage finance industry—resulting from the Dodd-Frank Wall Street Reform and Consumer Protection Act, the creation of the Consumer Finance Protection Bureau, and other legislation—have caused many traditional bank competitors to exit or substantially reduce some of their mortgage-related activities. Regulatory compliance requires constant monitoring, counterparty and vendor management, and internal and external audits. A material failure to comply with these laws or regulations could subject the Company to lawsuits, governmental actions, and/or damage to the Company's reputation, which could materially adversely affect the business, financial conditions, and the results of operations.

###### E.    Capital Structure

The following description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

###### 1.    The Notes

On August 8, 2013, Stearns and Stearns Co-Issuer Inc. issued the Notes. The Notes were issued in the amount of $250 million. Wilmington Trust, National Association is the indenture trustee and collateral agent of the Notes. The Notes are guaranteed by debtors Stearns Lending and Stearns Ventures, LLC (together with Stearns and Stearns Co-Issuer Inc., the "Note Obligors"). The Notes are secured by a lien on substantially all of the Note Obligors' assets, other than assets securing the Prepetition Repo Facilities (as defined below), subject to certain exceptions.

On April 13, 2018, Stearns tendered an offer to purchase, at par, up to $80 million of the Notes. Upon the tender offer's expiration on May 10, 2018, Stearns purchased $60 million of the Notes. In February 2019, Stearns purchased an additional $7 million of Notes through another tender offer. Finally, on May 24, 2019, Stearns offered to purchase an additional $42 million of Notes. Stearns did not purchase any Notes pursuant to this offer, having commenced these cases prior to the required payment date of July 15, 2019.

The current outstanding balance of the Notes is approximately $183 million. Various funds affiliated with Pacific Investment Management Company LLC ("PIMCO") owns approximately 67% of the outstanding principal balance of the Notes.

###### 2.    The Prepetition Repo Facilities

Similar to virtually all other mortgage lenders, the Debtors finance their mortgage origination business through so-called warehouse facilities pursuant to repurchase agreements. The Debtors, through Debtor Stearns Lending, collectively have four (4) repurchase agreements with four (4) lending institutions: (i) Bank of America, N.A., (ii) Texas Capital Bank, National Association, (iii) Wells Fargo Bank, N.A., and (iv) Barclays Bank PLC (each a "Prepetition

Repo Facility" and, collectively, the "Prepetition Repo Facilities"). Prior to the Petition Date, one additional warehouse facility and one gestation facility were terminated.

Pursuant to the Prepetition Repo Facilities, the Debtors sell newly originated mortgage loans to the counterparty to finance the originations of the loan and typically repurchase the loans within 30 days of origination when the Debtors sell the loans to Fannie Mae, Freddie Mac, Ginnie Mae or another purchaser. The Debtors obtain advances of less than 100% of the principal balance of the mortgage loans (referred to as "haircut") from the lenders under the Prepetition Repo Facilities, which requires the Debtors to use working capital to fund the remaining portion of the principal balance of the mortgage loans. The amount of the advances provided under each Prepetition Repo Facility range from 92.5% to 99% of the principal balance of agency-eligible mortgage loans.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What Is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and its interest holders. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes such plan binding upon a debtor and any creditor of or equity interest holder in such debtor, whether or not such creditor or equity interest holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed plan.

### B.    Why Are the Debtors Sending Me this Disclosure Statement?

During the Chapter 11 Cases, the Debtors will seek to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, Bankruptcy Code section 1125 requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.    What Happens to My Recovery If the Plan Is Not Confirmed or Does Not Become Effective?**

In the event that the Plan is not confirmed or does not become effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide holders of Claims and Interests with less than they would have received pursuant to the Plan. The Liquidation Analysis will be filed as part of the Plan Supplement.

**D.    If the Plan Provides that I Get a Distribution, Do I Get It Upon Confirmation or When the Plan Becomes Effective, and What Is Meant By "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court ("Confirmation"). Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After confirmation of the Plan by the Bankruptcy Court, several conditions need to be satisfied or waived so that the Plan can become effective. Initial distributions will only be made on the date the Plan becomes effective (the "Effective Date") or as soon as reasonably practicable thereafter, as specified in the Plan. The terms "consummation" and "substantial consummation" are sometimes used to indicate the occurrence of the Effective Date. *See* Section VII.B.7 of this Disclosure Statement, entitled "Conditions Precedent to Consummation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.

**E.    Is There Potential Litigation Related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections could potentially give rise to litigation. Certain Classes[7] are deemed to reject the Plan. The Debtors will seek Confirmation of the Plan notwithstanding the dissent of such objecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies Bankruptcy Code section 1129(b).

**F.    Will There Be Releases and Exculpation Granted to Parties in Interest as Part of the Plan?**

Yes, the Plan proposes to release each of the Released Parties.[8] The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the

---

[7]    Pursuant to the Plan and as used herein, a "Class" means a category of holders of Claims or Interests as set forth in Article III of the Plan and classified pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

[8]    As set forth in the Plan, the term Released Parties means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Credit Parties; (d) the Creditors' Committee and each of its members in their capacity as such; (e) the Plan Sponsor; (f) the Exit Repo Facility Parties; (g) Blackstone; and (i) with respect to each of the foregoing clauses (a) through (g), to the fullest extent permitted by law, such Person's Related Parties, in each case only in their capacity as such. All of the terms in the foregoing definition are as defined in the Plan.

Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Released Parties in obtaining their support for the Plan.

All of the Released Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties warrants the benefit of the release and exculpation provisions.

**Each holder of a Claim that votes to accept the Plan shall be deemed to have consented to the Plan's third-party release contained in Section 9.03 of the Plan (the "Third-Party Release") and will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and causes of action against Released Parties. Additionally, each holder of a Claim that either (i) abstains from voting on the plan or (ii) votes to reject the Plan but does not check the box in Item 3 of the Class 4 will also be deemed to have consented to the Plan's Third-Party Release and will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and causes of action against Released Parties. Regardless of whether holders elect to opt out of the Plan's Third-Party Release, holders recoveries under the Plan remain unaffected. The releases are an integral element of the Plan.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. If necessary, the Debtors will present evidence at the hearing on Confirmation of the Plan (the "Confirmation Hearing") to further demonstrate the basis for and propriety of the release and exculpation provisions. The Plan's release, exculpation, and injunction provisions are set forth in Article VI of this Disclosure Statement and in Article IX of the Plan.

### G.    What Is the Deadline to Vote on the Plan?

The Voting Deadline is September 20, 2019 at 4:00 p.m. (Eastern Time)

### H.    How Do I Vote for or Against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots that will be distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must either be (a) properly completed by hand, executed, and delivered in accordance with the instructions included in the ballot by: (i) first class mail, (ii) courier, or (iii) personal delivery or (b) properly completed electronically using the Solicitation Agent's (as defined below) E-Balloting Platform. Whether completing the ballot by hand or electronically using the Solicitation Agent's E-Balloting Platform, each holder's ballot must be **actually received by September 20, 2019 at 4:00 p.m. (Eastern Time)** at the following address: Stearns Holdings, LLC, c/o Prime Clerk (the "Solicitation Agent"). It is important that the holder of a Claim in Class 4 follow the specific instructions provided on such holder's ballot and the accompanying instructions. Except in the Debtors' sole discretion, ballots may not be transmitted by facsimile, email, or other electronic means, other than the Solicitation Agent's E-Balloting

Platform. For more information regarding voting, *see* Article VIII of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

### I.    Why Is the Bankruptcy Court Holding a Confirmation Hearing and When Will It Occur?

Bankruptcy Code section 1128(a) requires the Bankruptcy Court to hold a Confirmation Hearing and recognizes that any party in interest may object to Confirmation of the Plan.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**The Confirmation Hearing is scheduled for 10:00 a.m. (Eastern Time) on October 3, 2019.**

To provide additional notice to parties in interest in these cases, the Debtors will post to a website maintained by the Solicitation Agent various chapter 11 documents, including the Plan and this Disclosure Statement. The website address is: https://cases.primeclerk.com/stearns. Further, the Debtors intend to request Bankruptcy Court approval to publish a notice in national edition of the *Wall Street Journal*.

### J.    What Is the Effect of the Plan on the Debtors' Ongoing Business?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will continue as a going concern. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to the Effective Date have been satisfied or waived. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### K.    Who Will Serve as the Directors or Officers of the Reorganized Debtors?

The composition of the board of directors or managers of each Reorganized Debtor and, to the extent applicable, the officers of each Reorganized Debtor, will be disclosed prior to the Confirmation Hearing in accordance with Bankruptcy Code section 1129(a)(5).

Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be appointed or elected and serve pursuant to the terms of the

applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### L.    Who Do I Contact If I Have Additional Questions With Respect to This Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact Prime Clerk, the Debtors' Solicitation Agent:

By regular mail, hand delivery, or overnight mail at:

> c/o Prime Clerk LLC
> Re: Stearns Holdings, LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

By electronic mail at:

> Stearnsinfo@primeclerk.com

By telephone at:

> (844) 234-1461

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Solicitation Agent at https://cases.primeclerk.com/stearns (free of charge) or the Bankruptcy Court's website at http://www.nysb.uscourts.gov (for a fee).

### M.    Do the Debtors Recommend Voting in Favor of the Plan?

Yes. The Debtors believe the Plan provides for a larger distribution to creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    The Declining Mortgage Market

The mortgage origination business is significantly impacted by interest rate trends. In mid-2016, the 10-year Treasury was 1.60%. Following the U.S. presidential election, the Treasury rate rose to a range of 2.30% to 2.45% and maintained that range throughout 2017. The 10-year Treasury rate increased to over 3.0% for most of 2018. The rise in rates during this time

period reduced the overall size of the mortgage market, increasing competition and significantly reduced market revenues.

To counter the decline in origination volumes and revenues, the Debtors implemented several initiatives to reduce costs in the latter part of 2017 and throughout 2018. The Debtors reduced their fixed costs by approximately 40% through employee headcount reductions; vendor cost reductions; centralization of their corporate functions and regional operating center site closures. These measures resulted in a reduction of over $40 million in annualized costs. During this time period, the Debtors' lenders under the Prepetition Repo Facilities nevertheless began to express concerns about the impact of the market contraction on overall financial results and, more importantly, the upcoming maturity of the Notes – August of 2020 – and the fact that the Debtors were obligated to use $42 million of the proceeds from their MSR portfolio sale to tender for the notes in May 2019, which would put pressure on the Debtors' liquidity.

This requirement to repay $42 million of the proceeds stemmed from the Notes indenture, which required the Debtors to use the entirety of the MSR sale proceeds for certain permitted purposes within 360 days of receipt or to otherwise offer to repay an equal amount of the Notes with such proceeds. In the months leading up to the chapter 11 bankruptcy filings, the Debtors explored various potential permitted uses of the proceeds. The Debtors ultimately did not apply the proceeds to one of the purposes permitted under the Notes indenture and further were unable to repay the $42 million in Notes using the proceeds.

The Prepetition Repo Facilities were essential to the Debtors' operations. Thus, the Debtors resolved to take the steps necessary to restructure their balance sheet, including the terms of the Notes. Timing was important to maintain the financial strength of the Debtors and to ensure continued access to the Prepetition Repo Facilities at market terms to fund originations and operations. The Debtors therefore engaged legal and investment banking advisors in September 2018, far in advance of the Prepetition Repo Facilities' maturities, and even farther in advance of the May 2019 deadline to tender for $42 million of the Notes. The Company and its advisors used the next few weeks to assess the Company's alternatives and the Company worked to finalize its three-year forecast and related business plan, which would serve as a basis for formulating a restructuring proposal for holders of the Notes.

## B.    Negotiations with Stakeholders

In November 2018, the Debtors approached representatives of PIMCO, by far the largest holder of the Notes, in an effort to engage on restructuring alternatives. Over the following months, the Debtors and PIMCO exchanged multiple proposals to restructure the Notes, including through potential debt-for-equity exchange or sale transactions. Unable to reach consensus with PIMCO, the Company worked with Blackstone to develop a plan to restructure the Debtors' affairs in a manner that the Company believes will preserve the Debtors' as a going concern, thereby preserving the jobs of 2,700 employees and maximizing value for all the Debtors' stakeholders.

### C.    Plan Sponsorship Proposal

#### 1.    Formation of the Blackstone Investment Agreement

While the Debtors and Blackstone worked together to consider and develop other potential restructuring alternatives that may be acceptable to PIMCO, the Debtors, with the assistance of their investment banker, commenced a marketing process. The Debtors solicited potential transaction and/or financing partners interested in either investing in the Debtors, selling the Company outright as a going concern, or undertaking any other transaction alternative that could facilitate a restructuring of the Company's balance sheet. However, none of the potential transaction parties that the Debtors' approached expressed willingness to contribute value in an amount anywhere near what PIMCO demanded, i.e., significant new equity while leaving the full unpaid principal balance of the Notes in place.

In light of the Company's inability to find a transaction partner who would satisfy PIMCO's requests, Blackstone offered to infuse new money into the Company by serving as a plan sponsor. The Debtors determined that the proposed investment from Blackstone was the best offer for the Company and in the best interest interests of stakeholders. Accordingly, the Debtors and Blackstone negotiated terms of the proposed investment. On July 8, 2019, the Debtors and Blackstone entered into that certain investment agreement (the "Blackstone Investment Agreement"). Under the Blackstone Investment Agreement, Blackstone would contribute $60 million of new money (the "New Money Investment") in exchange for 100% of the equity in Stearns upon the effective date of the Plan. The parties agreed that the Blackstone Investment Agreement would be subject to a competitive process to determine if there were higher or otherwise better investment proposals available for the Debtors, as more fully set forth below. The New Money Investment will fund recoveries for the Company's Notes holders in these Chapter 11 Cases.

#### 2.    Plan Sponsor Selection Procedures

On July 24, 2019, the Bankruptcy Court entered the *Order (A) Approving the Plan Sponsor Selection Procedures; (B) Establishing Notice Procedures; and (C) Granting Related Relief* (the "Selection Procedures Order"). Pursuant to the Selection Procedures Order, the Bankruptcy Court authorized procedures to market test the New Money Investment contained in the Blackstone Investment Agreement and to obtain the highest or otherwise best investment proposal (the "Selection Procedures").

The Selection Procedures provide a process and requirements for parties interested in sponsoring the Debtors' Plan to submit proposals to the Debtors. The Debtors will provide parties that meet the requirements set forth in the Selection Procedures access to due diligence until September 6, 2019 at 4:00 p.m. (Eastern Time) (the "Proposal Deadline"). Following the Proposal Deadline, the Debtors, in their sound business judgment and in consultation with their advisors, will evaluate all proposals timely submitted in order to determine whether such proposals are "Qualified Proposals" as provided in the Selection Procedures. If the Debtors receive any additional Qualified Proposals,[9] the Debtors shall hold a meeting (the "Auction") on

---

[9]    For the avoidance of doubt, the Blackstone Investment Agreement is a Qualified Proposal pursuant to the Selection Procedures.

September 9, 2019, if necessary, as further set forth in the Selection Procedures. At the conclusion of the Auction, the Debtors will determine the highest or otherwise best investment proposal and select a sponsor for the Debtors' Plan from among the Qualified Proposals.

## V.    THE CHAPTER 11 CASES

### A.    First Day Papers

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 9, 2019. Recognizing that any interruption of the Debtors' business, even for a short period, could negatively impact customer and vendor relationships and the Debtors' goodwill, revenue, and profits, which would be detrimental to the value of the Debtors' estates, the Debtors filed certain first day motions seeking authorization for the Debtors to continue operating their businesses in the ordinary course. The first day motions seek to stabilize the Debtors' operations and are designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtors' business as a consequence of the filing of the Chapter 11 Cases. The following summary highlights certain of the first day papers.

### 1.    Cash Flow DIP and Cash Collateral Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Orders (A) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling A Final Hearing, and (G) Granting Related Relief* [Docket No. 20] (the "Cash Flow DIP Motion"). By the Cash Flow DIP Motion, the Debtors requested authority to use cash collateral of the holders of the Notes and to enter into a debtor in possession lending agreement with a maximum committed amount of $35 million (the "Cash Flow DIP Facility") with an affiliate of Blackstone (the "Cash Flow DIP Lender"). The Cash Flow DIP Facility affords the Debtors liquidity to fund their operations, including payment of vendors, employee payroll, facilities rent, and other necessary expenses. The Debtors project that the Notes' cash collateral likely will be sufficient to pay many of such expenses. Accordingly, the Debtors anticipate limited need for the funding available under the Cash Flow DIP Facility. The Cash Flow DIP Facility nonetheless is essential to ensure the Debtors will have sufficient liquidity during these cases to honor all their postpetition obligations.

The Debtors provided the Cash Flow DIP Lender with a lien on substantially all their assets, other than assets that constitute collateral under the DIP Repo Facility (as defined below), to secure the Debtors' obligations under the Cash Flow DIP Facility. Such lien primed the prepetition lien securing the claims of the Notes pursuant to section 364(d) of the Bankruptcy Code. Holders of the Notes are adequately protected in connection with such priming, and also in connection with the Debtors' proposed use of the Notes' cash collateral. The Bankruptcy Court entered an order granting the relief requested in the Cash Flow DIP Motion on an interim basis on July 11, 2019 [Docket No. 91] and on a final basis on August 1, 2019 [Docket No. 209].

### 2.    DIP Repo Facilities Motion

In addition to the Cash Flow DIP Facility, the Debtors require liquidity to fund their mortgage origination operations. In the weeks leading to the Petition Date, the Debtors and their advisors engaged in extensive negotiations with Blackstone and the lenders under the Debtors' Prepetition Repo Facilities regarding potential proposals for debtor in possession financing that would provide the Debtors with (a) liquidity to fund their operations in these Chapter 11 Cases and (b) the best path forward for their reorganization.

Accordingly, on the Petition Date, the Debtors filed the *Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to Enter into Repurchase Agreement Facilities and Related Documents; (B) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business (C) Granting Backup Liens and Superpriority Administrative Expense Claims; (D) Modifying the Automatic Stay; (E) Scheduling a Final Hearing; and (F) Granting Related Relief* (the "DIP Repo Motion"). Pursuant to the DIP Repo Motion, the Debtors sought authority for Stearns Lending (a) to obtain up to $1.5 billion in warehouse financing under a master repurchase agreements (the "DIP Repo Facility") and (b) to obtain access to over $2.0 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreements (together with the DIP Repo Facility, the "DIP Facilities"). The DIP Facilities ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted.

The Debtors ran a marketing process designed to obtain the most favorable terms for their debtor in possession warehouse financing. The Debtors negotiated the DIP Repo Facilities with parties to the DIP Facility in good faith and at arm's length, and believe that the terms of the DIP Facilities are competitive and the best that could be obtained under the circumstances. Further the DIP Facilities have been market tested and represent the best of three offers received by the Company. The Bankruptcy Court entered an order approving the DIP Facilities on an interim basis on July 11, 2019 [Docket No. 91] and on a final basis on August 1, 2019 [Docket 209].

### 3.    Cash Management Motion

On the Petition Date, the Debtors filed a motion seeking authority to continue using their cash management systems and their respective bank accounts, business forms, and intercompany transactions. The Debtors also sought a waiver of, or extension of time to comply with, requirements under Bankruptcy Code section 345(b). The Bankruptcy Court entered an order approving the use of the Debtors' cash management systems and their respective bank accounts, business forms, and intercompany transactions on an interim basis on July 10, 2019 [Docket No. 81] and on a final basis on July 31, 2019 [Docket No. 192].

### 4.    Wages and Benefits Motion

On the Petition Date, the Debtors filed a motion seeking authorization to pay prepetition wages, compensation, and amounts associated with employee benefit programs and continue such programs in the ordinary course. The Bankruptcy Court entered an order approving payments of employee wages, compensation, and benefits on an interim basis on July 10, 2019 [Docket No. 85] and on a final basis on July 31, 2019 [Docket No. 196].

### 5.    Insurance Motion

On the Petition Date, the Debtors filed a motion seeking authority to pay and maintain various insurance policies, including, among other things, the Debtors' property, general liability, workers' compensation, cyber liability, automobile liability, employers' liability, umbrella coverage, mortgage bankers' bonds, mortgage bankers' professional liability, directors' and officers' coverage, and excess liability. The Bankruptcy Court entered an order approving payments under such policies on an interim basis on July 10, 2019 [Docket No. 77] and on a final basis on July 31, 2019 [Docket No. 199].

### 6.    Taxes Motion

The Debtors filed a motion on the Petition Date seeking authorization to pay certain prepetition fees and taxes to various federal, state, county, and city taxing and licensing authorities. The Bankruptcy Court entered an order approving the payments of certain prepetition fees and taxes on a final basis on July 31, 2019 [Docket No. 191].

### 7.    Utilities Motion

On the Petition Date, the Debtors filed a motion seeking to establish procedures for determining adequate assurance of payment for future utility services. On July 31, 2019, the Bankruptcy Court entered an order approving the Debtors' procedures for determining adequate assurance of payment for future utility services [Docket No. 197].

### 8.    Mortgage Origination Motion

On the Petition Date, the Debtors filed a motion seeking authority, but not direction, to continue in the ordinary course of business (i) to originate and purchase mortgage loans; (ii) to sell and securitize loans, including by performing under certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, and private parties; (iii) to service and subservice loans pursuant to applicable Fannie Mae, Freddie Mac, and Ginnie Mae standards; (iv) to sell loan servicing rights, and to perform under existing related agreements, enter into amendments and modifications of prepetition related agreements, and enter into and perform under new related agreements; (v) to pay prepetition amounts owed to critical vendors; (vi) to fulfill compliance and regulatory obligations; and (vii) to provide assurances of future performance to Fannie Mae, Freddie Mac, and Ginnie Mae. The Bankruptcy Court entered an order granting such relief on an interim basis on July 10, 2019 [Docket No. 86] and on a final basis on July 31, 2019 [Docket No. 193].

### 9.    Joint Ventures Motion

On the Petition Date, the Debtors filed a motion seeking authority, but not direction, to continue supporting the Debtors' joint ventures and preferred partners in the ordinary course of business including (i) to purchase mortgage loans originated by the joint ventures and preferred partners, (ii) to provide shared support services to the joint ventures and preferred partners pursuant to certain shared services agreements, (iii) to extend lines of credit to the preferred partners on terms and in amounts consistent with past practice, (iv) to make capital contributions to the joint ventures and preferred partners pursuant to the limited liability company agreements at each relevant joint venture and preferred partner, and (v) to receive excess cash distributions

16

from the joint ventures and preferred partners (when and if payable). The Bankruptcy Court entered an order authorizing, but not directing, the Debtors to continue to support their joint ventures and preferred partners in the ordinary course on an interim basis on July 10, 2019 [Docket No. 84] and on a final basis on July 31, 2019 [Docket No. 194].

### B.    Executory Contracts and Unexpired Leases

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject executory contracts and unexpired leases. The Debtors are engaged in an evaluation of their executory contracts and unexpired leases, including the potential assumption, rejection, or amendment and assumption thereof. As part of a subsequently-filed supplement to the Plan or a motion to reject executory contracts and unexpired leases to be filed with the Bankruptcy Court, the Debtors will identify contracts to be rejected in a schedule. All remaining contracts will be assumed.

On July 17, 2019, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property* Nunc Pro Tunc *to the Petition Date* [Docket No. 121] seeking to reject certain unexpired leases. On July 31, 2019, the Debtors filed the *Debtors' Second Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property* Nunc Pro Tunc *to the Effective Rejection Dates* [Docket No. 205]. Both motions shall be heard by the Bankruptcy Court on September 11, 2019 at 2:00 p.m. (Eastern Time).

### C.    Schedules and Statements

The Debtors filed a motion on the Petition Date seeking up to a 30 day extension to file the Debtors' schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "Statements"). As set forth therein, the Debtors intend to file their Schedules and Statements at least one day prior to the hearing to approve the Disclosure Statement.

The Schedules and Statements will provide certain information pertaining to Claims. Interested parties may review the Schedules and Statements at the office of the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 or online at http://www.nysb.uscourts.gov.

## VI.    THE PLAN OF REORGANIZATION

As set forth in Section I of this Disclosure Statement, pursuant to the Plan, a Plan Sponsor (as defined below) will inject a new money investment into the Debtors to fund recoveries to holders of Class 2 Notes Secured Claims. The Plan provides that holders of claims in Class 1 (Priority Non-Tax Claims), Class 2 (Notes Secured Claims), and Class 3 (Other Secured Claims) will receive payment in full in cash on the effective date of the Plan or reinstatement or such other treatment that the Debtors elect that results in holders of claims in Class 3 being unimpaired. Claims in Class 7 (Intercompany Claims), Class 9 (Intercompany Interests), and Class 10 (Protos Interests) are also unimpaired, but no distributions shall be made on account of such claims. Claims in Class 5 (General Unsecured Claims), Class 6 (Artemis Note Claims), and Class 8 (Existing Stearns Holding Interests) will not receive any distributions under the Plan and are conclusively deemed to have rejected the Plan.

17

Holders of Claims in Class 4 (Go-Forward Trade Claims) are entitled to vote on the Plan.

THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY, AND IS SUBJECT TO, THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN. THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT A**.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF SOME OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN. UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**THE PLAN CONTAINS CERTAIN IMPORTANT RELEASE AND EXCULPATION PROVISIONS. THOSE PROVISIONS ARE RESTATED BELOW FOR YOUR CONVENIENCE.**

**A.    Plan's Release**

**1.    Release by the Debtors**

**Pursuant to Section 9.2 of the Plan, the Debtors shall release, to the maximum extent allowed by applicable law and except as otherwise specifically provided in the Plan or the Plan Supplement, the Released Parties (defined above) from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, their estates, and non-Debtor affiliates. The Debtors do not believe they have any such claims against any of the Released Parties.**

**2.    Releases by Holders of Claims**

**Pursuant to Section 9.3 of the Plan, each (i) holder of a Claim that votes to accept the Plan or (ii) holder of a Claim that abstains from voting or votes to reject the Plan, that does not elect to opt out of the releases contained therein by checking the box on its timely**

**submitted applicable Ballot, will release the Released Parties from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, their estates, and non-Debtor affiliates. For the sake of clarity, the Holders of Claims who are Releasing Parties shall not include Persons in Classes 1, 2, 3, 5, 6, 7, 8, 9, and 10 that are presumed to either accept the Plan or reject the Plan and/or such Persons' Related Parties. The Debtors do not believe any such claims exist against any of the Released Parties.**

### B.    Plan's Exculpation and Injunction

#### 1.    Exculpation

Pursuant to Section 9.4 of the Plan, each Released Party is released from any claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in- or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan, or any contract, instrument, release, or other agreement, or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the consummation, administration, and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement. The exculpation in Section 9.4 of the Plan is limited to claims that do not arise from Released Parties' gross negligence, intentional fraud or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law).

#### 2.    Injunction

Pursuant to Section 9.6 of the Plan, all persons who have held, hold, or may hold Claims or Interests that are released, discharged, or exculpated pursuant to the Plan shall be permanently enjoined from taking action against the Released Parties with respect to such enjoined claims.

## VII.    RISK FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

As noted above, there can be no guarantee that the assumptions, estimates, and projections underlying the Plan will continue to be accurate or valid at any time after the date hereof. This section of this Disclosure Statement explains that there are certain risk factors that each voting holder of a Claim should consider in determining whether to vote to accept or reject the Plan. Accordingly, each holder of a Claim who is entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this

Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### A.    General

The Plan sets forth the means for satisfying the Claims against and Interests in each of the Debtors. Certain Claims are not expected to be paid in full. Nevertheless, the reorganization of the Debtors' business and operations under the proposed Plan avoids the potentially adverse impact of the likely increased delays and costs associated with a chapter 7 liquidation of the Debtors. The Plan has been proposed after a careful consideration of all reasonable restructuring alternatives. Despite the risks inherent in the Plan, as described herein, the Debtors believe that the Plan is in the best interests of creditors when compared to all reasonable alternatives.

### B.    Bankruptcy Specific Risk Factors

#### 1.    The Plan May Not Be Accepted by Sufficient Holders of Impaired Claims.

The Plan is subject to a vote of holders of impaired Claims in voting classes and to Confirmation by the Bankruptcy Court. Article IX hereof summarizes the numerous requirements for Confirmation of the Plan, including that the Plan be accepted by at least one Class of impaired Claims. There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, while the Debtors believe the Plan is confirmable under the standards set forth in Bankruptcy Code section 1129, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

#### 2.    The Bankruptcy Court May Not Confirm the Plan.

Even if all voting impaired Classes vote in favor of the Plan, and even if with respect to any impaired Class deemed to have rejected the Plan the requirements for "cramdown" (discussed in more detail in Section IX.E herein) are met, the Bankruptcy Court, which, as a court of equity, has substantial discretion concerning Plan Confirmation, may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, a showing that Confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, see *infra* Section IX.C. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 3.    The Debtors are Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' operations and their ability to execute their business strategy will be subject to risks and uncertainties associated with bankruptcy. These risks include:

(a)    the Debtors' ability to continue as a going concern;

(b)    the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases;

(c)    the Debtors' ability to develop, prosecute, confirm, and consummate the proposed Plan or any other plan of reorganization with respect to the Chapter 11 Cases;

(d)    the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a plan of reorganization, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 cases;

(e)    the Debtors' ability to retain key vendors or secure alternative supply sources;

(f)    the Debtors' ability to obtain and maintain normal payment and other terms with vendors and service providers;

(g)    the Debtors' ability to maintain contracts that are critical to their operations;

(h)    the Debtors' ability to attract, motivate, and retain management and other key employees; and

(i)    the Debtors' ability to fund and execute their business plan.

### 4.    The Debtors' Business Could Suffer From a Long and Protracted Restructuring.

Although the Debtors will seek to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement and pendency of the Chapter 11 Cases could materially adversely affect the relationships among the Debtors, customers, employees, vendors, and service providers.

The Debtors' future results are dependent upon the successful Confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as their ability to obtain financing to fund operations may be harmed. Accordingly, if the Plan is not confirmed and implemented in a timely manner, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, or vendors to do business with a company that recently emerged from bankruptcy proceedings.

### 5.    Classification and Treatment of Claims and Interests

Bankruptcy Code section 1122 requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment by such holder regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 6.    Distribution to Holders of Allowed Claims Under the Plan

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately allowed and the funds available for distribution. Both the actual amount of allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of allowed Claims in a Class is higher than the Debtors' estimates or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of allowed Claims in such Class will be less than projected.

### 7.     Conditions Precedent to Consummation of the Plan

Article X of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### 8.     Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur very shortly after the date of Plan Confirmation, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 9.     Funding Necessary for the Consummation of the Plan

As of the date hereof, the Debtors contemplate that the use of cash collateral, the Cash Flow DIP Facility, and the DIP Repo Facilities will provide the Debtors with the necessary liquidity to fund the Debtors' business operations and administrative expenses during these Chapter 11 Cases. Although the Debtors have received commitments from certain parties, the use of cash collateral, the Cash Flow DIP Facility, and the DIP Repo Facilities are still subject to final approval by the Bankruptcy Court and such approval is not guaranteed. Should the Cash Flow DIP Facility proceeds not be received, or the Debtors not have access to the DIP Repo Facilities, the Debtors' ability to continue to operate could be placed in jeopardy. Further, the Debtors will require financing following Confirmation of the Plan in order to operate their business. The Debtors have received an initial exit financing proposal from Barclays Bank PLC, but finalizing and securing such exit financing will be a necessary component of consummating the Plan.

### C.     Industry-Specific Risk Factors

The Debtors' business is subject to extensive regulation by federal, state, and local governmental and regulatory authorities. Further, in recent years the policies, laws, rules, and regulations applicable to the Debtors' business have been rapidly evolving. Such changes, as well as the actual or alleged failure to comply with applicable federal, state, and local laws and regulations or to implement and adhere to adequate remedial measures designed to address any identified compliance deficiencies, may have an adverse consequence on the Company or its business, in addition to the following factors, risks or uncertainties that may affect the Company or its business:

(a)     Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;

(b)     Damage to the Debtors' reputation;

(c)     Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;

(d)    The substantial resources (including senior management time and attention) the Company devotes to, and the significant compliance costs the Company incurs in connection with, regulatory compliance and regulatory examinations and inquiries, and any consumer redress, fines, penalties or similar payments made in connection with resolving such matters;

(e)    Uncertainties relating to interest curtailment obligations and any related financial and litigation exposure (including exposure relating to false claims);

(f)    Potential costs and uncertainties, including the effect on future revenues, associated with and arising from litigation, regulatory investigations, and other legal proceedings, and uncertainties relating to the reaction of key counterparties to the announcement of any such matters;

(g)    The ability to maintain the loan origination or collection agency licenses and/or third-party default specialists, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;

(h)    Operational risks inherent in the mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;

(i)    Risks related to a significant amount of senior management turnover and employee reductions;

(j)    The ability to maintain or grow the mortgage loan originations business;

(k)    The ability to achieve the Company's strategic initiatives, particularly the ability to successfully develop origination capabilities and execute and realize planned operational improvements and efficiencies;

(l)    The success of the business strategy in returning to sustained profitability;

(m)    Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;

(n)    Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;

(o)    Risks and potential costs associated with technology and cybersecurity, including: the risks of technology failures and of cyber-attacks against us or our vendors; our ability to adequately respond to actual or attempted cyber-attacks; and our ability to implement adequate internal security measures and protect confidential borrower information;

(p)     Risks and potential costs associated with the implementation of new or more current technology, the use of vendors, or the transfer of the Company's servers or other infrastructure to new data center facilities;

(q)     The ability to renew advance financing facilities or warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities;

(r)     The effects of competition on existing and potential future business, including the impact of competitors with greater financial resources and broader scopes of operation;

(s)     The expiration of, or changes to, government mortgage modification, refinancing or other programs;

(t)     The ability to comply with evolving and complex accounting rules, many of which involve significant judgments and assumptions;

(u)     The ability to implement and maintain effective internal controls over financial reporting and disclosure controls and procedures;

(v)     Uncertainties regarding impairment charges relating to the intangible assets of the Company;

(w)     Administrative fines and financial penalties;

(x)     Litigation, including class action lawsuits; and

(y)     Civil and criminal liability.

### D.     Forward Looking Statements

### 1.     Books and Records

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained in the Plan and attached hereto is without inaccuracies.

### 2.     Financial Projections

Except for historical information, this Disclosure Statement may be deemed to contain "forward-looking" statements. The Company is including this cautionary statement for the

express purpose of availing itself of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or amount of Claims in the various Classes that might be allowed. The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in this "Risk Factors" section of this Disclosure Statement. Such factors have, in some instances, affected and in the future could affect the ability of the Company to achieve its projected results and may cause actual results to differ materially from those expressed in the Plan. The Company undertakes no obligation to update any forward-looking statements in this Disclosure Statement.

### E.    Disclosure Statement Disclaimer

#### 1.    This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. All forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

#### 2.    No Legal or Tax Advice Is Provided by This Disclosure Statement

This Disclosure Statement is not legal advice. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

#### 3.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties in interest.

#### 4.    No Waiver of Right to Object or Right to Recover Transfers and Assets

26

The vote by a holder of an allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or causes of action of the Debtors or their estates are specifically or generally identified herein.

### 5.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

### 6.    Potential Exists for Inaccuracies and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 7.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement or other materials included in the solicitation package. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel for the Debtors and the United States Trustee.

### F.    Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that chapter 7 liquidation would have on recoveries of holders of Claims and the Debtors' liquidation analysis will be filed as part of the Plan Supplement.

## VIII. SOLICITATION AND VOTING PROCEDURES

### A. Voting Status of Each Class

Under the Bankruptcy Code, creditors are entitled to vote on the Plan if their contractual rights are Impaired by the Plan and they are receiving a distribution under the Plan. Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. The following table sets forth which Classes of Claims will or will not be entitled to vote on the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Notes Secured Claim | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Go-Forward Trade Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | No (deemed to reject) |
| 6 | Artemis Note Claims | Impaired | No (deemed to reject) |
| 7 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 8 | Existing Stearns Holdings Interests | Impaired | No (deemed to reject) |
| 9 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 10 | Protos Interests | Unimpaired | No (deemed to accept) |

### B. Classes Entitled to Vote

The following Class is the only Class entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 4 | Go-Forward Trade Claims | Impaired |

If your Claim or Interest is not included in this Class, you are not entitled to vote and you will not receive a package containing relevant solicitation materials (the "Solicitation Package").

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims voting on the Plan. Acceptance by a Class requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan, counting in each case only those who actually vote.

### C. Voting Procedures

On the July 11, 2019, the Bankruptcy Court entered the *Order Scheduling the Disclosure Statement Hearing, Approving the Form and Manner of Notice of the Disclosure Statement Hearing, and Granting Related Relief* [Docket No. 98] (the "Disclosure Statement Hearing Order"). Pursuant to the Disclosure Statement Hearing Order, a hearing to consider the adequacy of this Disclosure Statement (the "Disclosure Statement Hearing") was scheduled on August 22,

2019 at 10:00 a.m. (Eastern Time). Additionally, on August 1, 2019, the Debtors filed the *Debtors' Motion for Order (I) Approving the Disclosure Statement; (II) Scheduling Hearing on Confirmation of the Plan; (III) Establishing Deadlines and Procedures for Filing Objections to Confirmation of the Plan; (IV) Establishing Deadlines and Procedures for Voting on the Plan; (V) Approving Solicitation Procedures; (VI) Establishing Procedures for Tabulation of Votes; and (VII) Granting Related Relief* [Docket No. 208] (the "Solicitation Procedures Motion" and the order approving the Solicitation Procedures Motion, the "Solicitation Procedures Order"). The Solicitation Procedures Motion will be heard at the Disclosure Statement Hearing and sets forth, and seeks approval of, the Plan solicitation procedures, as described herein and therein.

Additionally, on July 31, 2019, the Bankruptcy Court entered the *Order Authorizing Retention and Appointment of Prime Clerk LLC as Administrative Advisor* Nunc Pro Tunc *to the Petition Date* [Docket No. 203] pursuant to which the Debtors received authorization to retain Prime Clerk to, among other things, act as the Debtors' agent in connection with the solicitation of votes to accept or reject the Plan.

### 1.      Voting Record Date

The Voting Record Date is August 22, 2019 (the "Voting Record Date"). The Voting Record Date is the date for determining (a) which holders of Claims are entitled to vote to accept or reject the Plan and receive a Solicitation Package in accordance with the procedures for soliciting the Plan, as set forth in the Solicitation Procedures Order and (b) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

### 2.      Distribution of Solicitation Packages

Under the Plan, holders of Claims in Class 4 are entitled to vote to accept or reject the Plan. As such, the Debtors will provide Solicitation Packages to holders as of the Voting Record Date of allowed Go-Forward Trade Claims.

### 3.      General Voting Instructions

In order for the holder of a Claim in Class 4 to have such holder's ballot counted as a vote to accept or reject the Plan, such holder's ballot must be either (a) properly completed by hand, executed, and delivered in accordance with the instructions included in the ballot by (i) first class mail, (ii) courier, or (iii) personal delivery to the Solicitation Agent, or (b) properly completed electronically using the Solicitation Agent's E-Balloting platform. Whether completing the ballot by hand or electronically using the Solicitation Agent's E-Balloting Platform, each holder's Ballot must be **actually received by September 20, 2019 at 4:00 p.m. (Eastern Time) (the "Voting Deadline")** at the following address: c/o Prime Clerk LLC, 850 3rd Ave., Suite 412, Brooklyn, NY 11232 prior to 4:00 p.m. (Eastern Time). It is important that the holder of a Claim in Class 4 follow the specific instructions provided on such holder's ballot and the accompanying instructions. The holder of a Claim should also provide all of the information requested by the ballot, and, if completing the ballot by hand, should complete and

return all ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Solicitation Agent or their direct participant, as applicable. Except in the Debtors' sole discretion, ballots may not be transmitted by facsimile, email, or other electronic means, other than the Solicitation Agent's E-Balloting Platform.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT, PRIME CLERK, AT (844) 234-1461.

### 4.    Miscellaneous

All ballots must be signed by the holder of the appropriate classes of claims on such date. An otherwise properly executed ballot that attempts to partially accept and partially reject the Plan will likewise not be counted. If you cast more than one ballot voting the same Claim(s) before the Voting Deadline, the last valid ballot received on or before the Voting Deadline will be deemed to reflect your intent and, thus, to supersede any prior ballot. If you cast ballots received by the Solicitation Agent on the same day, but which are voted inconsistently, such ballots will not be counted.

Except as provided below, unless the ballot is timely submitted to the Solicitation Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking Confirmation of the Plan.

## IX.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### A.    The Confirmation Hearing

Bankruptcy Code section 1128(a) provides that the Bankruptcy Court, after notice, may conduct a Confirmation Hearing.

Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

### B.    Confirmation Standards

The following requirements must be satisfied under Bankruptcy Code section 1129(a) before the Bankruptcy Court may confirm a plan of reorganization.

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the proponent, by a Debtor, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.    The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint Plan with a Debtor or a successor to a Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of Interests and with public policies.

6.    The proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

7.    Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of the Debtors has approved any rate change provided for in the Plan.

8.    With respect to each holder within an impaired Class of Claims or Interests, each such holder (i) has accepted the Plan or (ii) will receive or retain under the Plan on account of

31

such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

9.      With respect to each Class of Claims or Interests, such Class (i) has accepted the Plan or (ii) is unimpaired under the Plan; *provided*, *however*, that if the Plan is rejected by an impaired Class, the Plan may be confirmed if it "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are impaired under the Plan.

10.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)      With respect to a Claim of a kind specified in Bankruptcy Code sections 507(a)(2) or 507(a)(3), on the Effective Date of the Plan, the holder of the Claim will receive on account of such Claim cash equal to the allowed amount of such Claim, unless otherwise agreed;

(b)      With respect to a Class of Claim of the kind specified in Bankruptcy Code sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7), each holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim or (ii) if such Class has not accepted the Plan, cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

(c)      With respect to a Priority Tax Claim of a kind specified in Bankruptcy Code section 507(a)(8), the holder of such Claim will receive on account of such claim deferred Cash payments, over a period not exceeding five years after the date of the order for relief, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim.

11.      If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).

12.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

13.      All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

14.      The Plan provides that following the Effective Date of the Plan, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall continue to pay all retiree benefits, as that term is defined in Bankruptcy Code section 1114, at the level established under subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to

Confirmation, for the duration of the period the debtor has obligated itself to provide such benefits.

### C.    Liquidation Analysis

As described above, Bankruptcy Code section 1129(a)(7) requires that each holder of an impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis will be filed as part of the Plan Supplement.

### D.    Financial Feasibility

Bankruptcy Code section 1129(a)(11) requires that a debtor demonstrate that Confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.

The Debtors believe that the Plan meets the feasibility requirement set forth in Bankruptcy Code section 1129(a)(11). As part of this analysis, the Debtors' management, with the assistance of their advisors, will file as a supplement to this Disclosure Statement (prior to the Disclosure Statement Hearing) financial projections. Based on such financial projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore, the Debtors believe that Confirmation and consummation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The financial projections will not have been examined or compiled by independent accountants. The Debtors make no representation as to their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the financial projections may vary from the projected results, and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cramdown" such Classes, as described below. A Class that is unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest, or the Debtors cure any default and reinstate the original terms of the obligation.

Under Bankruptcy Code sections 1126(c) and 1126(d) and except as otherwise provided in Bankruptcy Code section 1126(e): (i) an impaired Class of Claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than half in number of the voting allowed Claims have voted to accept the Plan and (ii) an impaired Class of Interests has accepted the Plan if the holders of at least two-thirds in amount of the allowed Interests of such Class actually voting have voted to accept the Plan.

### F.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all impaired Classes, provided that the Plan has been accepted by at least one impaired Class entitled to vote, without counting the vote of any "Insider", as defined in Bankruptcy Code section 101(31). Bankruptcy Code section 1129(b) permits the Debtors to confirm the Plan, notwithstanding the failure of any impaired Class to accept the Plan, in a procedure commonly known as "cramdown," so long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted the Plan.

#### 1.    No Unfair Discrimination

A plan "does not discriminate unfairly" if (i) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for nonconsensual Confirmation.

#### 2.    Fair and Equitable Treatment

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class receive everything to which they are legally entitled or, with respect to unsecured claims, that classes junior in priority to the class receive nothing.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims, and interests, which may be summarized as follows:

(a)    *Secured Claims*. With respect to the secured amount of its allowed claim, either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

(b)    *Unsecured Claims*. Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value or for administrative convenience purposes only.

(c)    *Interests*. Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value or for administrative convenience purposes only.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" requirements of the Bankruptcy Code. Certain Classes of Claims and Interests will receive no distribution under the Plan and are therefore conclusively deemed to reject the Plan. Accordingly, the Debtors will seek to confirm the Plan under Bankruptcy Code 1129(b) with respect to such Classes.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include, without limitation: (i) continuation of the pending Chapter 11 Cases, (ii) an alternative plan or plans of reorganization, or (iii) the liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases. In particular, the Debtors could have difficulty

gaining access to sufficient liquidity to allow them to continue their operations as a going concern. Moreover, protracted chapter 11 proceedings will make it difficult for the Debtors to expand their customer base, which is critical to the ultimate success of the Debtors' business.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Additionally, until the Plan is consummated, subject to certain conditions, the Debtors may determine to withdraw the Plan and propose and solicit different reorganization plans. Any such plans proposed by the Debtors or others might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of its assets, or a combination of both.

Although alternative plans of reorganization are possible, the present Plan is the result of a thorough assessment of restructuring alternatives undertaken in consultation with key stakeholders. Accordingly, the Debtors believe the prospect of an alternative plan of reorganization that delivers greater value to economic stakeholders is remote.

### C.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In chapter 7 cases, a trustee or trustees would be appointed to liquidate the assets of the Debtors.

However, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the estate. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated under a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to the holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially. In addition, as with a chapter 7 liquidation, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate under a chapter 11 plan.

36

The Liquidation Analysis will illustrate the recoveries the Debtors anticipate in a liquidation scenario. The Liquidation Analysis is premised upon a hypothetical liquidation in a chapter 7 case. In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to each class of creditors than that recoverable under the Plan. In the Debtors' opinion, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and Interests as great a realization potential as does the Plan.

The Liquidation Analysis will be filed as part of the Plan Supplement.

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are Unimpaired, otherwise entitled to payment in full in cash under the Plan, or deemed to reject the Plan.

The following summary is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given that the IRS will not challenge, nor that a court will sustain, any of the considerations discussed herein. In addition, this summary generally does not address foreign, state, or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle, or other integrated transaction, and investors in pass-through entities). Except where specifically noted below, this summary does not address the consequences to holders of Claims that are non-U.S. holders (as defined below).

For purposes of this discussion, a "non-U.S. holder" means any holder of a Claim (other than a partnership or other pass-through entity) that is not a "U.S. holder." A "U.S. holder" means a holder of a Claim that, for U.S. federal income tax purposes is, or is treated as, a citizen or individual resident of the United States, a corporation (including any entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia, an estate the income of which is

subject to U.S. federal income taxation regardless of its source, or a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (ii) the trust has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

The following summary of certain U.S. federal income tax consequences is for informational purposes only.

**Each holder of a Claim should consult its tax advisor regarding the U.S. federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan in light of such holder's particular circumstances.**

A.    **Certain Consequences to the Debtors**

Stearns is treated as a partnership for U.S. federal income tax purposes, and each of Stearns Lending, LLC, Stearns Ventures, LLC, bSNAP, LLC and Private Mortgage Advisors, LLC are disregarded as separate from Stearns for U.S. federal income tax purposes.  In addition, Protos Acquisition, LLC ("Protos") is a partnership owned by Blackstone for U.S. federal income tax purposes.  Although Stearns Co-Issuer Inc. is a corporation for U.S. federal income tax purposes, it does not own material assets or earn material income and therefore, is generally disregarded for purposes of this discussion. Accordingly, the Debtors generally pay no federal income taxes and minimal state taxes. Instead, the income, gain or loss of the Debtors is allocated to, and is reportable on, the tax returns of the existing holders of the equity interests in Stearns (or, in the case of Protos, Blackstone).  As a result of this structure, the Debtors do not anticipate incurring any material U.S. federal income tax consequences associated with the Plan.

To the extent that Stearns or Protos discharges any Claims that constitute indebtedness for U.S. federal income tax purposes for less than the outstanding amount of such Claim, Stearns or Protos, as applicable, will generally recognize cancelation of indebtedness income.  Such income will generally be allocated to the members of Stearns or Protos, as applicable, in accordance with the Stearns or Protos operating agreement.

B.    **Consequences to Holders of Go-Forward Trade Claims**

1.    **General**

Pursuant to the Plan and in satisfaction of their claims, holders of allowed Go-Forward Trade Claims will receive Cash in the amount equal to 95% of their allowed Go-Forward Trade Claims.

A holder of an allowed Go-Forward Trade Claim will generally recognize gain or loss equal to the difference between the holder's adjusted basis in its allowed Go-Forward Trade Claim and the amount of Cash received by the holder upon consummation of the Plan that is not

attributable to accrued but unpaid interest. The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the holder of the allowed Go-Forward Trade Claim and the nature of the allowed Go-Forward Trade Claim in its hands, whether the allowed Go-Forward Trade Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the allowed Go-Forward Trade Claim, and the creditor's holding period of the allowed Go-Forward Trade Claim. If the allowed Go-Forward Trade Claim in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss.  Such gain or loss will constitute long-term capital gain or loss if the holder of the allowed Go-Forward Trade Claim held such allowed Go-Forward Trade Claim for longer than one year or short-term capital gain or loss if the holder of the allowed Go-Forward Trade Claim held such allowed Go-Forward Trade Claim for one year or less. The deductibility of capital losses is subject to limitation under the Tax Code.

Pursuant to the Plan, to the extent that any Claim entitled to a distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest. A holder of an allowed Go-Forward Trade Claim will generally recognize ordinary income to the extent that the Cash received under the Plan is attributable to interest that accrued on an allowed Go-Forward Trade Claim but was not previously paid by the Debtor or included in income by the holder of the allowed Go-Forward Trade Claim.

A holder of an allowed Go-Forward Trade Claim may be entitled to a bad debt deduction if either: (i) the holder is a corporation; or (ii) the allowed Go-Forward Trade Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (b) a debt the loss from the worthlessness of which is incurred in the holder's trade or business.  A holder that has previously recognized a loss or deduction in respect of its allowed Go-Forward Trade Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such allowed Go-Forward Trade Claim.

## 2.    Market Discount

The market discount provisions of the Tax Code may apply to holders of an allowed Go-Forward Trade Claim.  If a holder of an allowed Go-Forward Trade Claim purchased the allowed Go-Forward Trade Claim at a price less than such an allowed Go-Forward Trade Claim's principal amount, the difference may constitute "market discount" for federal income tax purposes.  In general, a debt obligation (other than a debt obligation with a fixed maturity of one year or less) that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.  Any gain recognized by such holder on the receipt of

cash in respect of its allowed Go-Forward Trade Claim would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

### C.    Information Reporting and Withholding

All distributions to holders of allowed Go-Forward Trade Claims under the Plan are generally subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding." Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN") TIN, (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.

Backup withholding is not an additional tax and may be refunded by the IRS to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## XII.    PLAN SUPPLEMENT

Exhibits to the Plan not attached hereto shall be filed in one or more Plan Supplements. Any Plan Supplement (and amendments thereto) filed by the Debtors shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth therein. The Plan Supplements may be viewed at the office of the clerk of the Bankruptcy Court or its designee during normal business hours, by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov (PACER account required) or at the Solicitation Agent website https://cases.primeclerk.com/stearns, or by written request to the Solicitation Agent at:

By regular mail, hand delivery, or overnight mail at:

  c/o Prime Clerk LLC
  Re: Stearns Holdings, LLC
  c/o Prime Clerk LLC
  850 3rd Avenue, Suite 412
  Brooklyn, NY 11232

By electronic mail at:

  Stearnsinfo@primeclerk.com

By telephone at:

(844) 234-1461

The documents contained in any Plan Supplements shall be subject to approval by the Bankruptcy Court pursuant to the order confirming the Plan.

*[Remainder of Page Intentionally Left Blank]*

## XIII.    RECOMMENDATION AND CONCLUSION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: New York, New York
August 8, 2019

STEARNS HOLDINGS, LLC
on behalf of itself and its subsidiary Debtors

*/s/ David Schneider*
Name: David Schneider
Title:   Chief Executive Officer

Dated:    New York, New York
       August 8, 2019

                                      PROTOS ACQUISITION, LLC

                                      */s/ Nadim El Gabbani*
                                      Name: Nadim El Gabbani
                                      Title:   President

**<u>Exhibit A</u>**

**Plan of Reorganization**

**<u>Exhibit B</u>**

**Liquidation Analysis[10]**

**[TO COME]**

---

[10] The Debtors have requested authority to include their liquidation analysis in their Plan Supplement following completion of the Auction.

**<u>Exhibit C</u>**

**Financial Projections**

## FINANCIAL INFORMATION AND PROJECTIONS

The Debtors[11] prepared the financial projections set forth herein (the "<u>Financial Projections</u>") based on, among other things, the anticipated future financial condition and results of operations of the Debtors in a recapitalization scenario. In conjunction with the Debtors' advisors, the Debtors' management team developed and refined the Debtors' business plan and prepared consolidated financial projections for fiscal year 2019 through fiscal year 2022 (the "<u>Projection Period</u>").

As described in Section IX.D of the Disclosure Statement, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code as confirmation of the Plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors or any successors under the Plan. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. In general, as illustrated by the Financial Projections, the Debtors believe that the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Effective Date of the Plan will occur in October 2019. Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher Administrative Claims and Fee Claims, which could also impact the Financial Projections.

Although the Financial Projections represent the Debtors' commercially reasonable estimates and good faith judgment of the results of the Debtors' future operations, financial position, and cash flows, they are only estimates and actual results may vary considerably from the Financial Projections. Consequently, the inclusion of the Financial Projections should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of the Debtors' operations, financial position, and cash flows presented herein will be achieved. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in interest rates, further competition within the mortgage industry, changes in terms with material vendors

---

[11]    Unless otherwise defined herein, capitalized terms used in this Exhibit shall have the meaning ascribed to such terms in the Disclosure Statement or the Plan, as applicable, or as the context otherwise requires.

and service providers, and/or a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.

The Debtors do not, as a matter of course, publish their business plan, financial projections, or anticipated financial position. In connection with the planning and development of the Plan, these Financial Projections were prepared by the Debtors, with the assistance of their advisors, to present the anticipated impact of the Plan. The Debtors do not intend, and disclaim any obligation, to further update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

Factors that could cause actual results to differ materially include, but are not limited to, the following risks:

- Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;
- Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;
- Uncertainties relating to financial and litigation exposure (including exposure relating to false claims);
- The ability to maintain the loan origination and agency licenses, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;
- Operational risks inherent in the mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;
- The ability to maintain or grow the mortgage loan originations business;
- The ability to achieve the Company's strategic initiatives, particularly the ability to successfully develop origination capabilities and execute and realize planned operational improvements and efficiencies;
- Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;
- Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;
- Competitor pricing behaviors and strategies may negatively impact performance and results; and

- The ability to renew warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities.

Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS. THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

THE FINANCIAL PROJECTIONS REFLECT AN ESTIMATE OF THE IMPACT OF FRESH START REPORTING UNDER AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF POSITION 90-7 "FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE." THE ESTIMATED IMPACT IS PRELIMINARY AND A FULL ASSESSMENT OF THE ACTUAL IMPACT HAS BEEN INITIATED. AS SUCH, THE ACTUAL IMPACT OF FRESH START REPORTING AT THE EFFECTIVE DATE MAY VARY MATERIALLY AND MAY HAVE AN IMPACT ON ASSETS, LIABILITIES, AND SHAREHOLDER EQUITY AS REFLECTED ON THE REORGANIZED DEBTORS' CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING RELATED TO THE IMPLEMENTATION OF THE PLAN, THE CHAPTER 11 CASES, MANAGEMENT'S STRATEGY, ACHIEVING

OPERATING EFFICIENCIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS TO BE CONSIDERED" IN SECTION VII OF THE DISCLOSURE STATEMENT AND ELSEWHERE IN THE DEBTORS' ANNUAL REPORTS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' OR REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT

THE PLAN, HOLDERS OF CLAIMS IN THE VOTING CLASS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

### GENERAL ASSUMPTIONS AND METHODOLOGY

**1.    General Assumptions to the Financial Projections**

The Financial Projections reflect management's July business plan overview prepared in early July 2019. The Financial Projections assume the continuation of the Debtors' business strategy consistent with the current operations. This strategy includes mortgage loan origination and the generation of income primarily through gains upon the sale of mortgage loans. The Financial Projections assume the ongoing origination of mortgage loans through the Debtors' wholesale, retail, joint venture, and preferred partner production channels.

The Financial Projections reflect the economic impact of the cancellation of debt and accrued interest on such debt, as well as the rejection of certain contract and lease liabilities.

The Financial Projections are dependent on the interest rate environment (refinance) and housing sales (purchase). These projections are driven by the Mortgage Bankers Association purchase and refinance originations forecast published in June 2019, as well as historical trends.

The Financial Projections reflect the period of 2019 through 2022.

Upon emergence the Reorganized Debtors may adopt fresh-start accounting. The adoption of fresh-start accounting may result in adjustments to assets and liabilities due to the assignment of reorganization value and the effects of forgiveness or restructuring of debt which may be reflected in the final statement of operations of the predecessor entity.

**2.    Projected Income Statement Assumptions**

Stearns Holdings, LLC is a limited liability company classified as a partnership for federal and state income tax purposes. Stearns Holdings, LLC does not record liabilities for federal income taxes, as such taxes, if any, are the responsibility of its members.

Revenues are generated primarily through gain on sales of mortgages, associated hedging and trading activity, interest and fee income, and distributions from the Debtors' interests in joint ventures and preferred partners.

The Debtors' mortgage originations reflect the origination of Fannie Mae, Freddie Mac, and Ginnie Mae eligible mortgages, as well as non-conforming and bond loans, through the Debtors' wholesale, retail, joint venture, and preferred partner production channels. Growth in origination volumes is projected at each of these channels throughout the Projection Period.

The Financial Projections include the continued benefit of cost-cutting and margin-enhancing initiatives completed in 2017/2018, as well ongoing initiatives intended to reduce corporate costs, streamline and standardize loan fulfillment, and drive increased digital adoption.

The Financial Projections include expenses attributable to the general and administrative operations of the business, as well as the labor and commissions due to mortgage originators and brokers. Additionally, the Debtors' expenses include those associated with the servicing of retained loans, representing approximately one percent of total originations. Finally, the expenses include the impact of restructuring activities and professional fees associated with the reorganization.

### 3.   Projected Balance Sheet and Liquidity Assumptions

The balance sheet and liquidity projections reflect the Reorganized Debtors' capital structure, including the cancellation of debt and accrued interest on such debt, as well as the rejection of certain contract and lease liabilities. The Financial Projections do not include the assumption of any new debt or working capital facilities at emergence.

| Projected Income Statement ($ millions) | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| **Net Income from Loan Originations** | **$78.1** | **$80.9** | **$85.2** | **$88.8** |
| Servicing | (2.6) | (2.6) | (2.8) | (2.9) |
| Support Overhead | (59.2) | (55.3) | (57.1) | (59.2) |
| Net Interest | (1.7) | (1.6) | (1.6) | (1.6) |
| Senior Notes Interest Accrual | (9.5) | – | – | – |
| **Core Net Income** | **$5.1** | **$21.4** | **$23.6** | **$25.0** |
| Mortgage Servicing Rights Valuation Adjustment | (1.0) | – | – | – |
| Restructuring Costs | (53.7) | (1.2) | – | – |
| Other Restructuring Activities | 171.1 | – | – | – |
| **GAAP Net Income** | **$121.5** | **$20.2** | **$23.6** | **$25.0** |
| Plus: Interest Expense on Senior Notes | 9.5 | – | – | – |
| Plus: Depreciation (excl. unconsolidating JVs) | 8.7 | 5.1 | 5.2 | 5.3 |
| Plus: MSR Amortization | 0.9 | 0.9 | 0.9 | 1.0 |
| Plus: MSR Fair Value Adjustments | 1.0 | – | – | – |
| Minus: Capitalized Originated Mortgage Servicing Rights | (1.2) | (1.3) | (1.4) | (1.4) |
| **EBITDA** | **$140.3** | **$24.8** | **$28.4** | **$29.9** |
| Minus: MSR Amortization | (0.9) | (0.9) | (0.9) | (1.0) |
| Plus: Capitalized Originated Mortgage Servicing Rights | 1.2 | 1.3 | 1.4 | 1.4 |
| **Adj. EBITDA** | **$140.6** | **$25.3** | **$28.9** | **$30.4** |
| Plus: Restructuring & Transaction Costs | (117.4) | 1.2 | – | – |
| **Add'l Adjusted EBITDA w/o One-Timers** | **$23.2** | **$26.5** | **$28.9** | **$30.4** |

| Projected Liquidity | | | | |
|---|---|---|---|---|
| ($ millions) | 2019 | 2020 | 2021 | 2022 |
| Adj. EBITDA | $23.2 | $26.5 | $28.9 | $30.4 |
| Plus: Loan Loss Provision | 2.4 | 2.4 | 2.5 | 2.6 |
| Change in Interest Rate Lock Commitments | (7.3) | (0.2) | (0.2) | (0.2) |
| Change in Fair Value of Loans Held for Sale | 5.2 | 0.4 | (0.9) | (0.9) |
| **Cash Net Income from Continuing Ops.** | **$23.5** | **$29.1** | **$30.3** | **$31.8** |
| Change in Restricted Cash | $1.7 | – | – | – |
| Change in Warehouse Equity | 56.9 | 0.6 | (1.4) | (1.5) |
| Investment in Joint Ventures | 0.6 | (2.6) | (2.9) | (3.2) |
| Capital Expenditures | (7.2) | (3.0) | (4.0) | (5.0) |
| Net Merger & Acquisition Activities | (2.2) | (1.0) | (0.5) | – |
| Change in MSR Holdback | 7.4 | – | – | – |
| MSR Bulk Sale Proceeds | 8.9 | 1.0 | – | – |
| Change in Other Assets / Liabilities | (70.7) | (1.7) | 0.0 | (0.0) |
| **Cash Flow before Financing** | **$18.8** | **$22.3** | **$21.5** | **$22.1** |
| Senior Notes Repayment | (7.0) | – | – | – |
| Senior Notes Interest | (8.9) | – | – | – |
| Transaction Costs | (44.8) | (7.5) | – | – |
| **Cash Flow after Financing** | **($41.9)** | **$14.8** | **$21.5** | **$22.1** |
| Distributions | – | – | – | – |
| **Total Cash Flow** | **($41.9)** | **$14.8** | **$21.5** | **$22.1** |
| Beginning Unrestricted Cash | $83.7 | $61.0 | $75.8 | $97.3 |
| Total Cash Flow | (22.7) | 14.8 | 21.5 | 22.1 |
| **Ending Unrestricted Cash** | **$61.0** | **$75.8** | **$97.3** | **$119.4** |

| Projected Balance Sheet | | | | |
| ($ millions) | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Cash | $61.0 | $75.8 | $97.3 | $119.4 |
| Restricted Cash | 6.5 | 6.5 | 6.5 | 6.5 |
| Loans Held for Sale | 860.3 | 848.2 | 876.6 | 906.0 |
| LHFS (Scratch & Dent and Early Buyout) | 7.7 | 7.7 | 7.7 | 7.7 |
| LHFS (Fair Value) | 25.8 | 25.4 | 26.3 | 27.2 |
| LHFS - Construction | 24.3 | 24.3 | 24.3 | 24.3 |
| Interest Rate Lock Commitments | 20.0 | 20.2 | 20.4 | 20.6 |
| MSR Sale Holdbacks | 14.9 | 13.9 | 13.9 | 13.9 |
| MSRs | 7.0 | 7.5 | 8.0 | 8.4 |
| PP&E | 12.3 | 10.2 | 9.0 | 8.6 |
| Intangibles | -- | -- | -- | -- |
| Investments (JV, M&A) | 24.2 | 27.9 | 30.8 | 34.0 |
| Intercompany | 1.8 | 1.8 | 1.8 | 1.8 |
| Other Assets | 68.8 | 66.9 | 65.4 | 63.9 |
| Total Assets | $1,135.7 | $1,136.4 | $1,187.9 | $1,242.4 |
| | | | | |
| Accounts Payable & Accrued Liabilities | $58.5 | $59.1 | $60.2 | $61.5 |
| Warehouse Lines | 817.2 | 805.8 | 832.8 | 860.7 |
| Construction Lines | 24.2 | 24.2 | 24.2 | 24.2 |
| Other Liabilities | 37.5 | 28.9 | 28.7 | 53.1 |
| Total Liabilities | $937.4 | $918.0 | $945.9 | $975.3 |
| | | | | |
| Stearns Holdings Equity | 198.3 | 218.4 | 242.1 | 267.1 |
| Total Liabilities + Equity | $1,135.7 | $1,136.4 | $1,187.9 | $1,242.4 |

**<u>Exhibit D</u>**

**Organizational Chart**

Stearns Organizational Chart



**<u>EXHIBIT 2</u>**

**Redline of Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **STEARNS HOLDINGS, LLC,** *et al.*, | **Case No. 19-12226 (____SCC)** |
| **Debtors.**[1] | (~~Joint Administration Pending~~Jointly Administered) |

**DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF STEARNS HOLDINGS, LLC, ET AL.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Evan A. Hill
Edward P. Mahaney-Walter
4 Times Square
New York, NY 10036
Telephone: (212) 735-3000
Fax: (212) 735-2000

*~~Proposed~~ Counsel for Debtors and Debtors in Possession*

Dated: ~~July 9~~August 8, 2019
        New York, New York

---

[1] The Debtors and the last four digits of their taxpayer identification numbers are: Stearns Holdings, LLC (8219);Stearns Co-Issuer Inc. (7096); Stearns Lending, LLC (1773); Stearns Ventures, LLC (2386); Protos Acquisition LLC (4941); bSNAP, LLC (2498); and Private Mortgage Advisors, LLC (7493). The address of Protos Acquisition LLC is 345 Park Avenue, New York, NY 10154. The address of the other Debtors is c/o Stearns Lending, LLC, 750 East Highway, 121 Bypass, Suite 150, Lewisville, TX 75067.

# DISCLAIMER

THIS DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF STEARNS HOLDINGS, LLC AND ITS AFFILIATED DEBTORS CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.

THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETIES BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER,

BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS, WHICH WILL BE FILED AS A SUPPLEMENT TO THIS DISCLOSURE STATEMENT PRIOR TO THE DISCLOSURE STATEMENT HEARING, WILL BE PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.

THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS ARE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

PLEASE REFER TO ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

## VOTING

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY PRIME CLERK LLC ("PRIME CLERK"), THE DEBTORS' CLAIMS, NOTICING, AND SOLICITATION AGENT, NO LATER THAN 4:00 P.M. (EASTERN TIME) ON [•]SEPTEMBER 20, 2019 (THE "VOTING DEADLINE"). SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT AND IN THE DISCLOSURE STATEMENTSOLICITATION PROCEDURES ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

## CONFIRMATION

THE CONFIRMATION HEARING WILL COMMENCE ON [•]OCTOBER 3, 2019 AT [•]10:00 A.M. (EASTERN TIME), BEFORE THE HONORABLE [•]SHELLEY C. CHAPMAN, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS [•]SEPTEMBER 24, 2019 AT 4:00 P.M. (EASTERN TIME). ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENTSOLICITATION PROCEDURES ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

THE PLAN, THIS DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT AND EXHIBITS, ONCE FILED, AND OTHER DOCUMENTS AND MATERIALS RELATED THERETO MAY BE OBTAINED BY: (A) ACCESSING THE DEBTORS' RESTRUCTURING WEBSITE AT HTTPS://CASES.PRIMECLERK.COM/STEARNS, (B) EMAILING STEARNSINFO@PRIMECLERK.COM, (C) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT (844) 234-1461, OR (D) ACCESSING THE BANKRUPTCY COURT'S WEBSITE AT HTTP://WWW.NYSB.USCOURTS.GOV. COPIES OF SUCH DOCUMENTS AND MATERIALS MAY ALSO BE EXAMINED BETWEEN THE

HOURS OF 8:00 AM AND 4:00 PM, MONDAY THROUGH FRIDAY, EXCLUDING FEDERAL HOLIDAYS, AT THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   OVERVIEW OF THE DEBTORS' BUSINESS AND CAPITAL STRUCTURE ........ 4
      A.    The Debtors' Operations .................................................................. 4
      B.    Employees ........................................................................................ 5
      C.    Debtors' Organizational Structure .................................................. 5
      D.    Regulation of the Company's Business ........................................... 6
      E.    Capital Structure .............................................................................. 6

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
      AND PLAN ........................................................................................................ 7
      A.    What Is Chapter 11? ........................................................................ 7
      B.    Why Are the Debtors Sending Me this Disclosure Statement? ....... 7
      C.    What Happens to My Recovery If the Plan Is Not Confirmed or Does Not
            Become Effective? ............................................................................ 8
      D.    If the Plan Provides that I Get a Distribution, Do I Get It Upon Confirmation or
            When the Plan Becomes Effective, and What Is Meant By
            "Confirmation," "Effective Date," and "Consummation"? ............... 8
      E.    Is There Potential Litigation Related to the Plan? .......................... 8
      F.    Will There Be Releases and Exculpation Granted to Parties in Interest as Part of
            the Plan? ............................................................................................ 8
      G.    What Is the Deadline to Vote on the Plan? ...................................... 9
      H.    How Do I Vote for or Against the Plan? .......................................... 9
      I.    Why Is the Bankruptcy Court Holding a Confirmation Hearing and When Will It
            Occur? ............................................................................................... 10
      J.    What Is the Effect of the Plan on the Debtors' Ongoing Business? .. 10
      K.    Who Will Serve as the Directors or Officers of the Reorganized Debtors? ...... 10
      L.    Who Do I Contact If I Have Additional Questions With Respect to This
            Disclosure Statement or the Plan? ................................................... 11
      M.    Do the Debtors Recommend Voting in Favor of the Plan? .............. 11

IV.   EVENTS LEADING TO THE CHAPTER 11 FILINGS ...................................... 11
      A.    The Declining Mortgage Market .................................................... 11
      B.    Negotiations with Stakeholders ...................................................... 12
      C.    Plan Sponsorship Proposal ............................................................. 1413

V.    THE CHAPTER 11 CASES ............................................................................. 1514
      A.    First Day Papers ............................................................................. 1514
      B.    Executory Contracts and Unexpired Leases .................................... 17
      C.    The Claims Process                              18Schedules and Statements        17

- -

VI.     THE PLAN OF REORGANIZATION ............................................................. ~~18~~17
        A.      Plan's Release ............................................................................... ~~19~~18
        B.      Plan's Exculpation and Injunction ................................................ 19

VII.    RISK FACTORS TO BE CONSIDERED ...................................................... ~~20~~19
        A.      General ............................................................................................. 20
        B.      Bankruptcy Specific Risk Factors ................................................ 20
        C.      Industry-Specific Risk Factors ..................................................... ~~24~~23
        D.      Forward Looking Statements ......................................................... ~~26~~25
        E.      Risks Related to Obtaining Exit Financing ................................. 26
        ~~F~~E.      Disclosure Statement Disclaimer .................................................. ~~27~~26
        ~~G~~F.      Liquidation Under Chapter 7 ......................................................... ~~28~~27

VIII.   SOLICITATION AND VOTING PROCEDURES ......................................... 28
        A.      Voting Status of Each Class .......................................................... 28
        B.      Classes Entitled to Vote ................................................................ ~~29~~28
        C.      Voting Procedures .......................................................................... ~~29~~28

IX.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ........ 31
        A.      The Confirmation Hearing ............................................................. 31
        B.      Confirmation Standards .................................................................. ~~32~~31
        C.      Liquidation Analysis ...................................................................... 33
        D.      Financial Feasibility ...................................................................... ~~34~~33
        E.      Acceptance by Impaired Classes ................................................... 34
        F.      Confirmation Without Acceptance by All Impaired Classes ........ ~~35~~34

X.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ~~36~~35
        A.      Continuation of the Chapter 11 Cases .......................................... ~~36~~35
        B.      Alternative Plans of Reorganization .............................................. 36
        C.      Liquidation Under Chapter 7 or Chapter 11 .................................. ~~37~~36

XI.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ..................... ~~38~~37
        A.      Certain Consequences to the Debtors ............................................ ~~39~~38
        B.      Consequences to Holders of Go-Forward Trade Claims ............... ~~39~~38
        C.      Information Reporting and Withholding ........................................ 40

XII.    PLAN SUPPLEMENT ................................................................................ ~~41~~40

XIII.   RECOMMENDATION AND CONCLUSION .............................................. 42

ii

## EXHIBITS[2]

**Exhibit A**       Joint Chapter 11 Plan of Reorganization of Stearns Holdings, LLC, et al.

**Exhibit B**       Liquidation Analysis[3]

**Exhibit C**       Financial Projections

**Exhibit D**       Organizational Chart

---

[2]    Each Exhibit is incorporated herein by reference.

[3]    The Debtors have requested authority to file their liquidation analysis with their Plan Supplement following the completion of the Auction (as defined below).

iii

## I.    INTRODUCTION

On July 9, 2019 (the "Petition Date"), Stearns Holdings, LLC ("Stearns") and certain of its affiliates, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company"), each commenced a case (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors and debtors in possession under Bankruptcy Code section 1107(a) and 1108.

The Debtors submit this disclosure statement (as amended, modified, or supplemented, the "Disclosure Statement") pursuant to Bankruptcy Code section 1125 in connection with the solicitation of votes with respect to the *Joint Chapter 11 Plan of Stearns Holdings, LLC, et al.* dated July 9, 2019 (as amended, modified, or supplemented, the "Plan").[34] The Plan is annexed hereto as Exhibit A and is incorporated herein by reference.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Debtors' proposed Plan, as attached hereto. The Debtors reserve the right to modify the Plan consistent with Bankruptcy Code section 1127, Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and section 11.1 of the Plan.

The Plan provides for an equitable distribution of recoveries to the Debtors' creditors, preserves the value of the Debtors' business as a going concern, and preserves the jobs of employees. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation and costs, job loss, and/or lesser recoveries. **For these reasons, the Debtors urge you to return your ballot accepting the Plan.**

**WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g)). Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" unless (a) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of

---

[34]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

1

events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

**There is one creditor ~~groups~~group entitled to vote on the Plan whose votes are being solicited: holders of Go-Forward Trade Claims.**

**THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS WHO ACCEPT THE PLAN AND HOLDERS OF IMPAIRED CLAIMS WHO DO NOT VOTE TO ACCEPT OR REJECT THE PLAN AND DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN. IF HOLDERS OF IMPAIRED CLAIMS REJECT THE PLAN, THEY WILL NOT BE DEEMED TO HAVE ACCEPTED THE RELEASES. FOR THE SAKE OF CLARITY, THE HOLDERS OF CLAIMS WHO ARE RELEASING PARTIES SHALL NOT INCLUDE PERSONS IN CLASSES 1, 2, 3, 5, 6, 7, 8, 9, AND 10 THAT ARE PRESUMED TO EITHER ACCEPT THE PLAN OR REJECT THE PLAN AND/OR SUCH PERSONS' RELATED PARTIES.**

The following table summarizes (a) the treatment of any claim under Bankruptcy Code section 101(5) ("Claims") and any equity interest in the Debtors under Bankruptcy Code section 101(16) ("Interests") under the Plan, (b) which classes of Claims and Interests classified pursuant to Bankruptcy Code sections 1122 and 1123(a)(1) ("Classes") are impaired by the Plan, (c) which Classes are entitled to vote on the Plan, and (d) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article VI—The Plan of Reorganization below.

Pursuant to the Plan, a Plan Sponsor (as defined below) will inject a new money investment into the Debtors to fund recoveries to holders of the 9.375% senior secured notes due August 15, 2020 pursuant to an indenture (the "Notes"). The Plan provides that holders of claims in Class 1 (Priority Non-Tax Claims), Class 2 (Notes Secured Claims), and Class 3 (Other Secured Claims) will receive payment in full in cash on the effective date of the Plan or reinstatement or such other treatment that the Debtors elect that results in holders of claims being unimpaired. Claims in Class 5 (General Unsecured Claims), Class 6 (Artemis Note Claims), and Class ~~9~~8 (Existing Stearns Holding Interests) will not receive any distributions under the Plan and are therefore deemed to have rejected the Plan. Claims in Class 7 (Intercompany Claims)~~,~~ are reinstated; cancelled, released, waived, and discharged; or otherwise settled in the Debtors' sole discretion. Class 9 (Intercompany Interests), and Class 10 (Protos Interests) are reinstated for administrative convenience purposes.

Holders of Claims in Class 4 (Go-Forward Trade Claims) are impaired and therefore entitled to vote on the Plan. For the reasons stated herein, the Debtors urge the holders of Claims in Class 4 to accept the Plan.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|

2

| 1 | Priority Non-Tax Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount of Claims:** [To Come][4]$31,000[5] | Except to the extent that a holder of an allowed Priority Non-Tax Claim agrees to a less favorable treatment, the holder of an allowed Priority Non-Tax Claim, at the sole option of the Debtors or the Reorganized Debtors (as applicable): (A) will be paid in full in cash; (B) will have such claim reinstated; or (C) will receive such other treatment so that the claim is unimpaired. | Unimpaired | Presumed to Accept |
|---|---|---|---|---|
| 2 | Notes Secured Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount of Claims:** [To Come][5]**be determined based on the results of the Auction, if it occurs** | Except to the extent that a holder of an allowed Notes Secured Claim agrees to a less favorable treatment, holders of allowed Notes Secured Claims will receive cash provided(exclusive of such cash as may be necessary to pay the Allowed Cash Flow DIP Claim) to be paid by the Plan Sponsor on the effective date of the Plan in accordance with the Plan Sponsor Selection Procedures. | Unimpaired | Presumed to Accept |
| 3 | Other Secured Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount of Claims:** [To Come][6]$58,000 | Except to the extent that a holder of an allowed Other Secured Claim against the Debtors agrees to a less favorable treatment, allowed Other Secured Claims will receive (a) payment in full in cash; (b) reinstatement of their claims; or (c) such other treatment that results in not impairing such claims. | Unimpaired | Presumed to Accept |
| 4 | Go-Forward Trade Claims<br><br>**Estimated Recovery: 95%**<br>**Estimated Amount of Claims:** [To Come][7]$4,399,000 | Except to the extent that holders of allowed Go-Forward Trade Claims agree to a less favorable treatment, allowed Go-Forward Trade Claims will receive cash in an amount equal to 95% of their allowed claim amount. | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | General Unsecured Claims will not receive any distribution under the | Impaired | Deemed to Reject |

[4]  To be updated prior to the Disclosure Statement Hearing (as defined below).

[5]  All estimated amount values and classifications are based on current information available to the Debtors as of the date of filing of the Disclosure Statement and are subject to change.

[5]  To be updated prior to the Disclosure Statement Hearing.

[6]  To be updated prior to the Disclosure Statement Hearing.

[7]  To be updated prior to the Disclosure Statement Hearing.

3

| | **Estimated Recovery: 0%**  ~~Estimated Amount: [To Come][8]~~ | Plan. | | |
|---|---|---|---|---|
| 6 | Artemis Note Claims  **Estimated Recovery: 0%** | Artemis Note Claims will not receive any distribution under the Plan. | Impaired | Deemed to Reject |
| 7 | Intercompany Claims  **Estimated Recovery: N/A** | Intercompany Claims will be, at the debtors' discretion, (a) reinstated; (b) cancelled; or (c) otherwise settled. | Unimpaired | Presumed to Accept |
| 8 | Existing Stearns Holdings Interests  **Estimated Recovery: 0%** | Existing Stearns Holdings Interests will be cancelled. | Impaired | Deemed to Reject |
| 9 | Intercompany Interests  **Estimated Recovery: N/A** | Intercompany Interests will be reinstated. | Unimpaired | Presumed to Accept |
| 10 | Protos Interests  **Estimated Recovery: N/A** | Protos Interests will be reinstated. | Unimpaired | Presumed to Accept |

## II.    OVERVIEW OF THE DEBTORS' BUSINESS AND CAPITAL STRUCTURE

### A.    The Debtors' Operations

The Debtors are a leading private, independent mortgage company that originates residential mortgage loans through its national platform. The Company is the 20th largest mortgage lender in the United States, and has maintained disciplined lending standards with a focus on high credit standards and mortgage loan quality. The primary source of the Debtors' revenue is mortgage loan production, which generates income primarily through gains upon the sale of mortgage loans. The Debtors employ approximately 2,700 people, including employees of their joint ventures and preferred partners. They originate loans in all 50 states.[96]

The primary source of the Debtors' revenue is mortgage loan production, which generates income primarily through gains upon the sale of mortgage loans. The Debtors' primary production channels are wholesale, retail, joint venture, and preferred partners. The wholesale channel consists of mortgage loans that are sourced and submitted to the Debtors by independent mortgage brokers on behalf of borrowers. The retail channel originates mortgage loans directly

---

[8]    ~~To be updated prior to the Disclosure Statement Hearing.~~

[96]    Stearns Lending, LLC and Private Mortgage Advisors, LLC employs approximately 1,099 and 16 employees, respectively. The remaining employees are employed by the joint venture affiliates and other non-debtor entities, all of whom would be severely harmed by the failure of the Debtors.

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement 1138691v14 8/8/2019 10:10:29 AM

with borrowers through over 100 branch offices nationwide. The joint venture channel is comprised of nine (9) joint ventures. The Debtors own 47.5% of the interests in one of those joint ventures and they own 50% of the interests in all the others. The preferred partner channel consists of two independent mortgage banks. The Debtors own 50.8% of the interests in one of the preferred partners, and 51% of the interests in the other. During the twelve months ended December 31, 2018, the wholesale, retail, joint venture and preferred partner channels represented 55%, 14%, 23% and 5% of the Debtors' mortgage loan production, respectively.

Like almost all other mortgage companies that originate mortgages to borrowers with high credit ratings, the Debtors sell the loans they originate. Between 80% and 85% of the Debtors' loans are sold to, or securitized through, the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae"). Such sales are made pursuant to industry-standard forms of agreement and guidelines that require the loans to meet detailed eligibility criteria. The balance of the Debtors' loans are sold to other loan aggregators and investors, including JPMorgan Chase Bank. As described further below, the Debtors largely exited the business of servicing loans. Accordingly, they sell over 99% of their loans on a "servicing-released" or "flow servicing sale basis," meaning that the Debtors do not retain the right to service the loans after they are sold.

Prior to 2018, the Debtors had a substantial loan servicing division which generated net servicing income from their mortgage servicing rights ("MSR") portfolio. The net servicing income consisted of servicing fees and other servicing compensation less the fees paid to sub servicers. On January 31, 2018, the Debtors entered into an agreement with Freedom Mortgage Corporation to sell MSR's for a significant portion of the Debtors' serviced mortgage loan portfolio. Total gross proceeds were anticipated to be approximately $224.6 million. On February 1, 2018, the Debtors received $159.1 million of the proceeds. On May 1, 2018, the Debtors received an additional $42.3 million. An additional $10 million of proceeds was received on December 12, 2018 and another $8.8 million was received in June 2019. The outstanding proceeds will come due post-petition upon delivery of the remaining servicing documents.

### B.    Employees

The Debtors employ approximately 2,700 people, including employees of their joint ventures and preferred partners. As of the Petition Date, one of the Debtors, Stearns Lending (as defined below) employs approximately 1,099 full time employees ("Stearns Full Time Employees"), 8 part time employees ("Stearns Part Time Employees", together with Stearns Full Time Employees, "Stearns Eligible Employees"), and 8 temporary employees (the "Stearns Temporary Employees", together with Stearns Eligible Employees, the "Stearns Employees"). In addition to Stearns Employees, the Debtors rely upon approximately 50 independent contractors, temporary employees, and temporary staffing agencies to provide consulting services pertaining to accounts payable, information technology, accounting, payroll, and for clerical support. Another Debtor, Private Mortgage Advisors, LLC, employs approximately 16 full time employees.

### C.       Debtors' Organizational Structure

Funds managed by Blackstone's private equity group own approximately 70% of the interests in the Debtors. Mr. Glenn Stearns, the Debtors' founder, owns approximately 29%, and three other shareholders own the balance. The Blackstone managed funds acquired their ownership position from Mr. Stearns in December 2015. Stearns is a Delaware limited liability company. It owns 100% of the equity interests in the primary operating entity, Stearns Lending, LLC ("Stearns Lending") a Delaware limited liability company. Further, the Company, through Debtor Stearns Ventures, LLC, a Delaware limited liability company, owns interests in various joint ventures and preferred partners. These joint ventures and preferred partners include real estate companies, builders, relocation service providers, and financial service companies. Stearns Lending owns the interests in one of the preferred partners, while Stearns Ventures, LLC owns the interests in the other. The joint ventures and the preferred partners independently originate mortgage loans utilizing their own separate sources of financing. The Debtors provide critical back-office support to the joint ventures and preferred partners and, in some cases, fulfillment services in exchange for arms'-length fees. None of the joint ventures or preferred partners is a debtor in these Chapter 11 Cases. The Debtors will continue providing back-office and other support to ensure that the joint ventures and preferred partners continue their operations in the ordinary course without interruption.

The organizational chart, attached hereto as Exhibit D, illustrates the Debtors' organizational structure, as of the Petition Date.

### D.       Regulation of the Company's Business

The regulatory dynamics in the mortgage industry continue to evolve and become more stringent in nature. The residential mortgage industry is highly regulated and these regulations directly impact the Debtors' business. Increased regulatory and compliance requirements in the mortgage finance industry—resulting from the Dodd-Frank Wall Street Reform and Consumer Protection Act, the creation of the Consumer Finance Protection Bureau, and other legislation—have caused many traditional bank competitors to exit or substantially reduce some of their mortgage-related activities. Regulatory compliance requires constant monitoring, counterparty and vendor management, and internal and external audits. A material failure to comply with these laws or regulations could subject the Company to lawsuits, governmental actions, and/or damage to the Company's reputation, which could materially adversely affect the business, financial conditions, and the results of operations.

### E.       Capital Structure

The following description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

#### 1.       The Notes

On August 8, 2013, Stearns and Stearns Co-Issuer Inc. issued the Notes. The Notes were issued in the amount of $250 million. Wilmington Trust, National Association is the indenture trustee and collateral agent of the Notes. The Notes are guaranteed by debtors Stearns Lending and Stearns Ventures, LLC (together with Stearns and Stearns Co-Issuer Inc., the "Note Obligors"). The Notes are secured by a lien on substantially all of the Note Obligors' assets, other than assets securing the Prepetition Repo Facilities (as defined below), subject to certain exceptions.

On April 13, 2018, Stearns tendered an offer to purchase, at par, up to $80 million of the Notes. Upon the tender offer's expiration on May 10, 2018, Stearns purchased $60 million of the Notes. In February 2019, Stearns purchased an additional $7 million of Notes through another tender offer. Finally, on May 24, 2019, Stearns offered to purchase an additional $42 million of Notes. Stearns did not purchase any Notes pursuant to this offer, having commenced these cases prior to the required payment date of July 15, 2019.

The current outstanding balance of the Notes is approximately $183 million. Various funds affiliated with Pacific Investment Management Company LLC ("PIMCO") owns approximately 67% of the outstanding principal balance of the Notes.

## 2.    The Prepetition Repo Facilities

Similar to virtually all other mortgage lenders, the Debtors finance their mortgage origination business through so-called warehouse facilities pursuant to repurchase agreements. The Debtors, through Debtor Stearns Lending, collectively have four (4) repurchase agreements with four (4) lending institutions: (i) Bank of America, N.A., (ii) Texas Capital Bank, National Association, (iii) Wells Fargo Bank, N.A., and (iv) Barclays Bank PLC (each a "Prepetition Repo Facility" and, collectively, the "Prepetition Repo Facilities"). Prior to the Petition Date, one additional warehouse facility and one gestation facility were terminated.

Pursuant to the Prepetition Repo Facilities, the Debtors sell newly originated mortgage loans to the counterparty to finance the originations of the loan and typically repurchase the loans within 30 days of origination when the Debtors sell the loans to Fannie Mae, Freddie Mac, Ginnie Mae or another purchaser. The Debtors obtain advances of less than 100% of the principal balance of the mortgage loans (referred to as "haircut") from the lenders under the Prepetition Repo Facilities, which requires the Debtors to use working capital to fund the remaining portion of the principal balance of the mortgage loans. The amount of the advances provided under each Prepetition Repo Facility range from 92.5% to 99% of the principal balance of agency-eligible mortgage loans.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What Is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and

its interest holders. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes such plan binding upon a debtor and any creditor of or equity interest holder in such debtor, whether or not such creditor or equity interest holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed plan.

### B.    Why Are the Debtors Sending Me this Disclosure Statement?

During the Chapter 11 Cases, the Debtors will seek to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, Bankruptcy Code section 1125 requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    What Happens to My Recovery If the Plan Is Not Confirmed or Does Not Become Effective?

In the event that the Plan is not confirmed or does not become effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide holders of Claims and Interests with less than they would have received pursuant to the Plan. The Liquidation Analysis will be filed as part of a supplement to the Disclosure Statement prior to the Disclosure Statement Hearing (as defined below)the Plan Supplement.

### D.    If the Plan Provides that I Get a Distribution, Do I Get It Upon Confirmation or When the Plan Becomes Effective, and What Is Meant By "Confirmation," "Effective Date," and "Consummation"?

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court ("Confirmation"). Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After confirmation of the Plan by the Bankruptcy Court, several conditions need to be satisfied or waived so that the Plan can become effective. Initial distributions will only be made on the date the Plan becomes effective (the "Effective Date") or as soon as reasonably practicable thereafter, as specified in the Plan. The terms "consummation" and "substantial consummation" are sometimes used to indicate the occurrence of the Effective Date. *See* Section VII.B.7 of this Disclosure Statement, entitled "Conditions Precedent to

Consummation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.

### E.        Is There Potential Litigation Related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections could potentially give rise to litigation. Certain Classes[107] are deemed to reject the Plan. The Debtors will seek Confirmation of the Plan notwithstanding the dissent of such objecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies Bankruptcy Code section 1129(b).

### F.        Will There Be Releases and Exculpation Granted to Parties in Interest as Part of the Plan?

Yes, the Plan proposes to release each of the Released Parties.[118] The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Released Parties in obtaining their support for the Plan.

All of the Released Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties warrants the benefit of the release and exculpation provisions.

**Each holder of a Claim that votes to accept the Plan shall be deemed to have consented to the Plan's third-party release contained in Section 9.03 of the Plan (the "Third-Party Release") and will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and causes of action against Released Parties. Additionally, each holder of a Claim that either (i) abstains from voting on the plan or (ii) votes to reject the Plan but does not check the box in Item 3 of the Class 4 will also be deemed to have consented to the Plan's Third-Party Release and will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and causes of action against Released Parties. Regardless of**

---

[107]  Pursuant to the Plan and as used herein, a "Class" means a category of holders of Claims or Interests as set forth in Article III of the Plan and classified pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

[118]  As set forth in the Plan, the term Released Parties means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Credit Parties; (d) the Creditors' Committee and each of its members in their capacity as such; (e) the Plan Sponsor; (f) the Exit Repo Facility Parties; (g) Blackstone; and (i) with respect to each of the foregoing clauses (a) through (g), to the fullest extent permitted by law, such Person's Related Parties, in each case only in their capacity as such. All of the terms in the foregoing definition are as defined in the Plan.

**whether holders elect to opt out of the Plan's Third-Party Release, holders recoveries under the Plan remain unaffected. The releases are an integral element of the Plan.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. If necessary, the Debtors will present evidence at the hearing on Confirmation of the Plan (the "Confirmation Hearing") to further demonstrate the basis for and propriety of the release and exculpation provisions. The Plan's release, exculpation, and injunction provisions are set forth in Article VI of this Disclosure Statement and in Article IX of the Plan.

### G.    What Is the Deadline to Vote on the Plan?

The Voting Deadline is [September 20, 2019] at 4:00 p.m. (Eastern Time)

### H.    How Do I Vote for or Against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots that will be distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must either be (a) properly completed by hand, executed, and delivered in accordance with the instructions included in the ballot by: (i) first class mail, (ii) courier, or (iii) personal delivery or (b) properly completed electronically using the Solicitation Agent's (as defined below) E-Balloting Platform. Whether completing the ballot by hand or electronically using the Solicitation Agent's E-Balloting Platform, each holder's ballot must be **actually received by [September 20, 2019] at 4:00 p.m. (Eastern Time)** at the following address: Stearns Holdings, LLC, c/o Prime Clerk (the "Solicitation Agent"). It is important that the holder of a Claim in Class 4 follow the specific instructions provided on such holder's ballot and the accompanying instructions. Except in the Debtors' sole discretion, ballots may not be transmitted by facsimile, email, or other electronic means, other than the Solicitation Agent's E-Balloting Platform. For more information regarding voting, s*ee* Article VIII of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

### I.    Why Is the **Bankruptcy** Court Holding a Confirmation Hearing and When Will It Occur?

Bankruptcy Code section 1128(a) requires the Bankruptcy Court to hold a Confirmation Hearing and recognizes that any party in interest may object to Confirmation of the Plan.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**The Confirmation Hearing is scheduled for [•]10:00 a.m. (Eastern Time) on [•]October 3, 2019.**

To provide additional notice to parties in interest in these cases, the Debtors will post to a website maintained by the Solicitation Agent various chapter 11 documents, including the Plan and this Disclosure Statement. The website address is: https://cases.primeclerk.com/stearns. Further, the Debtors intend to request Bankruptcy Court approval to publish a notice in national edition of the *Wall Street Journal*.

**J.    What Is the Effect of the Plan on the Debtors' Ongoing Business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will continue as a going concern. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to the Effective Date have been satisfied or waived. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**K.    Who Will Serve as the Directors or Officers of the Reorganized Debtors?**

The composition of the board of directors or managers of each Reorganized Debtor and, to the extent applicable, the officers of each Reorganized Debtor, will be disclosed prior to the Confirmation Hearing in accordance with Bankruptcy Code section 1129(a)(5).

Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be appointed or elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

**L.      Who Do I Contact If I Have Additional Questions With Respect to This Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact Prime Clerk, the Debtors' Solicitation Agent:

By regular mail, hand delivery, or overnight mail at:

> c/o Prime Clerk LLC
> Re: Stearns Holdings, LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

By electronic mail at:

> Stearnsinfo@primeclerk.com

By telephone at:

> (844) 234-1461

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Solicitation Agent at https://cases.primeclerk.com/stearns (free of charge) or the Bankruptcy Court's website at http://www.nysb.uscourts.gov (for a fee).

**M.      Do the Debtors Recommend Voting in Favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**IV.      EVENTS LEADING TO THE CHAPTER 11 FILINGS**

**A.      The Declining Mortgage Market**

The mortgage origination business is significantly impacted by interest rate trends. In mid-2016, the 10-year Treasury was 1.60%. Following the U.S. presidential election, the Treasury rate rose to a range of 2.30% to 2.45% and maintained that range throughout 2017. The 10-year Treasury rate increased to over 3.0% for most of 2018. The rise in rates during this time period reduced the overall size of the mortgage market, increasing competition and significantly reduced market revenues.

To counter the decline in origination volumes and revenues, the Debtors implemented several initiatives to reduce costs in the latter part of 2017 and throughout 2018. The Debtors reduced their fixed costs by approximately 40% through employee headcount reductions; vendor cost reductions; centralization of their corporate functions and regional operating center site closures. These measures resulted in a reduction of over $40 million in annualized costs. During this time period, the Debtors' lenders under the Prepetition Repo Facilities nevertheless began to express concerns about the impact of the market contraction on overall financial results and, more importantly, the upcoming maturity of the Notes – August of 2020 – and the fact that the Debtors were obligated to use $42 million of the proceeds from their MSR portfolio sale to tender for the notes in May 2019, which would put pressure on the Debtors' liquidity.

This requirement to repay $42 million of the proceeds stemmed from the Notes indenture, which required the Debtors to use the entirety of the MSR sale proceeds for certain permitted purposes within 360 days of receipt or to otherwise offer to repay an equal amount of the Notes with such proceeds. In the months leading up to the chapter 11 bankruptcy filings, the Debtors explored various potential permitted uses of the proceeds. The Debtors ultimately did not apply the proceeds to one of the purposes permitted under the Notes indenture and further were unable to repay the $42 million in Notes using the proceeds.

The Prepetition Repo Facilities ~~are~~were essential to the Debtors' operations. Thus, the Debtors resolved to take the steps necessary to restructure their balance sheet, including the terms of the Notes. Timing was important to maintain the financial strength of the Debtors and to ensure continued access to the Prepetition Repo Facilities at market terms to fund originations and operations. The Debtors therefore engaged legal and investment banking advisors in September 2018, far in advance of the Prepetition Repo Facilities' maturities, and even farther in advance of the May 2019 deadline to tender for $42 million of the Notes. The Company and its advisors used the next few weeks to assess the ~~company's~~Company's alternatives and the Company worked to finalize its three-year forecast and related business plan, which would serve as a basis for formulating a restructuring proposal for holders of the Notes.

### B.    Negotiations with Stakeholders

~~Approximately seven months ago, in~~In November 2018, the Debtors approached representatives of PIMCO, by far the largest holder of the Notes, in an effort to engage on restructuring alternatives. ~~The Debtors initially proposed a partial pay down and an extension of the maturity of the Notes and relief from the $42 million tender requirement following the sale of the MSR portfolio, both of which were the focus of the Prepetition Repo Facilities lenders' concerns. However, PIMCO rejected this proposal out of hand. PIMCO only gave the Debtors two alternatives:  either secure a new capital injection of $50 million into the Company from Blackstone or, failing that, give PIMCO ownership of the Company. Despite these demands not being acceptable alternatives to the Debtors or Blackstone, they nonetheless developed further proposals for PIMCO. PIMCO, however, refused to consider anything other than the two alternatives described above.~~

Over the following months, the Debtors and PIMCO exchanged multiple proposals to restructure the Notes, including through potential debt-for-equity exchange or sale transactions.

Unable to reach consensus with PIMCO, the Company worked During this time period, the Debtors continued to work with the Prepetition Repo Facilities' lenders in an effort to maintain access to the Prepetition Repo Facilities. But certain of the Prepetition Repo Facility lenders expressed growing concern about the lack of a solution to the Company's balance sheet and liquidity challenges. Certain Prepetition Repo Facility lenders began reducing advance rates, increasing required collateral accounts, and increasing liquidity covenants, further contracting available working capital necessary to operate the business. Eventually, two Prepetition Repo Facility lenders advised the Debtors that they were prepared to terminate their respective Prepetition Repo Facility unless the Debtors and PIMCO agreed in principle to a deleveraging transaction by June 7, 2019. This did not happen. As a result, one Prepetition Repo Facility lender terminated its facility effective June 28, 2019 and a second advised that it will no longer allow new advances effective July 15, 2019.

In light of the foregoing, the Debtors and their advisors worked with Blackstone to develop new restructuring alternatives consistent with PIMCO's demands. To that end, the Company made a detailed proposal to PIMCO which would have transferred the majority of the equity in the enterprise to holders of the Notes. The holders of the Notes would have acquired control of the Company's board of managers under this proposal. Both Blackstone and the Company were ready, willing, and able to enhance the proposal in any negotiations in order to effect an orderly transition of control to holders of the Notes via an out-of-court exchange offer. A week later, however, PIMCO surprised the Debtors and Blackstone by stating that its funds refused to take ownership of the Company, despite previously having insisted on being given the keys.

PIMCO's advisors told the Debtors' advisors that PIMCO and its funds would accept one of two completely different alternatives. First, they said they would consider an offer by Blackstone to cash out the Notes. Second, and as an alternative, PIMCO's advisors said that the holders of the Notes would instead insist that the Debtors terminate all operations, fire the Debtors' employees, and sell their assets piecemeal as part of a company-wide liquidation. Needless to say, the liquidation alternative was completely and totally unacceptable to the Debtors and Blackstone. Indeed, PIMCO's about face from its previous insistence on being handed the equity put the Debtors in a highly untenable position with the Prepetition Repo Facilities' lenders and their rapidly approaching deadline.

The Debtors and Blackstone and their advisors nonetheless scrambled to respond. The Company was strongly opposed to an immediate, value-destructive liquidation. Accordingly, Blackstone developed a proposal to cash out the Notes at a discount to face. To support this proposal, the Debtors and their advisors prepared a liquidation analysis which demonstrated the likely consequences of closure of the enterprise: Note recoveries unsurprisingly would be very severely and negatively impacted in such a scenario. PIMCO's advisors probed the Debtors' liquidation analysis and challenged certain assumptions—without offering any analysis of their own. Two days later—on June 6, 2019—PIMCO radically changed course yet again.

PIMCO did not offer a counter to Blackstone's cash out offer. They simply said it was not acceptable. Instead, PIMCO reverted back to a demand it had made seven months prior in November 2018: it insisted that Blackstone make a significant equity infusion into the Debtors in exchange for a two-year maturity extension. PIMCO also insisted that the tender for $42 million

~~of the Notes go forward, despite the Debtors' worsening liquidity. PIMCO further stated that the only other proposal it would entertain was an immediate liquidation.~~

~~The Debtors and~~with Blackstone ~~did not respond to these outrageous demands. Indeed, the notion of a significant Blackstone equity infusion, with no compromise of the Notes and no relief on the $42 million tender requirement, had been rejected over six months before and was not realistic in light of the Debtors' exploration of market alternatives described below. With only a month to go before the $42 million tender deadline, the Debtors and Blackstone worked at a breakneck pace~~ to develop a plan to restructure the Debtors' affairs in a manner that the Company believes will preserve the Debtors' as a going concern, thereby preserving the jobs of 2,700 employees and maximizing value for all the Debtors' stakeholders.

### C.    Plan Sponsorship Proposal

#### 1.    Formation of the Blackstone Investment Agreement

While the Debtors and Blackstone worked together to consider and develop other potential restructuring alternatives that may be acceptable to PIMCO, the Debtors, with the assistance of their investment banker, commenced a marketing process. The Debtors solicited potential transaction and/or financing partners interested in either investing in the Debtors, selling the Company outright as a going concern, or undertaking any other transaction alternative that could facilitate a restructuring of the Company's balance sheet. However, none of the potential transaction parties that the Debtors' approached expressed willingness to contribute value in an amount anywhere near what PIMCO demanded, i.e., significant new equity while leaving the full unpaid principal balance of the Notes in place.

In light of the Company's inability to find a transaction partner who would satisfy PIMCO's requests, Blackstone offered to infuse new money into the Company by serving as a plan sponsor. The Debtors determined that the proposed investment from Blackstone was the best offer for the Company and in the best interest interests of stakeholders. Accordingly, the Debtors and Blackstone negotiated terms of the proposed investment. On July 8, 2019, the Debtors and Blackstone entered into that certain investment agreement (the "Blackstone Investment Agreement"). Under the Blackstone Investment Agreement, Blackstone would contribute $60 million of new money (the "New Money Investment") in exchange for 100% of the equity in Stearns upon the effective date of the Plan. The parties agreed that the Blackstone Investment Agreement would be subject to a competitive process to determine if there were higher or otherwise better investment proposals available for the Debtors, as more fully set forth below. The New Money Investment will fund recoveries for the Company's Notes holders in these Chapter 11 Cases.

#### 2.    Plan Sponsor Selection Procedures

On ~~the Petition Date, the Debtors filed *Motion of Debtors for an*~~July 24, 2019, the Bankruptcy Court entered the *Order (~~a~~A) Approving the Plan Sponsor Selection Procedures; (B) Establishing Notice Procedures; and (~~e~~C) Granting Related Relief* (the "Selection Procedures ~~Motion~~Order"). Pursuant to the Selection Procedures ~~Motion, the Debtors sought authorization from the~~Order, the Bankruptcy Court ~~to implement~~authorized procedures to market test the New

Money Investment contained in the Blackstone Investment Agreement and to obtain the highest or otherwise best investment proposal (the "Selection Procedures").

The Selection Procedures provide a process and requirements for parties interested in sponsoring the Debtors' Plan to submit proposals to the Debtors. The Debtors will provide parties that meet the requirements set forth in the Selection Procedures access to due diligence until [August 22September 6, 2019] at 4:00 p.m. (Eastern Time) (the "Proposal Deadline"). Following the Proposal Deadline, the Debtors, in their sound business judgment and in consultation with their advisors, will evaluate all proposals timely submitted in order to determine whether such proposals are "Qualified Proposals" as provided in the Selection Procedures. If the Debtors receive any additional Qualified Proposals,[129] the Debtors shall schedulehold a meeting (the "Auction") to solicit higher or otherwise better proposalson September 9, 2019, if necessary, as further set forth in the Selection Procedures. At the conclusion of the Auction, the Debtors will determine the highest or otherwise best investment proposal and select a sponsor for the Debtors' Plan from among the Qualified Proposals.[13]

## V.    THE CHAPTER 11 CASES

### A.    First Day Papers[14]

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 9, 2019. Recognizing that any interruption of the Debtors' business, even for a short period, could negatively impact customer and vendor relationships and the Debtors' goodwill, revenue, and profits, which would be detrimental to the value of the Debtors' estates, the Debtors filed certain first day motions seeking authorization for the Debtors to continue operating their businesses in the ordinary course. The first day motions seek to stabilize the Debtors' operations and are designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtors' business as a consequence of the filing of the Chapter 11 Cases. The following summary highlights certain of the first day papers.

#### 1.    Cash Flow DIP and Cash Collateral Motion

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Orders (A) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling A Final Hearing, and (G) Granting Related Relief* [Docket No. 20] (the "Cash Flow DIP Motion"). By the Cash Flow DIP Motion, the Debtors requested authority to use cash collateral of the holders

---

[129] For the avoidance of doubt, the Blackstone Investment Agreement is a Qualified Proposal pursuant to the Selection Procedures.

[13] To be updated with the results of the Auction.

[14] To be updated after First Day Hearing.

of the Notes and to enter into a debtor in possession lending agreement with a maximum committed amount of $35 million (the "Cash Flow DIP Facility") with an affiliate of Blackstone (the "Cash Flow DIP Lender"). The Cash Flow DIP Facility will affordaffords the Debtors liquidity to fund their operations, including payment of vendors, employee payroll, facilities rent, and other necessary expenses. The Debtors project that the Notes' cash collateral likely will be sufficient to pay all, or substantially all,many of such expenses. Accordingly, the Debtors anticipate limited need for the funding available under the Cash Flow DIP Facility. The Cash Flow DIP Facility nonetheless is essential to ensure the Debtors will have sufficient liquidity during these cases to honor all their postpetition obligations.

The Debtors propose to provide toprovided the Cash Flow DIP Lender with a lien on substantially all their assets, other than assets that constitute collateral under the DIP Repo Facility (as defined below), to secure the Debtors' obligations under the Cash Flow DIP Facility. Such lien will primeprimed the prepetition lien securing the claims of the Notes pursuant to section 364(d) of the Bankruptcy Code. Holders of the Notes will beare adequately protected in connection with such priming, and also in connection with the Debtors' proposed use of the Notes' cash collateral. The Bankruptcy Court entered an order granting the relief requested in the Cash Flow DIP Motion on an interim basis on July 11, 2019 [Docket No. 91] and on a final basis on August 1, 2019 [Docket No. 209].

### 2. DIP Repo Facilities Motion

In addition to the Cash Flow DIP Facility, the Debtors require liquidity to fund their mortgage origination operations. In the weeks leading to the Petition Date, the Debtors and their advisors engaged in extensive negotiations with Blackstone and the lenders under the Debtors' Prepetition Repo Facilities regarding potential proposals for debtor in possession financing that would provide the Debtors with (a) liquidity to fund their operations in these Chapter 11 Cases and (b) the best path forward for their reorganization.

Accordingly, on the Petition Date, the Debtors filed the *Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to Enter into Repurchase Agreement Facilities and Related Documents; (B) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business (C) Granting Backup Liens and Superpriority Administrative Expense Claims; (D) Modifying the Automatic Stay; (E) Scheduling a Final Hearing; and (F) Granting Related Relief* (the "DIP Repo Motion"). Pursuant to the DIP Repo Motion, the Debtors sought authority for Stearns Lending (a) to obtain up to $1.5 billion in warehouse financing under a master repurchase agreements (the "DIP Repo Facility") and (b) to obtain access to over $2.0 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreements (together with the DIP Repo Facility, the "DIP Facilities"). The DIP Facilities will ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted.

The Debtors ran a marketing process designed to obtain the most favorable terms for their debtor in possession warehouse financing. The Debtors negotiated the DIP Repo Facilities with parties to the DIP Facility in good faith and at arm's length, and believe that the terms of the DIP Facilities are competitive and the best that could be obtained under the circumstances. Further the DIP Facilities have been market tested and represent the best of three offers received

by the Company. ~~For these reasons, and as more fully explained in the DIP Repo Motion, the Debtors have asked the~~The Bankruptcy Court ~~to approve~~entered an order approving the DIP Facilities ~~and grant the relief requested in the DIP Repo Motion~~on an interim basis on July 11, 2019 [Docket No. 91] and on a final basis on August 1, 2019 [Docket 209].

### 3.    Cash Management Motion

On the Petition Date, the Debtors filed a motion seeking authority to continue using their cash management systems and their respective bank accounts, business forms, and intercompany transactions. The Debtors ~~are~~also ~~seeking~~sought a waiver of, or extension of time to comply with, requirements under Bankruptcy Code section 345(b). The Bankruptcy Court entered an order approving the use of the Debtors' cash management systems and their respective bank accounts, business forms, and intercompany transactions on an interim basis on July 10, 2019 [Docket No. 81] and on a final basis on July 31, 2019 [Docket No. 192].

### 4.    Wages and Benefits Motion

On the Petition Date, the Debtors filed a motion seeking authorization to pay prepetition wages, compensation, and amounts associated with employee benefit programs and continue such programs in the ordinary course. The Bankruptcy Court entered an order approving payments of employee wages, compensation, and benefits on an interim basis on July 10, 2019 [Docket No. 85] and on a final basis on July 31, 2019 [Docket No. 196].

### 5.    Insurance Motion

On the Petition Date, the Debtors filed a motion seeking authority to pay and maintain various insurance policies, including, among other things, the Debtors' property, general liability, workers' compensation, cyber liability, automobile liability, employers' liability, umbrella coverage, mortgage bankers' bonds, mortgage bankers' professional liability, directors' and officers' coverage, and excess liability. The Bankruptcy Court entered an order approving payments under such policies on an interim basis on July 10, 2019 [Docket No. 77] and on a final basis on July 31, 2019 [Docket No. 199].

### 6.    Taxes Motion

The Debtors filed a motion on the Petition Date seeking authorization to pay certain prepetition fees and taxes to various federal, state, county, and city taxing and licensing authorities. The Bankruptcy Court entered an order approving the payments of certain prepetition fees and taxes on a final basis on July 31, 2019 [Docket No. 191].

### 7.    Utilities Motion

On the Petition Date, the Debtors filed a motion seeking to establish procedures for determining adequate assurance of payment for future utility services. On July 31, 2019, the Bankruptcy Court entered an order approving the Debtors' procedures for determining adequate assurance of payment for future utility services [Docket No. 197].

### 8.    Mortgage Origination Motion

On the Petition Date, the Debtors filed a motion seeking authority, but not direction, to continue in the ordinary course of business (i) to originate and purchase mortgage loans; (ii) to sell and securitize loans, including by performing under certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, and private parties; (iii) to service and subservice loans pursuant to applicable Fannie Mae, Freddie Mac, and Ginnie Mae standards; (iv) to sell loan servicing rights, and to perform under existing related agreements, enter into amendments and modifications of prepetition related agreements, and enter into and perform under new related agreements; (v) to pay prepetition amounts owed to critical vendors; (vi) to fulfill compliance and regulatory obligations; and (vii) to provide assurances of future performance to Fannie Mae, Freddie Mac, and Ginnie Mae. The Bankruptcy Court entered an order granting such relief on an interim basis on July 10, 2019 [Docket No. 86] and on a final basis on July 31, 2019 [Docket No. 193].

### 9.    Joint Ventures Motion

On the Petition Date, the Debtors filed a motion seeking authority, but not direction, to continue supporting the Debtors' joint ventures and preferred partners in the ordinary course of business including (i) to purchase mortgage loans originated by the joint ventures and preferred partners, (ii) to provide shared support services to the joint ventures and preferred partners pursuant to certain shared services agreements, (iii) to extend lines of credit to the preferred partners on terms and in amounts consistent with past practice, (iv) to make capital contributions to the joint ventures and preferred partners pursuant to the limited liability company agreements at each relevant joint venture and preferred partner, and (v) to receive excess cash distributions from the joint ventures and preferred partners (when and if payable). The Bankruptcy Court entered an order authorizing, but not directing, the Debtors to continue to support their joint ventures and preferred partners in the ordinary course on an interim basis on July 10, 2019 [Docket No. 84] and on a final basis on July 31, 2019 [Docket No. 194].

### B.    Executory Contracts and Unexpired Leases

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject executory contracts and unexpired leases. The Debtors are engaged in an evaluation of their executory contracts and unexpired leases, including the potential assumption, rejection, or amendment and assumption thereof. As part of a subsequently-filed supplement to the Plan or a motion to reject executory contracts and unexpired leases to be filed with the Bankruptcy Court, the Debtors will identify contracts to be rejected in a schedule. All remaining contracts will be assumed.

On July 17, 2019, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property* Nunc Pro Tunc *to the Petition Date* [Docket No. 121] seeking to reject certain unexpired leases. On July 31, 2019, the Debtors filed the *Debtors' Second Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property* Nunc Pro Tunc *to the Effective Rejection Dates* [Docket No. 205]. Both motions shall be heard by the Bankruptcy Court on September 11, 2019 at 2:00 p.m. (Eastern Time).

C.    ~~The Claims Process~~**Schedules and Statements**

The Debtors filed a motion on the Petition Date seeking up to a 30 day extension to file the Debtors' schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "Statements"). As set forth therein, the Debtors intend to file their Schedules and Statements at least one day prior to the hearing to approve the Disclosure Statement.

The Schedules and Statements will provide certain information pertaining to Claims. Interested parties may review the Schedules and Statements at the office of the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 or online at http://www.nysb.uscourts.gov.

## VI.    THE PLAN OF REORGANIZATION

As set forth in Section I of this Disclosure Statement, pursuant to the Plan, a Plan Sponsor (as defined below) will inject a new money investment into the Debtors to fund recoveries to holders of Class 2 Notes Secured Claims. The Plan provides that holders of claims in Class 1 (Priority Non-Tax Claims), Class 2 (Notes Secured Claims), and Class 3 (Other Secured Claims) will receive payment in full in cash on the effective date of the Plan or reinstatement or such other treatment that the Debtors elect that results in holders of claims in Class 3 being unimpaired. Claims in Class 7 (Intercompany Claims), Class 9 (Intercompany Interests), and Class 10 (Protos Interests) are also unimpaired, but no distributions shall be made on account of such claims. Claims in Class 5 (General Unsecured Claims), Class 6 (Artemis Note Claims), and Class 8 (Existing Stearns Holding Interests) will not receive any distributions under the Plan and are conclusively deemed to have rejected the Plan.

Holders of Claims in Class 4 (Go-Forward Trade Claims) are entitled to vote on the Plan.

THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY, AND IS SUBJECT TO, THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN. THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT A**.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF SOME OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN. UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS

AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**THE PLAN CONTAINS CERTAIN IMPORTANT RELEASE AND EXCULPATION PROVISIONS. THOSE PROVISIONS ARE RESTATED BELOW FOR YOUR CONVENIENCE.**

**A.    Plan's Release**

**1.    Release by the Debtors**

Pursuant to Section 9.2 of the Plan, the Debtors shall release, to the maximum extent allowed by applicable law and except as otherwise specifically provided in the Plan or the Plan Supplement, the Released Parties (defined above) from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, their estates, and non-Debtor affiliates. The Debtors do not believe they have any such claims against any of the Released Parties.

**2.    Releases by Holders of Claims**

Pursuant to Section 9.3 of the Plan, each (i) holder of a Claim that votes to accept the Plan or (ii) holder of a Claim that abstains from voting or votes to reject the Plan, that does not elect to opt out of the releases contained therein by checking the box on its timely submitted applicable Ballot, will release the Released Parties from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, their estates, and non-Debtor affiliates. **For the sake of clarity, the Holders of Claims who are Releasing Parties shall not include Persons in Classes 1, 2, 3, 5, 6, 7, 8, 9, and 10 that are presumed to either accept the Plan or reject the Plan and/or such Persons' Related Parties.** The Debtors do not believe any such claims exist against any of the Released Parties.

**B.    Plan's Exculpation and Injunction**

**1.    Exculpation**

Pursuant to Section 9.4 of the Plan, each Released Party is released from any claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in- or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan, or any contract, instrument, release, or other agreement, or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the

consummation, administration, and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement. The exculpation in Section 9.4 of the Plan is limited to claims that do not arise from Released Parties' gross negligence, intentional fraud or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law).

### 2.    Injunction

Pursuant to Section 9.6 of the Plan, all persons who have held, hold, or may hold Claims or Interests that are released, discharged, or exculpated pursuant to the Plan shall be permanently enjoined from taking action against the Released Parties with respect to such enjoined claims.

## VII.    RISK FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

As noted above, there can be no guarantee that the assumptions, estimates, and projections underlying the Plan will continue to be accurate or valid at any time after the date hereof. This section of this Disclosure Statement explains that there are certain risk factors that each voting holder of a Claim should consider in determining whether to vote to accept or reject the Plan. Accordingly, each holder of a Claim who is entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### A.    General

The Plan sets forth the means for satisfying the Claims against and Interests in each of the Debtors. Certain Claims are not expected to be paid in full. Nevertheless, the reorganization of the Debtors' business and operations under the proposed Plan avoids the potentially adverse impact of the likely increased delays and costs associated with a chapter 7 liquidation of the Debtors. The Plan has been proposed after a careful consideration of all reasonable restructuring alternatives. Despite the risks inherent in the Plan, as described herein, the Debtors believe that the Plan is in the best interests of creditors when compared to all reasonable alternatives.

### B.    Bankruptcy Specific Risk Factors

#### 1.    The Plan May Not Be Accepted by Sufficient Holders of Impaired Claims.

The Plan is subject to a vote of holders of impaired Claims in voting classes and to Confirmation by the Bankruptcy Court. Article IX hereof summarizes the numerous requirements for Confirmation of the Plan, including that the Plan be accepted by at least one Class of impaired Claims. There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, while the Debtors believe the Plan is confirmable under the standards set forth in Bankruptcy Code section 1129, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

### 2.      The Bankruptcy Court May Not Confirm the Plan.

Even if all voting impaired Classes vote in favor of the Plan, and even if with respect to any impaired Class deemed to have rejected the Plan the requirements for "cramdown" (discussed in more detail in Section IX.E herein) are met, the Bankruptcy Court, which, as a court of equity, has substantial discretion concerning Plan Confirmation, may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, a showing that Confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, see *infra* Section IX.C. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3.      The Debtors are Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' operations and their ability to execute their business strategy will be subject to risks and uncertainties associated with bankruptcy. These risks include:

(a)     the Debtors' ability to continue as a going concern;

(b)     the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases;

(c)     the Debtors' ability to develop, prosecute, confirm, and consummate the proposed Plan or any other plan of reorganization with respect to the Chapter 11 Cases;

(d)     the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a plan of reorganization, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 cases;

(e)     the Debtors' ability to retain key vendors or secure alternative supply sources;

(f)     the Debtors' ability to obtain and maintain normal payment and other terms with vendors and service providers;

(g)    the Debtors' ability to maintain contracts that are critical to their operations;

(h)    the Debtors' ability to attract, motivate, and retain management and other key employees; and

(i)    the Debtors' ability to fund and execute their business plan.

### 4.    The Debtors' Business Could Suffer From a Long and Protracted Restructuring.

Although the Debtors will seek to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement and pendency of the Chapter 11 Cases could materially adversely affect the relationships among the Debtors, customers, employees, vendors, and service providers.

The Debtors' future results are dependent upon the successful Confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as their ability to obtain financing to fund operations may be harmed. Accordingly, if the Plan is not confirmed and implemented in a timely manner, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, or vendors to do business with a company that recently emerged from bankruptcy proceedings.

### 5.    Classification and Treatment of Claims and Interests

Bankruptcy Code section 1122 requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of

the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment by such holder regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## 6.    Distribution to Holders of Allowed Claims Under the Plan

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately allowed and the funds available for distribution. Both the actual amount of allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of allowed Claims in a Class is higher than the Debtors' estimates or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of allowed Claims in such Class will be less than projected.

## 7.    Conditions Precedent to Consummation of the Plan

Article X of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## 8.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur very shortly after the date of Plan Confirmation, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

## 9.    Funding Necessary for the Consummation of the Plan

As of the date hereof, the Debtors contemplate that the use of cash collateral, the Cash Flow DIP Facility, and the DIP Repo Facilities will provide the Debtors with the necessary liquidity to fund the Debtors' business operations and administrative expenses during these Chapter 11 Cases. Although the Debtors have received commitments from certain parties, the use of cash collateral, the Cash Flow DIP Facility, and the DIP Repo Facilities are still subject to final approval by the Bankruptcy Court and such approval is not guaranteed. Should the Cash Flow DIP Facility proceeds not be received, or the Debtors not have access to the DIP Repo Facilities, the Debtors' ability to continue to operate could be placed in jeopardy. Further, the Debtors will require financing following Confirmation of the Plan in order to operate their business. The Debtors have received an initial exit financing proposal from Barclays Bank PLC, but finalizing and securing such exit financing will be a necessary component of consummating the Plan.

### C.    Industry-Specific Risk Factors

The Debtors' business is subject to extensive regulation by federal, state, and local governmental and regulatory authorities. Further, in recent years the policies, laws, rules, and regulations applicable to the Debtors' business have been rapidly evolving. Such changes, as well as the actual or alleged failure to comply with applicable federal, state, and local laws and regulations or to implement and adhere to adequate remedial measures designed to address any identified compliance deficiencies, may have an adverse consequence on the Company or its business, in addition to the following factors, risks or uncertainties that may affect the Company or its business:

(a)    Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;

(b)    Damage to the Debtors' reputation;

(c)    Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;

(d)    The substantial resources (including senior management time and attention) the Company devotes to, and the significant compliance costs the Company incurs in connection with, regulatory compliance and regulatory examinations and inquiries, and any consumer redress, fines, penalties or similar payments made in connection with resolving such matters;

(e)    Uncertainties relating to interest curtailment obligations and any related financial and litigation exposure (including exposure relating to false claims);

(f)    Potential costs and uncertainties, including the effect on future revenues, associated with and arising from litigation, regulatory investigations, and other legal proceedings, and uncertainties relating to the reaction of key counterparties to the announcement of any such matters;

(g)    The ability to maintain the loan origination or collection agency licenses and/or third-party default specialists, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;

(h)    Operational risks inherent in the mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;

(i)    Risks related to a significant amount of senior management turnover and employee reductions;

(j)    The ability to maintain or grow the mortgage loan originations business;

(k)    The ability to achieve the Company's strategic initiatives, particularly the ability to successfully develop origination capabilities and execute and realize planned operational improvements and efficiencies;

(l)    The success of the business strategy in returning to sustained profitability;

(m)    Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;

(n)    Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;

(o)    Risks and potential costs associated with technology and cybersecurity, including: the risks of technology failures and of cyber-attacks against us or our vendors; our ability to adequately respond to actual or attempted cyber-attacks; and our ability to implement adequate internal security measures and protect confidential borrower information;

(p)    Risks and potential costs associated with the implementation of new or more current technology, the use of vendors, or the transfer of the Company's servers or other infrastructure to new data center facilities;

(q)    The ability to renew advance financing facilities or warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities;

(r)    The effects of competition on existing and potential future business, including the impact of competitors with greater financial resources and broader scopes of operation;

(s)    The expiration of, or changes to, government mortgage modification, refinancing or other programs;

(t)    The ability to comply with evolving and complex accounting rules, many of which involve significant judgments and assumptions;

(u)    The ability to implement and maintain effective internal controls over financial reporting and disclosure controls and procedures;

(v)    Uncertainties regarding impairment charges relating to the intangible assets of the Company;

(w)    Administrative fines and financial penalties;

(x)    Litigation, including class action lawsuits; and

(y)    Civil and criminal liability.

### D.    Forward Looking Statements

#### 1.    Books and Records

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained in the Plan and attached hereto is without inaccuracies.

#### 2.    Financial Projections

Except for historical information, this Disclosure Statement may be deemed to contain "forward-looking" statements. The Company is including this cautionary statement for the express purpose of availing itself of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or amount of Claims in the various Classes that might be allowed. The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in this "Risk Factors" section of this Disclosure Statement. Such factors have, in some instances, affected and in the future could affect the ability of the Company to achieve its projected results and may cause actual results to differ materially from those expressed in the Plan. The Company undertakes no obligation to update any forward-looking statements in this Disclosure Statement.

### E.    Risks Related to Obtaining Exit Financing

The Debtors have received an initial exit financing proposal from Barclays Bank PLC to refinance the DIP Repo Facility prior to the effective date of the Plan.  During the course of these Chapter 11 Cases, the Debtors will seek to obtain commitments from Barclays Bank PLC to provide exit financing and solicit commitments from other parties to provide exit financing. However, there is no assurance that such commitments will be obtained, which could hinder the Debtors' ability to consummate the transactions contemplated under the Plan. Even if the Debtors are able to obtain a commitment for an exit facility, there can be no assurance that the Reorganized Debtors will be able to meet the terms of such exit facility and there is a risk that the Reorganized Debtors default thereunder and the lenders take enforcement action against the Reorganized Debtors, including execution or foreclosure against assets of the Reorganized Debtors.

### FE.    Disclosure Statement Disclaimer

#### 1.    This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. All forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

#### 2.    No Legal or Tax Advice Is Provided by This Disclosure Statement

This Disclosure Statement is not legal advice. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 3.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties in interest.

### 4.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or causes of action of the Debtors or their estates are specifically or generally identified herein.

### 5.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

### 6.    Potential Exists for Inaccuracies and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 7.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement or other materials included in the solicitation package. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon

by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel for the Debtors and the United States Trustee.

### ~~G~~F. Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that chapter 7 liquidation would have on recoveries of holders of Claims and the Debtors' liquidation analysis will be filed as part of ~~a supplement to the Disclosure Statement and filed prior to the Disclosure Statement Hearing (as defined below)~~the Plan Supplement.

## VIII.    SOLICITATION AND VOTING PROCEDURES

### A.    Voting Status of Each Class

Under the Bankruptcy Code, creditors are entitled to vote on the Plan if their contractual rights are Impaired by the Plan and they are receiving a distribution under the Plan. Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. The following table sets forth which Classes of Claims will or will not be entitled to vote on the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Notes Secured Claim | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Go-Forward Trade Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | No (deemed to reject) |
| 6 | Artemis Note Claims | Impaired | No (deemed to reject) |
| 7 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 8 | Existing Stearns Holdings Interests | Impaired | No (deemed to reject) |
| 9 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 10 | Protos Interests | Unimpaired | No (deemed to accept) |

### B.    Classes Entitled to Vote

The following Class is the only Class entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 4 | Go-Forward Trade Claims | Impaired |

If your Claim or Interest is not included in this Class, you are not entitled to vote and you will not receive a package containing relevant solicitation materials (the "Solicitation Package").

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the

actual total Allowed Claims voting on the Plan. Acceptance by a Class requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan, counting in each case only those who actually vote.

### C.    Voting Procedures

On the ~~Petition Date, the Debtors filed the *Debtors' Motion for*~~July 11, 2019, the Bankruptcy Court entered the *Order Scheduling the Disclosure Statement Hearing, Approving the Form and Manner of Notice of the Disclosure Statement Hearing, and Granting Related Relief* [Docket No. 98] (the "Disclosure Statement ~~Motion~~Hearing Order"). Pursuant to the Disclosure Statement ~~Motion, the Debtors are seeking~~Hearing Order, a hearing to consider the adequacy of this Disclosure Statement (the "Disclosure Statement Hearing") was scheduled on August 22, 2019 at 10:00 a.m. (Eastern Time). Additionally, on August 1, 2019, the Debtors ~~intend to file a subsequent motion to~~filed the *Debtors' Motion for Order (I) Approving the Disclosure Statement; (II) Scheduling Hearing on Confirmation of the Plan; (III) Establishing Deadlines and Procedures for Filing Objections to Confirmation of the Plan; (IV) Establishing Deadlines and Procedures for Voting on the Plan; (V) Approving Solicitation Procedures; (VI) Establishing Procedures for Tabulation of Votes; and (VII) Granting Related Relief* [Docket No. 208] (the "Solicitation Procedures Motion" and the order approving the Solicitation Procedures Motion, the "Solicitation Procedures Order"). The Solicitation Procedures Motion will be heard at the Disclosure Statement Hearing ~~that~~and sets forth, and seeks approval of, the Plan solicitation procedures. ~~Such solicitation procedures will be as set forth~~, as described herein and ~~as will be described more fully in a subsequent motion~~therein.

Additionally, on July 31, 2019, the Bankruptcy Court entered the *Order Authorizing Retention and Appointment of Prime Clerk LLC as Administrative Advisor Nunc Pro Tunc to the Petition Date* [Docket No. 203] pursuant to which the Debtors ~~are seeking~~received authorization to retain Prime Clerk to, among other things, act as the Debtors' agent in connection with the solicitation of votes to accept or reject the Plan.

### 1.    Voting Record Date

The Voting Record Date is [August ~~21~~22, 2019] (the "Voting Record Date"). The Voting Record Date is the date for determining (a) which holders of Claims are entitled to vote to accept or reject the Plan and receive a Solicitation Package in accordance with the procedures for soliciting the Plan, as set forth in the ~~Disclosure Statement~~Solicitation Procedures Order and (b) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

### 2.    Distribution of Solicitation Packages

Under the Plan, holders of Claims in Class 4 are entitled to vote to accept or reject the Plan. As such, the Debtors will provide Solicitation Packages to holders as of the Voting Record Date of allowed Go-Forward Trade Claims.

### 3.    General Voting Instructions

In order for the holder of a Claim in Class 4 to have such holder's ballot counted as a vote to accept or reject the Plan, such holder's ballot must be either (a) properly completed by hand, executed, and delivered in accordance with the instructions included in the ballot by (i) first class mail, (ii) courier, or (iii) personal delivery to the Solicitation Agent, or (b) properly completed electronically using the Solicitation Agent's E-Balloting platform. Whether completing the ballot by hand or electronically using the Solicitation Agent's E-Balloting Platform, each holder's Ballot must be **actually received by [September 20, 2019] at 4:00 p.m. (Eastern Time) (the "Voting Deadline")** at the following address: c/o Prime Clerk LLC, 850 3rd Ave., Suite 412, Brooklyn, NY 11232 prior to 4:00 p.m. (Eastern Time). It is important that the holder of a Claim in Class 4 follow the specific instructions provided on such holder's ballot and the accompanying instructions. The holder of a Claim should also provide all of the information requested by the ballot, and, if completing the ballot by hand, should complete and return all ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Solicitation Agent or their direct participant, as applicable. Except in the Debtors' sole discretion, ballots may not be transmitted by facsimile, email, or other electronic means, other than the Solicitation Agent's E-Balloting Platform.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU

LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT, PRIME CLERK, AT (844) 234-1461.

### 4.    Miscellaneous

All ballots must be signed by the holder of the appropriate classes of claims on such date. An otherwise properly executed ballot that attempts to partially accept and partially reject the Plan will likewise not be counted. If you cast more than one ballot voting the same Claim(s) before the Voting Deadline, the last valid ballot received on or before the Voting Deadline will be deemed to reflect your intent and, thus, to supersede any prior ballot. If you cast ballots received by the Solicitation Agent on the same day, but which are voted inconsistently, such ballots will not be counted.

Except as provided below, unless the ballot is timely submitted to the Solicitation Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking Confirmation of the Plan.

## IX.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### A.    The Confirmation Hearing

Bankruptcy Code section 1128(a) provides that the Bankruptcy Court, after notice, may conduct a Confirmation Hearing.

Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

### B.    Confirmation Standards

The following requirements must be satisfied under Bankruptcy Code section 1129(a) before the Bankruptcy Court may confirm a plan of reorganization.

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the proponent, by a Debtor, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or

in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.       The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint Plan with a Debtor or a successor to a Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of Interests and with public policies.

6.       The proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

7.       Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of the Debtors has approved any rate change provided for in the Plan.

8.       With respect to each holder within an impaired Class of Claims or Interests, each such holder (i) has accepted the Plan or (ii) will receive or retain under the Plan on account of such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

9.       With respect to each Class of Claims or Interests, such Class (i) has accepted the Plan or (ii) is unimpaired under the Plan; *provided*, *however*, that if the Plan is rejected by an impaired Class, the Plan may be confirmed if it "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are impaired under the Plan.

10.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)       With respect to a Claim of a kind specified in Bankruptcy Code sections 507(a)(2) or 507(a)(3), on the Effective Date of the Plan, the holder of the Claim will receive on account of such Claim cash equal to the allowed amount of such Claim, unless otherwise agreed;

(b)       With respect to a Class of Claim of the kind specified in Bankruptcy Code sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7), each holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim or (ii) if such Class has not accepted the Plan, cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

(c)       With respect to a Priority Tax Claim of a kind specified in Bankruptcy Code section 507(a)(8), the holder of such Claim will receive on account of such

claim deferred Cash payments, over a period not exceeding five years after the date of the order for relief, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim.

11.     If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).

12.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

13.     All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

14.     The Plan provides that following the Effective Date of the Plan, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall continue to pay all retiree benefits, as that term is defined in Bankruptcy Code section 1114, at the level established under subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the debtor has obligated itself to provide such benefits.

### C.     Liquidation Analysis

As described above, Bankruptcy Code section 1129(a)(7) requires that each holder of an impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis will be filed as part of ~~a supplement to the Disclosure Statement prior to the Disclosure Statement Hearing (as defined below)~~the Plan Supplement.

### D.     Financial Feasibility

Bankruptcy Code section 1129(a)(11) requires that a debtor demonstrate that Confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.

The Debtors believe that the Plan meets the feasibility requirement set forth in Bankruptcy Code section 1129(a)(11). As part of this analysis, the Debtors' management, with the assistance of their advisors, will file as a supplement to this Disclosure Statement (prior to the Disclosure Statement Hearing) financial projections. Based on such financial projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore,

the Debtors believe that Confirmation and consummation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The financial projections will not have been examined or compiled by independent accountants. The Debtors make no representation as to their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the financial projections may vary from the projected results, and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

E.    **Acceptance by Impaired Classes**

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cramdown" such Classes, as described below. A Class that is unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest, or the Debtors cure any default and reinstate the original terms of the obligation.

Under Bankruptcy Code sections 1126(c) and 1126(d) and except as otherwise provided in Bankruptcy Code section 1126(e): (i) an impaired Class of Claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than half in number of the voting allowed Claims have voted to accept the Plan and (ii) an impaired Class of Interests has accepted the Plan if the holders of at least two-thirds in amount of the allowed Interests of such Class actually voting have voted to accept the Plan.

F.    **Confirmation Without Acceptance by All Impaired Classes**

Bankruptcy Code section 1129(b) allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all impaired Classes, provided that the Plan has been accepted by at least one impaired Class entitled to vote, without counting the vote of any "Insider", as defined in Bankruptcy Code section 101(31). Bankruptcy Code section 1129(b) permits the Debtors to confirm the Plan, notwithstanding the failure of any impaired Class to

accept the Plan, in a procedure commonly known as "cramdown," so long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted the Plan.

### 1.      No Unfair Discrimination

A plan "does not discriminate unfairly" if (i) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for nonconsensual Confirmation.

### 2.      Fair and Equitable Treatment

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class receive everything to which they are legally entitled or, with respect to unsecured claims, that classes junior in priority to the class receive nothing.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims, and interests, which may be summarized as follows:

(a)      *Secured Claims*. With respect to the secured amount of its allowed claim, either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

(b)      *Unsecured Claims*. Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value or for administrative convenience purposes only.

(c)      *Interests*. Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any

property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value or for administrative convenience purposes only.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" requirements of the Bankruptcy Code. Certain Classes of Claims and Interests will receive no distribution under the Plan and are therefore conclusively deemed to reject the Plan. Accordingly, the Debtors will seek to confirm the Plan under Bankruptcy Code 1129(b) with respect to such Classes.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include, without limitation: (i) continuation of the pending Chapter 11 Cases, (ii) an alternative plan or plans of reorganization, or (iii) the liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases. In particular, the Debtors could have difficulty gaining access to sufficient liquidity to allow them to continue their operations as a going concern. Moreover, protracted chapter 11 proceedings will make it difficult for the Debtors to expand their customer base, which is critical to the ultimate success of the Debtors' business.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Additionally, until the Plan is consummated, subject to certain conditions, the Debtors may determine to withdraw the Plan and propose and solicit different reorganization plans. Any such plans proposed by the Debtors or others might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of its assets, or a combination of both.

Although alternative plans of reorganization are possible, the present Plan is the result of a thorough assessment of restructuring alternatives undertaken in consultation with key stakeholders. Accordingly, the Debtors believe the prospect of an alternative plan of reorganization that delivers greater value to economic stakeholders is remote.

### C.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In chapter 7 cases, a trustee or trustees would be appointed to liquidate the assets of the Debtors.

However, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the estate. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated under a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to the holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially. In addition, as with a chapter 7 liquidation, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate under a chapter 11 plan.

The Liquidation Analysis will illustrate the recoveries the Debtors anticipate in a liquidation scenario. The Liquidation Analysis is premised upon a hypothetical liquidation in a chapter 7 case. In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to each class of creditors than that recoverable under the Plan. In the Debtors' opinion, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and Interests as great a realization potential as does the Plan.

The Liquidation Analysis will be filed as part of ~~a supplement to the Disclosure Statement prior to the Disclosure Statement Hearing (as defined below)~~the Plan Supplement.

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following

summary does not address the U.S. federal income tax consequences to holders whose Claims are Unimpaired, otherwise entitled to payment in full in cash under the Plan, or deemed to reject the Plan.

The following summary is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given that the IRS will not challenge, nor that a court will sustain, any of the considerations discussed herein. In addition, this summary generally does not address foreign, state, or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle, or other integrated transaction, and investors in pass-through entities). Except where specifically noted below, this summary does not address the consequences to holders of Claims that are non-U.S. holders (as defined below).

For purposes of this discussion, a "non-U.S. holder" means any holder of a Claim (other than a partnership or other pass-through entity) that is not a "U.S. holder." A "U.S. holder" means a holder of a Claim that, for U.S. federal income tax purposes is, or is treated as, a citizen or individual resident of the United States, a corporation (including any entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia, an estate the income of which is subject to U.S. federal income taxation regardless of its source, or a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (ii) the trust has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

The following summary of certain U.S. federal income tax consequences is for informational purposes only.

**Each holder of a Claim should consult its tax advisor regarding the U.S. federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan in light of such holder's particular circumstances.**

### A.    Certain Consequences to the Debtors

Stearns is treated as a partnership for U.S. federal income tax purposes, and each of Stearns Lending, LLC, Stearns Ventures, LLC, bSNAP, LLC and Private Mortgage Advisors, LLC are disregarded as separate from Stearns for U.S. federal income tax purposes.  In addition, Protos Acquisition, LLC ("Protos") is a partnership owned by Blackstone for U.S. federal income tax purposes.  Although Stearns Co-Issuer Inc. is a corporation for U.S. federal income tax purposes, it does not own material assets or earn material income and therefore, is generally disregarded for purposes of this discussion. Accordingly, the Debtors generally pay no federal income taxes and minimal state taxes. Instead, the income, gain or loss of the Debtors is allocated to, and is reportable on, the tax returns of the existing holders of the equity interests in Stearns (or, in the case of Protos, Blackstone).  As a result of this structure, the Debtors do not anticipate incurring any material U.S. federal income tax consequences associated with the Plan.

To the extent that Stearns or Protos discharges any Claims that constitute indebtedness for U.S. federal income tax purposes for less than the outstanding amount of such Claim, Stearns or Protos, as applicable, will generally recognize cancelation of indebtedness income.  Such income will generally be allocated to the members of Stearns or Protos, as applicable, in accordance with the Stearns or Protos operating agreement.

### B.    Consequences to Holders of Go-Forward Trade Claims

#### 1.    General

Pursuant to the Plan and in satisfaction of their claims, holders of allowed Go-Forward Trade Claims will receive Cash in the amount equal to 95% of their allowed Go-Forward Trade Claims.

A holder of an allowed Go-Forward Trade Claim will generally recognize gain or loss equal to the difference between the holder's adjusted basis in its allowed Go-Forward Trade Claim and the amount of Cash received by the holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the holder of the allowed Go-Forward Trade Claim and the nature of the allowed Go-Forward Trade Claim in its hands, whether the allowed Go-Forward Trade Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the allowed Go-Forward Trade Claim, and the creditor's holding period of the allowed Go-Forward Trade Claim. If the allowed Go-Forward Trade Claim in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss.  Such gain or loss will constitute long-term capital gain or loss if the holder of the allowed Go-Forward Trade Claim held such allowed Go-Forward Trade Claim for longer than one year or short-term capital gain or loss if the holder of the allowed Go-Forward Trade Claim held such allowed Go-Forward Trade Claim for one year or less. The deductibility of capital losses is subject to limitation under the Tax Code.

Pursuant to the Plan, to the extent that any Claim entitled to a distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest. A holder of an allowed Go-Forward Trade Claim will generally recognize ordinary income to the extent that the Cash received under the Plan is attributable to interest that accrued on an allowed Go-Forward Trade Claim but was not previously paid by the Debtor or included in income by the holder of the allowed Go-Forward Trade Claim.

A holder of an allowed Go-Forward Trade Claim may be entitled to a bad debt deduction if either: (i) the holder is a corporation; or (ii) the allowed Go-Forward Trade Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (b) a debt the loss from the worthlessness of which is incurred in the holder's trade or business.  A holder that has previously recognized a loss or deduction in respect of its allowed Go-Forward Trade Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such allowed Go-Forward Trade Claim.

## 2. Market Discount

The market discount provisions of the Tax Code may apply to holders of an allowed Go-Forward Trade Claim.  If a holder of an allowed Go-Forward Trade Claim purchased the allowed Go-Forward Trade Claim at a price less than such an allowed Go-Forward Trade Claim's principal amount, the difference may constitute "market discount" for federal income tax purposes.  In general, a debt obligation (other than a debt obligation with a fixed maturity of one year or less) that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.  Any gain recognized by such holder on the receipt of cash in respect of its allowed Go-Forward Trade Claim would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

## C. Information Reporting and Withholding

All distributions to holders of allowed Go-Forward Trade Claims under the Plan are generally subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding." Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN") TIN, (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.

Backup withholding is not an additional tax and may be refunded by the IRS to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## XII. PLAN SUPPLEMENT

Exhibits to the Plan not attached hereto shall be filed in one or more Plan Supplements. Any Plan Supplement (and amendments thereto) filed by the Debtors shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth therein. The Plan Supplements may be viewed at the office of the clerk of the Bankruptcy Court or its designee during normal business hours, by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov (PACER account required) or at the Solicitation Agent website https://cases.primeclerk.com/stearns, or by written request to the Solicitation Agent at:

By regular mail, hand delivery, or overnight mail at:

c/o Prime Clerk LLC
Re: Stearns Holdings, LLC
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

By electronic mail at:

Stearnsinfo@primeclerk.com

By telephone at:

(844) 234-1461

The documents contained in any Plan Supplements shall be subject to approval by the Bankruptcy Court pursuant to the order confirming the Plan.

*[Remainder of Page Intentionally Left Blank]*

## XIII.  RECOMMENDATION AND CONCLUSION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

45

Dated: New York, New York
~~July 9~~August 8, 2019

STEARNS HOLDINGS, LLC
on behalf of itself and its subsidiary Debtors

*/s/ David Schneider*

Name: David Schneider
Title:   Chief Executive Officer

[Signature Page to Disclosure Statement With Respect to Joint Chapter 11 Plan of Reorganization]

Dated:   New York, New York
         ~~July 9~~August 8, 2019

                                   PROTOS ACQUISITION, LLC

                                   */s/ Nadim El Gabbani*
                                   _____
                                   Name: Nadim El Gabbani
                                   Title:   President

[Signature Page to Disclosure Statement With Respect to Joint Chapter 11 Plan of Reorganization]

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement
1138691v14 8/8/2019 10:10:29 AM

**<u>Exhibit A</u>**

**Plan of Reorganization**

**Exhibit B**

**Liquidation Analysis**[10]

**[TO COME]**

---

[10] The Debtors have requested authority to include their liquidation analysis in their Plan Supplement following completion of the Auction.

**Exhibit C**

**Financial Projections**

**[TO COME]**

## FINANCIAL INFORMATION AND PROJECTIONS

The Debtors[11] prepared the financial projections set forth herein (the "Financial Projections") based on, among other things, the anticipated future financial condition and results of operations of the Debtors in a recapitalization scenario. In conjunction with the Debtors' advisors, the Debtors' management team developed and refined the Debtors' business plan and prepared consolidated financial projections for fiscal year 2019 through fiscal year 2022 (the "Projection Period").

As described in Section IX.D of the Disclosure Statement, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code as confirmation of the Plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors or any successors under the Plan. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. In general, as illustrated by the Financial Projections, the Debtors believe that the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Effective Date of the Plan will occur in October 2019. Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher Administrative Claims and Fee Claims, which could also impact the Financial Projections.

Although the Financial Projections represent the Debtors' commercially reasonable estimates and good faith judgment of the results of the Debtors' future operations, financial position, and cash flows, they are only estimates and actual results may vary considerably from the Financial Projections. Consequently, the inclusion of the Financial Projections should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of the Debtors' operations, financial position, and cash flows presented herein will be achieved. The Financial Projections are based on

---

[11]    Unless otherwise defined herein, capitalized terms used in this Exhibit shall have the meaning ascribed to such terms in the Disclosure Statement or the Plan, as applicable, or as the context otherwise requires.

forecasts of key economic variables and may be significantly impacted by, among other factors, changes in interest rates, further competition within the mortgage industry, changes in terms with material vendors and service providers, and/or a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.

The Debtors do not, as a matter of course, publish their business plan, financial projections, or anticipated financial position. In connection with the planning and development of the Plan, these Financial Projections were prepared by the Debtors, with the assistance of their advisors, to present the anticipated impact of the Plan. The Debtors do not intend, and disclaim any obligation, to further update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

Factors that could cause actual results to differ materially include, but are not limited to, the following risks:

- Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;

- Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;

- Uncertainties relating to financial and litigation exposure (including exposure relating to false claims);

- The ability to maintain the loan origination and agency licenses, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;

- Operational risks inherent in the mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;

- The ability to maintain or grow the mortgage loan originations business;

- The ability to achieve the Company's strategic initiatives, particularly the ability to successfully develop origination capabilities and execute and realize planned operational improvements and efficiencies;

- Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement 1138691v14 8/8/2019 10:10:29 AM

- Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;
- Competitor pricing behaviors and strategies may negatively impact performance and results; and
- The ability to renew warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities.

Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS. THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

THE FINANCIAL PROJECTIONS REFLECT AN ESTIMATE OF THE IMPACT OF FRESH START REPORTING UNDER AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF POSITION 90-7 "FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE."  THE ESTIMATED IMPACT IS PRELIMINARY AND A FULL ASSESSMENT OF THE ACTUAL IMPACT HAS BEEN INITIATED. AS SUCH, THE ACTUAL IMPACT OF FRESH START REPORTING AT THE EFFECTIVE DATE MAY VARY MATERIALLY AND MAY HAVE AN IMPACT ON ASSETS, LIABILITIES, AND SHAREHOLDER EQUITY AS REFLECTED ON THE REORGANIZED DEBTORS' CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement 1138691v14 8/8/2019 10:10:29 AM

SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING RELATED TO THE IMPLEMENTATION OF THE PLAN, THE CHAPTER 11 CASES, MANAGEMENT'S STRATEGY, ACHIEVING OPERATING EFFICIENCIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS TO BE CONSIDERED" IN SECTION VII OF THE DISCLOSURE STATEMENT AND ELSEWHERE IN THE DEBTORS' ANNUAL REPORTS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' OR REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND REORGANIZED DEBTORS, AS

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement 1138691v14 8/8/2019 10:10:29 AM

APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS IN THE VOTING CLASS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

## GENERAL ASSUMPTIONS AND METHODOLOGY

**1.   General Assumptions to the Financial Projections**

The Financial Projections reflect management's July business plan overview prepared in early July 2019. The Financial Projections assume the continuation of the Debtors' business strategy consistent with the current operations. This strategy includes mortgage loan origination and the generation of income primarily through gains upon the sale of mortgage loans. The Financial Projections assume the ongoing origination of mortgage loans through the Debtors' wholesale, retail, joint venture, and preferred partner production channels.

The Financial Projections reflect the economic impact of the cancellation of debt and accrued interest on such debt, as well as the rejection of certain contract and lease liabilities.

The Financial Projections are dependent on the interest rate environment (refinance) and housing sales (purchase). These projections are driven by the Mortgage Bankers Association purchase and refinance originations forecast published in June 2019, as well as historical trends.

The Financial Projections reflect the period of 2019 through 2022.

Upon emergence the Reorganized Debtors may adopt fresh-start accounting. The adoption of fresh-start accounting may result in adjustments to assets and liabilities due to the assignment of reorganization value and the effects of forgiveness or restructuring of debt which may be reflected in the final statement of operations of the predecessor entity.

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement 1138691v14 8/8/2019 10:10:29 AM

### 2.   Projected Income Statement Assumptions

Stearns Holdings, LLC is a limited liability company classified as a partnership for federal and state income tax purposes. Stearns Holdings, LLC does not record liabilities for federal income taxes, as such taxes, if any, are the responsibility of its members.

Revenues are generated primarily through gain on sales of mortgages, associated hedging and trading activity, interest and fee income, and distributions from the Debtors' interests in joint ventures and preferred partners.

The Debtors' mortgage originations reflect the origination of Fannie Mae, Freddie Mac, and Ginnie Mae eligible mortgages, as well as non-conforming and bond loans, through the Debtors' wholesale, retail, joint venture, and preferred partner production channels. Growth in origination volumes is projected at each of these channels throughout the Projection Period.

The Financial Projections include the continued benefit of cost-cutting and margin-enhancing initiatives completed in 2017/2018, as well ongoing initiatives intended to reduce corporate costs, streamline and standardize loan fulfillment, and drive increased digital adoption.

The Financial Projections include expenses attributable to the general and administrative operations of the business, as well as the labor and commissions due to mortgage originators and brokers. Additionally, the Debtors' expenses include those associated with the servicing of retained loans, representing approximately one percent of total originations. Finally, the expenses include the impact of restructuring activities and professional fees associated with the reorganization.

### 3.   Projected Balance Sheet and Liquidity Assumptions

The balance sheet and liquidity projections reflect the Reorganized Debtors' capital structure, including the cancellation of debt and accrued interest on such debt, as well as the rejection of certain contract and lease liabilities. The Financial Projections do not include the assumption of any new debt or working capital facilities at emergence.

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement 1138691v14 8/8/2019 10:10:29 AM

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement
1138691v14 8/8/2019 10:10:29 AM

Redline Stearns_Disclosure Statement 1138691v12 and Stearns_Disclosure Statement
1138691v14 8/8/2019 10:10:29 AM

**<u>Exhibit D</u>**

**Organizational Chart**

**Stearns Organizational Chart**



| Summary report: Litéra® Change-Pro TDC 10.1.0.400 Document comparison done on 8/8/2019 10:10:28 AM | |
|---|---|
| **Style name:** Option 3a Strikethrough Double Score No Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** dm://CHISR02A/1138691/12 | |
| **Description:** Stearns_Disclosure Statement | |
| **Modified DMS:** dm://CHISR02A/1138691/14 | |
| **Description:** Stearns_Disclosure Statement | |
| **Changes:** | |
| Add | 181 |
| Delete | 137 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 3 |
| Embedded Excel | 0 |
| Format changes | 1 |
| **Total Changes:** | 322 |