<u>**FOR PUBLICATION**</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| **STEARNS HOLDINGS, LLC,** *et al.*, | Case No. 19-12226 (SCC) |
| **Debtors.**[1] | Jointly Administered |

**MODIFIED BENCH DECISION CONFIRMING THE**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
<u>**STEARNS HOLDINGS, LLC, ET AL.**</u>

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are: Stearns Holdings, LLC (8219); Stearns Co-Issuer Inc. (7096); Stearns Lending, LLC (1773); Stearns Ventures, LLC (2386); Protos Acquisition LLC (4941); bSNAP, LLC (2498); and Private Mortgage Advisors, LLC (7493). The address of Protos Acquisition LLC is 345 Park Avenue, New York, NY 10154. The address of the other Debtors is c/o Stearns Lending, LLC, 750 East Highway, 121 Bypass, Suite 150, Lewisville, TX 75067.

A P P E A R A N C E S:

**SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP**
*Attorneys for Debtors and Debtors-in-Possession*
Four Times Square
New York, New York 10036-6522
By:     Jay M. Goffman, Esq.
        Mark A. McDermott, Esq.
        Shana A. Elberg, Esq.
        Evan A. Hill, Esq.
        Edward P. Mahaney-Walter, Esq.

**WILLIAM K. HARRINGTON**
United States Trustee for Region 2
U.S. Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, New York 10014
By:     Brian Masumoto, Esq.

**HOGAN LOVELLS US LLP**
*Attorneys for Pacific Investment Management Company LLC*
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
By:     Bennett L. Spiegel, Esq.
        David P. Simonds, Esq.


– and –


390 Madison Avenue
New York, New York 10017
By:     Michael C. Hefter, Esq.
        M. Hampton Foushee, Esq.

**REED SMITH LLP**
*Attorneys for the Indenture Trustee*
1201 North Market Street, Suite 1500
Wilmington, Delaware 19801
By:     Kurt F. Gwynne, Esq.
        Jason D. Angelo, Esq.

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Stearns Holdings, LLC, et al.*, dated as of September 19, 2019 [Dkt. No. 353] (the "Amended Plan"), pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code").[2]

## Background

The Court assumes familiarity with the background and history of the Stearns chapter 11 proceedings but will provide a high-level summary of the most recent events leading to this confirmation hearing today.

After unsuccessful prepetition negotiations with their secured noteholders, Stearns Holdings, LLC, and certain of its affiliates (collectively, the "Debtors") filed these chapter 11 cases on July 9, 2019 (the "Petition Date"). At that time, the Debtors stated their intention to preserve their businesses as a going concern, thereby preserving the jobs of over 2,700 employees and maximizing value for all of their stakeholders. (*See Declaration of Stephen Smith in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 3].) Blackstone Capital Partners VI NQ/NF L.P. and Blackstone Family Investment Partnership VI-NQ-ESC L.P. (together, "Blackstone") hold approximately 70% of the equity interests in the Debtors. Concurrently with the filing of their chapter 11 cases, the Debtors filed a plan and disclosure statement pursuant to which Blackstone agreed to serve as plan sponsor and to inject an amount equal to $60 million of cash into the Debtors. The Debtors set up a market test process whereby

---

[2]    This decision was dictated on the record of the hearing held on October 24, 2019. It has been modified to include full citations and defined terms, and reflects minor additional non-substantive modifications. The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

other interested parties could bid on the opportunity to serve as plan sponsor in place of Blackstone, which plan sponsor selection process was approved by this Court by order dated July 24, 2019 [Dkt. No. 151].  The chapter 11 plan filed by the Debtors on August 8, 2019 [Dkt. No. 219] (the "Original Plan"), together with the accompanying disclosure statement, provided information to the Debtors' stakeholders with respect to their potential recoveries in these cases were such plan to be consummated pursuant to the stalking-horse plan sponsor proposal.

Simultaneously with their marketing process, in accordance with their fiduciary duties to maximize value for their stakeholders, the Debtors also continued to actively pursue other alternatives.   Significantly, the Debtors continued to engage in rigorous arms'-length negotiations regarding the terms of a consensual restructuring with majority holders of the 9.375% senior secured notes due 2020 issued by Debtor Stearns Holdings, LLC (the "Notes").  As of the Petition Date, the outstanding balance of the Notes was approximately $183 million.  Certain holders of Notes for which Pacific Investment Management Company LLC ("PIMCO") serves as investment manager or adviser (the "PIMCO Noteholders") collectively own approximately 67% of the outstanding principal balance of the Notes.

The ongoing negotiations between the Debtors and the PIMCO Noteholders culminated in a global settlement (the "Global Settlement") between the Debtors, PIMCO, and Blackstone as to the terms of a consensual restructuring that was memorialized in a Restructuring Support Agreement (the "RSA") between and among the (i) Debtors, (ii) Blackstone, (iii) the PIMCO Noteholders, and (iv) certain holders of Notes managed by Manulife Investment Management and Putnam Investment Management, LLC (together with the PIMCO Noteholders, the "Consenting Noteholders"), dated as of September 5, 2019.  The parties to the RSA collectively committed to support and execute an amended plan of reorganization consistent with the term

4

sheet attached to the RSA, which resulted in the Amended Plan. The Debtors filed a motion with this Court for authorization to enter into the RSA as a sound exercise of their business judgment pursuant to section 363(b)(1) of the Bankruptcy Code [Dkt. No. 317]. No objections to the motion were filed, and the motion was approved by order dated September 26, 2019 [Dkt. No. 350] (the "RSA Order").

## The Amended Plan

The Amended Plan,[3] filed on September 19, 2019 [Dkt. No. 338], the solicitation version of which was filed on September 26, 2019 [Dkt. No. 353], provides greater distributions to virtually all of the Debtors' creditors than they would otherwise have received under the Original Plan. Under the Original Plan, holders of allowed Go-Forward Trade Claims (as defined in the Original Plan) would have received distributions equal to 95% of their allowed Go-Forward Trade Claims, while holders of allowed General Unsecured Claims would not have received any distributions at all on account of their allowed claims. Under the Amended Plan, the recovery to holders of allowed unsecured claims in Class 4 has increased from 95% to 100% and the recovery to holders of allowed unsecured claims in Class 5 has increased from 0% to 100%. Stated differently, under the Amended Plan, all unsecured creditors are receiving payment in full, in cash. The 100% recovery to Claims in Class 5 is the result of Blackstone's agreement under the RSA and the Amended Plan to fund all Effective Date payments for Class 5 Claims as part of the New Money Investment comprised of (a) $65 million in cash and (b) cash in an amount sufficient to fund all payments to Claims in Class 5 to be made on the Effective Date, which Blackstone is providing as plan sponsor.

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Plan.

In exchange for the New Money Investment and other consideration (and not on account of existing interests), Blackstone will be issued the Reorganized Stearns Holdings Interests and all Existing Stearns Holdings Interests will be cancelled.

The Amended Plan also provides for a comprehensive restructuring of significant indebtedness by eliminating the Notes.  Under the Amended Plan, holders of the Notes will receive total consideration of (i) $65 million in cash funded by the increased New Money Investment; (ii) warrants to purchase non-voting Class B units in the Reorganized Debtors worth 15% of the aggregate value appreciation of the Reorganized Debtors above the New Money Investment in accordance with the RSA; and (iii) 5% senior unsecured notes due 2024 issued by the Reorganized Debtors on the Effective Date in the aggregate principal amount of (x) $15 million, less (y) 90% of payments to be made on the Effective Date from the New Money Investment to holders of General Unsecured Claims (with such payments to be deemed capped at $12.5 million for purposes of calculating the reduction of the principal amount of such notes) on account of their Notes Claims.  Under the Original Plan, were it to be consummated pursuant to the stalking-horse plan sponsor proposal, holders of Notes Claims would only have received their pro rata share of $60 million in cash, which was the amount to be contributed by the plan sponsor.

The Amended Plan summarizes the terms of the Global Settlement as follows:

The Plan includes and effectuates a good faith compromise of Claims and Causes of Action, as set forth in the RSA (the "Global Settlement"). In particular, the Plan Sponsor has agreed to, among other things, (a) provide the New Money Investment in exchange for 100% of the Reorganized Stearns Holdings Interests; and (b) release each Noteholder from any Claims and Causes of Actions pursuant to Section 9.3 of the Plan, except for any Noteholder that (i) opts out of the releases contained in Section 9.3 by checking the box on its timely submitted applicable Ballot or (ii) votes to reject the Plan. The Consenting Noteholders, in turn, have agreed to, with respect to the Plan and subject to the terms and conditions of the RSA, (a) waive their ability to make an election pursuant to

section 1111(b) of the Bankruptcy Code; (b) provide a release of Claims and Causes of Action pursuant to Section 9.3 of the Plan; (c) waive any portion of a Notes Secured Claim that is unsecured, if any, pursuant to section 506(a) of the Bankruptcy Code; (d) waive their right to object, encourage another Entity to object, or support another Entity's objection to the Plan; (e) not propose, file, support, or vote for any restructuring, workout, asset sale, or plan other than this Plan; (f) not take any action that is materially inconsistent with the RSA; (g) vote all their Claims or Interests, as applicable, to accept the Plan, on a timely submitted and duly-executed ballot consenting to any releases under the Plan; and (h) not withdraw, amend, or revoke their tender, consent, or vote with respect to the Plan. The Global Settlement will fully and finally satisfy all Claims held by the Consenting Noteholders. . . .

Amended Plan, § 5.16.

Finally, the Amended Plan provides for the implementation of a Cash Flow Exit Facility and Exit Repo Facilities for the Debtors. The Cash Flow Exit Facility will satisfy the Debtors' obligations under the Cash Flow DIP Facility and the Exit Repo Facilities will satisfy the Debtors' obligations under the DIP Repo Facilities, while also providing the Debtors with the financing capacity to operate their mortgage origination business following the Effective Date.

By their memorandum of law filed in support of the Amended Plan [Dkt. No. 409] (the "Confirmation Brief"), the Debtors submit that the Global Settlement reflected in the RSA and embodied by the terms of the Amended Plan removes the specter of value-destructive litigation that could have delayed confirmation (and resulted in a breach of milestones under the Debtors' financing facilities), depleted estate resources, and caused significant damage to the Debtors' enterprise.  Accordingly, in addition to demonstrating that the Amended Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code, by the Confirmation Brief, the Debtors submit that all of the applicable factors set forth by the Second Circuit in its *Iridium* decision weigh in favor of approval of the Global Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  *See Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir.

2007).  Because the Amended Plan incorporates the terms of the Global Settlement, the Debtors

seek this Court's authority pursuant to Bankruptcy Rule 9019 to consummate the Global

Settlement in conjunction with confirmation of the Amended Plan.

In support of confirmation of the Amended Plan, the Debtors also filed (i) the
*Declaration of D.J. Baker in Support of Confirmation of Debtors' Amended Joint Chapter 11*
*Plan of Reorganization of Stearns Holdings LLC, et al.* (the "Baker Decl."), (ii) the *Declaration*
*of Stephen Smith in Support of Confirmation of the Amended Joint Chapter 11 Plan of*
*Reorganization of Stearns Holdings, LLC, et al.* (the "Smith Decl."), (iii) the *Declaration of Paul*
*Sheaffer in Support of Debtors' Amended Joint Chapter 11 Plan of Reorganization of Stearns*
*Holdings LLC, et al.* (the "PJT Decl."), (iv) the *Declaration of Robert Campagna, Alvarez and*
*Marsal North America, LLC, in Support of Confirmation of the Amended Joint Chapter 11 Plan*
*of Reorganization of Stearns Holdings LLC, et al.* (the "A&M Decl."), and (v) the *Declaration of*
*Craig E. Johnson of Prime Clerk, LLC Regarding the Solicitation of Votes and Tabulation of*
*Ballots Cast on the Amended Joint Chapter 11 Plan of Reorganization of Stearns Holdings, LLC,*
*et al.* (the "Voting Decl." and, collectively with the Baker Decl., the Smith Decl., the PJT Decl.,
and the A&M Decl., the "Plan Declarations").

Only one party objected to the Amended Plan, the Office of the United States Trustee
(the "UST"). The UST included objections to the Amended Plan in (i) the *Objection of United*
*States Trustee to Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Stearns*
*Holdings, LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 223] and (ii) the
*Objection of United States Trustee to Amended Disclosure Statement for Amended Joint Chapter*
*11 Plan of Reorganization of Stearns Holdings, LLC, et al., Pursuant to Chapter 11 of the*
*Bankruptcy Code* [Dkt. No. 336] (together, the "UST Objection"). The objections to the

Amended Plan contained in the UST Objection were expressly preserved for the confirmation hearing [*See* Dkt. Nos. 236 and 339]. On October 22, 2019, PIMCO filed a limited response to the UST Objection and a joinder to the Confirmation Brief [Dkt. No. 417].

A hearing on confirmation of the Amended Plan was held on October 24, 2019. The Plan Declarations were admitted into evidence and no party elected to cross-examine any of the declarants present in the courtroom. The Court heard legal argument on the objection of the UST, which did not present any evidence.

**UST Objection to Confirmation**

The UST, the sole objector to confirmation of the Amended Plan, asserts a number of objections to confirmation.

Releases

First, the UST raises several objections to Section 9.3 of the Amended Plan, which provides for releases for certain non-Debtor parties by other non-Debtor parties (the "Third-Party Releases"). The UST argues that (i) the Court does not have subject matter jurisdiction to grant such releases; (ii) the Court should not approve the Third-Party Releases because they are not consensual; (iii) the Debtors have not demonstrated how the Third-Party Releases are consistent with the holding in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005), as the parties receiving the Third-Party Releases must have played an integral role in formulating the Amended Plan or must have given consideration for such releases.

The Third-Party Release contained in Section 9.3 of the Amended Plan provides, in pertinent part, that the Releasing Parties release the Released Parties from any and all claims asserted or assertable on behalf of the Debtors; provided, however, that nothing in Section 9.3

shall be construed to release any party or entity from gross negligence, intentional fraud, willful

misconduct, or criminal conduct, as determined by a Final Order. "Releasing Parties" is defined

in Section 135 of the Amended Plan as, collectively:

> (a) the DIP Credit Parties; (b) the Creditors' Committee, if any, and each of its members in their capacity as such; (c) each holder of a Claim voting to accept the Plan; (d) each holder of a Claim abstaining from voting or voting to reject the Plan, unless such holder elects to opt out of the releases contained in Section 9.3 by checking the box on its timely submitted applicable Ballot; (e) the Consenting Equity Holders; (f) the Consenting Noteholders; (g) the Indenture Trustee; and (h) with respect to each of the foregoing clauses (a) through (g), to the fullest extent permitted by law, such Person's Related Parties, in each case in their capacity as such. For the sake of clarity, the Releasing Parties identified in items (c) and (d) above shall not include Persons in Classes 1, 3, 4, 5, 6, 7, 8, 9, or 10 that are presumed to either accept the Plan or reject the Plan and/or such Persons' Related Parties.

"Released Party" is defined in Section 134 of the Amended Plan as:

> each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Credit Parties; (d) the Creditors' Committee and each of its members in their capacity as such; (e) the Exit Repo Facility Parties; (f) the Consenting Equity Holders; (g) each Noteholder, except for any Noteholder that (i) opts out of the releases contained in Section 9.3 by checking the box on its timely submitted applicable Ballot or (ii) votes to reject the Plan; (h) the Indenture Trustee; and (i) with respect to each of the foregoing clauses (a) through (h), to the fullest extent permitted by law, such Person's Related Parties, in each case only in their capacity as such.

The UST asserts that the Court does not have subject matter jurisdiction to grant the

proposed releases. The Debtors disagree, arguing that, pursuant to section 1334(b) of title 28 of

the United States Code, bankruptcy jurisdiction includes "all civil proceedings arising under title

11, or arising in or related to cases under title 11" and, therefore, the Court's subject matter

jurisdiction extends to approval of third-party releases if the releases are included in a chapter 11

plan. (*See* Confirmation Brief ¶ 108 (citing, *e.g.*, *In re Millennium Lab Holdings II, LLC*, 575

B.R. 252, 273, 287 (Bankr. D. Del. 2017) (finding that the court had statutory authority to

consider a plan that included third-party releases as a core proceeding)).)

10

Because a confirmation hearing in which a debtor seeks entry of a proposed order confirming a plan is a core proceeding, the Court finds that it has subject matter jurisdiction over the Amended Plan and the Third-Party Releases included in such plan. Moreover, the Amended Plan specifically provides that the Third-Party Releases are expressly limited to Claims or Causes of Action "based on or relating to" the Debtors, the Chapter 11 Cases, and certain specified actions, negotiations, processes, and documents relating to the Chapter 11 Cases. *See* Amended Plan § 9.2.

Additionally, because the claims to be released here could have an effect on the *res* of the bankruptcy estate, this conceivable effect confers jurisdiction on the Court to enjoin such third-party claims. As this Court has previously held in *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 288 (Bankr. S.D.N.Y. 2016), in order to approve a non-debtor release included in a plan of reorganization, a bankruptcy court must have subject matter jurisdiction over the released claims, which turns on whether the claims might have "any conceivable effect" on the bankruptcy estate. *See also In re Quigley Co.*, 676 F.3d 45, 57 (2d Cir. 2012) ("[T]he touchstone for bankruptcy jurisdiction remains 'whether [the outcome of a third-party action] might have any 'conceivable effect' on the bankruptcy estate.'") (citation omitted). A third-party claim has a "conceivable effect" on the estate if the outcome "could alter the debtor's rights, liabilities, options, or freedom of action" and "affect 'the handling and administration of the bankruptcy estate." *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, 2007 U.S. Dist. LEXIS 90482, 2007 WL 4323003, at *1, n. 1 (S.D.N.Y. Dec. 10, 2007) (citations omitted). The Second Circuit has held that a bankruptcy court has jurisdiction to enjoin third-party, non-debtor claims that directly affect the *res* of the estate. *See Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-*

11

*Manville)*, 517 F.3d 52, 66 (2d Cir. 2008) ("[A] bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate.").

Having concluded that it has subject matter jurisdiction to consider the Third-Party Releases, the Court turns to the analysis of the Third-Party Releases under *Metromedia* and its progeny to determine whether the Third-Party Releases are justified and should be approved.

If a bankruptcy court has subject matter jurisdiction to enjoin third-party claims, it may approve a non-debtor release "under some circumstances, but not as a routine matter," *Adelphia Commc'ns Corp.*, 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007), and "only in rare cases." *Metromedia*, 416 F.3d at 141. In *Metromedia*, the Second Circuit explained that a non-debtor release should not be approved absent a finding that the circumstances are unique and "render the release terms important to success of the plan." *Id.* at 143.

Applying *Metromedia*, courts in this District have held that a non-debtor release may be justified in cases where (i) the released parties provide a substantial contribution to the debtor's estate, (ii) where the claims are "channeled" to a settlement fund rather than extinguished, (iii) where the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution, (iv) where the released party provides substantial consideration, (v) where the plan otherwise provides for the full payment of the enjoined claims, or (vi) where the creditors consent. *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 269 (Bankr. S.D.N.Y. 2014); *In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010); *Adelphia Commc'ns Corp.*, 368 B.R. at 268; *Metromedia*, 416 F.3d at 142. Courts have also found that a non-consensual third-party release can be appropriate where the release plays an important part in the debtor's plan of reorganization. *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).

12

The UST asserts that the Third-Party Releases are not consensual because creditors who reject the Amended Plan or who abstain from voting are deemed to have consented to such releases unless they affirmatively "opt out" from granting the Third-Party Releases, and there is no basis to conclude that a creditor's inaction in failing to opt out constitutes consent to the release. (UST Objection [Dkt. No. 223] at 10.) The Debtors respond that opt-out releases in this case are consistent with precedent set by this Court, namely, this Court's prior rulings that inaction is indeed action under appropriate circumstances, particularly when the holder of a claim is clearly informed that its rights will be affected if it fails to act. (Confirmation Brief ¶¶ 105-107.) In addition, the Debtors emphasize that those parties deemed to accept or reject the Amended Plan, including all holders of Unsecured Claims, are *not* bound by the Third-Party Releases, and the only parties granting the Third-Party Releases are (a) parties receiving Debtor Releases; (b) parties voting in favor of the Amended Plan, and (c) holders of Claims that abstain from voting or vote to reject the Amended Plan, unless such holder elects to opt out of the Third-Party Releases.

The Court finds that the Third-Party Releases here are consensual with respect to the Releasing Parties, each of whom was given an opportunity to affirmatively reflect its consent or not to the Third-Party Releases. The ballots distributed to holders of Claims entitled to vote on the Amended Plan clearly informed holders of Claims entitled to vote of the steps required to take if they disagreed with the scope or the grant of the releases. Thus, affected parties were on clear notice of the Third-Party Releases, including the option to opt out of the Third-Party Releases, rendering such releases consensual, as this Court has held in prior cases involving similar facts and circumstances. *See, e.g.*, *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *7 (Bankr. S.D.N.Y. Jan 14. 2010) (finding that where creditors had

13

accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, such creditors had expressly consented to the non-debtor releases, and the non-debtor releases satisfied the standards set forth in *Metromedia* for granting such releases).

Even assuming, *arguendo*, that the Releasing Parties were found to not have consented to the Third-Party Releases, the Second Circuit has held that a non-consensual third-party release can be appropriate where the release plays an important part in the debtor's plan of reorganization, where the released party has made a substantial financial contribution to the debtor's chapter 11 case, or where the released party provides "substantial consideration." *See Genco*, 513 B.R. at 269; *Drexel Burnham Lambert*, 960 F.2d at 293. Here, the Debtors assert persuasively that the substantial consideration provided by the Released Parties is entirely consistent with the types of contributions courts have identified as a basis for approving a non-debtor, non-consensual release under *Metromedia*. In addition, the Global Settlement is an essential element of the Amended Plan and the Third-Party Releases are a crucial component of the Global Settlement; thus, the Third-Party Releases are integral to the Debtors' reorganization efforts.

As described by Mr. Jan Baker in his declaration in support of confirmation of the Amended Plan, the Released Parties have made significant economic and non-economic contributions that have been integral to the Amended Plan and the Global Settlement incorporated therein. Specifically, in addition to serving as plan sponsor and stalking horse and facilitating the Debtors' marketing process, Blackstone, in connection with the RSA, agreed to increase its contribution as plan sponsor to $65 million and to contribute additional cash

sufficient to fund all payments to claims in Class 5. This financial contribution significantly increased recoveries to creditors under the Amended Plan.

PIMCO and the Consenting Noteholders also contributed substantial consideration to the Debtors' reorganization by, *inter alia*, negotiating an improved New Money Investment from Blackstone, agreeing to support the Amended Plan and forebear from further contentious and expensive litigation which may have been value-destructive to the Debtors' reorganization and their businesses, and waiving their right to make an election under section 1111(b) of the Bankruptcy Code with respect to any portion of a claim arising from the Notes that is unsecured. As the Debtors correctly assert, that alone could have easily derailed this reorganization process and the Debtors' ability to reorganize successfully.

The Exit Repo Facility Parties are providing the Debtors with the Exit Repo Facility, which will enable the Debtors to satisfy their obligations under the DIP Repo Facilities and have continued access to financing to fund mortgages and hedge interest rate risk in order to operate their mortgage origination business consistent with past practice and without interruption. Notably, when the Exit Repo Facility Parties agreed to provide exit financing to the Reorganized Debtors, they made the exit financing available to other potential plan sponsors during the Debtors' marketing process even before the Debtors entered into the RSA.

Accordingly, the contributions of the Released Parties in negotiating and agreeing to the Global Settlement have resulted in improved recoveries to the Debtors' creditors and will enable the Debtors to maximize the value of their estates and maintain their businesses as a going concern after emergence. Such contributions have also enabled the Debtors to propose a plan that has the support of all classes of creditors and to emerge from chapter 11 expeditiously, which is critical to the Debtors' businesses. As well-summarized by Mr. Baker, "[t]he capital

injection provided by the Plan Sponsor will allow the Debtors to fund the Plan, and the resulting restructuring of the Company's pre-petition capital structure will ensure its post-emergence viability. Importantly, the Plan will also save thousands of jobs that were initially jeopardized by the Debtors' liquidity issues that precipitated the filing, and subsequently by the litigation that threatened to derail these Chapter 11 Cases." (Baker Decl. ¶ 22.)

The Court finds that the record in this case is indeed robust regarding the material contributions the Released Parties have made individually and cooperatively and collectively in order to achieve the Global Settlement contained in the Amended Plan. For all of these reasons, the Court finds that the Third-Party Releases are appropriate and easily satisfy the standard articulated in *Metromedia* and its progeny; accordingly, the UST Objection to the Third-Party Releases is overruled.

Exculpation

The exculpation provision in Section 9.4 of the Amended Plan provides an exculpation and limitation of liability for certain claims that may be asserted against the Released Parties that participated in formulating and negotiating the Amended Plan. Such provision provides, in pertinent part, that "[e]xcept as otherwise specifically provided in the Plan or Plan Supplement, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence, intentional fraud or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law) . . . ." (Amended Plan § 9.4.)

The UST objects to the exculpation provision, asserting that such provision (i) improperly extends to non-estate fiduciaries and (ii) does not adhere to Rule 1.8(h)(1) of the New

York Rules of Professional Conduct, which rule restricts attorneys from making agreements limiting their liability to a client for malpractice.

In response, the Debtors argue that, in the Second Circuit, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved because courts have recognized the appropriateness of extending exculpation to parties who make a substantial contribution to a debtor's reorganization and play an integral role in building consensus in support of a debtor's restructuring, as the Released Parties have done here in the Debtors' chapter 11 cases. (*See* Confirmation Brief ¶ 115 (citing, *e.g.*, *In re Residential Capital, LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) [Dkt. No. 6066, ¶ 291] (approving exculpation of certain prepetition lenders who "played a meaningful role . . . in the mediation process, and through the negotiation and implementation of the Global Settlement and Plan"); *In re WorldCom, Inc.*, Case No. 02-13533 (AJG), 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving exculpation provisions where "[t]he inclusion of the Exculpation Provision … in the Plan [was] vital to the successful negotiation of the terms of the Plan in that without such provisions, the Covered Parties would have been less likely to negotiate the terms of the settlements and the Plan.")).)

By his declaration, Mr. Baker testifies that the Released Parties provided a substantial contribution to the Chapter 11 Cases and that the exculpation provision was a critical component of forming a consensual Amended Plan. Specifically, he states that "these exculpation provisions were specifically negotiated as part of the Plan process. I further believe that these negotiations and compromises were crucial to the formulation of the Plan and likely would not have occurred without the protection from liability that the exculpation provisions provide to those who are subject to Exculpated Claims." (Baker Decl. ¶ 36.)

17

As previously discussed, the Released Parties have provided substantial contributions to the Debtors' reorganization efforts.  The Court finds credible the testimony of Mr. Baker that the protection the exculpation provision affords was essential to the promotion of good-faith plan negotiations that might not otherwise have occurred had the negotiating parties faced the risk of future collateral attacks from other parties.  Moreover, the Court notes that, while the Debtors propose to exculpate the Released Parties whose contributions and concessions have made the Amended Plan possible, Section 9.4 explicitly provides that no Released Party will be immune from liability "for gross negligence, intentional fraud or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law)."  In light of the exculpation provision's carve-out for gross negligence, intentional fraud, and willful misconduct, the Court finds that (i) the standard of care established by the exculpation provision is entirely consistent with, and appropriate under, applicable law and (ii) the protections afforded by the exculpation provision, which represent an integral component of the Global Settlement and the Amended Plan, are reasonable and appropriate.

With respect to the UST's argument regarding the New York Rules of Professional Conduct, the Court finds that such a provision has no bearing on the standard of care established in an exculpation provision contained in a plan, and the Court declines to grant the UST's request that the Amended Plan be modified to include a caveat that the exculpation provision is consistent with Rule 1.8(h)(1), as such caveat is neither warranted nor required.

Postpetition Interest

The UST next argues that claims in Classes 4 and 5, which are treated as unimpaired under the Amended Plan, should be treated as impaired because holders of claims in Classes 4 and 5 are being paid in full, in cash, but are not receiving postpetition interest on their claims.

The Debtors disagree. They assert that payment of postpetition interest to these Classes is barred by section 502(b)(2) of the Bankruptcy Code, rendering claims in Classes 4 and 5 unimpaired. In support of their position, the Debtors cite to decisions rendered by Courts of Appeal in other Circuits which have held that creditors are unimpaired when the Bankruptcy Code, and not the plan, is the source of the creditors' impairment. (*See* Confirmation Brief ¶ 119 (citing *Ultra Petroleum Corp. v. Ad Hoc Comm. Of Unsecured Creditors of Ultra Res., Inc. (In re Ultra Petroleum Corp.)*, 913 F.3d 533, 539-40 (5th Cir. 2019); *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 204-05 (3d Cir. 2003); *Thompson v. Ky. Lumber Co. (In re Ky. Lumber Co.)*, 860 F.2d 674, 676 (6th Cir. 1988)).)

While the Debtors have cited to decisions from three other Circuits in support of their position, the UST points to no binding precedent from the Second Circuit or from this District which requires the Court to conclude that holders of claims in Classes 4 and 5 are required to receive postpetition interest in addition to payment in full, in cash, in order to be treated as unimpaired. In addition, the Court observes that, as a practical matter, no holder of a claim in Class 4 or 5 has objected to its treatment under the Amended Plan. While the Court declines to hold that the treatment afforded to holders of claims in Classes 4 and 5 here is permissible in every case, the Court overrules the UST Objection based on the facts and circumstances of the instant case, in particular, the facts that, here, (i) the Debtors are not solvent; (i) both of the affected classes of unsecured creditors will receive increased recoveries – with Class 5 creditors in particular receiving a 100% increase in recoveries as compared to the Original Plan – as a result of the Global Settlement; and (iii) no economic party in interest has objected to the treatment of Classes 4 or 5 under the Amended Plan. Indeed, as pointed out in colloquy with

Debtors' counsel during the confirmation hearing, even if creditors in Classes 4 and 5 were to be solicited and voted to reject the Amended Plan, the Amended Plan would still be confirmable.

Fees

The Amended Plan provides that, on the Effective Date, the Debtors shall pay or reimburse the reasonable and documented fees and expenses incurred by PIMCO, the indenture trustee of the Notes, and Blackstone in connection with the Debtors' restructuring efforts.  The U.S. Trustee objects to the payment of such fees and expenses, asserting that professionals seeking the reimbursement of their fees and expenses from a debtor must first be retained under section 327 of the Bankruptcy Code or must move for reimbursement pursuant to section 503 of the Code, and in each case must file a fee application with the Court.  The Debtors and PIMCO disagree, submitting that (i) the Debtors' business decision to pay such fees has already been approved by the Court's orders approving the Debtors' entry in the RSA and approving the Debtors' Cash Flow DIP Facility [Dkt. No. 209]; (ii) payment of such fees is appropriate under section 363(b) of the Bankruptcy Code; and (iii) such fees are a crucial component of the Global Settlement for which the Debtors are seeking approval pursuant to Bankruptcy Rule 9019.

Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Pursuant to section 363(b), a debtor may use property of the estate outside the ordinary course of business if there is a sound business reason to do so.  *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citation omitted) ("The standard used for judicial approval of the use of estate property outside of the ordinary course of business is also the business judgment of the debtor.").  Courts in this District have authorized reimbursement of professional fees and expenses under section 363 of

the Bankruptcy Code.  *See*, *e.g.*, *Official Comm. Of Unsecured Creditors of Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 29 (S.D.N.Y. 2005).

The Debtors' motion seeking authorization to enter into the RSA set forth in detail the business reasons for the Debtors' determination to enter into the Global Settlement and RSA, which reasons are also described in the Baker Declaration filed in support of confirmation and include the following: (i) the Global Settlement's elimination of the risk of further contentious and costly litigation which might jeopardize the Debtors' ability to consummate a plan of reorganization and destroy the value of their businesses; (ii) the improved recoveries for several classes of the Debtors' creditors under the Global Settlement and Amended Plan as compared with the Original Plan; and (iii) the substantially reduced debt service obligations following emergence which will enable the Reorganized Debtors to conduct their businesses and "carve[] a clear – and consensual – path forward for the Debtors' emergence from bankruptcy."  (Baker Decl. ¶ 29.)  As set forth in the Smith Declaration, consummation of the Amended Plan will result in the reduction of approximately $150 million of debt from the Debtors' balance sheet and will place the Debtors' business in a significantly improved financial position upon emergence from chapter 11.  (Smith Decl. ¶ 6.)  No party, including the UST, objected to the Debtors' motion for authorization to enter into the RSA, and, by the RSA Order, the Court approved the Debtors' decision to enter into the RSA (and the payment of the professional fees as a component of the RSA) as a sound exercise of the Debtors' business judgment.

Even assuming, *arguendo*, that this Court had not previously authorized the Debtors' entry into the RSA (and, accordingly, payment of the professional fees) in accordance with section 363(b)(1) of the Code, the Court finds that payment of such fees is also appropriate under Bankruptcy Rule 9019.

The Court will now turn to consideration of the Global Settlement, of which payment of the professional fees is a crucial component, under Bankruptcy Rule 9019.

By the Confirmation Brief and through the Baker Declaration, the Debtors have demonstrated convincingly that the factors set forth by the Second Circuit in its *Iridium* decision weigh heavily in favor of approval of the Global Settlement pursuant to Bankruptcy Rule 9019. *See Iridium*, 478 F.3d at 462. Specifically, the Debtors have established that the Global Settlement (i) resolves objections and litigation that were likely to be costly, complex, and contentious and had the potential to delay the Debtors' emergence from chapter 11 and harm their business operations; (ii) is fully supported by the Debtors' key constituencies; and (iii) is the product of extensive, hard-fought, good faith, arms' length negotiations. As evidenced by the rigorous process and negotiations that led to the Amended Plan, which are described in detail in the Baker Declaration, the unanimous approval by the voting class, and the lack of objections to the Amended Plan by any economic stakeholder, the Global Settlement falls well above the lowest point in the range of reasonableness, the applicable standard for approval of a settlement under Bankruptcy Rule 9019. The Debtors have resoundingly demonstrated that the Global Settlement, a value-accretive compromise whose terms are embodied in the Amended Plan, is in the best interests of their estates and their creditors and is fair and equitable, and the Court approves the Global Settlement pursuant to Bankruptcy Rule 9019.

As the Debtors correctly point out, this Court has held that, where consideration is paid pursuant to a settlement, the Court need not review such payment under section 503(b) of the Bankruptcy Code. *See*, *e.g.*, *In re Charter Communications, Inc.*, Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009) [Dkt. No. 921]. Because, pursuant to Bankruptcy Rule 9019, the Court has approved the Global Settlement, the Court declines to evaluate under section 503

of the Code the Amended Plan's provision for payment of such professional fees under such settlement.  Finally, the Court notes that sections 327 and 330 of the Bankruptcy Code, each cited in the UST Objection, are simply not relevant to payment of the professional fees at issue here, as such Code sections address retained professionals.  Because the professionals retained by Blackstone, PIMCO, and the Indenture Trustee are not professionals retained by the Debtors or by an official committee, *In re Lehman Brothers Holdings Inc.*, 508 B.R. 283 (S.D.N.Y. 2014) – cited by the UST Objection – is also inapplicable.  The UST Objection to the payment of the professional fees included in the Global Settlement is hereby overruled.

Based on the evidence in the record, including the record of the confirmation hearing and the Plan Declarations, the Court concludes that all of the requirements for confirmation of the Amended Plan under sections 1129(a) and 1129(b) of the Bankruptcy Code, to the extent applicable here, have been satisfied.  The Amended Plan is confirmed.

Dated: November 13, 2019
New York, New York

/s/ Shelley C. Chapman_____
UNITED STATES BANKRUPTCY JUDGE